ACCEPTED
14-15-00004-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
7/28/2015 8:27:19 AM
CHRISTOPHER PRINE
CLERK

## CAUSE NO. 14-15-00004-CV

IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
7/28/2015 8:27:19 AM
CHRISTOPHER A. PRINE
Clerk

## LAUREL MILLER AND ELIANA MILLER
### Appellants and Cross-Appellees

**vs.**

## DEBO HOMES, LLC
### Appellee and Cross-Appellant

From Cause No. 13-DCV-209822
In the 400th Judicial District Court
Fort Bend County, Texas

## APPELLEE AND CROSS-APPELLANT DEBO HOMES, LLC'S BRIEF

Craig Welscher
State Bar No. 21167200
Nicholas Martinez
State Bar No. 24087986
The Welscher Law Firm, P.C.
1111 North Loop West, Suite 702
Houston, Texas 77008
(713) 862-0800 – Telephone
(713) 862-4003 – Facsimile
Email: nmartinez@welscherlaw.com
*Attorneys for Appellee & Cross-Appellant*

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

## Appellants and Cross-Appellees

Laurel Miller and Eliana Miller

## Appellants' Counsel

Timothy A. Hootman- *Appellate Counsel*
SBN: 09965450
2402 Pease St.
Houston, Texas 77003
Telephone: (713) 247-9548
Facsimile: (713) 583-9523
Email: thootman2000@yahoo.com

Brian H. Crockett- *Trial Counsel*
SBN: 24074094
10565 Katy Freeway, Ste. 400
Houston, Texas 77024
Telephone: (713) 779-3476
Email: brian@crockettlaw.com

## Appellee and Cross-Appellant

Debo Homes, LLC

## Appellee's Trial & Appellate Counsel

Craig Welscher
SBN: 21167200
Nicholas Martinez
SBN: 24089786
The Welscher Law Firm, P.C.
1111 N. Loop West, Suite 702
Houston, Texas 77008
Telephone: (713) 862-0800
Facsimile: (713) 862-4003
Email: nmartinez@welscherlaw.com

## REQUEST FOR ORAL ARGUMENT

Appellee moves to place this case to the argument calendar. This case meets the standards in Rule 39.1 for oral argument, in that (a) this appeal is not frivolous, (b) the dispositive issues raised in this appeal have not been recently and authoritatively decided, (c) the facts and legal arguments are not adequately presented in the briefs and record, and (d) as described in the accompanying memorandum, the decisional process would be significantly aided by oral argument.

Specifically, this brief presents extensive arguments regarding what is factually sufficient to support a Deceptive Trade Practices Act finding. Appellee believes that oral argument would allow this Court to question counsel regarding specific pieces of evidence from trial and how those relate to the DTPA issues.

# TABLE OF CONTENTS

PAGE

Identity of Counsel and Parties...................................................................................ii

Request for Oral Argument.........................................................................................iii

Table of Contents.......................................................................................................iv

Index of Authorities……………..............................................................................viii

Statement of the Case..................................................................................................1

Issues Presented……….............................................................................................2

Statement of Facts…....................................................................................................3

Summary of the Argument..........................................................................................8

Argument.....................................................................................................................9

    A. THE DTPA REQUIRES THE MILLERS TO PROVIDE EVIDENCE FOR A REPRESENTATION IN § 17.46(B) ....................................................................9

        1. The No Evidence Standard.................................................................9

        2. The DTPA Elements and Standard......................................................9

    B. THERE IS NO EVIDENCE THE ALLEGED REPRESENTATIONS WERE BREACHED BY DEBO...........................................................................................................10

        1. Representation No. 1: That Debo Hires the Highest Quality Subcontractors.....................................................................................10

        2. Representation No. 2: Onsite Supervision and Inspections.....................14

        3. Representation No. 3: That Debo Obtains Third-Party Inspections........16

4. Representation No. 4: The AC Unit in the Model Home Would be in the Home in Question....................................................................................16

5. Representation No. 5: That All Problems Would be Fixed.....................17

C. THE ALLEGED REPRESENTATIONS IN SUPPORT OF THE JURY'S FINDING TO QUESTION NO. 1 ARE NONACTIONABLE PUFFERY UNDER THE DTPA................19

1. The Puffery Standard............................................................................19

2. The Millers' Representations at Trial are Puffery and Opinion...............21

   a. Representation No. 1: That Debo Hires the Highest Quality Subcontractors...................................................................................21

   b. Representation No. 2: Onsite Supervision and Inspections................23

   c. Representation No. 5: That All Problems Would be Fixed................25

3. Debo's Alleged Representations Are Nonactionable Opinions Under *Ghosh*..................................................................................................27

   a. (1) Intertwined with direct representations of present facts and (3) based on past or present facts.............................................................27

   b. (2) The speaker has knowledge of its falsity....................................28

   c. (4) The speaker has special knowledge of facts that will occur or exist in the future...................................................................................30

D. THE MILLERS SHOULD NOT BE AWARDED PREJUDGMENT INTEREST...................31

1. Debo's Tender Into the Court Registry Precludes Prejudgment Interest................................................................................................31

E. THE MILLERS SHOULD NOT BE AWARDED POSTJUDGMENT INTEREST.................32

1. Debo's Deposit Into the Court Registry Halts Postjudgment Interest................................................................................................32

Conclusion...................................................................................................32

Prayer........................................................................................................33

Certificate of Compliance.......................................................................34

Certificate of Support.............................................................................34

Certificate of Service..............................................................................34

Appendix......................................................................................................a

1. Clerk's Record

    a. Volume 1

        i. Plaintiff's Original Petition, Requests for Disclosure and Demand for Jury Trial

    b. Volume 2

        i. Plaintiffs Trial Witness List

        ii. Jury Charge

    c. Volume 3

        i. Defendant Debo Homes, LLC's Motion to Disregard the Jury's Answer to Question Number One

        ii. Order Denying Defendant's Motion to Disregard the Jury's Answer to Question Number of the Jury's Charge

        iii. Defendant Debo Homes, LLC's Response to the Plaintiffs' Motion for Judgment on the Jury Verdict

        iv. Final Judgment

2. Reporter's Record

   a. Volume 2

      i.   Examination of Laurel Miller

   b. Volume 3

      i.   Examination of Laurel Miller

     ii.   Examination of Harold Knueppel

    iii.   Examination of Kris Dominguez

    iv.   Examination of Juan Carlos Hernandez

   c. Volume 4

      i.   Examination of Eduardo Michael Cisneros

   d. Volume 6

      i.   Plaintiffs' Exhibit 1

     ii.   Plaintiffs' Exhibit 10

    iii.   Plaintiffs' Exhibit 12

    iv.   Defendant's Exhibit 2

     v.   Defendant's Exhibit 10

    vi.   Defendant's Exhibit 11

   vii.   Defendant's Exhibit 14

  viii.   Defendant's Exhibit 20

# INDEX OF AUTHORITIES

*TEXAS CASE LAW:*

*Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 370 (Tex. App.-Houston [1st Dist.] 2012, pet. granted)...................................................................24

*Anglo-Dutch Petroleum Int'l, Inc. v. Shore Harbour Capital Management Corp.*, No. 01-09-00417-CV, 2011 WL 862117, *4-5 (Tex. App.- Houston [1st Dist.] Mar. 10, 2011, no pet.) (mem. op.).................................................................................30

*Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 463-64 (Tex. App.- Dallas 1990, writ denied)............................................................................................................20-21, 24

*Breault v. Psarovarkas*, No. 01-01-00122-CV, 2003 WL 876651, *7 (Tex. App.-Houston [1st Dist.] Feb. 28, 2003, pet. denied) (mem. op.).....................................32

*Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 648 (Tex. App.- Austin 2000, pet. denied)..............................................................................................................31-32

*GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App.- Austin 2008, no pet.)......................................................................................................20, 24, 27, 28

*Hedley Feedlot v. Weatherly Trust*, 855 S.W.2d 826, 838-39 (Tex. App.- Amarillo 1993, writ denied)...............................................................................19-20, 24

*Helm v. Kingston*, No. 13-10-00224-CV, 2011 WL 6746064, *5-7 (Tex. App.-Corpus Christi Dec. 21, 2011, pet. denied) (mem. op.).....................................22-23

*Kramer v. Hollmann*, No. 02-11-00136-CV, 2012 WL 5869423, *1, 4-5 (Tex. App.- Fort Worth Nov. 21, 2012, pet. denied) (mem. op.)................................13, 14

*Lozano v. Lozano*, 52 S.W.3d 141, 166 (Tex. 2001)................................................17

*Matis v. Golden*, 228 S.W.3d 301, 307-09 (Tex. App.- Waco 2007, no pet.)....29-30

*McCrea v. Cubilla Condominium Corp. N.V.*, 685 S.W.2d 755, 759-60 (Tex. App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.)...................................................15, 16, 19

*Miga v. Jensen*, 96 S.W.3d 207, 212 (Tex. 2002)....................................................32

*Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App.- Austin 1999, pet. denied)....................................................25

*Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 125 (Tex. App.- Corpus Christi 1999, pet. denied)....................................................31

*Pennington v. Singleton*, 606 S.W.2d 682, 685-89 (Tex. 1980)....................................................20

*Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995)....................................................21

*Reynolds v. Murphy*, 188 S.W.3d 252, 268 (Tex. App.- Fort Worth 2006, pet. denied)....................................................25

*Rocor Int'l v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002)........9, 15

*Roubein v. Marino Home Builders*, No. 13-01-711-CV, 2002 WL 1765579, *4 (Tex. App.- Corpus Christi Aug. 1, 2002, pet. denied, not designated for publication)....................................................26-27

*Rush v. Barrios*, 56 S.W.3d 88, 94-95 (Tex. App.- Houston [14th Dist.] 2001, pet. denied)....................................................9

*Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 621 (Tex. 2004)............9, 13

*St. Paul Mercury Ins. Co. v. Billiot*, 342 S.W.2d 161, 164 (Tex. App.- Beaumont 1960, writ ref'd)....................................................32

*Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003)....................................................9

*Trenholm v. Ratcliff*, 646 S.W.2d 927, 930-31 (Tex. 1983)........................20, 24, 30

*Werth v. Johnson*, 294 S.W.3d 908, 910-11 (Tex. App.- Beaumont 2009, no pet.)....................................................30-31

***TEXAS STATUTES:***

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ §§ 17.41-17.63................................................................10

## STATEMENT OF THE CASE

Appellants and Cross-Appellees Laurel Miller ("L. Miller") and Eliana Miller ("E. Miller") (collectively, the "Millers") filed suit against Appellee and Cross-Appellant Debo Homes, LLC ("Debo") alleging violations of the Texas Deceptive Trade Practices Act ("DTPA") among other causes for Debo's construction of the Millers' home (C.R. Vol. 1, at p. 9-19).

Before trial commenced, Debo deposited $60,300.00 into the trial court's registry (R.R. Vol. 6, at Dft. Ex. 20). The case then proceeded to trial and the jury found Debo violated the DTPA and awarded the Millers $60,650.00 in actual damages (C.R. Vol. 2, at p. 560-82). Debo subsequently challenged the jury's DTPA finding in a motion to disregard (C.R. Vol. 3, at p. 755-954), which the trial court denied (C.R. Vol. 3, at p. 971-72). Debo then deposited an additional $350.00 into the trial court's registry (C.R. Vol. 3, at p. 1122).

Upon the Millers' motion to enter judgment based on the jury's findings, Debo challenged the Millers' request for prejudgment and postjudgment interest due to Debo's tender of money into the registry of the court (C.R. Vol. 3, at p. 1115-47). The trial court denied Debo's challenge, awarding Millers prejudgment and postjudgment interest on $60,650.00 (C.R. Vol. 3, at p. 1148-51).

1

# ISSUES PRESENTED

1. The Jury's DTPA finding in Question No. 1 must be disregarded because a) there is no evidence to support a breach of the DTPA and 2) the Millers' purported representations in support of a DTPA finding are mere puffery.

2. The Millers must not be granted any prejudgment or postjudgment interest on their damages award because Debo made a complete tender of the actual damages amount into the trial court's registry.

## STATEMENT OF FACTS

In April 2013, the homebuyers Millers and general contractor Debo agreed to a new home construction contract (the "Agreement") (R.R. Vol. 6, at Pltf. Ex. 1). The Agreement indicated that the Millers would pay the total amount of $178,000.00, which the parties ultimately agreed would be paid solely in cash installments (R.R. Vol. 2, at p. 32:3-16). The Millers made total cash payments to Debo in the amount of $60,300.00 (R.R. Vol. 6, at Dft. Ex. 2).

Since the Millers agreed to make cash installments, Debo had to fund the majority of the construction project out of their own pocket, which included purchasing the lot for $18,500.00 and paying $86,359.79 for the subcontractors (R.R. Vol. 6, at Pltf. Ex. 10; R.R. Vol. 3, at p. 239:22-25 & 240:1-6). In total, Debo paid $151,100.78 out of its own pocket to build the home at issue (R.R. Vol. 6, at Pltf. Ex. 10).

The Millers claimed in their pleadings that Debo made "numerous representations to induce the Millers to purchase the home" (C.R. Vol. 1, at p. 10).[1] Believing those representations were unfulfilled during the first phase of construction, the Millers hired a lawyer to send a letter to Debo, threatening litigation, ordering Debo to cease all communications with the Millers, and ordering Debo to halt construction (R.R. Vol. 6, at Dft. Ex. 10). Debo responded

---

[1] These amorphous "representations" are summarized in a chart on pages 5-6, *infra*.

soon thereafter, reiterating their commitment to customer satisfaction and fulfillment (R.R. Vol. 6, at Dft. Ex. 11). Debo also acknowledged that if the Millers were still unsatisfied, that they were "free to terminate the contract with Debo Homes and we will refund you 100% of the money you have given us after we sell the house" (R.R. Vol. 6, at Dft. Ex. 11). The Millers' response to Debo's olive branch would be this lawsuit (C.R. Vol. 1, at p. 9-19). The parties never closed on the home purchase and the Millers never inspected the finished house. To mitigate their damages, Debo sold the home to a third party for $10,000.00 less than what the Millers agreed to pay (R.R. Vol. 6, at Dft. Ex. 14).

Still unhappy with Debo's attempt to resolve the dispute, the Millers filed suit against Debo, asking for $100,000 to $500,000 in damages plus exemplary damages and attorney's fees (C.R. Vol. 1, at p. 9-19). The Millers claimed that Debo's representations amounted to a violation of the DTPA, specifically pled by the Millers as Texas Business and Commerce Code, Chapter 17.41, *et seq.*, Section 17.45(5), and Section 17.46(b) (C.R. Vol. 1, at p. 14). Before trial commenced, Debo deposited $60,300.00 into the court's registry on August 14, 2014 (R.R. Vol. 6, at Dft. Ex. 20).

At trial, the Millers failed to designate any expert who could opine as to the construction of a residential home, what a high quality subcontractor was, and what is to be expected during the normal course of construction (C.R. Vol. 2, at p.

4

484-85). Instead, L. Miller attempted to provide expert testimony but was continually sustained throughout her testimony (R.R. Vol. 2, at p. 40:4-7 & 14-17, 41:1-4, 44:20-22, & 45:10-12). The Millers also presented their home inspector Harold Knueppel ("Knueppel"), who was limited to only describing what he saw (R.R. Vol. 3, at p. 140-44).[2]

Since the Millers presented no facts regarding construction defects or that the home was indeed defective, the Millers instead presented evidence about what representations were made to them by Debo salesman Kris Dominguez ("Dominguez") before construction began. The following chart summarizes these representations and the Millers' proffered evidence to support the falsity of those representations:

| CHART OF THE MILLERS' ALLEGED REPRESENTATIONS | | | |
|---|---|---|---|
| *Representation No.* | *Representation* | *Alleged Breach* | *Cite* |
| No. 1[3] | That Debo hires the highest quality subcontractors | a) L. Miller testifies to seeing split boards, bowed boards, "cracked things" b) framers correctly cut a | R.R. Vol. 2, at p. 33:11-15, 36:16-25, & 37:1-4 R.R. Vol. 3, at p. 25:13-25 & 26:1-4, 28:14-22, & 32:19-25 & 33:1 |

---

[2] Before Knueppel testified, the Judge warned that if Knueppel provided any expert testimony regarding construction, he would be removed from the courtroom (R.R. Vol. 3, at p. 139:23-25 & 140:1-4).
[3] For the remainder of this brief, Debo will refer to each representation in this chart as "Representation No. 1," etc.

| | | piece of wood c) speculation that fence diggers cut a power line d) "holes" did not line up | |
|---|---|---|---|
| No. 2 | Onsite supervision would oversee the project at all times | a) only saw workers and subcontractors b) saw two Debo people or two men | R.R. Vol. 2, at p. 33:25 & 34:1-3; p. 37:15-18 R.R. Vol. 3, at p. 24:20-25 & 25:1-4 |
| No. 3 | Debo obtains third-party inspections | None[4] | R.R. Vol. 2, at p. 34:4-8 |
| No. 4 | AC unit in the model home would be the same | None[5] | R.R. Vol. 2, at p. 34:21-25 & 35:1-10 |
| No. 5 | That all problems would be fixed | None[6] | R.R. Vol. 2, at p. 35:11-18 |

The Jury found in favor of the Millers' DTPA claim against Debo in response to Question No. 1 (C.R. Vol. 2, at p. 563). Based on that finding, the Jury awarded the Millers a combined $60,650.00 in actual damages (C.R. Vol. 2, p. 566). The Jury unanimously rejected the Millers' additional DTPA questions that Debo acted unconscionably and knowingly (C.R. Vol. 2, at p. 564-65). Based on

---

[4] The only evidence in the record establishes that Debo did indeed perform these inspections (R.R. Vol. 6, at Pltf. Ex. 12).

[5] At one point, L. Miller is asked if "that is the A/C unit you saw in the model home" and she answers "[n]o, not at all" (R.R. Vol. 2, at p. 45:18-20). L. Miller never says this is referring to the home in question. This will be addressed in more detail in Section (B)(4), *infra*.

[6] L. Miller clarified that Debo had until closing to make any and all necessary repairs (R.R. Vol. 3, at p. 68:2-4 & 106:21-24). The parties never closed.

those findings, the Jury unanimously awarded the Millers $0 for attorney's fees at all stages of litigation (C.R. Vol. 2, at p. 577). The Jury did not leave the attorney's fees question blank, but rather wrote in "$0" (C.R. Vol. 2, at p. 577). Debo subsequently deposited an additional $350.00 into the court's registry on December 12, 2014, totaling $60,650.00 (C.R. Vol. 3, at p. 1122).

After trial, the trial court awarded the Millers full prejudgment interest from the date the Millers filed their lawsuit on October 7, 2013 until the court entered judgment and full postjudgment interest from the date of judgment (C.R. Vol. 3, at p. 1148-49). The trial court entered its judgment on December 22, 2014 (C.R. Vol. 3, at p. 1150).

## SUMMARY OF THE ARGUMENT

***Issue One: Whether Debo's motion to disregard the jury's finding that Debo violated the DTPA should be granted***

The Millers' only successful claim at trial was their DTPA claim against Debo. To support a DTPA finding, the Millers were first required to show that Debo made some kind of actionable representation recognized by the DTPA. The Millers' evidence presented at trial failed to show 1) that Debo's alleged representations were false and 2) even if there was evidence of false representations, those representations merely amount to puffery.

***Issue Two: Whether the Millers should be granted any prejudgment interest***

It is uncontroverted that Debo deposited $60,650.00 into the court registry prior to the entry of judgment. Since a prejudgment tender of the entire sum of Millers' damages was made by Debo, Debo is excused from having to pay prejudgment interest.

***Issue Three: Whether the Millers should be granted any postjudgment interest***

Debo's $60,650.00 pre-judgment deposit also halts the accumulation of postjudgment interest. Debo must be excused from the trial court's ruling requiring Debo to pay postjudgment interest.

## ARGUMENTS AND AUTHORITIES

### A. *THE DTPA REQUIRES THE MILLERS TO PROVIDE EVIDENCE FOR A REPRESENTATION IN § 17.46(B)*

### 1. The No Evidence Standard

If there is no evidence to support the Jury's answer to Question No. 1, then Debo's Motion to Disregard the Jury's answer to that question should have been granted. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003). If the Plaintiffs' evidence to support the Jury's answer to Question No. 1 is no more than a scintilla, it is no evidence. *Rush v. Barrios*, 56 S.W.3d 88, 94-95 (Tex. App.- Houston [14th Dist.] 2001, pet. denied). A scintilla is "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence," which has the legal effect of no evidence. *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 621 (Tex. 2004) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 363 (1960)). "More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence." *Rocor Int'l v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

### 2. The DTPA Elements and Standard

The Millers' pleadings claimed that Debo committed a violation of the

DTPA "laundry list" found in Business & Commerce Code § 17.46(b) and committed an unconscionable act as that term is defined in § 17.45(5) (C.R. Vol. 1, at p. 14). The Jury unanimously rejected the Millers' claim that Debo committed an unconscionable action but found in a 10-2 decision that Debo committed a violation of § 17.46(b) (C.R. Vol. 2, at p. 563-65).

To sustain a Jury finding under § 17.46(b), the Millers must show that 1) they are a consumer, 2) Debo can be sued under the DTPA, 3) Debo committed a false, misleading, or deceptive act or practice that is specifically enumerated in the "laundry list" found in § 17.46(b) and that was relied on by the Millers to their detriment, and 4) Debo's action was a producing cause of the Millers' damages. TEX. BUS. & COMM. CODE §§ 17.41-17.63. Elements 3 and 4 are at issue.

## B. THERE IS NO EVIDENCE THE ALLEGED REPRESENTATIONS WERE BREACHED BY DEBO

### 1. Representation No. 1: That Debo Hires the Highest Quality Subcontractors

Even if the representation that Debo utilizes only the highest quality subcontractors is actionable under the DTPA, the Millers offered no evidence to show that there was a breach of that undefined standard.

L. Miller repeatedly told the Jury that she was not a construction expert and had idea what actually constituted a construction defect:

**Q:** Have you had any formal training in construction?

10

**A:** No.

**Q:** Have you ever been taught how to identify construction defects?

**A:** No (R.R. Vol. 3, at p. 88:24-25 & 89:1-4).

. . .

**Q:** But you weren't sure whether or not this was supposed to have insulation?

**A:** That's right. I'm not a construction expert (R.R. Vol. 3, at p. 137:14-16).

In support of her non-expert testimony, L. Miller provided the following regarding her idea of a high quality subcontractor:

**Q:** Once you paid Debo Homes the $60,300, did you go back out and look at the highest quality subcontractors work on the framing?

**A:** Yeah. Well, we – we went out to the site, and we looked around. They were – a couple of weeks later, they were doing the framing, and I just – I just started looking around, you know, looking – okay, here's the – trying to identify which room's which. And I looked up, and I saw split boards, like broke in half, and other boards bowedbowed [sic] out and other boards that just didn't look right, and cracked things here and there (R.R. Vol. 2, at p. 36:16-25 & 37:1-2).

. . .

**A:** He called down to the man on the ground. Then the man on ground cut – cut a board, handed it up to the man on the roof. The man on the roof set it on the roof. It was like a – like a piece of the solid base of the roof board, not like a shingle, just like a main board for the roof – and then kind of moved it back and forth, shook his head, threw it off the roof. Then called down to the man on the ground a second time. The man on the ground cut a second

11

board, handed it up to the man on the roof. The man on the roof tried to place it again. The man on the roof threw it down, called down to the man on the ground a third time. A third board was cut, handed up, the man on the roof tried to place it again. Still didn't work, threw it down. A fourth time the man on the roof called down, a fourth board was cut, handed it up, wiggled it this way and that way, got it to fit and then moved on (R.R. Vol. 3, at p. 25:13-25 & 26:1-4).

. . .

**Q:** Tell us what you saw about your fence being built.

**A:** Okay. They were digging the holes, and while they were digging the holes, all of a sudden a bunch of neighbors decided to come from around, from behind the house and next door. And all of a sudden – excuse me – we wondered what was going on, why all of a sudden we're meeting the neighbors. Well evidently, they had cut the power, cut the lines upon digging the holes.

**Q:** Did that sound like the highest quality subcontractors that Kris promised?

**A:** No. I would think they'd know where the lines were (R.R. Vol. 3, at p. 28:14-25 & 29:1).

. . .

**Q:** Talk to me about the windows where the brick façade was at compared to the window holes that they made of the house.

**A:** Yes. They didn't line up. The holes that were cut into the frame were not the same holes for the brick. So, they were – they were off. And when I brought that to their attention, they said, oh, that would work out, that just works itself out (R.R. Vol. 3, at p. 32:19-25 & 33:1).

L. Miller's supposition regarding when repairs are made during construction,

12

where the electric lines should be, how "holes" are supposed to line up, and what she thinks happened fails to raise above the scintilla of evidence standard. This testimony creates a mere surmise or suspicion that the subcontractor was not of the highest quality. *See Southwestern Bell*, 164 S.W.3d at 621. L. Miller admitted that her testimony was not based on any expertise and that she no way of knowing whether the construction was defective (R.R. Vol. 3, at p. 88:24-25 & 89:1-4).

The Millers' claims resemble those discussed by a recent Fort Worth opinion. In the *Kramer* case, the homebuyer plaintiffs sued the defendant homebuilders for the homebuilders' faulty construction and corresponding representations about the house's construction. *Kramer v. Hollmann*, No. 02-11-00136-CV, 2012 WL 5869423, *1 (Tex. App.- Fort Worth Nov. 21, 2012, pet. denied) (mem. op.) The builder represented that they would build a "kick butt house," the homebuyers would be "pleased as punch," and that the house would be "magnificent" and one of the "finest." *Id.* at *4. Those statements were subjective impressions, lacking specific representations. *Id.* at *4-5. The builder's representations also pertained to the future, which allowed the homebuyers an opportunity to check into their accuracy with their own diligence. *Id.*

Likewise, the Millers had an opportunity before construction commenced to determine if Debo's subcontractors were the "highest quality subcontractors" under the Millers' standards. The Millers failed to investigate. Dominguez' statements

13

are akin to those in *Kramer* as well because the representation that a subcontractor is of the "highest quality" mirrors the *Kramer* representation the home would be "one of the finest homes in the city." *Kramer*, 2012 WL 5869423, at *4-5. As such, this alleged representation is not sufficient evidence and fails to provide a legal basis for the Jury's answer to Question No. 1.

## 2. Representation No. 2: Onsite Supervision and Inspections

In Representation No. 2, L. Miller *never states* that Debo represented to her that Debo would be onsite at all times. Rather, L. Miller claims the following as an actionable representation: "there would be onsite supervision at all times overseeing the project" (R.R. Vol. 2, at p. 34:2-3).

L. Miller admitted that she was not at the construction site all of the time and instead was there once or twice a week (R.R. Vol. 3, at p. 109:10-15). Despite her absence from the site, the Millers claim the following supports this representation:

**Q:** Did you ever see anyone from Debo Homes out there?

**A:** I never saw anyone from Debo Homes. I only saw the actual workers, the subcontractors out there (R.R. Vol. 2, at p. 37:15-18).

. . .

**Q:** How many people from Debo Homes were out there?

**A:** I saw two people.

**Q:** Did you see any superintendents or anyone from Debo Homes?

**A:** I did not. There were just two, two men (R.R. Vol. 3, at p. 24:25 & 25:1-

14

4).

These representations fail to establish that there was absolutely no onsite supervision. L. Miller may have complained to the Jury that no one from Debo was there, but L. Miller never said Debo had to be the ones supervising the work. Instead, L. Miller clarified that she expected third parties, *not Debo*, to be supervising (R.R. Vol. 2, at p. 34:4-8). By L. Miller's own admission, whether Debo was the party actually providing the supervision is irrelevant. This testimony fails to provide a reasonable basis for a vital fact regarding this representation. *Rocor Int'l*, 77 S.W.3d at 262.

Of additional importance, a representation is only actionable under the DTPA if that representation is material to the transaction. *McCrea v. Cubilla Condominium Corp. N.V.*, 685 S.W.2d 755, 759 (Tex. App.- Houston [1st Dist.] 1985, writ ref'd n.r.e.). In *McCrea*, the Houston court analyzed the materiality of the defendant's representation that a roof was only two years old when in fact evidence presented demonstrated the roof was three years old. *Id.* at 760. Despite the apparent falsity of that representation, the court noted "the evidence also shows that the characteristics of the roof would have been the same whether it was two or three years old." *Id.* The court ruled that no damages resulted because of the immaterial representation regarding the age of the roof. *Id.*

The Millers presented no lay or expert testimony or evidence to demonstrate

15

that not having Debo's constant and uninterrupted supervision was material and necessary to the construction of a house. Instead, Debo presented evidence that its superintendent Eduardo "Michael" Cisneros ("Cisneros") supervised the home at issue and another home a street over during the same timeframe (R.R. Vol. 4, at p. 80:1-25 & 81:1-11). The Millers did not question this evidence or provide rebuttal evidence showing Debo's supervision routine to be damaging to the Millers. Just like it does not matter whether a roof is two or three years old, it does not matter whether a supervisor is actually at a construction site constantly or a street away. *See McCrea*, 685 S.W.2d at 759-60.

### 3. Representation No. 3: That Debo Obtains Third-Party Inspections

It is without question that Debo hired Mortgage Property Services, Inc. ("MPS") to inspect the home at issue (R.R. Vol. 6, at Pltf. Ex. 12). In fact, the Millers themselves entered this exhibit into the record (R.R. Vol. 4, at p. 6:16-25, 7:1-25, & 8:1-4). That Exhibit 12 establishes that MPS inspected the home on April 25, 2013, May 10, 2013, and August 7, 2013 (R.R. Vol. 6, at Pltf. Ex. 12). The Millers only provided evidence that this representation was fulfilled.

### 4. Representation No. 4: The AC Unit in the Model Home Would be in the Home in Question

L. Miller vaguely testified that she went up into some attic where Dominguez told her she was going to get that same AC unit (R.R. Vol. 2, at p.

16

34:23-25). During direct examination, the following exchange occurred to support the claim that Debo breached that representation:

**Q:** Let me talk to you about the A/C unit.

**A:** Yes.

**Q:** Is that the A/C unit that you saw in the model home?

**A:** No, not at all (R.R. Vol. 2, at p. 45:16-20).

There is no context to determine what the Millers' attorney was referring to when he said "[i]s that." Neither L. Miller nor her attorney noted what AC unit they were referring to. L. Miller did not say she was referring to the AC unit in the home in question. Finally, neither L. Miller nor her attorney referred to any exhibit number. As such, the record is devoid of any evidence that the AC unit in the home in question was different from the model home. This representation provides no evidence for the Jury to find a DTPA violation under Question No. 1. *Lozano v. Lozano*, 52 S.W.3d 141, 166 (Tex. 2001).

5. **Representation No. 5: That All Problems Would be Fixed**

Since the Millers' attorney ordered Debo to stop construction before the closing date, L. Miller admitted that Debo still had a chance to perform any repairs:

**Q:** Now, you agree that after you told Debo about the issues they needed to repair in the home, that they could have repaired them?

**A:** Yes, they could have.

17

**Q:** And you told Kris about these concerns and problems?

**A:** Yes. Yes, we did.

**Q:** And Debo did, indeed, repair them, didn't they?

**A:** They repaired some. I don't believe they repaired all of them.

**Q:** You don't believe they repaired all of them, or do you know they didn't repair all of them?

**A:** Well, I can't know, because they drywalled it.

**Q:** So, you're saying that there are hidden things behind that drywall?

**A:** There may be. I don't know. They drywalled it.

**Q:** Ms. Miller, you understood that when you brought these concerns to Debo, the home was still under construction?

**A:** Yes.

**Q:** And you understood that Debo still had work to do?

**A:** Yes (R.R. Vol. 3, at p. 106:21-25 & 107:1-22).

The Millers' claim that all repairs were not made is based on mere conjecture that there may be things behind the walls. There is absolutely no evidence of any repairs not being made or any expert testimony discussing fatal flaws with the construction.

The aforementioned *McCrea* case's discussion of materiality also applies to this representation. Debo superintendent Cisneros provided insight as to what a punch out is: "The punch out is when you repair the 2 by 4s that are either cracked or damaged. You remove the temporary wood" (R.R. Vol. 4, at p. 83:16-18). Explaining why there were issues that needed to be fixed with the home, Cisneros

18

explained as follows:

> **Q:** Why was there an issue in the first place?
>
> **A:** Because these are things that are normally that – these are normal things that are left to be dealt with until the end when there's a punch out (R.R. Vol. 4, at p. 90:15-18).
>
> . . .
>
> **Q:** And normally when do those get repaired? When do you fix those?
>
> **A:** Minimum, maximum three days, or one day after finishing.
>
> **Q:** Let me ask a better question. During the construction process, as you call it, when do you make all the repairs to the frame?
>
> **A:** It's at the end after the man or the plumbing company is finished, the AC people are finished, and the electricians are finished (R.R. Vol. 4, at p.105:15-24).

The testimony presented at trial demonstrated that repairs are to be made at the punch out stage, not at random stages throughout the construction process. It is immaterial if a repair is not immediately made after it is discovered. *See McCrea*, 685 S.W.2d at 759-60. The evidence demonstrates that Debo maintained a system for when to make repairs, not that repairs were not made.

### C. THE ALLEGED REPRESENTATIONS IN SUPPORT OF THE JURY'S FINDING TO QUESTION NO. 1 ARE NONACTIONABLE PUFFERY UNDER THE DTPA

#### 1. The Puffery Standard

A DTPA claim cannot be upheld if it is based on puffery, which is an expression of opinion by a seller not made as a representation of fact. *Hedley*

19

*Feedlot v. Weatherly Trust*, 855 S.W.2d 826, 838-39 (Tex. App.- Amarillo 1993, writ denied) (discussing *Pennington v. Singleton*, 606 S.W.2d 682, 685-89 (Tex. 1980)). "An imprecise or vague representation constitutes a mere opinion." *Id.* at 839 (citation omitted). "General statements are generally regarded as expressions of the seller's opinion or 'the puffing of his wares' and do not create an express warranty." *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 463 (Tex. App.- Dallas 1990, writ denied) (quotations and citation omitted).

"Pure expressions of opinion are not actionable." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). But "[e]ven an opinion may be actionable if: (1) it is 'intertwined' with 'direct representations of present facts;' (2) 'the speaker has knowledge of its falsity;' (3) it is 'based on past or present facts;' or (4) the speaker has 'special knowledge of facts that will occur or exist in the future.'" *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App.- Austin 2008, no pet.) (citing *Trenholm*, 646 S.W.2d at 930-31).

This Section C argues that Representations Nos. 1, 2, & 5 are nonactionable puffery. Representations Nos. 3 & 4 are not addressed. Section (C)(2) addresses why Representations Nos. 1, 2, & 5 are nonactionable puffery and Section (C)(3) briefly argues why the four *Ghosh* scenarios do not apply.

## 2. The Millers' Representations at Trial are Puffery and Opinion

### a. *Representation No. 1: That Debo Hires the Highest Quality Subcontractors*

L. Miller testified that Debo told her "they hired the highest quality subcontractors that there are, just the highest quality" (R.R. Vol. 2, at p. 33:14-15). The Millers did not provide any additional details as to what "highest quality" meant or provide any additional evidence regarding that claim. There is no evidence whereby the Millers provided examples of what actually constitutes the "highest quality" subcontractor.

In the Supreme Court's *Prudential* case, the highest court ruled that the representations that a property is "superb," "super fine," and "one of the finest little properties in the City of Austin" were nonactionable puffery. *Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995). Here, the representation that subcontractors are of the "highest quality" is just as nonactionable because it does not involve facts. *Id.* Rather, it is Debo's salesman's opinion about the subcontractors and their work. Debo salesman Dominguez was merely puffing his wares, trying to make a sale to the Millers by using broad, unspecific boasts about Debo's work. *See Autohaus*, 794 S.W.2d at 463 ("[g]eneral statements are generally regarded as expressions of the seller's opinion or 'the puffing of his wares' and do not create an express warranty") (citation omitted).

21

An unreported Corpus Christi case discussed the situation where a homebuilder represented to its client that the condominium unit was of "good quality" and an "extremely well-built . . . two-bedroom townhouse with a rebar foundation." *Helm v. Kingston*, No. 13-10-00224-CV, 2011 WL 6746064, *5-6 (Tex. App.- Corpus Christi Dec. 21, 2011, pet. denied) (mem. op.). The court agreed that "the representation that the unit was 'extremely well built' is general and vague . . . " *Id.* at *6. However, when grouped together, the builder's statements were actionable because of the specific statement about the rebar and since the individual who made the representation was the president of the construction company. *Id.* Of additional importance, the builder's statements related to a *past or present* condition, not a *future* occurrence. *Id.* Relying upon a Fifth Circuit ruling, the court noted that "the quality of workmanship in such units may be objectively judged by reference to precise specifications and well-defined terms" in holding the statements actionable. *Id.* at *7.

In the case before this Court, Debo's salesman Dominguez did not make specific representations regarding past or present conditions of the property. The Millers do not allege that Dominguez made a false representation regarding the specific construction materials used on the home. Rather, Dominguez' imprecise statements were made regarding the *future* construction of the home for the Millers (R.R. Vol. 2, at p. 33:14-15). The Millers provided no objective way in which to

22

gauge the subcontractors' performance, leaving the Jury with no standard to judge whether Debo's representation was true. As discussed in the following sections, Dominguez' additional representations are just as "general and vague" as the representation regarding the highest quality subcontractors. Debo's representation about the future performance of its subcontractors is unlike the specific representations made by the builder in *Helm* and therefore do not support the Jury's finding in Question No. 1. *See Helm*, 2011 WL 6746064, at *5-7.

b. *Representation No. 2: Onsite Supervision and Inspections*

L. Miller explained at trial that Debo salesman Dominguez represented "there would be onsite supervision at all times overseeing the project" and "there would be third-party, independent inspections of the homesite at – building inspections at various stages of the building while it was going up" (R.R. Vol. 2, at p. 34:2-3 & 6-8). These alleged representations were made regarding the future performance, not present facts, as L. Miller noted there "would be" certain supervision.

L. Miller clarified that even though she was told there would be onsite supervision at all times, she was incapable of verifying that:

**Q:** Now, you weren't at the home site, or were you at the home site every day after you signed the contract?

**A:** Not every day, no. It was impossible to be there every day. I was

23

definitely there once or twice a week (R.R. Vol. 3, at p. 109:10-15).

"Statements regarding future events generally fall into two categories: predictions and promises to perform. Because the future is generally unascertainable, these statements are typically non-actionable in fraud." *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 370 (Tex. App.- Houston [1st Dist.] 2012, pet. granted) (citing *Trenholm*, 646 S.W.2d at 930). "While misrepresentations concerning future performance are actionable under the DTPA, a general statement concerning a future [event] should be looked at differently." *Autohaus*, 794 S.W.2d at 464.

Representation No. 2 regards the future, which makes it impossible to verify at the time it was made. *See Autohaus*, 794 S.W.2d at 464. Both Debo and the Millers were unable to verify the veracity of that statement, indicating that Debo was just making expressions of opinion and not fact. *See, e.g., id.*; *GJP, Inc.*, 251 S.W.3d at 889. The Millers even admitted it was impossible to verify there was someone there every day at the construction site (R.R. Vol. 3, at p. 109:10-15). An actionable representation for DTPA must not be based on such opinion or puffing. *Hedley Feedlot*, 855 S.W.2d at 839. What constitutes "supervision" was undefined by the Milers at trial and they never explained what that term meant to them. As such, it is inherently vague and open to interpretation, making it nonactionable. *Hedley Feedlot*, 855 S.W.2d at 839.

In the *Reynolds* case, the court ruled that the representations "[a]nd for the past years, I've made money for other people – people like you. . . .," that their method is "the safest possible way to invest in the future," and that it "can help you invest in the future so that you multiply your wealth up to five times over the next 10 years" were nonactionable. *Reynolds v. Murphy*, 188 S.W.3d 252, 268 (Tex. App.- Fort Worth 2006, pet. denied). Similarly, the statement that an investment will "produce large revenues for a long time" is a representation about the future that as a matter of law is nonactionable under the DTPA. *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App.- Austin 1999, pet. denied). Not only is the representation that there *will* be onsite "supervision" vague and ambiguous, that statement concerns actions that *will* happen in the future. As such, the statement was merely Debo's opinion. Since Debo was incapable of guaranteeing what happens in the future and the Millers were absent from the construction site, the Jury was without an actionable representation to support Question No. 1. *See, e.g., Reynolds*, 188 S.W.3d at 268; *Paull*, 987 S.W.2d at 218-19.

   c. *Representation No. 5: That All Problems Would be Fixed*

The Millers complained that Debo promised to make all of the repairs on the home:

   **Q:** Did Kris ever tell you all problems that Debo Homes decides to fix is

25

what they'd fix?

**A:** He did not tell us that, no. He said all problems would be fixed (R.R. Vol. 2, at p. 35:19-22).

Like the representation regarding future supervision, this representation also pertains to the future, opening it up to scrutiny. *Autohaus*, 794 S.W.2d at 464.

L. Miller clarified that Debo was allowed to make any repairs before closing:

**Q:** So, then Debo was allowed to repair any problems before closing?

**A:** Yes. It says they shall complete the problems (R.R. Vol. 3, at p. 68:2-4).

. . .

**Q:** Now, you agree that after you told Debo about the issues they needed to repair in the home, that they could have repaired them.

**A:** Yes, they could have (R.R. Vol. 3, at p. 106:21-24).

Again, Debo's representations involved future actions that were incapable of being verified until the time of closing. In an unreported but factually similar case out of Corpus Christi, the court ruled that "mere recitals by [the homebuilder defendant] that he would send someone (*in futuro*) to fix the garage or that he believed the garage was fixed, do not add up to guarantee." *Roubein v. Marino Home Builders*, No. 13-01-711-CV, 2002 WL 1765579, *4 (Tex. App.- Corpus Christi Aug. 1, 2002, pet. denied, not designated for publication). The court there found the statement to be puffery, a mere statement of opinion. *Id.*

Here, L. Miller claims that Dominguez told her that any problems would be

26

fixed in the future and that Debo would have until closing to fix those problems. (R.R. Vol. 2, at p. 35:19-22; R.R. Vol. 3, at p. 68:2-4 & 106:21-24). Dominguez' statements were his opinion about a future occurrence, failing to add up to an actionable statement. *See Roubein*, 2002 WL 1765579, at *4.

### 3. Debo's Alleged Representations Are Nonactionable Opinions Under *Ghosh*

Even if Debo's alleged representations are all nonactionable opinions, the *Ghosh* case, *supra*, identified four ways in which Dominguez' salesman opinions to the Millers may be actionable: (1) it is 'intertwined' with 'direct representations of present facts;' (2) 'the speaker has knowledge of its falsity;' (3) it is 'based on past or present facts;' or (4) the speaker has 'special knowledge of facts that will occur or exist in the future. *GJP, Inc.*, 251 S.W.3d at 889. Each of those four scenarios will be addressed in the following subparagraphs.

#### a. *(1) Intertwined with direct representations of present facts and (3) based on past or present facts*

Scenarios (1) and (3) both require Dominguez' statements to be about *present* facts, not future promises. *Id.* Here, Dominguez' representations were all regarding the *future*.

For Representation No. 1, L. Miller testified that was made by Dominguez during contract negotiations (R.R. Vol. 2, at p. 32:3-25 & 33:1-15). There is no evidence that construction had already commenced and that Dominguez'

27

representations were about the present performance of those subcontractors.

For Representation No. 2, L. Miller specifically testified that Dominguez represented "that there *would be* onsite supervision" and "there *would be* third-party, independent inspections" (R.R. Vol. 2, at p. 33:25 & 34:1-8) (emphasis added). This testimony establishes that Dominguez made promises about future performance, not past or present facts.

Finally, for Representation No. 5, L. Miller similarly testified that Dominguez "said all problems *would be* fixed" (R.R. Vol. 2, at 35:19-22) (emphasis added). Likewise, this is a statement regarding future performance with no relation to present or past facts.

### b. *(2) The speaker has knowledge of its falsity*

For the second scenario identified by *Ghosh*- that Dominguez has knowledge of the falsity of his statements- the record is devoid of any such evidence. *See GJP, Inc.*, 251 S.W.3d at 889.

During Dominguez' testimony, the Millers' attorney confirmed with Dominguez that he has nothing to do with the construction phase:

**Q:** Now, Kris, what's your position at Debo Homes?
**A:** Sales (R.R. Vol. 3, at p. 146:20-21).
. . .
**Q:** Well, let me ask you an easier way. After you get the contract signed, what more do you have involved with the actual construction?

**A:** Nothing.

**Q:** So, you do still talk to the customers, but you don't have any involvement or knowledge about construction, right?

**A:** Yes (R.R. Vol. 3, at p. 154:19-25 & 155:1).

. . .

**Q:** Well, you don't have any involvement in the construction, right? That's what you said.

**A:** I don't have any involvement in the construction, no (R.R. Vol. 3, at p. 159:6-9).

Kris succinctly summed up his role with Debo: "Because I don't do construction. I sell homes" (R.R. Vol. 3, at p. 188:16).

In the *Matis* case, the defendants sold investments to the plaintiffs. *Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. App.- Waco 2007, no pet.). In selling the investments to the plaintiffs, the defendants represented that "(1) invested funds were refundable; and (2) returns would be paid monthly, beginning shortly after the initial investment, and amount to one hundred percent for ten months." *Id.* There, the defendants had special knowledge and access to unique investment information. *Id.* The Waco court found those representations to be actionable and non-puffery. *Id.* at 308-09. However, for the purposes of *Matis'* application to the second scenario identified by *Ghosh*, the Waco court found the defendants' statements "were not necessarily made with knowledge of their falsity." *Id.* at 309.

If the *Matis* representations fail to rise to the level of "knowledge of falsity,"

then there is no evidence that Dominguez had knowledge of the falsity of the alleged representations. *See Matis*, 228 S.W.3d at 308-09. Salesman Dominguez' representations all involved the construction phase, something of which he had no knowledge of. The Millers offered no counter evidence, whether direct or circumstantial, to show that Dominguez knew what he was saying was false. *See Anglo-Dutch Petroleum Int'l, Inc. v. Shore Harbour Capital Management Corp.*, No. 01-09-00417-CV, 2011 WL 862117, *4-5 (Tex. App.- Houston [1st Dist.] Mar. 10, 2011, no pet.) (mem. op.) (finding no "knowledge of falsity" because of no evidence showing the speaker knew the statement was false).

c. *(4) The speaker has special knowledge of facts that will occur or exist in the future*

As discussed above, Dominguez' knowledge of the construction phase is nonexistent. Dominguez' expressions to the Millers were nonactionable expressions of opinion- Dominguez' opinions about the future construction phase. *See Trenholm*, 646 S.W.2d at 930. In a recent Beaumont case, the defendant/future executrix made an alleged actionable representation regarding a probate issue to the plaintiff/testator. *Werth v. Johnson*, 294 S.W.3d 908, 910-11 (Tex. App.- Beaumont 2009, no pet.). In discussing the Supreme Court's *Trenholm* case and whether the speaker had special knowledge of the facts, the Beaumont court ruled the speaker's statements were not actionable. *Id.* There, the speaker represented to

30

the plaintiff that the plaintiff would receive a house to live in once a certain individual passed away. *Id.* The speaker made the representation at a time when the speaker was not yet the executrix; instead, the plaintiff was still in complete control of his own estate. *Id.* The plaintiff attempted to argue that the speaker had special knowledge as the future executrix, but that argument was rejected. *Id.*

Here, Dominguez made representations about future construction, something of which he had no special knowledge of. Different individuals at Debo managed the construction phase, not Dominguez. The trial record reflects that one individual- Debo superintendent Cisneros- managed the daily construction (R.R. Vol. 4, at p. 79:13-14 & 80:1-21). Dominguez only possessed a salesman's knowledge about selling a home and not specialized knowledge of the construction process.

**D. THE MILLERS SHOULD NOT BE AWARDED PREJUDGMENT INTEREST**

**1. Debo's Tender Into the Court Registry Precludes Prejudgment Interest**

"[P]rejudgment interest should not be assessed on funds that were deposited into the registry of the court." *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 648 (Tex. App.- Austin 2000, pet. denied); *see, Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 125 (Tex. App.- Corpus Christi 1999, pet. denied) (damaged party should not be entitled to prejudgment interest on money that defendant had already paid into the registry of the court).

The Jury awarded total damages to the Millers in the amount of $60,650.00 (C.R. Vol. 2, at p. 566). It is uncontroverted that Debo deposited the entire amount of the jury's $60,650.00 verdict into the registry of the court (R.R. Vol. 6, at Dft. Ex. 20; C.R. Vol. 3, at p. 1122). As such, prejudgment interest should not be assessed on those funds. *Browning Oil Co.*, 38 S.W.3d at 648. The trial court's award of prejudgment interest commencing on October 7, 2013 and totaling the amount of $3,663.92 must be reversed in its entirety. *Id.*

### E. THE MILLERS SHOULD NOT BE AWARDED POSTJUDGMENT INTEREST

### 1. Debo's Deposit Into the Court Registry Halts Postjudgment Interest

An unconditional tender of the amount owed under a judgment terminates the accrual of postjudgment interest. *Miga v. Jensen*, 96 S.W.3d 207, 212 (Tex. 2002). "[A] tender into the registry of the trial court of all sums due under the judgment is a means of halting post-judgment interest." *Breault v. Psarovarkas*, No. 01-01-00122-CV, 2003 WL 876651, *7 (Tex. App.- Houston [1st Dist.] Feb. 28, 2003, pet. denied) (mem. op.) (citing *St. Paul Mercury Ins. Co. v. Billiot*, 342 S.W.2d 161, 164 (Tex. App.- Beaumont 1960, writ ref'd)).

Debo deposited all $60,650.00 of the judgment into the trial court registry before the trial court rendered judgment (R.R. Vol. 6, at Dft. Ex. 20; C.R. Vol. 3, at p. 1122). As such, the trial court's award of postjudgment interest must be reversed and the Millers may not collect postjudgment interest. *Miga*, 96 S.W.3d at 212.

## CONCLUSION

The Jury's finding that Debo violated the Texas Deceptive Trade Practices Act is without evidentiary support. The alleged representations in support of a DTPA finding are not actionable under the puffery defense. Finally, the Millers are not entitled to any prejudgment and postjudgment interest because of Debo's full and unconditional tender of all sums owing into the trial court's registry.

## PRAYER

Appellee and Cross-Appellant, Debo Homes, LLC, prays that this Court grant their Appeal and disregard the Jury's affirmative finding to Question No. 1. Furthermore, Debo Homes, LLC prays that this Court reverse the trial court's award of prejudgment and postjudgment interest to Laurel and Eliana Miller.

Respectfully submitted,

**THE WELSCHER LAW FIRM**


*/s/ Nicholas Martinez*
Craig Welscher
State Bar No. 21167200
Nicholas Martinez
State Bar No. 24087986
The Welscher Law Firm, P.C.
1111 North Loop West, Suite 702
Houston, Texas 77008
(713) 862-0800 – Telephone
(713) 862-4003 – Facsimile
Email: nmartinez@welscherlaw.com
*Attorneys for Appellee & Cross-Appellant*

33

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing instrument is in compliance with the word count limit of TRAP 9.4(i)(2)(B) of 15,000 words as it contains 7,135 words.

*/s/ Nicholas Martinez*
Nicholas Martinez

## CERTIFICATE OF SUPPORT

I certify that I have reviewed the record and brief and have concluded that every factual statement made in the brief is supported by competent evidence included in the appendix or record.

*/s/ Nicholas Martinez*
Nicholas Martinez

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded to all known counsel of record in the manner required by Texas Rule of Appellate Procedure 9.5, on this the 27th day of July, 2015.

***Via Electronic Service***
Timothy A. Hootman
2402 Pease St.
Houston, Texas 77003

*/s/ Nicholas Martinez*
Nicholas Martinez

# APPENDIX

1. **_Clerk's Record_**

   a. **_Volume 1_**

      i.   Plaintiff's Original Petition, Requests for Disclosure and Demand for Jury Trial

   b. **_Volume 2_**

      i.   Plaintiffs Trial Witness List

      ii.  Jury Charge

   c. **_Volume 3_**

      i.   Defendant Debo Homes, LLC's Motion to Disregard the Jury's Answer to Question Number One

      ii.  Order Denying Defendant's Motion to Disregard the Jury's Answer to Question Number One of the Jury's Charge

      iii. Defendant Debo Homes, LLC's Response to the Plaintiffs' Motion for Judgment on the Jury Verdict

      iv.  Final Judgment

2. **_Reporter's Record_**

   a. **_Volume 2_**

      i.   Examination of Laurel Miller

   b. **_Volume 3_**

      i.   Examination of Laurel Miller

      ii.  Examination of Harold Knueppel

iii.    Examination of Kris Dominguez

iv.    Examination of Juan Carlos Hernandez

*c.  Volume 4*

  i.    Examination of Eduardo Michael Cisneros

*d.  Volume 6*

  i.    Plaintiffs' Exhibit 1

  ii.    Plaintiffs' Exhibit 10

 iii.    Plaintiffs' Exhibit 12

 iv.    Defendant's Exhibit 2

  v.    Defendant's Exhibit 10

 vi.    Defendant's Exhibit 11

vii.    Defendant's Exhibit 14

viii.    Defendant's Exhibit 20

**CLERK'S RECORD**



Volume **1** of **3**

Trial Court Cause No: **13-DCV-209822**
in the 400th Judicial District Court
of Fort Bend County, Texas,
Honorable Maggie Perez-jaramillo, Judge Presiding

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

4/14/2015 8:55:52 AM
CHRISTOPHER A. PRINE
Clerk

Style:  Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant.

Appealed to the

Court of Appeals for the Fourteenth Court Of Appeals District of Texas, at Houston, Texas

**Court Of Appeals No:  14-15-00004-CV**

*Attorney for Appellant(s):*
Brian H Crockett
 SBN:  24074094
Crockett Law PC
10565 Katy Fwy Ste 400
Houston TX  77024
Telephone:  713-779-3476
Facsimile:  888-779-3237
E-Mail Address:
*Appellant(s):*
Laurel Miller and Eliana Miller

*Attorney for Appellee(s):*
Nicholas Martinez
 SBN:  24087986
The Welscher Law Firm
1111 North Loop West Suite 702
Houston Tx  77008
Telephone:  713-862-0800
Facsimile: :713-862-4003
E-Mail Address: :
*Appellee(s):*
Debo Homes, LLC

Electronically submitted to the Court of Appeals for the Fourteenth Court Of Appeals District of Texas, at Houston, Texas

on March 23, 2015.

DISTRICT CLERK ANNIE REBECCA ELLIOTT
Fort Bend County, Texas

By:_____/s/  Lisa Tucker_____
    Deputy District Clerk  **Lisa Tucker**
    Telephone:  **(281) 341-4516**

13-DCV-209822
ORPE
Original Petition
2721893

CAUSE NO. _____    13-DCV-209822

| | | |
|---|---|---|
| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs | § | OF FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC. | § | |
| | § | 400TH JUDICIAL DISTRICT |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL PETITION, REQUESTS FOR DISCLOSURE AND DEMAND FOR TRIAL BY JURY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **LAUREL AND ELIANA MILLER,** hereinafter referred to as the "Millers," and file this their Original Petition complaining of **DEBO HOMES, LLC.** hereinafter referred to as "Defendant Debo," and for cause of action would respectfully show to the Court as follows:

### I.

### DISCOVERY CONTROL PLAN

1.      Plaintiff intends that discovery be conducted under Level 2 and affirmatively pleads they are seeking monetary relief aggregating more than $50,000.

### II.

### PARTIES

2.      Plaintiffs, **LAUREL AND ELIANA MILLER,** are individuals residing in Fort Bend County, Texas

3.      Defendant, **DEBO HOMES, LLC.** is a Limited Liability Company organized under the laws of the state of Texas and authorized to do business in this state. Defendant may be

9

served by serving its registered agent for service Juan Carlos Hernandez at 1118 FM 2977, Richmond, Texas 77469. Plaintiffs request service and citation on Defendant at this time.

## III.

## VENUE AND JURISDICTION

4. Venue is proper in Fort Bend County, Texas, pursuant to Section 15.002 of the Tex. Civ. Prac. & Rem. Code, because the incident giving rise to this action occurred in Fort Bend County, Texas.

5. This court has jurisdiction over the cause because the amount in controversy is within the jurisdictional limits of this Court.

## IV.

## CONDITIONS PRECEDENT

6. The Millers timely notified Defendant Debo of such complaint pursuant to Section 17.505(a) of the Texas Business and Commerce Code and Chapter 38 of the Texas Civil Practices and Remedies Code by letter and would show compliance with all conditions precedent to the filing of this suit and recovery of additional damages and attorney's fees. Defendant responded by denying any liability.

## V.

## FACTS

7. On or about April 13, 2013, the Millers entered in to a contract for the construction of a home at ███████████████████████████████. The builder of the home was Debo Homes, LLC. Prior to the sale of the home to the Millers, Defendant Debo Home made numerous representations to induce the Millers to purchase the home. These representations included but were not limited to the construction of the home, performance warranties, the

10

supervision and inspection of its subcontractors' work, the construction being of the finest quality and if the Millers identified any problems or had any concerns with the construction that Debo would make sure all of their worries were taken care of. Shortly after purchasing the home, the Millers became concerned with Debo's construction of the home. Specifically, the foundation started to crack, the square footage of the home was less than agreed, among other serious defects. The Millers hired a home inspector to identify any defects. The numerous errors and omission on the part of the Defendant were documented throughout the report. The Millers demanded the Defendant fix the problems. The Defendant assured the Millers that all of the problems would be fixed.

8.    Despite Defendant's assurances and the reports, which documented serious defects, the Defendant continued to build the home without repairing all of the defects. The Millers demanded all of the repairs to be made once again. Once again the Defendant continued to construct the home without making the Miller's requested repairs. It became clear the Defendant was attempting to cover up the defects by closing up the walls to prevent the Millers from identifying the increasing number of defects and shotty construction.

9.    On May 22, 2013, fed up with the Defendant's unconscionable acts, the Millers demanded the Defendant to cease and desist its covert actions, until all defects were identified and repaired. Defendant agreed to cease and desist. Shortly thereafter, the Millers' hired a construction expert to visit the property. The Defendant was notified of the construction experts intended inspection date on July 27, 2013. A few days before the inspection, the Millers visited the home in preparation for its inspection on the following week. The Millers were shocked to find the Defendant had completed construction, without making any repairs, and had the home listed for sale. This situation was brought to the attention of the Defendant, who responded by claiming the

11

Millers no longer owned the home, the Millers were trespassers and Defendant would not be returning the monies paid by the Millers for the construction of the home.

## VI.

## CAUSES OF ACTION

### Count One – Fraud and Fraudulent Inducement to Contract

10.     The statements and averments contained in paragraphs 7-9, above, are adopted fully by reference as if set out verbatim herein.

11.     Defendant Debo fraudulently induced the Millers into the agreement to purchase the home. Defendant made false statements and representations to the Millers before their purchase that were material and/or omitted to disclose material facts to the Millers with respect to the agreement to purchase the Home and the nature of its construction. Defendant further made false statements and representations to the Millers concerning the defects and repairs in the home. Defendant Debo knew that the above promises, statements and representations were false and/or that the omitted information was material at the time they were made, for the purpose of inducing the Plaintiff to enter into the agreements and allow the Defendant to cover up the numerous defects. Millers relied on these false statements and representations and/or omissions to their detriment and suffered damages as a result.

12.     Defendant Debo's actions proximately caused damages to the Millers in a sum which is in excess of the minimum jurisdictional limits of this Court, all of which the Millers now seek.    Defendant Debo actions and conduct were committed knowingly, intentionally, and maliciously with conscious disregard for the rights of the Millers.    As a result, the Millers are entitled to recover exemplary damages from Defendant Debo.

## Count Two – Fraud in a Real Estate Transaction Texas Business & Commercial Code Section 27.01 et. al.

13. The statements and averments contained in paragraphs 7-9, above, are adopted fully by reference as if set out verbatim herein.

14. The Millers assert that Defendant Debo committed fraud as defined by Texas business & Commercial Code Section 27.01(a) by; (1) making false representations of a past or material fact, (2) the false representations were made to Millers for the purpose of inducing the Millers to enter into a contract to purchase the home, and (3) the Millers relied on the representations made by the Defendant Debo in entering into the contract to purchase the home.

15. Millers further assert that Defendant Debo committed fraud as defined by Texas Business & Commercial Code Section 27.01(a) by (1) having actual awareness of the falsity of a representation or promise made by another person, (2) failing to disclose the falsity of the representation or promise to the Millers, and (3) benefiting from the false representation or promise.

16. As a direct and proximate result of the Defendant Debo's conduct, the Millers were damaged in a sum which is in excess of the jurisdictional limits of the Court, all of which the Millers now seek.

17. The Millers further seek recovery of reasonable and necessary attorneys' fees, expert witness fees, costs for depositions and all other costs and damages available by statute and at common law.

18. The Defendant Debo's conduct, as described hereinabove, was made with actual awareness of the falsity, and the Defendant Debo are therefore, liable to the Millers for exemplary damages.

13

## Count Three – Texas Deceptive Trade Practices Act

19. The statements and averments contained in paragraphs 7-9, above, are adopted fully by reference as if set out verbatim herein.

20. Millers would show that Defendant Debo engaged in certain false, misleading and deceptive acts, practices and/or omissions actionable under the Texas Deceptive Trade Practices – Consumer Protection Act (Texas Business and Commerce Code, Chapter 17.41, *et seq.*), as alleged herein below.

21. By seeking and/or acquiring the goods and/or services of the Defendants by purchase, the Millers qualify as 'consumers' as the term is defined by the D.T.P.A., and therefore Millers may recover under the D.T.P.A.

22. **Unconscionable Action or Course of Action**. Defendants engaged in an "unconscionable action or course of action" to the detriment of the Millers as the term is defined by Section 17.45(5) of the Texas Business and Commerce Code, by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiff to a grossly unfair degree.

23. **Violations of Section 17.46(b)**. Defendants violated Section 17.46(b) of the Texas Business and Commerce Code, by:

    (a) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    (b) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    (c) representing that an agreement confers or involves rights, remedies, or obligations which it does not have, or which are prohibited by law; and

    (d) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

14

24.     **Producing Cause.** The Millers would show that the acts, practices and/or omissions complained of were the producing cause of the Millers' damages more fully described herein below.

25.     **Reliance.** The Millers would further show the acts, practices and/or omissions complained of under Section 17.46(b) of the Texas Business and Commerce Code were relied upon by Millers to their detriment.

## Count Four – Breach of Contract

26.     The statements and averments contained in paragraphs 7-9, above, are adopted fully by reference as if set out verbatim herein.

27.     The Millers and Defendant entered into a valid contract for the construction of a home. Defendant breached that contract by failing construct the home, as agreed. As a result of that breach, the Millers have been damaged without the promised home, or the funds used to purchase the home. As a further result of that breach, the Millers were forced to retain attorneys and are, therefore, entitled to recover attorney's fees under Chapter 38 of the Texas Civil Practices & Remedies Code and pursuant to the contract agreement.

## VII.

## DAMAGES

28.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, the Millers affirmatively plead they are seeking monetary relief of $100,000 to $500,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and for judgment for all other relief to which they have shown themselves entitled. The Millers have suffered the following economic and actual damages because of the actions and omissions of Defendant described herein above:

(a)     Past and future out-of-pocket expenses;

15

(b)     Past mental anguish;
(c)     Expert costs;
(d)     Attorney fees;
(e)     Court costs; and
(f)     All other damages provided for under Texas law.

## MULTIPLE DAMAGES

29.     The statements and averments contained in Paragraphs 7-9 are adopted fully by reference as if set out verbatim herein.

30.     As alleged herein above, the Millers would show that the false, misleading and deceptive acts, practices and omissions complained of herein were committed "knowingly" in that Defendant Debo had actual awareness of the falsity, deception, or unfairness of such acts, practices, and omissions.

31.     The Millers further avers that such acts, practices, and/or omissions were committed "intentionally" in that, Defendants specifically intended that Millers act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

32.     Therefore, the Millers are entitled to recover multiple damages as provided by 17.50(b)(1) of the Texas Business and Commerce Code.

## EXEMPLARY DAMAGES

33.     The statements and averments contained in Paragraphs 7-9 are adopted fully by reference as if set out verbatim herein.

34.     The Millers would further show that the acts and omissions of Defendant Debo, complained of herein, were committed knowingly, willfully, intentionally, with actual awareness, and with the specific and predetermined intention of enriching said Defendant at the expense of the Millers. In order to punish Defendant for such unconscionable overreaching and to deter such actions or omissions in the future, the Millers also seek recovery from Defendant for exemplary

16

damages as provided by Section 41.003(1) of the Texas Civil Practice and Remedies Code and Section 27.01 of the Texas Business and Commerce Code.

## ATTORNEY'S FEES

35. The Millers have provided the Defendant with written notice pursuant to Texas Business & Commercial Code, Section 17.505 (a) and (b), Chapter 38 of the Texas Civil Practices and Remedies Code or the opportunity to settle. Because of Defendant's refusal to take responsibility for its acts or omissions, the Millers were forced to hire the undersigned attorney to pursue those claims on their behalf.

36. To compensate the Millers for reasonable and necessary attorney's fees thereby incurred, the Millers are entitled to recover reasonable and necessary attorneys' fees for the prosecution of these claims, for breach of warranties, D.T.P.A. pursuant to Texas Business & Commercial Code Section 17.41 et seq., Texas Business & Commercial Code, Section 27.01, et seq. (statutory fraud) and Chapter 38 of the Texas Civil Practices and Remedies Code and all other applicable law. The Millers also seek recovery of expert witness's fees, costs for copies of depositions and costs of court pursuant to Texas Business & Commercial Code Section 27.01, et seq. and pursuant to the terms of any other relevant statute.

## VIII.

## JURY DEMAND

37. The Millers tender the appropriate jury fee.

17

## IX.

## XI. RULE 193.7 NOTICE

38.    Plaintiffs give notice to all Defendants that they intend to use all discovery responses as evidence at trial in accordance with such right and privileges established by Texas Rules of Civil Procedure 193.7.

## X.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, **LAUREL AND ELIANA MILLER**, respectfully prays that Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Millers against Defendants for:

    (a) Actual damages;

    (b) Treble / Exemplary damages;

    (c) Pre-judgment interest;

    (d) Post-judgment interest;

    (e) Reasonable and necessary attorney's fees in prosecuting the case and all stages of appeal, exert witness fees, and deposition costs;

    (f) Costs of suit; and

    (g) Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

*[Signature on next page]*

18

*NEWTON, JONES & SPAETH*

By: _____

**H. Dwayne Newton**
State Bar No. 14977200
Brian H. Crockett
State Bar No. 24074094
3405 Marquart
Houston, Texas 77027
(713) 493-7620 - Telephone
(713) 493-7633 – Facsimile
dnewton@newton-lawyers.com
bcrockett@newton-lawyers.com

**ATTORNEYS FOR PLAINTIFFS**
**LAUREL AND ELIANA MILLER**

19



Volume **2** of **3**

Trial Court Cause No: **13-DCV-209822**
in the 400th Judicial District Court
of Fort Bend County, Texas,
Honorable Maggie Perez-jaramillo, Judge Presiding

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

4/14/2015 8:55:52 AM

CHRISTOPHER A. PRINE
Clerk

Style:    Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant.

Appealed to the

Court of Appeals for the Fourteenth Court Of Appeals District of Texas, at Houston, Texas

**Court Of Appeals No: 14-15-00004-CV**

*Attorney for Appellant(s):*
Brian H Crockett
 SBN: 24074094
Crockett Law PC
10565 Katy Fwy Ste 400
Houston TX 77024
Telephone: 713-779-3476
Facsimile: 888-779-3237
E-Mail Address:
*Appellant(s):*
Laurel Miller and Eliana Miller

*Attorney for Appellee(s):*
Nicholas Martinez
 SBN: 24087986
The Welscher Law Firm
1111 North Loop West Suite 702
Houston Tx 77008
Telephone: 713-862-0800
Facsimile: :713-862-4003
E-Mail Address: :
*Appellee(s):*
Debo Homes, LLC

Electronically submitted to the Court of Appeals for the Fourteenth Court Of Appeals District of Texas, at Houston, Texas

on March 23, 2015.

DISTRICT CLERK ANNIE REBECCA ELLIOTT
Fort Bend County, Texas

By:_____/s/ Lisa Tucker_____
     Deputy District Clerk **Lisa Tucker**
     Telephone: **(281) 341-4516**

394

Filed
8/5/2014 6:34:02 PM
**Annie Rebecca Elliott**
District Clerk
Fort Bend County, Texas
Nereyda Flores

NO. 13-DCV-209822

| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC | § | |
| Defendant. | § | 400TH JUDICIAL DISTRICT |

## PLAINTIFFS TRIAL WITNESS LIST

**Fact Witnesses:**

Laurel Miller
Eliana Miller
c/o Brian H. Crockett
Crockett Law, PC
10565 Katy Fwy, Ste 400
Houston, Texas 77024

Plaintiffs' in this case and may testify as to incident made the basis of this lawsuit and their damages.

Harold Knueppel
Knueppel Inspection Services, Inc.
1102 Colonial Heights Drive
Richmond, Texas 77406
281.433.2507

Person with knowledge of Plaintiffs' damages and necessity of repair.

Juan Carlos Hernandez
Juan Carlos Hernandez, Jr.
Kris Dominguez
c/o Craig Welscher
The Welscher Law Firm
111 North Loop West, Ste 702
Houston, Texas 77008

Defendants.

Plaintiffs reserve the right to call any and all witnesses designated by any other party to this litigation.

484

**Expert Witnesses:**

Brian H. Crockett
Crockett Law, PC
10565 Katy Fwy, Ste 400
Houston, Texas 77024

Plaintiffs' counsel, who will testify as to Plaintiff's reasonable and necessary attorney's fees and costs.

Plaintiffs reserve the right to call any and all expert witnesses designated by any other party to this litigation.

Respectfully submitted,

*CROCKETT LAW, PC*

By: _____

Brian H. Crockett
State Bar No. 24074094
10565 Katy Fwy, Ste 400
Houston, Texas 77024
(713) 779-3467 - Telephone
(888) 779-3237 – Facsimile
brian@crockettlawtx.com

**ATTORNEY FOR PLAINTIFFS**
**LAUREL AND ELIANA MILLER**

2

485

## NO. 13-DCV-209822

| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLP | § | 400TH JUDICIAL DISTRICT |

**MEMBERS OF THE JURY:**

You have been given all the instructions appropriate for your deliberations.

Please continue your deliberations.

**FILED**

AT _____ M.

AUG 2 2 2014

Clerk District Court, Fort Bend Co., TX

_____
**CLIFFORD J. VACEK**
**Presiding Judge**

559

13-DCV-209822
CHCO
Charge of the Court
3182708



NO. 13-DCV-209822

| | | |
|---|---|---|
| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC | § | |
| Defendant. | § | 400TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during your deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.      Do not let bias, prejudice or sympathy play any part in your decision.

2.      Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

560

3.     You are to make up your own mind about the facts.  You are the sole judges of the credibility of the witnesses and the weight to give their testimony.  But on matters of law, you must follow all of my instructions.

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important.  No one should say that any question or answer is not important.

6.     Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted into evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

9.     Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

The charge uses the following term(s):

1. "Millers" mean Eliana and Laurel Miller.

2. "Debo" means Debo Homes, LLC

3. The Agreement shall refer to the New Home Contract signed between Debo Homes, LLC ~~AND THE~~ ~~August~~ *April* 13, 2013. *Millers* ~~~~

4. The "Home" shall refer to 11115 Leah Elizabeth Dr., Needville, Texas 77461.

## INSTRUCTIONS

1.    A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts.

3

**QUESTION 1:**

Did Debo engage in any false, misleading, or deceptive act or practice that the Millers relied on to their detriment and that was a producing cause of damages to the Millers?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means any of the following:

1. Representing the Home, construction, supervision or Agreement had sponsorship, approval, characteristics, uses, or benefits or qualities that it did not have; or

2. Representing the Home, construction, supervision or Agreement were a particular quality, if it was of another; *oR* *ᴀɴᴅ*

3. Representing that the Agreement confers or involves rights that it did not have or involve; or

4. Failing to disclose information about the Home, construction, supervision, performance or agreement that was known at the time of the transaction with the intention to induce the Millers into a transaction they otherwise would not have entered into if the information had been disclosed.

Answer "Yes" or "No."

Answer: _~~Yes~~ Yes_

No.

Mike Zangh.

MAnuel Roberts

**QUESTION 2:**

Did Debo engage in any unconscionable action or course of action that was a producing cause of damages to the Millers.

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Answer "Yes" or "No."

Answer: ___*NO*___ *UNANIMOUS*

564

If you answered "Yes" to Question 1 or Question 2, then answer the following question. Otherwise do not answer the following question.

**QUESTION 3:**

Did Debo engage in such conduct knowingly?

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person act with actual awareness.

In answering this question, consider only the conduct that you have found was a producing cause of damages to the Millers.

Answer "Yes" or "No."

Answer: _____No_____ Unan mous

6

565

If you answered "Yes" to Question 1 or Question 2, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 4:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents, if any:

a. Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____1,000.00_____

b. Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____59,300.00_____

c. Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____350.00_____

Unanimous

7

566

**QUESTION 5:**

Did Debo fail to comply with the Agreement?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonably expected;
2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;
5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No."

Answer: _____NO (Unanimous)_____

8

567

**QUESTION 6:**

Did the Millers fail to comply with the Agreement?

Answer "Yes" or "No."

Answer: _____No_____ ~~Voytett M's~~

Y

N
yyy

11 - 1

~~Voyatt Shaw~~
Zhag

Mike Zanghi

If you answered "Yes" to both Question 5 and Question 6, then answer Question 7. Otherwise, do not answer Question 7.

**QUESTION 7:**

Who failed to comply with the agreement first?

Answer "Debo" or the "Millers."

Answer:  _____

569

If you answered "Yes" to Question 5, than answer the following question. Otherwise, do not answer the following question.

**QUESTION 8:**

Was Debo's failure to comply excused?

Failure to comply by Debo is excused by the Millers' previous failure to comply with a material obligation of the Agreement.

Failure to comply by Debo is excused by the Millers' prior repudiation of the Agreement. A party repudiates an agreement when he indicates, by his words or actions, that he is not going to perform his obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

Failure to comply by Debo is excused if compliance is waived by the Millers. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Failure to comply by Debo is excused if the Millers committed fraud against Debo. Fraud occurs when-

1. a party makes a material misrepresentation, and
2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
3. the misrepresentation is made with the intention that it should be acted on by the other party, and
4. the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means

a. a false statement of fact, or
b. a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or
c. a statement of opinion based on a false statement of fact, or
d. a statement of opinion that the maker knows to be false.

Answer "Yes" or "No."

Answer: _____

11

570

**QUESTION 9**:

Did Debo substantially perform under the terms of the Agreement?

"Substantial performance" means that there has been no willful departure from the terms of the agreement and no omission in essential points and that the agreement has been honestly and faithfully performed in its material and substantial particulars and the only variance from the strict and literal performance consists of technical or unimportant omissions or details.

Answer "Yes" or "No."

Answer: _Yes_    ~~Unanimous~~ Unanimous

12

571

If you answered "Yes" to Question 5, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 10:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents, if any:

    a.  Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____

    b.  Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____

    c.  Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____

572

If you answered "Yes" to Question 6, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 11:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Debo for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents, if any:

a. The difference between the amount paid to Debo by the Benges for Debo's building of the Home and the amount the Millers had agreed to pay Debo for building the Home

Answer: _____

b. Reasonable and necessary expenses incurred in attempting to market and sell the Home to another party besides the Millers.

Answer: _____

c. Reasonable and necessary costs to keep the Home maintained during that period and interest payments made.

Answer: _____

14

573

**QUESTION 12:**

Did Debo commit fraud in the sale of real estate against the Millers?

Fraud in the sale of real estate occurs when:



a.    there is a false representation of a past or existing material fact, and

b.    the false representation is made to a person for the purpose of inducing that person to enter into the Agreement, and

c.    the false representation is relied on by that person in entering into the Agreement.

Answer "Yes" or "No."

Answer:    ___NO___ Unanimous

574



N/A

If you answered "Yes" to Question 12, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 13:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such fraud in the sale of real estate?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents, if any:

    a.  Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____

    b.  Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____

    c.  Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____

16

575

Answer the following question only if you answered "Yes" to Question 12. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following Question.

**QUESTION 14:**

Do you find by clear and convincing evidence that the harm to the Millers resulted from fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Fraud occurs when-

a.    there is a false representation of a past or existing material fact, and

b.    the false representation is made to a person for the purpose of inducing that person to enter into the Agreement, and

c.    the false representation is relied on by that person in entering into the Agreement.

Fraud does not include the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interest.

Fraud does not include breaches that the law condemns as "fraudulent" merely because they *tend* to deceive others, violate confidence, or cause injury to public interest, the actor's mental state being immaterial.

Answer "Yes" or "No."

Answer:    _____

17

576

If you answered "Yes" to Question 1, Question 2, Question 5, or Question 12, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 15:**

What is a reasonable fee for the necessary services of the Millers' attorney, stated in dollars and cents?

Answer with an amount for each of the following:

a. For representation in the trial court.

Answer: _____ $0$ _____

b. For representation through appeal to the Court of Appeals.

Answer: _____ $0$ _____

c. For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____ $0$ _____

d. For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: _____ $0$ _____

e. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____ $0$ _____

Unanimus

18

577

If you answered "Yes" to Question 6, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 16:**

What is a reasonable fee for the necessary services of Debo's attorney, stated in dollars and cents?

Answer with an amount for each of the following:

  a.  For representation in the trial court.

Answer: _____

  b.  For representation through appeal to the Court of Appeals.

Answer: _____

  c.  For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____

  d.  For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: _____

  e.  For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____

578

<u>PRESIDING JUROR:</u>

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

a. Have the complete charge read aloud if it will be helpful to your deliberations;

b. Preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

c. Give written questions or comments to the bailiff who will give them to the judge;

d. Write down the answers you agree on;

e. Get the signatures for the verdict certificate; and

f. Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

<u>INSTRUCTIONS FOR SIGNING THE VERDICT CERTIFICATE:</u>

1. You may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. That means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2. If ten jurors agree on every answer, those ten jurors sign the verdict. If eleven jurors agree on every answer, those eleven jurors sign the verdict. If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4. There are some special instructions before Question 14 explaining how to answer Question 14. Please follow that instruction. If all twelve of you answer Yes to Question 14, you will need to complete a second verdict certificate for Question 14.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the Judge of this fact.

When you have answered all the questions you are required to answer under the

579

instructions of the Judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

Do you understand these instructions? If you do not, please tell me now.


_____
JUDGE PRESIDING

FILED

AUG 2 2 2014
AT_____ 10:36 A.M.

Clerk District Court, Fort Bend Co., TX

21

580

## VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.


_____        _____
Signature of Presiding Juror                      Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below

____✓_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below


PRINT:                                    SIGN:

1. David Scott Stripling

2. Norbert Burch

3. Alyissa Spencer                        Alyssa Spencer

4. Rolanda Bailey                         Rolanda Bailey

5. Peter Cawthorne                        Cawthorne

6. Stephanie Kusek                        Stephanie Kusek

7. Angela P Reeves

8. Gregory Prihoda                        Gregory Prihoda

9. Carol Leverett                         Carol Leverett

10. Wyatt Shaw

11. _____

12. _____

**FILED**

AUG 22 2014

AT _____5:12 P M_

Clerk District Court, Fort Bend Co., TX

581

## ADDITIONAL CERTIFICATE

I certify that the jury was unanimous in answering "Yes" to the following question. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

**_QUESTION 14_**

_____
Signature of Presiding Juror

David Scott Stripling
Printed Name of Presiding Juror

All Answers remain the same. Signed in error.

23

58½



Volume **3** of **3**

Trial Court Cause No: **13-DCV-209822**
in the 400th Judicial District Court
of Fort Bend County, Texas,
Honorable Maggie Perez-jaramillo, Judge Presiding

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

4/14/2015 8:55:52 AM

CHRISTOPHER A. PRINE
Clerk

Style:    Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant.

Appealed to the

Court of Appeals for the Fourteenth Court Of Appeals District of Texas, at Houston, Texas

**Court Of Appeals No:  14-15-00004-CV**

***Attorney for Appellant(s):***
Brian H Crockett
 SBN:  24074094
Crockett Law PC
10565 Katy Fwy Ste 400
Houston TX  77024
Telephone:  713-779-3476
Facsimile:  888-779-3237
E-Mail Address:
***Appellant(s):***
Laurel Miller and Eliana Miller

***Attorney for Appellee(s):***
Nicholas Martinez
 SBN:  24087986
The Welscher Law Firm
1111 North Loop West Suite 702
Houston Tx  77008
Telephone:  713-862-0800
Facsimile: :713-862-4003
E-Mail Address: :
***Appellee(s):***
Debo Homes, LLC

Electronically submitted to the Court of Appeals for the Fourteenth Court Of Appeals District of Texas, at Houston, Texas

on March 23, 2015.

DISTRICT CLERK ANNIE REBECCA ELLIOTT
Fort Bend County, Texas

By:_____/s/  Lisa Tucker_____
    Deputy District Clerk  **Lisa Tucker**
    Telephone:  **(281) 341-4516**

752

Filed
9/23/2014 4:34:11 PM
**Annie Rebecca Elliott**
District Clerk
Fort Bend County, Texas
Lisa Tucker

Cause No. 13-DCV-209822

| | | |
|---|---|---|
| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | OF FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC, | § | |
| DEFENDANT. | § | 400TH JUDICIAL DISTRICT |

### DEFENDANT DEBO HOMES, LLC'S MOTION TO DISREGARD THE JURY'S ANSWER TO QUESTION NUMBER ONE

**COMES NOW**, Defendant, DEBO HOMES, LLC ("Debo" or "Defendant"), and files this, their Motion to Disregard the Jury's Answer to Question Number One (hereinafter referred to as the "Motion") and in support respectfully shows the Court as follows:

### I. INTRODUCTION AND FACTS

1. On Friday, August 22, 2014, at 5:12 p.m., the Jury in this case rendered its verdict. By a 10 to 12 vote, the Jury answered Question Number One "Yes," which is a Deceptive Trade Practices Act ("DTPA") predicate question. *See* Ex. 1 at pg. 4. In conjunction with their "Yes" answer in Question Number One, the Jury then appropriately answered Questions Numbers 4 and 15. *See* Ex. 1 at pgs. 7 and 18. For Question Number 4, the Jury awarded the plaintiffs Laurel Miller ("Laurel") and Eliana Miller ("Eliana") (collectively the "Millers" or "Plaintiffs") a total of $60,650.00 in damages. *See* Ex. 1 at pg. 7. For Question Number 15, the Jury unanimously awarded the Plaintiffs $0 in reasonable attorney's fees. *See* Ex. 1 at pg. 18.

2. At trial, Laurel testified that Debo made the following representations to her:

    a. That Debo hires the highest quality subcontractors. *See* Ex. 2 at pg. 10 lines 12-13.

    b. That there would be onsite supervision at all times overseeing the project. *See* Ex. 2 at pg. 10 line 25 and pg. 26 at line 1.

1

755

c. That there would be various third-party independent inspections of the home site at various stages of the building while it was going up. *See* Ex. 2 at pg.11 lines 4-6.

d. That the AC unit and appliances Laurel saw in Debo's model home would be the same ones in the home in question. *See* Ex. 3 at pg. 35 line 7-8.

3. Of the two Plaintiffs, only Laurel testified and presented evidence. Eliana did not provide any evidence that any actionable statements or representations under the DTPA were ever made to her. Laurel did not provide any evidence that any actionable statements or representations under the DTPA were ever made to Eliana. The two checks given to Debo in the amount of $1,000.00 and $59,300.00 were from Laurel's bank account and there was no testimony presented at trial that any of that money was from Eliana. *See* Ex. 4.

4. The Plaintiffs presented no evidence to support that those four representations were actionable. Furthermore, the Plaintiffs are legally barred from prevailing on a DTPA cause of action based on those four representations.

## II. THE PLAINTIFFS ARE LEGALLY BARRED FROM BRINGING A DTPA CAUSE OF ACTION BASED ON THE FOUR REPRESENTATIONS

A. *Puffery is Nonactionable Under the DTPA*

5. A cause of action under the DTPA cannot be based on opinion or puffing. *See, e.g., Hedley Feedlot v. Weatherly Trust*, 855 S.W.2d 826, 839 (Tex. App. Amarillo 1993) (discussing *Pennington v. Singleton*, 606 S.W.2d 682, 685-89 (Tex. 1980)); *Milt Ferguson Motor Co. v. Zeretzke*, 827 S.W.2d 349, 355 (Tex. App. San Antonio 1991). "'Puffery' is an expression of opinion by a seller not made as a representation of fact." *Reynolds v. Murphy*, 188 S.W.3d 252, 268 n.23 (Tex. App. Fort Worth 2006) (citing *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 729, 25 Tex. Sup. Ct. J. 266 (Tex. 1982).

2

6. To determine whether a statement is indeed an assertion of material fact or opinion/puffery depends on the circumstances in which the statement is made. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App. Austin 2008) (citing *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). "Relevant circumstances include the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future." *Id.* (quotations and citation omitted).

7. "An imprecise or vague representation constitutes a mere opinion." *Hedley Feedlot*, 855 S.W.2d at 839 (citation omitted). "General statements are generally regarded as expressions of the seller's opinion or 'the puffing of his wares' and do not create an express warranty." *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 463 (Tex. App.- Dallas 1990, writ denied) (quotations and citation omitted).The *Autohaus* case also noted "[a]nother circumstance which is treated as indicating whether a statement is a mere expression of opinion is whether or not its correctness is a matter of which either of the parties can judge as well as the other . . ." *Id.* (quoting *United States Pipe & Foundry Co. v. City of Waco*, 108 S.W.2d 432, 436-37 (Tex. 1937)).

8. "Statements regarding future events generally fall into two categories: predictions and promises to perform. Because the future is generally unascertainable, these statements are typically non-actionable in fraud." *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 370 (Tex. App. Houston 1st Dist. 2012) (citing *Trenholm*, 646 S.W.2d at 930). "While misrepresentations concerning future performance are actionable under the DTPA, a general statement concerning a future [event] should be looked at differently." *Autohaus*, 794 S.W.2d at 464.

3

757

9. Puffery includes "broad, and vague, commendatory language comparing one's goods favorably with others, or praising them as good, proper, sufficient and the like." *GJP*, 251 S.W.3d at 889 (quotations and citations omitted). Examples of nonactionable puffery include the following:

a. that a property is "superb," "super fine," and "one of the finest little properties in the City of Austin," *Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995);

b. that a settlement is "top dollar," *Transport Ins. Co.*, 898 S.W.2d at 276;

c. "I don't expect our growth to continue at this pace, which has been nothing short of phenomenal," *Allen*, 367 S.W.3d at 374-75;

d. mere recitals to send someone, in the future, to fix a garage or that the speaker believed the garage was fixed, *Roubein v. Marino Home Builders*, 2002 Tex. App. LEXIS 565, 13-14 (Tex. App. Corpus Christi Aug. 1, 2002);

e. mailings and newsletters stating that "[a]nd for the past years, I've made money for other people – people like you. . . .," that their method is "the safest possible way to invest in the future," and that it "can help you invest in the future so that you multiply your wealth up to five times over the next 10 years," *Reynolds v. Murphy*, 188 S.W.3d 252, 268 (Tex. App. Fort Worth 2006);

f. claims that an investment is "low risk" and will "produce large revenues for a long time," *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App. Austin 1999, pet. denied);

g. an attorney's representation that the case "will be aggressively defended at trial," *Izen v. Richard M. Law & Dunn*, 1998 Tex. App. LEXIS 7487, 8-9 (Tex. App. Houston 14th Dist. Dec. 3, 1998);

h. a car salesman's statements that the car was the best engineered car in the world, probably would not have mechanical difficulties, and probably would only need servicing for oil changes, *Autohaus*, 794 S.W.2d at 464.

B. *The Representation that Debo Hires the Highest Quality Subcontractors*

10. Debo's purported conclusory remarks about how the home in question would be constructed in the future is not about anything specific that could be verified at the present moment those remarks were made. *See, e.g., Allen*, 367 S.W.3d at 370 (future statements are generally non-actionable under fraud); *Autohaus*, 794 S.W.2d at 464 (future statements are looked at differently than statements about the present under the DTPA); *GJP*, 251 S.W.3d at

4

758

889 (one factor in determining if a statement is puffery is whether the statement relates to the present or future).

11. Whether something is of the "highest quality" is a vague and imprecise statement of Debo's opinion. As a matter of law, such a statement is nonactionable under the DTPA. *Allen*, 367 S.W.3d at 370. In the Supreme Court's ruling in *Prudential*, the Court ruled that the defendant's representations that a property is "superb," "superfine," and "one of the finest little properties in the City of Austin" were nonactionable. *Prudential*, 896 S.W.2d at 163. Here, the statement that there would be the "highest quality subcontractors" is the same as *Prudential's* statements about quality. *Id.*; *see Transport Ins. Co.*, 898 S.W.2d at 276 (representation that a settlement is "top dollar" is nonactionable). It is near impossible to factually verify that Debo did indeed use the highest quality subcontractors, which is why that statement is mere opinion and not actionable. *See id.*

C. *The Representation that there would be Onsite Supervision at all Times*

12. This representation regards the future, which makes it impossible to verify at the time it was made. *See Autohaus*, 794 S.W.2d at 464. Both Debo and the Plaintiffs were unable to verify the veracity of that statement, indicating that Debo was just making expressions of opinion and not fact. *See, e.g., id.*; *GJP*, 251 S.W.3d at 889. An actionable representation for DTPA must not be based on such opinion or puffing. *Hedley Feedlot*, 855 S.W.2d at 839. What constitutes "supervision" was undefined by the Plaintiffs at trial and they never explained what that term meant to them. As such, it is inherently vague and open to interpretation, making it nonactionable. *Hedley Feedlot*, 855 S.W.2d at 839.

13. In the *Reynolds* case, the court ruled that the representations "[a]nd for the past years, I've made money for other people – people like you. . . .," that their method is "the safest

759

possible way to invest in the future," and that it "can help you invest in the future so that you multiply your wealth up to five times over the next 10 years" were nonactionable. *Reynolds*, 188 S.W.3d at 268. Similarly, the statement that an investment will "produce large revenues for a long time" is a representation about the future that as a matter of law is nonactionable under the DTPA. *Paull*, 987 S.W.2d at 218-19. Not only is the representation that there *will* be onsite "supervision" vague and ambiguous, that statement concerns actions that *will* happen in the future. As such, the statement was merely Debo's opinion because they were incapable of guaranteeing what happens in the future. *See, e.g., Reynolds*, 188 S.W.3d at 268; *Paull*, 987 S.W.2d at 218-19.

D. *The Representation that there would be Various Third-party Independent Inspections at Various Stages*

14. Like the other representations identified by Plaintiffs, this one is also vague and imprecise. The Plaintiffs did not specify at trial what types of "inspections" were promised to them. This representation also concerned what would happen in the future at "various stages," a time and place that is undefined. Debo could not give a specific date when such an inspection would occur because it regarded the future. *See Autohaus*, 794 S.W.2d at 464.

E. *The Representation that the AC Unit and Appliances in the Model Home would be the same in the Home in Question*

15. Again, it was impossible for Debo to factually guarantee that something would happen in the future. At the time this representation allegedly occurred, the home in question was not even under construction yet. *See* Ex. 3 at pg. 83 lines 15-18. Both Debo and the Plaintiffs were incapable of verifying what would be in the home in the future or what circumstances could change between the time of the representation and the time the AC unit was installed. As such,

6

760

Debo's statement is nonactionable puffery regarding vague representations about the future. *See,* *e.g., Reynolds,* 188 S.W.3d at 268; *Paull,* 987 S.W.2d at 218-19.

16. For this representation, the Plaintiffs failed to specify what was meant by "would be the same." It is unclear whether the Plaintiffs believed they would get the same size, color, shape, model, or make.

## III.    THE PLAINTIFFS PRESENTED NO EVIDENCE IN SUPPORT OF THE FOUR REPRESENTATIONS

A. *The No Evidence Standard*

17. If there is no evidence to support the Jury's answer to Question Number One, then the Motion should be granted. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex. 2003). If the Plaintiffs' evidence to support the Jury's answer to Question Number One is no more than a scintilla, it is no evidence. *Rush v. Barrios,* 56 S.W.3d 88, 94-95 (Tex. App.- Houston [14th Dist.] 2001, pet. denied). A scintilla is "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence," which has the legal effect of no evidence. *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 621 (Tex. 2004) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 363 (1960)).

B. *Eliana Miller Presented No Evidence*

18. At trial, Eliana did not take the stand to testify as to what representations Debo made to her. Of the four representations mentioned in this Motion, none of them were ever in writing. Eliana did not even provide a scintilla of evidence that Debo made any representations to her. Laurel provided no evidence that Debo made any representations to Eliana. As such, Eliana's DTPA claim against Debo fails as a matter of law. *Tiller,* 121 S.W.3d at 713.

7

761

C. *The Representation that Debo Hires the Highest Quality Subcontractors*

19. Not only is this representation nonactionable puffery, the Plaintiffs failed to present any evidence that Debo did not use the highest quality subcontractors. The Plaintiffs presented no evidence of what the highest quality subcontractors are. The Plaintiffs presented no evidence to show that Debo's subcontractors' work was subpar. On the contrary, the Plaintiffs presented evidence that Debo's subcontractors work was of good quality and passed third party inspections. *See* Ex. 5.

D. *The Representation that there would be Onsite Supervision at all Times*

20. The Plaintiffs failed to present evidence showing that there was no onsite supervision at all times. The Plaintiffs' testimony failed to indicate that Debo had absolutely no supervision on the construction site. The inspection reports by Mortgage Property Services ("MPS") show that supervision did indeed occur throughout the building process. *See* Ex. 5.

E. *The Representation that there would be Various Third-party Independent Inspections at Various Stages*

21. The Plaintiffs themselves introduced the MPS inspections reports, which are third-party independent inspections. *See* Ex. 5. These inspections occurred on April 25, 2013, May 10, 2013, and August 7, 2013. *See* Ex. 5. This representation was completely true and without falsity.

F. *The Representation that the AC Unit and Appliances in the Model Home would be the same in the Home in Question*

22. The Plaintiffs never presented any evidence on what type of air conditioning unit was present in the model home. The Plaintiffs never described the type, model, make, or specifications of the unit in the model home. The Plaintiffs never described the type, model, make, or specifications of the unit in the home in question. The Plaintiffs presented no evidence

8

that what was in the home in question was any different in any manner from what was in the model home.

23. There is no expert testimony indicating that what was installed in the home in question differed in any manner from the unit installed in the model home. No one testified that the unit in the home in question was any more expensive or less energy efficient than the unit in the model home.

24. Since there is no evidence to compare one AC unit from the other, it is impossible to tell whether one unit was indeed different from the other.

## IV.    THE PLAINTIFFS' DAMAGES ARE $0

25. If Debo is successful in this Motion and this Court disregards the Jury's "Yes" answer to Question Number One, then the Jury's answer to Question Number Four is moot. In the predicate to Question Number Four, it states that the Jury may only answer this question if they answered "Yes" to Question Number One or Question Number Two.[1] See Ex. 1 at pg. 7.

26. Since the Jury's answer to both Question Number One and Question Number Two are now effectively "No," Question Number Four must be left blank. The damages awarded to Plaintiffs now total $0.

27. On August 18, 2014, Debo deposited $60,300.00 into the Registry of Court. See Ex. 6. Since the Plaintiffs are entitled to $0, this money, along with any interest, must be returned to Debo in full.

## V.    CONCLUSION

This Court must disregard the Jury's answer to Question Number One because the alleged representations are nonactionable as a matter of law under the DTPA. The Jury's answer

---

[1] The Jury answered "No" to Question Number Two. See Ex. 1 at pg. 5.

763

to Question Number One is without more than a scintilla of supporting evidence. As such, the Plaintiffs' damages must be left blank in Question Number Four.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Debo Homes, LLC prays that the Honorable Court grant Debo Homes, LLC's Motion to Disregard the Jury's Answer to Question Number One and grant Defendant all other relief to which they may be entitled.

Respectfully submitted,

THE WELSCHER LAW FIRM

*/s/ Nicholas Martinez /s/*

Craig Welscher
TBN: 21167200
Nicholas Martinez
TBN: 24087986
1111 North Loop West, Suite 702
Houston, Texas 77008
Phone No.: (713) 862-0800
Facsimile No.: (713) 862-4003
ATTORNEYS FOR DEBO

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded to all known counsel of record in the manner required by the Texas Rules of Civil Procedure, on this the 23rd day of September, 2014.

*Via Facsimile: (888) 779-3237*
*Via Email: brian@crockettlawtx.com*
Brian H. Crockett
Crockett Law, PC
10565 Katy Fwy., Ste. 400
Houston, Texas 77024

*/s/ Nicholas Martinez /s/*
Nicholas Martinez

10

764

# EXHIBIT 1: JURY VERDICT



13-DCV-209822
CHCO
Charge of the Court
2182708

## NO. 13-DCV-209822

| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiffs, | § | |
| | § | |
| VS. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC | § | |
| Defendant. | § | 400TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

**MEMBERS OF THE JURY:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during your deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.  Do not let bias, prejudice or sympathy play any part in your decision.

2.  Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

766

3.      You are to make up your own mind about the facts.  You are the sole judges of the credibility of the witnesses and the weight to give their testimony.  But on matters of law, you must follow all of my instructions.

4.      If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.      All the questions and answers are important.  No one should say that any question or answer is not important.

6.      Answer "yes" or "no" to all questions unless you are told otherwise.  A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise.  Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case.  If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no."  A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted into evidence.  For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.      Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision.  Answer each question carefully without considering who will win.  Do not discuss or consider the effect your answers will have.

8.      Do not answer questions by drawing straws or by any method of chance.

9.      Some questions might ask you for a dollar amount.  Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.     Do not trade your answers.  For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors.  The same ten jurors must agree on every answer.  Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again.  This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial.  If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

2

767

The charge uses the following term(s):

1. "Millers" mean Eliana and Laurel Miller.

2. "Debo" means Debo Homes, LLC

3. The Agreement shall refer to the New Home Contract signed between Debo Homes, LLC on August 13, 2013.

4. The "Home" shall refer to 11115 Leah Elizabeth Dr., Needville, Texas 77461.

## INSTRUCTIONS

1. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts.

3

768

**QUESTION 1:**

Did Debo engage in any false, misleading, or deceptive act or practice that the Millers relied on to their detriment and that was a producing cause of damages to the Millers?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means any of the following:

1. Representing the Home, construction, supervision or Agreement had sponsorship, approval, characteristics, uses, or benefits or qualities that it did not have; or

2. Representing the Home, construction, supervision or Agreement were a particular quality, if it was of another;  *R*  *N*

3. Representing that the Agreement confers or involves rights that it did not have or involve; or

4. Failing to disclose information about the Home, construction, supervision, performance or agreement that was known at the time of the transaction with the intention to induce the Millers into a transaction they otherwise would not have entered into if the information had been disclosed.

Answer "Yes" or "No."

Answer: ~~No~~ Yes

Y          N          Y          No.

Mike Znngh.

MAnvel Robarts

4

769

**QUESTION 2:**

Did Debo engage in any unconscionable action or course of action that was a producing cause of damages to the Millers.

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Answer "Yes" or "No."

Answer:        _NO_   UNANIMOUS

5

770

If you answered "Yes" to Question 1 or Question 2, then answer the following question. Otherwise do not answer the following question.

**QUESTION 3:**

Did Debo engage in such conduct knowingly?

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person act with actual awareness.

In answering this question, consider only the conduct that you have found was a producing cause of damages to the Millers.

Answer "Yes" or "No."

Answer:        _No_   Unanimous

6

771

If you answered "Yes" to Question 1 or Question 2, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 4:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents, if any:

    a. Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____1,000.00_____

    b. Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____59,800.00_____

    c. Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____350.00_____

Unanimous

7

772

**QUESTION 5:**

Did Debo fail to comply with the Agreement?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonably expected;
2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;
5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No."

Answer: _____NO (Unanimous)_____

Y          N

8

**QUESTION 6:**

Did the Millers fail to comply with the Agreement?

Answer "Yes" or "No."

Answer:    *No*

Y

N

11 - 1

Wyatt Shaw

Zhg

Mike Zanghi

9

774

*N/A*

If you answered "Yes" to both Question 5 and Question 6, then answer Question 7. Otherwise, do not answer Question 7.

**QUESTION 7:**

Who failed to comply with the agreement first?

Answer "Debo" or the "Millers."

Answer: _____

10

775

*N/A*

If you answered "Yes" to Question 5, than answer the following question. Otherwise, do not answer the following question.

**QUESTION 8:**

Was Debo's failure to comply excused?

Failure to comply by Debo is excused by the Millers' previous failure to comply with a material obligation of the Agreement.

Failure to comply by Debo is excused by the Millers' prior repudiation of the Agreement. A party repudiates an agreement when he indicates, by his words or actions, that he is not going to perform his obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

Failure to comply by Debo is excused if compliance is waived by the Millers. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Failure to comply by Debo is excused if the Millers committed fraud against Debo. Fraud occurs when-

1. a party makes a material misrepresentation, and
2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
3. the misrepresentation is made with the intention that it should be acted on by the other party, and
4. the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means

a. a false statement of fact, or
b. a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or
c. a statement of opinion based on a false statement of fact, or
d. a statement of opinion that the maker knows to be false.

Answer "Yes" or "No."

Answer: _____

11

776

**QUESTION 9:**

Did Debo substantially perform under the terms of the Agreement?

"Substantial performance" means that there has been no willful departure from the terms of the agreement and no omission in essential points and that the agreement has been honestly and faithfully performed in its material and substantial particulars and the only variance from the strict and literal performance consists of technical or unimportant omissions or details.

Answer "Yes" or "No."

Answer: _Yes_  ~~Unanimous~~ UNAⁿᵢᵐₒᵤₛ

12

777

*N/A*

If you answered "Yes" to Question 5, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 10:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents, if any:

    a.   Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____

    b.   Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____

    c.   Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____

13

778

*N/A*

If you answered "Yes" to Question 6, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 11:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Debo for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents, if any:

    a. The difference between the amount paid to Debo by the Benges for Debo's building of the Home and the amount the Millers had agreed to pay Debo for building the Home

Answer: _____

    b. Reasonable and necessary expenses incurred in attempting to market and sell the Home to another party besides the Millers.

Answer: _____

    c. Reasonable and necessary costs to keep the Home maintained during that period and interest payments made.

Answer: _____

14

779

**QUESTION 12:**

Did Debo commit fraud in the sale of real estate against the Millers?

Fraud in the sale of real estate occurs when:

a.  there is a false representation of a past or existing material fact, and

b.  the false representation is made to a person for the purpose of inducing that person to enter into the Agreement, and

c.  the false representation is relied on by that person in entering into the Agreement.

Answer "Yes" or "No."

Answer:  _NO_  Unanimous

15

780

*N/A*

If you answered "Yes" to Question 12, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 13:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such fraud in the sale of real estate?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents, if any:

    a.  Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer:    _____

    b.  Any money, if any, paid by the Millers to Debo as Installment payment.

Answer:    _____

    c.  Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer:    _____

16

781

*N/A*

Answer the following question only if you answered "Yes" to Question 12. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following Question.

## QUESTION 14:

Do you find by clear and convincing evidence that the harm to the Millers resulted from fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Fraud occurs when-

 a.  there is a false representation of a past or existing material fact, and

 b.  the false representation is made to a person for the purpose of inducing that person to enter into the Agreement, and

 c.  the false representation is relied on by that person in entering into the Agreement.

Fraud does not include the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interest.

Fraud does not include breaches that the law condemns as "fraudulent" merely because they *tend* to deceive others, violate confidence, or cause injury to public interest, the actor's mental state being immaterial.

 Answer "Yes" or "No."

 Answer: _____

17

782

If you answered "Yes" to Question 1, Question 2, Question 5, or Question 12, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 15:**

What is a reasonable fee for the necessary services of the Millers' attorney, stated in dollars and cents?

Answer with an amount for each of the following:

     a.     For representation in the trial court.

Answer: _____ *0* _____

     b.     For representation through appeal to the Court of Appeals.

Answer: _____ *0* _____

     c.     For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____ *0* _____

     d.     For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: _____ *0* _____

     c.     For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____ *0* _____

*Unanimous*

18

783

N/A

If you answered "Yes" to Question 6, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 16:**

What is a reasonable fee for the necessary services of Debo's attorney, stated in dollars and cents?

Answer with an amount for each of the following:

     a.     For representation in the trial court.

Answer: _____

     b.     For representation through appeal to the Court of Appeals.

Answer: _____

     c.     For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____

     d.     For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: _____

     e.     For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____

784

PRESIDING JUROR:

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

    a. Have the complete charge read aloud if it will be helpful to your deliberations;

    b. Preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c. Give written questions or comments to the bailiff who will give them to the judge;

    d. Write down the answers you agree on;

    e. Get the signatures for the verdict certificate; and

    f. Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## INSTRUCTIONS FOR SIGNING THE VERDICT CERTIFICATE:

1. You may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. That means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2. If ten jurors agree on every answer, those ten jurors sign the verdict. If eleven jurors agree on every answer, those eleven jurors sign the verdict. If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4. There are some special instructions before Question 14 explaining how to answer Question 14. Please follow that instruction. If all twelve of you answer Yes to Question 14, you will need to complete a second verdict certificate for Question 14.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the Judge of this fact.

When you have answered all the questions you are required to answer under the

20

785

instructions of the Judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

Do you understand these instructions? If you do not, please tell me now.

_____
JUDGE PRESIDING

FILED

AUG 2 2 2014

AT_____

Clerk District Court, Fort Bend Co., TX

21

786

## VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.


_____     _____
Signature of Presiding Juror                    Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below

____✓____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below


PRINT:                                  SIGN:

1. David Scott Stripling

2. NORBERT BURCH

3. ALYISSA SPENCER

4. Rolanda Bailey

5. PETER CAWTHORNE

6. Stephanie Kusek

7. Angela P Reeves

8. Gregory Prihoda

9. CAROL Leverett

10. Wyatt Shaw

11.

12.

**FILED**

AUG 22 2014
AT _____ 5:17 P.M.
Clerk District Court, Fort Bend Co., TX

22

787

## ADDITIONAL CERTIFICATE

I certify that the jury was unanimous in answering "Yes" to the following question. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

*QUESTION 14*

_____
Signature of Presiding Juror

David Scott Stripling
Printed Name of Presiding Juror

All Answers remain the same. Signed in error.

23

788

# EXHIBIT 2: JURY TRIAL EXCERPT TESTIMONY OF LAUREL MILLER VOLUME 1

LAUREL AND ELIANA MILLER  ) IN THE DISTRICT COURT
  )
VS.  ) FORT BEND COUNTY, TEXAS
  )
DEBO HOMES, LLC  ) 400TH JUDICIAL DISTRICT

---

**JURY TRIAL EXCERPT
TESTIMONY OF LAUREL MILLER
VOLUME 1**

---

On the 19th day of August, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Clifford J. Vacek, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

Mr. Brian H. Crockett
Texas Bar No. 24074094
Mr. William G. Kanyha
Texas Bar No. 24087827
Crockett Law, PC
10565 Katy Freeway, Suite 400
Houston, TX  77024
Telephone:  713.779.3476
Counsel for Plaintiffs


Mr. Nicholas T. Martinez
Texas Bar No. 24087986
Mr. Craig Welscher
Texas Bar No. 21167200
The Welscher Law Firm
1111 North Loop West, Suite 702
Houston, TX  77008
Telephone:  713.862.0800
Counsel for Defendants

**VOLUME 1**

**Jury Trial Excerpt**

August 19, 2014

                                                    **PAGE VOL.**

Laurel Miller                        Direct      Cross    V.Dire
    By Mr. Crockett                  4 v1

Reporter's Certificate ..........................25    1


**EXHIBITS OFFERED BY PLAINTIFFS**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Contract | 7 v1 | 8 v1 |
| 2 | Photographs | 16 v1 | 16 v1 |

**LAUREL MILLER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

Q.    (BY MR. CROCKETT) Laurie, can you go ahead and introduce yourself to the jury?

A.    Yes.  My name is Laurel Miller.

Q.    And Laurie, who's the other Plaintiff in this case?

A.    That's my daughter.  Her full name is Eliana, but we all call her Ellie.

Q.    Now, this home that you were going to buy from Debo Homes, who was it for?

A.    It was for my daughter and myself.

Q.    Was there a reason you wanted to be in that area?

A.    Yes.  We really -- we really liked being out in the country, like the Needville area, and we wanted to be out there.  And that neighborhood afforded us a lot more land for the price and a little out of the city area a little bit.

Q.    I know that you have a bunch of dogs.

A.    Yes, we do.  We love our dogs.

Q.    What was it about being in this area that was also important to you?

A.    We weren't tied down to an HOA.  Right now,

we're kind of in a subdivision where there's an HOA, and we have a small back yard. And my daughter's a dog groomer, and we were trying to get a house where she could do grooming in the garage and really made a nice custom house so she could have -- do her dog grooming in the garage and have a nice back yard where the dogs could -- and not a business, per se, just for our personal dogs -- and have the dogs run around in the back yard and have a nice -- this was going to be like a half acre, a little more than a half acre, just a nice size for the two of us and our few dogs, and run around with them. And we also -- we played fly ball with them and dock dogs, a couple of dog sports that's like a hobby for us with the dogs. We just enjoy them a whole lot, and it's just -- this would have afforded a whole lot of extra fun. And it was a little smaller home with a bigger -- with a bigger yard for us. And being a newer home, we were pretty excited about getting into it.

Q. Now, was there a reason you were looking for a new home versus a used home or an older home?

A. Yes. Neither myself nor my daughter know how to make any repairs. We're in an older home now, and it's just repair after repair. And we know that's just a matter of what it is. We've been in the home ten

years now, and it's just when it rains, the back yard floods. It's typical. When it needs paint, it needs -- it just needs this and that, normal upkeep for a 35-year-old home, and we just thought a new home would just give us peace of mind that we wouldn't have to do these things. And once we -- plus, being on a fixed income, I couldn't afford, once we paid out, to keep paying on these repairs and pay on a mortgage and pay on taxes, et cetera. So, it just -- it gets very expensive, all these extra payments, and I just can't do these things myself, you know, always having to hire out.

MR. CROCKETT: Your Honor, permission to approach the witness?

THE COURT: Yes, sir.

Q. (BY MR. CROCKETT) Ms. Miller, I'm showing you what's been marked as Plaintiff's Exhibit No. 1.

A. Yes.

Q. Do you recognize this?

A. Yes. That's the sales contract that Debo Homes, Kris Dominguez and Ellie and I got into back in April of '13.

Q. Now, in this contract, were y'all purchasing the house with the cash payment plan, or was this the finance plan?

A. No, sir. That was -- that was financing. We wanted to get financing with just a small -- like $1,000 down or something they said we could get, and we could go to the bank and get financing, because the interest rates were so darn low. So, we wanted to get in on that.

Q. If you can look through Exhibit No. 1 --

A. Yes.

Q. -- can you confirm that this contract is the initial contract that y'all signed?

A. (Referring to document.)

Q. And the signatures at the end, is that yours and your daughter's?

A. Yeah.

Q. Go back to it.

A. Yes.

Q. Okay.

MR. CROCKETT: Your Honor, the Plaintiffs would ask that we can admit Exhibit No. 1.

MR. MARTINEZ: Judge, we believe it's been pre-admitted already, so no objections.

THE COURT: There have been no exhibits that have been pre-admitted. Do you have any objection to Plaintiff's Exhibit 1?

MR. MARTINEZ: No, Judge.

THE COURT: Plaintiff's Exhibit 1 is admitted.

Q. (BY MR. CROCKETT) Now, Ms. Miller, on Exhibit No. 1, who was this contract between?

A. It was between me and my daughter and Debo Homes.

Q. And what was the purchase price for this home?

A. The full purchase price is $178,000.

Q. And on Part B, it talks about the financing of that home. How much were you trying to finance?

A. (No response.)

Q. I'm sorry, it's actually on your screen, might be easier to see there.

A. No, it's not.

Q. No?

THE COURT: Your screen is not on?

THE WITNESS: No.

THE COURT: Sheriff, can you turn that screen on?

THE WITNESS: That's why I'm trying to see.

Q. (BY MR. CROCKETT) I'm sorry.

A. No, I apologize.

(Bailiff turned on screen)

THE WITNESS: Thank you.

797

Q. (BY MR. CROCKETT) What was the amount that y'all were going to try to finance?

A. Yes, $118,700.

Q. Did y'all qualify for financing?

A. No, sir, we didn't qualify.

Q. When Kris Dominguez learned that y'all didn't qualify for financing, what did he tell you about their cash installment plan?

A. Yes. He told us that they have cash clients that just pay cash. They come in -- he said they have lots of people that do that, and they do it in three phases. Phase 1 starts the process. Phase 2 is where -- is right at the drywall, and Phase 3 is at the closing.

Q. Tell us, what was your hesitation about entering into a cash installment plan?

A. Well, I had -- I'm a very frugal person, so I saved and saved for -- really forever. And so here was just pretty much everything just being emptied out into this home. Just it really scared me. And just to make three lump sum payments like this, whereas, had it been financed, it would be a slow trickle out, an easy way to pay over the course of very many years. And just having a fixed income, disability income, it was very scary to me not to have that reserve money in the bank should

something catastrophic happen.

Q. Had you already been down the road with a bunch of repairs in a home?

A. Yes, in my current home, only because it's an older home. That's what we could afford now, and -- well, back ten-plus years ago. So -- and I didn't want to buy into another home that needed continual repairs. That's why we were looking at a new home.

Q. So, when Kris Dominguez learned about your retirement money, what did he tell you about Debo Homes' subcontractors?

A. Well, he told us they hired the highest quality subcontractors that there are, just the highest quality.

Q. Are you aware of the other types of homes that Debo Homes builds? Do they only build small single-family homes?

A. No, they -- they build single-family homes like we were looking at, and homes smaller than we were looking at, all the way up to million-dollar homes. And we drove by them, and we saw them.

Q. And they looked nice?

A. They did. I couldn't afford them.

Q. What did Kris Dominguez tell you about who would be supervising those subcontractors?

A. He told us that there would be onsite

supervision at all times overseeing the project.

Q. What did Kris Dominguez tell you about who would also be checking Debo Homes' work?

A. He said there would be third-party, independent inspections of the homesite at -- building inspections at various stages of the building while it was going up.

Q. Now, when you were having these conversations with Kris, I think the defense lawyer alluded earlier that this was a very long process of saying we had a lot of questions, didn't we?

A. We -- we actually met with Kris twice, but on the second occasion, we signed the contract. The first time, we were there a good couple of hours asking a lot of questions. Then we came back a second time and signed the contract because we asked so many questions. I wanted to know exactly what we were getting into, what appliances, what A/C unit, what -- just what exactly was going to be in our house versus the model house.

Q. Did Kris tell you every single thing you wanted to hear?

A. He did. He said -- when I asked if I'm going to get -- we actually went up in the attic, and I said, "Am I going to get this A/C unit?" And he said yes. Because that one looked efficient, because the house we're in, being older, it's not efficient. My A/C bill

is crazy for the home we're in. It's just -- you know, I was comparing now to then. And I asked about the stove, and I asked about the hot water heater because I didn't want an attic hot water heater. I asked about fixtures and just various things that just popped in my head at those times. And he said -- every answer was what's in this model home, and really, he had exactly what I wanted to hear at every step of that moment.

Q. And even after that, what did -- what did Kris tell you about, if there were any problems after the first payment, what safeguard did you have?

A. Well, the next payment wouldn't be needed until the drywall is going in. So, there would be -- if there were any problems, we wouldn't have to give him the next payment until then. And he said any problems, all problems would be fixed along the way.

Q. Did Kris ever tell you all problems that Debo Homes decides to fix is what they'd fix?

A. He did not tell us that, no. He said all problems would be fixed.

Q. These promises or these representations that Kris Dominguez told y'all, did you rely on them?

A. Absolutely. He was the person that -- he was the go-to person. In fact, he told us, Kris told us that we were not allowed to speak to anyone else onsite,

that we were not to disturb the workers, we were not to disturb anyone else, and we held up to that. We did not want to disturb them. We did not want to stop their work. We left everyone else alone, and if we saw anything unusual, then we contacted Kris personally.

Q. Based on what Mr. Dominguez told you, did you pay Debo Homes $60,300?

A. Yes, we did. We were excited to get that house going.

Q. Did you start packing up your house?

A. We did. Not only did we start packing up the house, we still have things in boxes we haven't unpacked.

Q. Once you paid Debo Homes the $60,300, did you go back out and look at the highest quality subcontractors work on the framing?

A. Yeah. Well, we -- we went out to the site, and we looked around. They were -- a couple of weeks later, they were doing the framing, and I just -- I just started looking around, you know, looking -- okay, here's the -- trying to identify which room's which. And I looked up, and I saw split boards, like broke in half, and other boards bowed out and other boards that just didn't look right, and cracked things here and there. And I contacted Kris to tell him that it looked

like these were issues, what I had seen. I told him what I had seen.

Q. How long did you stay out there and watch the framers work?

A. Oh, I can't say for sure, but maybe -- maybe an hour or so, maybe a couple of hours.

Q. In that time period, did you look across the street and see Debo Homes' superintendent apparently working on another house next-door?

A. No. Actually, there were no other houses being constructed around that whole block. Ours was the only house on the whole block being constructed.

Q. Did you ever see anyone from Debo Homes out there?

A. I never saw anyone from Debo Homes. I only saw the actual workers, the subcontractors out there.

Q. So, you contacted Kris Dominguez, told him that -- you told him what, exactly?

A. I told him I saw some problems out there that I need to address with him. I saw some broken boards. I saw a pipe that didn't look attached. I saw -- I just saw some things that didn't look right. I'm just -- I'm not a construction expert or anything. I just saw things that didn't look right. So, he told me he would meet me out there, I don't recall whether it was the

next day or the following. So, we met, and he looked at it all with me, and he handed me a can of red spray paint and asked me to spray the areas that looked unusual.

Q. Did that seem odd to you, that the salesman's telling you to find the defects in the house?

A. I don't know if it felt unusual. I just felt like, oh, I guess we're working together at this point. I just was happy that we were working together right then and there.

MR. CROCKETT: Your Honor, you want me to keep asking to approach?

THE COURT: Just go ahead.

MR. CROCKETT: Thank you, Your Honor.

Q. (BY MR. CROCKETT) Ms. Miller, I'm showing you what's been marked as Plaintiff's Exhibit No. 2.

A. Uh-huh.

Q. It is a bunch of photographs. Have you seen these photographs before?

A. Yes.

Q. Are these photographs photographs that were taken of different problems at the home throughout construction?

A. (Referring to documents.) Yes.

Q. Do these photographs fairly and accurately

represent the things that you saw during the construction?

A. A lot of the problems, I'm not going to say all of the problems. Yeah.

Q. Thank you.

MR. CROCKETT: Your Honor, we'd ask that Plaintiff's Exhibit No. 2 be admitted.

THE COURT: For the record, how many photos are there?

MR. CROCKETT: Your Honor, it is 33.

THE COURT: Any objection?

MR. MARTINEZ: Yes, Judge. Hearsay, expert report, improper predicate, all three.

THE COURT: Overruled. Plaintiff's Exhibit 2, consisting of 33 photos, is admitted.

Q. (BY MR. CROCKETT) Ms. Miller, you talked about some of the problems you were seeing in the house. I will eventually learn how to use this thing. Now, what was the issue that you saw with this?

A. Well, that was at the top of the garage, and that just -- when I walked into the garage, and I just went straight in the garage and looked up, I said, oh, my goodness, that board is just split square in half, and that's going to hold up the whole roof, the garage area to the roof. And I just thought that's not

supposed to be split like that.

MR. MARTINEZ: Objection, Judge. This is expert testimony about what beam is going to hold up what part of the roof.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Now, here we've got a picture of a beam, Ms. Miller. What was the problem that you saw here?

A. Well, it looked there that there were no ties. There's supposed to be metal ties on the bottom of that --

MR. MARTINEZ: Objection, Judge. How would she know whether or not a tie is supposed to be there? She's not a construction expert.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Actually, Ms. Miller, I'm talking about as far as the beams here -- it doesn't show very well -- do you see any issues with the cracks against the beams?

A. Yes.

Q. Were you concerned about that?

A. Yes. They should not be cracked. They should be flush. They should be cut flush.

MR. MARTINEZ: Objection, this is all expert testimony about what should be what in the

construction.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Did you see broken beams and boards throughout the framing?

A. Yes, I did.

MR. MARTINEZ: Objection, leading.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Did you see broken beams and boards?

A. Yes, I did.

Q. Throughout the home?

A. Yes, I did.

Q. Did you tell Kris Dominguez about these broken beams and boards?

A. Immediately.

Q. And this red spray paint, this is the spray paint you put on there?

A. Yes, it is.

Q. Ms. Miller, do you know what this is? (Indicating.)

A. Yes, that's a pipe. That's like a vent pipe. It's a vent pipe.

Q. When you looked at the home and the framing, did you wonder why some of the vents and the pipes weren't connected to anything?

A. Yes. I just had an awful lot of questions, so when Kris asked me to spray paint things that didn't look right that I had questions about, that's exactly what I did.

Q. Do you know who wrote on the beams when they weren't even?

A. Yes.

Q. Who did that?

A. Mr. Kneuppel.

Q. Okay. Did you notice -- well, what was the issue with the beams being uneven?

MR. MARTINEZ: Judge --

MR. CROCKETT: Judge, I'm not asking for an expert opinion. I'm just saying did she see beams that were uneven.

MR. MARTINEZ: That question's okay.

MR. CROCKETT: Okay. I'm sorry.

Q. (BY MR. CROCKETT) Did you see uneven beams throughout the home?

A. Yes, I did.

Q. When you mean uneven, were there beams that were actually shorter than the other beams that were doing the same job?

MR. MARTINEZ: Objection, leading.

THE COURT: Overruled.

A. There were beams shorter and unattached at the base.

Q. (BY MR. CROCKETT) Let me show you -- do you know what this picture is of, Ms. Miller?

A. Yes.

Q. Where is this at in your house -- or what was your house -- what part of the house?

A. In the attic, I believe.

Q. Is this piece of wood in the attic connected to the support beam?

A. No, sir.

Q. When you were out there, did you see wood that was just floating, not connected to anything?

A. Yes, sir.

Q. Did you have some concerns about that?

A. Absolutely.

Q. We talked about short boards. Did you see things like that throughout the house?

A. Yes.

Q. Now, is this board right here nailed into this board that's too short?

A. I believe so. I believe so.

Q. This board, when you were looking at it, was it actually sitting on a beam just part of the wood? Did you have concerns about that?

A. I had a lot of concerns. It just -- like I said, it just didn't look right, and I know I can't fix these things myself.

Q. How would you describe the wood that you saw as the frame? What did it look like to you?

A. It just --

MR. MARTINEZ: Objection, opinion.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) What did the wood that was framing your house look like?

A. Looked like scrap lumber, like -- it just looked like it was picked off the scrap pile.

Q. Do you know what's in this picture, Ms. Miller?

A. Yes.

Q. What is it?

A. It's two boards that don't meet that's supposed to meet.

MR. MARTINEZ: Objection. "Supposed to meet," how does she know that?

THE COURT: Sustained.

Q. (BY MR. CROCKETT) When we talked before about boards that were shorter --

A. Yes.

Q. -- and had other boards attached to them.

A. Yes.

Q.    Is that the kind of thing you were talking about right here?

A.    Yes.  It's just -- yes.

Q.    What about this vent?

A.    Yes.  That's the vent for the dryer, the dryer vent.  That's the utility room like right below that, and it's crushed, and it would have been a fire hazard.

MR. MARTINEZ:  Objection as to being a fire hazard.

THE COURT:  Sustained.

Q.    (BY MR. CROCKETT) Did you have concerns about the vent being crushed?

A.    Absolutely.

Q.    Let me talk to you about the A/C unit.

A.    Yes.

Q.    Is that the A/C unit that you saw in the model home?

A.    No, not at all.

Q.    Did it look anything like that?

A.    No, sir.

Q.    Did the A/C unit have a drip pan that was about half the size of the actual A/C unit?

A.    No.  No, sir.

Q.    Did you tell Kris Dominguez about your concerns that the A/C unit wasn't the same?

A.   Yes.

Q.   What did Kris tell you?

A.   He said -- he really didn't say anything.   He just said, "We'll get to it, we'll see."

Q.   Did Kris ever get to any of these things?

A.   He got to some, but not all.

Q.   Do you know what this picture is?   It's kind of hard to make it out.   Did you have expectation that you'd have insulated pipes in your home?

A.   Yes, yes.

Q.   Does the pipe here look like it's actually insulated?

A.   No.   That -- that brought -- I looked up, and there were a lot of uninsulated pipes here and there, so I took pictures.

Q.   Kris told you they were going to get to it?

A.   He did.   He said maybe.   He said -- he did tell me they're not going to get to everything, they wouldn't do everything.

Q.   When you saw these photographs, did you end up hiring somebody to come and look at the house?

A.   I did.   I hired -- I hired a home inspector, because I was very concerned, because I knew I was uncomfortable with what I saw, and I didn't really know exactly what I was looking at.   So, I hired a home

inspector to come and take a look at the house.

THE COURT: Counsel, let's go ahead and break for the day.

*  *  *  *  *  *  *  *  *  *

THE STATE OF TEXAS §

COUNTY OF FORT BEND §

I, Karen Romeo Rothman, Official Court Reporter in and for the 400th District Court of Fort Bend County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $150.00 and will be paid by Defendant.

WITNESS MY OFFICIAL HAND this, the 17th day of September, 2014.

Karen Romeo Rothman, CSR, CRR
Texas CSR 1510
Official Court Reporter
400th District Court
Fort Bend County, Texas
301 Jackson
Richmond, Texas 77469
Telephone:  281.341.4421
Expiration:  12/31/2014

# EXHIBIT 3: JURY TRIAL EXCERPT TESTIMONY OF LAUREL MILLER VOLUME 2

## REPORTER'S RECORD
### TRIAL COURT CAUSE NO. 13-DCV-209822

| | |
|---|---|
| LAUREL AND ELIANA MILLER | ) IN THE DISTRICT COURT |
| | ) |
| VS. | ) FORT BEND COUNTY, TEXAS |
| | ) |
| DEBO HOMES, LLC | ) 400TH JUDICIAL DISTRICT |

---

## JURY TRIAL EXCERPT
## TESTIMONY OF LAUREL MILLER
### VOLUME 2

---

On the 20th day of August, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Clifford J. Vacek, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

816

**APPEARANCES**

Mr. Brian H. Crockett
Texas Bar No. 24074094
Mr. William G. Kanyha
Texas Bar No. 24087827
Crockett Law, PC
10565 Katy Freeway, Suite 400
Houston, TX  77024
Telephone:  713.779.3476
Counsel for Plaintiffs


Mr. Nicholas T. Martinez
Texas Bar No. 24087986
Mr. Craig Welscher
Texas Bar No. 21167200
The Welscher Law Firm
1111 North Loop West, Suite 702
Houston, TX  77008
Telephone:  713.862.0800
Counsel for Defendants

**VOLUME 2**

**Jury Trial Excerpt**

**August 20, 2014**

                       **PAGE VOL.**

| Laurel Miller | Direct | Cross | V.Dire |
|---|---|---|---|
| By Mr. Crockett | 4 v2 | | |
| By Mr. Martinez | | 44 v2 | |
| By Mr. Crockett | 118 v2 | | |
| By Mr. Martinez | | 122 v2 | |

Reporter's Certificate ..........................130  2

**DIRECT EXAMINATION (CONTINUED)**

Q.    (BY MR. CROCKETT) Now, Ms. Miller, yesterday we talked about the contract that y'all had entered into, the initial contract.  Then we had the other agreement as far as the cash installment plan.  You saw construction happen.  We went through the photographs. What we're going to talk about now is basically after you saw these photographs, what happened, what did you see, what did you do.  Okay?

A.    (Nodding.)  Yes.

Q.    When we were looking at the photographs in Exhibit No. 2, the broken boards, broken beams, the areas that you had concerns, you brought that to the attention of Kris Dominguez?

A.    Immediately, yes.  Yes.

Q.    I'm going to show you Exhibit No. 3, which is the text messages between yourself and Kris Dominguez. Did you tell Kris that you wanted him to see what you had saw out at the construction?

A.    Yes, because I saw things I wasn't comfortable with, and I wanted him to see exactly what I was looking at.

Q.    Did Kris agree to meet you?

A.    He did.

Q.    When Kris got there, you told Kris an inspector

was coming? You told Kris that there was the inspector coming on May 9th?

A. Yes.

Q. And Kris was there with the inspector?

A. Yes.

Q. Okay. Who was the inspector you hired?

A. I hired a man named Harold Kneuppel.

Q. Why did you hire Mr. Kneuppel?

A. I looked up on the Internet and -- under home inspectors, and I -- he had credentials. He had -- he had done home inspections all over the United States and outside the United States. He was an older gentleman. He also lived in Fort Bend County for, my gosh, a very long time, and I just thought here's a man who --

MR. MARTINEZ: Objection, Judge, a lot of this is hearsay about his credentials, posings on the web site.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Ms. Miller, my question with you is --

A. Yes.

Q. -- why did you feel like you had to hire Mr. Kneuppel? Why couldn't you just tell Kris Dominguez and Kris Dominguez would have it fixed?

A. Because Kris was telling me that they were

going to fix some things, but they weren't going to fix everything.

Q. When you went to -- when you had this meeting with Kris -- and Kris was present the entire time and he saw everything that you saw, right?

A. Yes.

Q. What response did he have as far as all of the issues you saw?

A. He kind of looked up and went, looked around and -- (looking different directions) -- he -- he did hand me a can of red spray paint and asked me to spray things that I thought was unusual.

Q. Did Mr. Kneuppel issue a report about all of his findings?

A. He did.

MR. MARTINEZ: Judge, objection, expert report and hearsay.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Did Mr. Kneupple issue a report with all of the things that he found?

A. Yes, he did.

Q. Did you give that report to Kris Dominguez?

A. Yes, I did.

Q. Did you have a meeting with Kris Dominguez at your house about that report?

A.   Yes, we did.

Q.   Who was -- who else was at that meeting?

A.   My daughter, Ellie, and myself, Kris, and I believe a friend of mine, Stan.

Q.   Okay.   Did you see anybody who was a superintendent from Debo Homes during that meeting?

A.   Yes, yes.   The superintendent -- yes, and that was the first time I had -- I had met him, the superintendent.

Q.   You didn't see him all those days that he was there every day across the street?

A.   No.   Across the street, no, because this was the only house being built in that whole block.

Q.   Did the inspector -- let me say it this way: Did Debo Homes' superintendent come and talk to you about the problems that you saw?

A.   No, he did not talk with me at all.   He and Kris went to another part of the house and talked privately.

Q.   At any time did anyone from Debo Homes, other than Kris, come and talk to you about the problems in the house?

A.   No.   And we were specifically instructed by Kris not to talk with anyone else.   We were only to talk with Kris about the house.

Q. Did you want to talk to the superintendent about all the problems that you saw?

A. I would have liked to know what the superintendent was saying about what the fixes were going to be and what the remedies were, yes.

Q. After Kris went in the other room and came back, what did Kris tell you the superintendent had agreed to?

A. Nothing specific. He just said -- he said, "We're going to fix some things. We're not going to fix everything."

Q. Was that the first time that there was a change in how Kris was talking to y'all?

A. Yes. Prior to that, he was, "Oh, we've got this covered, we're going to make you happy, we're going to do whatever you want." And at that point, his demeanor changed, and he said, "We're just not going to fix everything." He was very curt.

Q. After that meeting, did Debo Homes tell you that they wanted to start putting the drywall in?

A. It was very soon, very soon after that meeting.

Q. Debo Homes start asking you for anything else?

A. Right after that, they started asking for the next payment.

Q. How much was the next payment?

A.    $59,300.

Q.    Now, did Kris just ask once or twice?

A.    No.  He asked multiple times through texts, through phone calls, just to the point where I -- I wasn't -- couldn't even take his calls anymore.

Q.    Did you tell Kris that you weren't going to make another payment until you knew that the repairs were complete?

A.    Yes, yes.  I told him that the next payment wasn't due until the next phase, that was the drywall, when the drywall was actually going in, and that all the problems -- the problems were supposed to be fixed prior to the drywall, and another inspection was supposed to be done prior to the drywall.  Everything prior to the drywall.  But he just kept going on about, "You owe the next payment, you owe the next payment."

Q.    Did you have Mr. Kneuppel come back and do another inspection?

A.    I did.  He came back for a second -- it was after the insulation went in and prior to the drywall.

Q.    In between the time that the first inspection happened and the second inspection, did Debo Homes keep constructing the house?

A.    Yes, they never stopped.  It was -- it was like just being in a whirlwind.

Q. When you went out to the second time, did you ask Kris Dominguez to be there?

A. Yes, he was invited at every step. I wanted them part of it. This was going to be our home. I wanted them -- they were our builder. I wanted them part of the process. This was -- this was not something that I felt that they should be left out of.

Q. Did Kris Dominguez show up at the second inspection?

A. He did not.

Q. In the second inspection, were there problems with the new work that Debo Homes had been doing over the last four days?

A. Yes, there were additional problems on top of the original problems that hadn't been fixed.

Q. Did Kris tell you he wanted money again?

A. Yes. That -- that did not stop. The continual asking for the $59,300 just did not stop.

Q. So, we had the May 9th inspection. On May 11th, did you tell Debo Homes that you wanted to have another inspection to confirm that all of the problems had been fixed?

A. Yes, I did.

Q. Did you actually text Kris on May 11th that you wanted to have Mr. Kneuppel come back again -- this

thing will eventually catch. Did you tell him you wanted him to come back again and confirm that the repairs were done?

A. Yes.

Q. You told Kris, and he knew that you wanted him to come back again?

A. Yes, yes.

Q. And that inspection was going to happen before or after the drywall went in?

A. Before the drywall. Mr. Kneuppel specifically said after the insulation --

MR. MARTINEZ: Objection, hearsay as to what Mr. Kneuppel said.

THE WITNESS: He said it to me.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Did you tell Debo Homes that you wanted Mr. Kneuppel to come back out before the drywall got installed?

A. Yes.

Q. Did Debo Homes understand from the message you sent -- did Kris ever say, "I don't understand why you want to come back out again before it gets installed"?

A. Kris understood from my texts.

Q. Later that day, what did Kris tell you about the drywall?

A.   He said they were supposed to be -- he said he has until Monday to complete his part, because we're sheetrocking on Tuesday.  That's what Kris wrote.

Q.   5-13, this was after the second inspection, and Kris texted y'all that all that he was told was that they started at 2:00 to 3:00, and that's it, and that they're going to finish today?

A.   (Nodding.)  Yes.

Q.   Were you ever aware that -- other than that day, that they were just going to start drywalling?

A.   No.

Q.   Did you make the $59,300 payment?

A.   No, I never made the second payment.

Q.   But they started drywalling anyway?

A.   They did.

Q.   Here's the text message here about them starting on 5-14, May 14th.

     MR. MARTINEZ:  Can we get a date from the previous one?

     MR. CROCKETT:  May 13.

Q.   (BY MR. CROCKETT) The previous one is May 13th. May 14th, at 10:51 a.m., Kris told y'all for the very first time that they were going to drywall at 2:00 to 3:00?

A.   (Nodding.)

Q. Or tomorrow, right?

A. Yes.

Q. So, did you think that they were going to drywall May 15th, if he wrote you that on May 14th?

A. Yes.

Q. Had you been able to get Mr. Kneuppel back out to do the inspection?

A. If we had a whole day? I don't know. It's possible, if we had --

MR. MARTINEZ: Object to speculation.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) And then actually an hour later, about an hour and a half later, Kris texts you "Can you please call me, because they're showing up today and not tomorrow to sheetrock the house. My boss will knock a hundred dollars off."

MR. MARTINEZ: That assumes facts not in evidence and misconstrues the evidence there. That's talking about insulation, not sheetrock.

THE COURT: Overrule the objection.

Q. (BY MR. CROCKETT) Did they install the drywall on May 14th?

A. They did.

Q. When you went out to the house on May 15th, did you see that they had already drywalled over a bunch of

things?

A.    Yes, yes, the drywall was in.

Q.    Why did you take these pictures?

A.    To show that the drywall was in.  I was shocked.  I couldn't believe -- we were supposed to still be in frame and insulation.

THE COURT:  Counsel, I see some people coming in the courtroom.  Are these witnesses?

MR. CROCKETT:  No, they're not.

THE COURT:  Okay.  I'm going to depend on you to let me know if any come in, so that I can instruct them.

Q.    (BY MR. CROCKETT) We've got drywall up here. Were you surprised to see the drywall up throughout the house?

A.    Yes, yes.

Q.    Were these areas that you were planning to inspect?

A.    Oh, yes.

Q.    When Debo Homes put the drywall in, before they put it in, is there anything that you ever said to tell Debo Homes, "You can't make the repairs"?  Did they ever tell you, "Why won't you let us make the repairs?"

A.    I'm sorry?

Q.    Bad question.  Before the drywall got put in,

did anyone from Debo Homes come to you and say, "Why aren't you letting us repair the problems with the house?"

A. No.

Q. Would you have given Debo Homes as much time as they needed to make the repairs before the drywall went in?

A. Absolutely. We -- we wanted -- wanted a great house. We wanted a solid house without problems. We wanted a house that we didn't have to worry about fixing up, and we would give them as much time as they needed prior to even thinking about moving in. We were in no rush to move in.

Q. After this happened, did you walk away from the contract like Debo Homes' lawyer said?

A. No.

Q. Let me talk to you about the continued construction that you saw afterwards. After the drywall went in, did you have a chance to see Debo Homes working on your roof?

A. Yes, absolutely.

Q. How many people from Debo Homes were out there?

A. I saw two people.

Q. Did you see any superintendents or anyone from Debo Homes?

A.    I did not.  There were just two, two men.

Q.    And what were they doing?

A.    One man was on the roof, and another worker was on the ground.  The man on the roof called down to the man on the ground --

MR. MARTINEZ:  Objection, hearsay.

MR. CROCKETT:  Judge --

THE COURT:  I haven't heard any statements yet.  Overruled.

A.    He called down to the man on the ground.  Then the man on ground cut -- cut a board, handed it up to the man on the roof.  The man on the roof set it on the roof.  It was like a -- like a piece of the solid base of the roof board, not like a shingle, just like a main board for the roof -- and then kind of moved it back and forth, shook his head, threw it off the roof.  Then called down to the man on the ground a second time.  The man on the ground cut a second board, handed it up to the man on the roof.  The man on the roof tried to place it again.  The man on the roof threw it down, called down to the man on the ground a third time.  A third board was cut, handed up, the man on the roof tried to place it again.  Still didn't work, threw it down.  A fourth time the man on the roof called down, a fourth board was cut, handed it up, wiggled it this way and

that way, got it to fit and then moved on.

Q. (BY MR. CROCKETT) Does that sound like the highest quality subcontractors that Kris promised you?

A. I was -- I just went -- I was just shocked. I was (indicating). I just couldn't believe it.

Q. Did that give you some concern about all the uneven boards you saw before on the frame?

A. It just kind of brought everything home.

Q. Right then and there, did you walk away from the contract, like Debo Homes' lawyer said?

A. No, I didn't. We still stuck with it. I don't run away from things.

Q. Let me talk to you about the driveway. Did you see Debo Homes pour your driveway?

A. Yes, I did.

Q. Did you see that the driveway was framed with wood around it?

A. Yes. Yes, it was.

Q. Was there anything -- in the actual forms where they were pouring the concrete, was there any mesh, was there any rebar, was there anything?

A. No, just the dirt, just the base dirt that they flattened out.

Q. Have you ever seen drywall -- not drywall -- a driveway after this or a sidewalk be poured?

MR. MARTINEZ: Objection, relevance, other sidewalks not near this house.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) After you saw your driveway poured, did you ask Kris Dominguez why there was no rebar or mesh inside the driveway?

A. I did.

Q. What did Kris tell you about the mesh?

A. He told me -- I asked him why there was no rebar in the driveway, and he told me that, had we wanted rebar, we would have had to specify that at the time of the signing of the contract.

Q. Did Kris tell you that they put mesh in the driveway?

A. He did tell us that they automatically put mesh in the driveway.

Q. What did you tell Kris about what you had saw?

A. I told him I saw that there was no -- neither mesh nor rebar, there was just plain cement, and he insisted that it had to have mesh, after I told him it didn't because I saw it being poured.

Q. What explanation did Kris give you?

A. He gave me no explanation. He just (indicating) was quiet.

Q. Let me ask you, when you saw the driveway being

poured, how many people from Debo Homes were there?

A. There were no people from Debo Homes. It was just the contractors.

Q. After you saw the driveway being poured and the responses back from Kris, did you run away from the contract, like Debo Homes' lawyers told us?

A. I did not.

Q. Did you have a chance to see your fence being installed?

A. Yes. Yes, we did.

Q. Tell us what you saw about your fence being installed.

A. Okay. They were digging the holes, and while they were digging the holes, all of a sudden a bunch of neighbors decided to come from around, from behind the house and next door. And all of a sudden -- excuse me -- we wondered what was going on, why all of a sudden we're meeting the neighbors. Well evidently, they had cut the power, cut the lines upon digging the holes.

Q. Did that sound like the highest quality subcontractors that Kris promised you?

A. No. I would think they'd know where the lines were.

Q. Did you run away from the contract after you saw that, like Debo Homes' lawyer said you did?

A.    No, we didn't.   We still stuck with it.

Q.    This was that driveway you were talking about, right?

A.    Yes, that's it.

Q.    Why did you take a picture of that driveway again?

A.    Because I watched it being poured, and there was no rebar, no mesh.   There was nothing other than concrete to hold it together, and --

MR. MARTINEZ:   Objection, getting into expert testimony about holding driveways together.   She doesn't know what rebar is for.

THE COURT:   Overruled.

Q.    (BY MR. CROCKETT) You can answer the question.

A.    Okay.   There was nothing but plain cement to hold it together.

Q.    Your next-door neighbors, do they have a driveway?

A.    Yes, they do.

MR. MARTINEZ:   Objection, same objection as earlier, relevance about other driveways, other sidewalks.

THE COURT:   Overruled.

Q.    (BY MR. CROCKETT) Your neighbors next-door, did they have a driveway?

A.    Yes, the neighbors next-door had a driveway.

Q.    Did Debo Homes build that house?

A.    Yes, they did.

Q.    How did that driveway look?

A.    It was very broken up.

Q.    How old was that house?

A.    About five years old, at the most.

Q.    Did you have some concerns after seeing your driveway get poured and then seeing the neighbor's driveway?

A.    Yes, yes.  We looked over at the neighbor's driveway, and we said that's what ours is going to look like in a couple of years.  That's --

MR. MARTINEZ:  Objection, speculation.

THE COURT:  Overruled.

Q.    (BY MR. CROCKETT) Let me talk to you about some of the other things about the repairs Debo Homes said you didn't let them do.

MR. CROCKETT:  I'm sorry, can I -- bailiff, how do I get rid of this green thing that I've accidentally written on there?

BAILIFF:  Touch the bottom right on the screen.

MR. CROCKETT:  Thank you.

Q.    (BY MR. CROCKETT) Now, on here, Debo Homes said

that they were going to put the waterproofing on this foundation, right?

A. Yes.

Q. When Debo Homes said they were going to make some repairs, is that the repair that they made?

A. That is exactly it.

Q. Did you have some concerns about the waterproofing that was the repair job?

A. Yes, yes.

Q. Did you run away from the contract, like Debo Homes' lawyer said you did?

A. No. We still -- we still kept going.

Q. Had Debo Homes started doing the brick facade of your house?

A. Yes.

Q. What happened to the waterproofing?

A. I really don't know. it's gone.

Q. How did that make you feel about how good the repairs were being done?

A. Well, pretty upset. It was there, and now it's gone. So, what else was there and then it's gone?

Q. Now, talk to me about this brick wall.

A. Yes. It was free-standing. I could put my fist inside between the framing and the brick wall.

Q. You're talking about right here? (Indicating.)

A. Yes, sir. And we actually looked in there with a flashlight, and there was no -- there was nothing holding that wall to the frame. It was just free-standing. And I leaned on it, and it started to move. And it was very disturbing. Plus, it shrunk in the rest of the house. The house was not all the way to the edge.

Q. What do you mean by that?

A. Well, if the house was in a good three inches or so, that means the room sizes were smaller.

Q. Did you tell Kris Dominguez about the brick facade?

A. Yes, immediately.

Q. Did Kris tell you, "We're going to repair it"?

A. He said, "We'll take care of it."

Q. Talk to me about the windows where the brick facade was at compared to the window holes that they made of the house.

A. Yes. They didn't line up. The holes that were cut into the frame were not the same holes for the brick. So, they were -- they were off. And when I brought that to their attention, they said, oh, that would work out, that just works itself out.

Q. Did you tell them that they had to repair it right now, or that you were going to run away from the

contract?

A. I never said that. We just wanted the house fixed so we could enjoy living there.

Q. Now, the window here, what was going on with this window?

A. I don't know how it got broken, but it's -- it's -- inside, it's a broken master bedroom window.

Q. Did Kris tell you, "We're going to get it replaced right away"?

A. He never said -- he said, "We'll fix it."

Q. Did you get that a lot?

A. Yes.

Q. When you add up all of the things that you saw and you look at all of the responses that Debo Homes gave you, did you ultimately say, "I want to confirm all the repairs are actually going to be done before I pay you any more money"?

A. That's exactly what was said.

Q. Did you ever see those repairs happening?

A. We saw some repairs happening. We didn't see enough repairs happening.

Q. Did you see the construction of the house keep going, though?

A. The construction never stopped.

Q. On May 21st, did you write an e-mail to Kris

Dominguez telling him that you wanted them to stop construction?

A. I did.

Q. Did you outline all of the things that you saw or had an issue with with Debo Homes?

A. I did.

Q. Did construction stop?

A. It did not.

Q. You told Debo Homes, "We expect Debo Homes to complete all of these repairs prior to us submitting any more funds"?

A. Yes.

Q. So, you didn't pay them anything more, and the construction kept going?

A. That's correct.

Q. Ultimately, did you have to ask us to tell them to stop?

A. Ultimately, yes. It was not something we wanted to do. It was something we had to do.

Q. Now, this letter was made on May 22nd. Did Debo Homes stop after we sent our letter?

A. They did not.

Q. You know that Debo Homes told us that they were going to let us inspect the house, right?

A. Yes, they did.

Q.   Did we have an inspection scheduled for July?

A.   We did.

Q.   Let me ask you this:   After Debo Homes knew that you had hired lawyers, did they keep calling you directly?

A.   They did.

Q.   Now, were they calling you to say, "Ms. Miller, let's try to work this out, let's do the repairs"?

A.   No.  No.

Q.   What did Kris Dominguez keep calling you about?

A.   $59,300.

Q.   At that point, when he kept calling and calling, did you say, "Talk to my lawyers"?

A.   That's exactly -- prior to that, I wouldn't have had to.  I didn't have lawyers.

Q.   Wasn't how the defense lawyer had said earlier, which was right from the start, you said, "Talk to my lawyers."  Did Debo Homes send you this letter directly?

MR. MARTINEZ:   I object to what counsel said.  There's no question.  He was making a statement.

THE COURT:   Sustained.

Q.   (BY MR. CROCKETT) Did Debo Homes write you a letter, directly to you, May 29th, 2013?

A.   Yes.

Q.   And it's supposed to be from Juan Carlos

Hernandez, the President of Debo Homes?

A. Yes.

Q. On May 29th, Mr. Hernandez said, "It's come to my attention that you have some concerns about the quality of the construction and the materials that go into your home." Did you have some concerns?

A. (Nodding.) Yes, we had a lot of concerns.

Q. Now, when you first met with Kris Dominguez, he told y'all that they had a third-party independent inspector inspect the entire work from Debo Homes, almost a check the checker?

A. Yes. They had -- that's exactly what he told us -- third-party independent inspectors throughout the building process.

Q. Mr. Hernandez's letter was the first time that you knew that there was only three inspections?

A. Yes.

Q. Did you learn for the first time that they also have onsite supervising all of the subcontractors' work?

A. Yes.

Q. Did you actually ever see that?

A. No, we did not see that.

Q. You couldn't even talk to the guy, if you wanted to?

A. No, we were -- we were specifically told not to

talk with the workers.

Q. Now, this part is really interesting. At the end of it, Juan Carlos Hernandez told y'all, "If you are not happy with our service, you are free to terminate the contract with Debo Homes, and we'll refund you a hundred percent of the money you gave us after we sell the house." Are you surprised now that they're actually suing you, saying you breached the contract?

A. Yes.

Q. Did they say a lot of things to you and then say something different later?

A. Unfortunately, that's exactly what happened.

Q. Now, Debo Homes' lawyer said that they offered you a hundred percent of the money whenever they sold the house. Did you ask him for a specific date?

A. Well, we tried to work it out that it would happen within 90 days.

Q. Did you ever hear a single thing from Debo Homes or its lawyers?

A. We never heard anything. It just -- everything got silent at that point.

Q. A week before the inspection that was scheduled, did you go out to the house to see whether or not anything had been changed or altered?

A. Yes. We wanted to make sure everything was --

was okay for the building inspector to get out there and keep going. We still hadn't pulled out.

Q. Is this what you saw when you got there? (Indicating.)

A. That's exactly what we saw.

Q. Were you shocked that your home was available for sale?

A. We were dumbstruck.

Q. Now, you bought some fans, some fixtures for your new house, right?

A. Yes, we did.

Q. Did you see Debo Homes installed them?

A. Yes. We -- we specifically wanted extra ceiling fans for the rooms because it keeps energy costs down. You know, this way we could keep the AC a little higher and put the fans on, a little nicer. And Kris told us just drop them off at his office, he'll make sure they get in the house.

Q. They got in there, didn't they?

A. They did.

Q. Were you surprised to see the sales table out there?

A. Yes. Evidently, looks like they're -- they've got a nice little office going on in there.

Q. Let me ask you this: Your home, what was the

floor supposed to be?

A. It's supposed to be all tile, a hundred percent. We didn't want carpet because of the dogs. We have carpet now, and it just gets eaten up.

Q. This back corner here and in the other parts in the house, what did they install?

A. They put carpet throughout the bedrooms.

Q. They built the house cheaper?

A. Yes, they did.

Q. They're not asking for a reduction off of their lost profits, even though they saved money making it cheaper, are they?

MR. MARTINEZ: Objection, it assumes facts not in evidence about the cost of tile and carpet.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Did Debo Homes tell you that they would give you your money back for the money that they saved building a cheaper home?

MR. MARTINEZ: Objection, same objection.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) When we asked Debo Homes what was going on, and we went to the house and saw that it was completed, what did they tell you?

A. They told us we were trespassing. We didn't go in the house, we went around the outside of the house.

They told us it's not our house, and that we were trespassing, and that we don't have any right to be on -- on the property at all.

Q. Did you feel like they were intimidating you?

A. Intimidating, and just we couldn't understand how a house we owned a third of already --

MR. MARTINEZ: Objection, it's a legal conclusion about --

THE COURT: Sustained.

Q. (BY MR. CROCKETT) What did Debo Homes' lawyers tell you about that $60,300, how much of that were they going to give you back?

A. They were going to -- they were going to give it minus the attorney's fees, broker's fees, interest, any and all costs.

Q. Is that what Juan Carlos Hernandez said in Exhibit No. 6?

A. No.

Q. That he was going to seek all lost profits, pay for all my attorney's fees, my interest? Did he ever tell you that?

A. No, not at all.

Q. Now, you know that -- Exhibit No. 8 -- Debo Homes ultimately sold your house to someone else?

A. Yes.

Q. Sold it for $168,000?

A. Yes.

Q. They signed that contract on October 19, 2013. See that?

A. Yes.

MR. MARTINEZ: Objection, leading.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Did you hear Debo Homes' lawyer said that they actually didn't close on the house until December?

A. Yes, and we didn't find out about it until May in the deposition.

Q. So, you waited two months for them. How long did they wait for you?

A. A couple of days.

Q. After Debo Homes sold your house, did Debo Homes pay you back the money that Juan Carlos Hernandez --

A. They paid us nothing.

Q. -- promised he would do?

A. Yes.

Q. You heard Debo Homes' lawyer tell you they put $60,300 in the Court's registry?

A. Yes, I heard that.

Q. Do you know when they did that?

A.   Yes.   We found out that they put it in just last week, but we found out on Monday, this past Monday.

Q.   Over the last year and a half, what changed, other than 12 jurors?

A.   Nothing.

Q.   How long have we been in this lawsuit?

A.   Since the end of May, 2013.   2013.

MR. MARTINEZ:   Objection, that assumes facts not in evidence.   This was filed in October.

THE COURT:   Overruled.   You can cross-examine her.

Q.   (BY MR. CROCKETT) How long have you had to deal with Debo Homes and their lawyers?

A.   Since the end of May, 2013.

Q.   During that entire time, have they ever said anything to you other than you're going to pay our lost profits, or attorneys fees, our lost interest, and anything else that we come up with?

A.   No.

Q.   That's all you've ever heard?

A.   Yes.

Q.   If Kris Dominguez would have told you this is the way that Debo Homes was going to do business with y'all, would you have handed over $60,300?

A.   Never.

Q.   Did Debo Homes make promises, representations to y'all that as of today you know weren't true?

A.   Yes.

Q.   What did Debo Homes tell y'all, what did they promise y'all about their subcontractors?

MR. MARTINEZ:   Objection, asked and answered many times.

THE COURT:   Overruled.

A.   They promised that they would be the highest quality subcontractors.

Q.   (BY MR. CROCKETT) What did Debo Homes tell you about their supervision of those highest quality subcontractors?

MR. MARTINEZ:   Same objection.

THE COURT:   Overruled.

A.   That there would be continual onsite supervision at the jobsite, at the home.

Q.   (BY MR. CROCKETT) What did Debo Homes tell you about the third-party inspectors?

A.   That there would be multiple building inspections of the structure and at various phases --

Q.   What did Debo Homes tell you --

A.   -- by a third-party inspector.

Q.   What did Debo Homes tell you about the next time you'd have to pay $59,300?

A.   That that would not have to happen until we go into sheetrock, and that all problems would be fixed before we paid the next phase.

Q.   What did Kris Dominguez tell you about the AC unit and the appliances that were going to be installed in your house?

A.   That they would be the same ones that we saw in the model house.

Q.   Were any of those a hundred percent true?

A.   No, not at all.

Q.   Now, Debo Homes' lawyers talked earlier about saying that this was the contract; regardless of whatever we told you, the contract says that we don't have to follow that.

MR. MARTINEZ:   Objection, counsel is making a statement?

THE COURT:   Sustained.

Q.   (BY MR. CROCKETT) In this contract, when was this contract signed, Exhibit No. 1?  Was this signed -- let me ask a better question.  Exhibit No. 1, when this was signed, were you doing the cash installment plan or were you doing the financing?

A.   This was the financing.  This was when we tried to get financing.  We went in with that -- with that mind-set.

Q. And y'all signed this April 13th?

A. Yes.

Q. Is that what you remember?

A. Yes.

Q. And when you came back to meet with Kristopher Dominguez, when you didn't qualify for financing -- I think I need a better one. How many days later from the original contract did y'all write a check to Debo Homes for $59,300 and a thousand dollars in earnest money?

A. I believe it was three days later.

Q. April 16th, 2013. And you paid them that money, correct?

A. Yes.

Q. And the agreement was the cash installment plan?

A. Yes.

Q. After you made that agreement, did Kris Dominguez tell you, "Well, we're still going to hold you to this other agreement that says whatever we just told you right now, we're going to ignore that, and we're going to say that that doesn't apply"?

A. No, he never said that.

Q. Other than after this lawsuit was filed, did you ever hear from anyone at Debo Homes, other than their lawyers, that they weren't going to honor any

agreement that wasn't in writing?

A. Can you rephrase the question?

Q. Before this lawsuit was filed --

A. Yes.

Q. -- did anyone from Debo Homes ever tell you, "Well, we're going to hold you to the old contract and all these representations we just made, we're not going to honor"?

A. No.

Q. Once this lawsuit happened, did you find out that was the defense?

A. Yes.

Q. During your deposition, is that when you found out Debo Homes was saying, "Well, No. 19 says we don't have to honor anything that's not in writing, no warranties, no promises"?

A. That's exactly when I found out.

Q. In your agreement with Debo Homes, is anywhere in this contract that talks about the cash installment plan?

A. No, because that contract is all about the financing.

Q. Is anywhere in this contract that Debo Homes put in writing that you didn't have to make a payment until before the problems had been fixed?

A. That contract -- no, because, again, that's about the financing.

Q. Did Kris Dominguez tell you a different story?

A. He did.

Q. Debo Homes lawyer said that y'all were here asking for treble damages and all this excess damages because you just wouldn't take your money back when they offered it to you. Did they ever offer your money back?

A. Not really. They offered it minus this, minus attorney fees, minus the costs and other fees, and so it never came down to just our money back.

Q. Are you suing Debo Homes just about this incident? Is this all about just you?

A. No. It's not about me. Because if they can build me a home like this, they can build anybody a home like this. If they can take my money, they can take anybody's money. They can -- it's very upsetting that I and my daughter have had to go through this, but they can do this to anyone.

Q. Ms. Miller, if you wouldn't have been out on that jobsite, if you wouldn't have been there and saw the work that was done, you think that any of the repairs would have been done?

MR. MARTINEZ: Objection, speculation.

THE COURT: Sustained.

Q.    (BY MR. CROCKETT) If you wouldn't have been there to see the crushed vent pan, you think it would have been fixed?

MR. MARTINEZ:  Same objection.

THE COURT:  Sustained.

Q.    (BY MR. CROCKETT) Based on the work that Debo Homes did or what you witnessed, you think that you would be doing a bunch of repairs after you paid off this house?

MR. MARTINEZ:  Objection, speculation.

THE COURT:  Overruled.

A.    Yes, I think we would.  And I think we'd be paying very high AC bills based on the air conditioning unit they put in versus the one they promised us.  I think we'd have a wet ceiling based on the pan being too small for the AC unit.

MR. MARTINEZ:  Objection.  This is getting into the cost of electricity, the ceiling pan from the AC unit.

THE COURT:  What's your legal objection, counsel?

MR. MARTINEZ:  Speculation and expert testimony.

THE COURT:  Sustained.

Q.    (BY MR. CROCKETT) Ms. Miller, I want to talk to

you about the construction timeline.

MR. CROCKETT: Judge, I have a demonstrative that I've talked to defense counsel about. I think they're looking for your ruling on my timeline.

MR. MARTINEZ: We object to the -- he's making statements in that demonstrative there, expert opinion, hearsay.

MR. CROCKETT: Judge, it's all things that she's already testified about.

MR. MARTINEZ: Some of which was expert testimony, which I've objected to.

MR. CROCKETT: I can show Your Honor.

THE COURT: Bring it up.

(Bench conference)

MR. MARTINEZ: The portion that we're objecting to, all the words in writing and that sort of stuff.

THE COURT: This is it?

MR. CROCKETT: That's it, Judge.

MR. MARTINEZ: If I may, Judge, they changed a little bit --

MR. CROCKETT: It says stop construction.

MR. MARTINEZ: This is repetitive, and it's confusing.

MR. CROCKETT: You can delete it. I'm

just trying to get the timeline in here.

MR. MARTINEZ: Yeah. We're fine with that.

THE COURT: Okay.

(End of bench conference)

Q. (BY MR. CROCKETT) Ms. Miller, I want to talk to you about this timeline, because it's a big deal in this construction timeline. At the very left side, April 16th, 2013, is that when you entered into your cash installment agreement?

A. Yes.

Q. And what were the representations, the promises that Kris Dominguez told y'all?

A. That we would get the same things that were in the model home; that we would have quality superior quality workers; that they would be supervised at all times; that they --

Q. Let me ask you this.

A. Yes.

Q. On May 9th and 13th --

A. Yes.

Q. -- when Mr. Kneuppel did the report --

A. Yes.

Q. -- are those pictures of what you saw?

A. Yes.

Q.   Does that sound like, what you saw, anything like Mr. Kneuppel gave y'all, or what Debo Homes promised y'all?

A.   It's nothing what they promised.

Q.   May 14th, we talked about those text messages, is Kris Dominguez demanding more money from y'all?

A.   Absolutely.

Q.   In fact, on the inspection from May 13th, in these photographs you already saw that they had all the drywall waiting to be thrown up?

A.   Yes.

Q.   When you did the inspection on May 13th, how late at night was it?

A.   Oh, it was -- it was after hours.  There were no more workers there.

Q.   And May 14th, all the drywall went up?

A.   Yes.

Q.   May 21st and the 22nd, was Debo told to stop construction?

A.   Yes.

Q.   Did you ever pay them the money for the drywall?

A.   I did not.

Q.   In fact, did construction ever really stop?

A.   It did not.  It just kept going and going like

a snowball going downhill.

Q. May 29th, is it accurate that Debo Homes, the president of the company, told you that you're free to terminate the contract, have no liability to us, and we'll give you your money back when we sell the house?

A. Yes, he did.

Q. Was any of that true?

A. It turned out not to be true.

Q. June 3rd was the closing date. Did you ever tell Debo that if they're not done with the home and the repairs by June 3rd, that you were walking from the contract?

A. Never.

Q. July 24th, your home was complete?

A. (Nodding.) Yes.

Q. Is there anywhere in this entire timeline that you told Debo Homes, "We're not going to let you make the repairs"?

A. Never. We wanted them to make the repairs.

Q. Do you have any idea how Debo Homes was going to make the repairs like their lawyer said, when the home was complete?

A. We couldn't have -- no. Not once the drywall went up, we didn't know how it was possible.

MR. CROCKETT: Thank you, Ms. Miller.

THE WITNESS: Thank you.

MR. CROCKETT: Your Honor, I pass the witness.

MR. MARTINEZ: Judge, may I proceed?

THE COURT: You may.

MR. MARTINEZ: I apologize, one moment to get my computer back up.

THE WITNESS: Sir, may I have water?

THE COURT: I'm sorry?

THE WITNESS: May I have water? I have water there.

THE COURT: Yes, ma'am.

THE WITNESS: Thank you.

MR. CROCKETT: (Handing.)

THE WITNESS: Thank you.

**CROSS-EXAMINATION**

Q. (BY MR. MARTINEZ) Good morning, Ms. Miller.

A. Good morning.

Q. I'm a little confused. Now, I thought throughout this whole transaction you were relying upon that contract we've seen here in Exhibit 1 signed April 13th. Is that not correct?

A. That's the contract for financing.

Q. So, you're not suing Debo for breach of contract based upon that contract?

A.   Correct.

Q.   So, you're saying that contract has nothing to do with this case?

A.   Correct.  That's not the contract -- that's not the contract that we're -- that's in question.

Q.   Where is the other contract that's in question?

A.   We don't have a copy of it.

Q.   So, why did we just go through a bunch of questions about this contract, if this is irrelevant to you?

A.   I don't know.

Q.   Then why are you suing my client for breach of contract when there's no contract?

A.   I don't know.  They asked us -- they had a three-tier payment program that Kris came up with, and he had it written down, he had it in writing.

Q.   Where is that three-tier payment program in writing?

A.   I don't know.

Q.   You just said it was in writing.

A.   It was.

Q.   Where is it?

A.   I don't know.

Q.   So, are you telling the ladies and gentlemen of the jury that they should disregard that contract

entirely?

A. I suppose so.

Q. So, you're suing Debo based upon an oral contract, then, if there's no contract in writing?

A. I'm not sure.

Q. Well, Ms. Miller, I'm sorry, but I do need you to be sure.

A. I'm not a lawyer.

Q. Well, if you're not relying on that contract, then what are you relying on? Because you're suing Debo Homes for breach of contract. Where is the contract?

A. Kris had it.

Q. That's the first time I've heard that, Ms. Miller.

A. Kris wrote down the three-tier program. He came up with three payments, and he had written them down on a contract.

Q. Like that? (Indicating.)

A. It was similar, yes, like that.

Q. And you signed it?

A. We did.

Q. You realize that in Texas, you have to have a written contract to sue for issues involving property?

A. No, I'm not aware --

MR. CROCKETT: I'm going to object to a

lot of the legalese that Debo Homes' lawyer is trying to ask about.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Ms. Miller, if I started asking you questions about this contract, you're telling the ladies and gentlemen of the jury that I really shouldn't be doing that?

A. (No response.)

Q. You understand the question?

A. Not really. Can you rephrase it?

Q. I know your lawyer went through the contract at length, so is it unfair for me to go through the contract and ask you questions as well?

A. I'm not sure.

Q. Ms. Miller, I'm not sure either. I'm just confused, because I don't understand why we went through that whole direct examination --

A. Yes.

Q. -- talking about the contract, when you are telling me right now that that is not the contract.

A. It's not. It's -- that one is in reference to the financing.

Q. When was this other contract signed?

A. Three days later, on the 16th.

Q. Ms. Miller, I asked you in your deposition

before, did you read this contract fully, this one, Exhibit 1.

A. Yes.

Q. And you fully understood its terms?

A. Yes.

Q. Since I don't have a copy of this other contract, what terms are different between that and this other contract?

A. The way the money is proportioned.

Q. Is that the only difference?

A. From what I -- from what I can recall, possibly.

Q. So, is it fair for me to talk about this contract and say it's the same as this other contract, as long as I don't talk about that part, the sales price portion? Is that the only difference, that circled part?

A. That's one difference. I'm not sure if it's the only difference.

Q. Well, Ms. Miller, I need to know, because this is the first time I've heard this. I'm a little bit surprised, and I'd like to be able to tell the ladies and gentlemen of the jury what you signed and what you're suing Debo for. Is that fair?

A. Yes, it's fair.

Q. Ms. Miller, would you care to look at Exhibit 1 in full and please tell us what's different between this contract and this other contract signed three days later?

A. Like I said, I believe it's primarily the money.

Q. Okay. But I'm offering you the contract, if you'd like to look it over and perhaps tell us what's different, because this is the first time I've heard this. I didn't get to discuss it in deposition, so this is my only shot.

A. I can't -- after a year and a half, I can't -- I can't tell you each and every aspect that might be different, but I believe it's primarily just the money aspect.

Q. Okay. Well, let's go ahead and break it down then and see if we can figure out what's different and what's new right here, today in this courtroom for the very first time.

Now, Ms. Miller, your attorney went over this section with you a while ago, isn't that correct, No. 19?

A. Yes.

Q. Is this the same in both contracts?

A. I believe so.

Q. Now, is it true that says that all representations and warranties must be in writing?

A. It does say that.

Q. So, you've been talking a lot today about how Kris and Debo made a lot of oral representations to you during the negotiation phase, correct?

A. Yes.

Q. Well, then why did you sign a contract with that clause in there, if you were relying upon oral representations?

A. Because when you choose your items for a home, they're not in that contract. You go through and you choose a stove. That's not in there. And that's why they have a model, so you can choose a stove, and efficient HVAC, high-energy AC unit, and so they can show you what they offer. So, you know what you're going to get in your home, or they wouldn't show you a model home. And when they tell you this is this and this is that. And then they show you tile samples and they show you other samples, and when you ask, "Am I going to get that," and they say yes, you expect to get exactly that.

Q. I think my question is a little bit different. I agree that, you know, if you choose a stove or a color of roof, that's a separate, you know, detailed home

selection chart. I'm asking you about those representations that Kris made to you, like you'll love the home; we'll have a superintendent there at all times; you know, we'll fix everything immediately. Where is that written down?

A. (Reading.) It's not in there.

Q. Well, is it true?

A. I do know Debo advertises that they use the highest quality workers.

MR. MARTINEZ: I'll object as nonresponsive.

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Well, Ms. Miller, you said you read this contract from A to Z, or you read through the entire thing, correct?

A. Yes.

Q. And you understood it?

A. Yes.

Q. And you accepted all of its terms?

A. Yes.

Q. And you had a realtor there to look it over for you?

A. Yes, who is a friend, yes, a friend.

Q. But you did have a realtor read over the contract and explain some things to you?

A.    Yes.

Q.    That leads me to my question, Ms. Miller:  Why are you relying upon oral statements, oral statements?  If you had a realtor read it over to you, you read the whole thing, you understood it and you're relying upon those representations, then why did you agree to that clause, No. 19?

A.    (Reading.)  Because it says -- we never expected --

Q.    I'm sorry?

A.    We trusted Kris.  At that point, he still had our trust.  We trusted everything he was telling us.  We asked questions, he said everything right.  We asked -- we had -- I had a long page of questions.  He gave us all the right answers.  Our friend, Stan, the realtor, asked questions.  He gave him all the right answers.

Q.    Ms. Miller, also there's another thing in paragraph 19 I'd like to point out.  I didn't mean to write over that.  Would you mind reading the underlined portion?

A.    It says, "Seller may continue to show the property and receive, negotiate and accept backup offers."

Q.    And you agreed to that condition?

A.    Yes.

Q. Twice, actually?

A. Yes.

Q. And you fully understood what that meant?

A. Yes.

Q. So, why are we now in this court having you complain about Debo selling the home to someone else, if you agreed to that?

A. We're here because we weren't offered our money back at the point --

MR. MARTINEZ: I'll object to nonresponsive, Judge.

Q. (BY MR. MARTINEZ) My question is: Why are you complaining about the home being sold to someone else when it's in the contract that they're allowed to do that?

A. (No response.)

THE COURT: Can you answer the question?

A. I'm sorry, can you rephrase?

Q. (BY MR. MARTINEZ) Sure. The question is: Why are you complaining that Debo Homes sold the house to the Benges and not you when this contract explicitly says Debo may do that?

A. We're here because we were never given an opportunity to fix the problems, to get to that point, to even negotiate to that point. As I see, this says

negotiate and accept backup offers. We were never given that opportunity to negotiate. We were never given opportunity whether that was a backup or a go-ahead. We were never given opportunities.

Q. Ms. Miller, my question is: Why wasn't Debo allowed to talk to the Benges or anyone else in the community about selling this home?

A. They were allowed.

Q. Then what's the problem with Debo selling the home to the Benges?

A. We just didn't know about it until this past May, and then they still kept our money.

MR. MARTINEZ: I'll object as nonresponsive to the "kept our money."

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Ms. Miller, you're complaining that -- now, you're complaining that you didn't know that the home was sold to someone else until May?

A. Yes.

Q. And who did you expect to tell you that information?

A. Well, we would have liked for Debo to tell us.

Q. I agree, but as of the time the contract was agreed to with the Benges, which is October, and the

time that the home was finally sold to the Benges, which was New Year's Eve, 2013, at that point, isn't it true that you had already filed this lawsuit?

A. Yes.

Q. Well, isn't it also true that you told Debo, "Don't contact me"?

A. Yes.

Q. Well, then how do you expect them to tell you what happened to the home?

A. I would expect them to tell our attorney.

Q. To tell your attorney, not you?

A. Yes.

Q. I want to make that clear.

A. Thank you.

Q. So, Ms. Miller, you had no problem with Debo selling the home to the Benges, a third party, right?

A. Not after all the -- not after all that time had gone by.

Q. So, it's perfectly fine that they sold it to someone else for a lower price?

A. Not after they didn't make the house the way we wanted it, put carpet in it.

Q. Ms. Miller, I just wanted to know whether or not you're going -- if you're telling the jury is it okay for Debo to sell the home to someone else. Is it

okay or not, according to you?

A. Because it wasn't the house we wanted anymore, yes, it's okay, later on.

Q. Ms. Miller, I'd like to talk about the default provision in this contract. Well, first of all, take your time reading it. Is it different from this contract and from this other contract you just told us about?

A. I don't know for sure. I'd have to -- I can guess it might be the same.

Q. Well, would you mind reading it to the jury?

A. No, I don't mind. "If buyer fails to comply with this contract, buyer will be in default, and seller may: A, enforce specific performance, seek other relief as may be provided by law, or both; or B, terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from the contract. If seller fails to comply with this contract, seller will be in default, and buyer may: A, enforce specific performance, seek such other relief as may be provided by law, or both; or B, terminate this contract and receive the earnest money, thereby releasing both parties from this contract."

Q. Now, having read that, do you have a better recollection of whether that's the same in this contract

as well as in the other one?

A.   I'll say it's the same.

Q.   Okay.   You understand that if Debo's found to be in breach or you're found to be in breach, the breaching party has to forfeit the earnest money, correct?

A.   Yes.

Q.   And how much was the earnest money?

A.   $1,000.

Q.   We touched upon this topic a little bit, but I think it would be helpful if you wouldn't mind reading Section F to the jury.

A.   "Completion of repairs, treatments and improvements.   Unless otherwise agreed in writing, seller shall complete all agreed repairs, treatments and improvements," parentheses work, "prior to the closing date.   All required permits must be obtained and work must be performed by persons who are licensed or otherwise authorized by law to provide such work.   At buyer's election, any transferable warranties received by seller with respect to the work will be transferred to buyer at buyer's expense.   If seller fails to complete any agreed work prior to the closing date, buyer may exercise remedies under Paragraph 15 or extend the closing date up to 15 days, if necessary, for seller

to complete work."

Q.    Do you recall if this section is the same in this contract as well as this other contract?

A.    I don't recall exactly, but it may be.

THE COURT:  Ladies and gentlemen of the jury, let's go ahead and take our morning break at this time.  If you would please be back in the jury room at 10:45.

(Jury out)

THE COURT:  Counsel, see y'all back at 10:45.

(Short break)

(Jury in)

THE COURT:  Be seated.  You may continue.

MR. MARTINEZ:  Thank you, Judge.

Q.    (BY MR. MARTINEZ) Ms. Miller, before we took a break, I believe we were talking about Section F, about completion of repairs, treatments and improvements.  I believe you just read that section to the jury, then we took a break.  And do you recall whether or not that section is the same in this contract as well as the other contract?

A.    I believe it's probably the same.

Q.    So, then Debo was allowed to repair any problems before closing?

A. Yes. It says they shall complete the problems.

Q. Correct. Now, Ms. Miller, earlier today you testified that there's a three-tiered payment structure?

A. Yes, it was three phases, three phases, three-tier payments, that was written down in -- that Kris wrote up for us in the contract, yes.

Q. Ms. Miller, do you ever remember testifying differently about that?

A. About the three different --

Q. About how the payment structure works?

A. No. We first went for financing. We didn't get it. And when we couldn't get the financing, we went back and --

MR. MARTINEZ: I object as nonresponsive.

Q. (BY MR. MARTINEZ) My question was just whether you remember testifying differently, yes or no.

A. Can you rephrase the question then?

Q. Sure. My question was: First, you testified earlier today that -- and yesterday that there was a three-tier payment structure.

A. Yes, I did.

Q. Now, do you ever remember testifying differently about how that structure was set up?

A. I don't recall.

Q.   Do you recall that on May 8th, 2014, we took your deposition in your lawyer's former office?

A.   Yes.

Q.   Do you remember me asking you how the second payment was going to be?

A.   Yes, I remember that.

Q.   And what was your response?

A.   I believe I said we were set to pay at the time of drywall.

MR. MARTINEZ:  Judge, at this point, I'd like to show her deposition excerpt, and it does contradict that testimony.

THE COURT:  You may.

Q.   (BY MR. MARTINEZ) Ms. Miller, the question was: "So, when was the second payment supposed to be?"

Your answer:  "I'm not sure."

So, why did you just tell the ladies and gentlemen of the jury that you told me in your deposition about the payment structure?

A.   Well, I knew we had an agreement about payment structure.  We had talked about how much to pay and how much I was going to pay in which phases.

Q.   Ms. Miller, did you not understand the question when I asked it on May 8th?

A.   I did.

Q.   Then why did you not tell me about how the payment structure was supposed to work?

A.   I'm not sure.

Q.   You're not sure?

A.   No.

MR. CROCKETT:   Judge, we would just object as far as mischaracterizing.   If we can get some time context about the question, was he asking when during the exact time period was the second payment supposed to be made, or this is when the contract says?   I can clear it up on the other side, but here he's actually saying when during the construction.

MR. MARTINEZ:   That's not what it says.   I asked her if she understood the question.   She said yes.

MR. CROCKETT:   All right.   We'll clear it up.

THE COURT:   Overrule the objection.

Q.   (BY MR. MARTINEZ) So, Ms. Miller, why are you giving the jury different testimony?

A.   I don't believe I am.

Q.   Well, you testified back then that you didn't know the payment structure.   You testified yesterday and today that you knew the payment structure.   Then you just told the jury that that's really not what you said in your deposition.   So, are you not being truthful?

A.    I am being truthful.

Q.    Well, maybe it's just the fact that your lawyer's been telling you what to say at trial?

A.    That's not true.  I'm not sure if on that -- during the deposition, they were asking me for a specific date, and I might have thought you were asking me for a specific date, because there was no specific date set up.

Q.    So, now you're telling me that you were confused about that question, based on what your lawyer just objected to?

A.    You were asking an awful lot of questions.

MR. CROCKETT:  We object to the --

MR. MARTINEZ:  She's changing her testimony based upon what he just said to the Court.

THE COURT:  Overruled.

Q.    (BY MR. MARTINEZ) You just heard your lawyer say that you may have been confused and you may not have understood that question.  You heard him say that?

A.    Yes.

Q.    And you heard me ask you whether or not you understood that question, and you said yes, right?

A.    Yes.

Q.    Now, you're telling me that, well, maybe that question meant something else.  Didn't you just say

that?

A. It depends what it was -- what the prior questions were in reference to.

Q. Isn't that what your lawyer just said? Is it?

A. It is.

MR. MARTINEZ: I object to side-bar, Judge.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Now, Ms. Miller, on May 21st, 2013, you told them in an e-mail what repairs they needed to make?

A. Yes.

Q. Let's go ahead and get that e-mail. Ms. Miller is that indeed the e-mail you sent Debo on May 21st, or a portion of it?

A. That's part of it, yes.

Q. And that's the rest of it, correct?

A. Yes, yes.

Q. Now, in that e-mail, you specifically pointed out what repairs you wanted Debo to make?

A. Yes.

Q. And you told Debo that you wouldn't give them anymore money before they made those repairs?

A. Those, and then I wrote, "The above are a quick list and may not include all of the problems.

Therefore, we will not be limited to these lists." And it's right there in that paragraph below, right in the --

MR. MARTINEZ: I'll object as nonresponsive.

Q. (BY MR. MARTINEZ) My question was, yes, whether or not you said once you make these repairs, you'll submit more funds?

A. No, that's not.

Q. That's not what it says?

A. No, there's more.

Q. Okay. I agree, but I'm just asking you whether or not you told Debo that once they make the repairs in those lists, along with other repairs, then you would submit more funds?

A. On this note, there's more.

Q. More repairs?

A. Well, it depends -- we have to check to make sure everything -- that it's done.

Q. Because it says here you will not be limited to those lists, right?

A. Yes.

Q. That's what you mean?

A. Yes.

Q. Okay. I'm just getting at, once those repairs

are made, whatever repairs are made, you agreed to give Debo the second payment?

A. Not those repairs. It has to be -- the house has to be done and checked, and then we would agree.

Q. So, now the house has to be completely done before you give another payment?

A. I didn't say completely done.

Q. Ms. Miller, I just want to know when would you be submitting the second payment?

A. Just prior to drywall, just as the drywall was ready to go in.

Q. And once repairs were made?

A. Yes.

Q. Okay. But the very next day, May 22nd --

A. Yes.

Q. -- your lawyer told Debo to cease construction completely.

A. Yes.

Q. How can they make repairs if they're not working?

A. They weren't working -- they weren't making repairs all along.

Q. No, my question is: If you tell them to stop working completely, how are they supposed to go in the house and make the repairs?

A.    We needed to get an inspection.

MR. MARTINEZ:  Objection, nonresponsive.

THE COURT:  Overruled.

Q.    (BY MR. MARTINEZ) Ms. Miller, your attorney told Debo to stop working on May 22nd.

A.    Yes.

Q.    The day after you told Debo to make repairs.

A.    Yes.

Q.    When was Debo supposed to make those repairs, then, if you told them to not do any more construction?

A.    I don't know.  The drywall had already gone in.

Q.    Well, isn't that a little contrasting?  On one hand, you're asking Debo to make repairs immediately, and you'll pay them.  Now, on the other hand, your lawyer's telling them to stop, don't do anything.

A.    I agree it is contrasting, because they weren't supposed to get put the drywall in until they got paid to put the drywall in.

Q.    I'm still getting mixed signals.  Which is it, repair and go on, or stop?

A.    They were already past the point that they were supposed to be --

Q.    I'm sorry.

A.    -- so we had to tell them to stop.

Q.    So, you're saying that one day difference is

what matters? That on May 21st, you're saying repair it, but on May 22nd, they were past the deadline to make repairs?

A. They wouldn't listen to me, so I had to involve an attorney.

Q. Over the span of -- so, you sent your e-mail, let's see, 5:38 p.m., May 22nd, correct?

A. Yes.

Q. And your lawyer sent his e-mail the very next day, May 22nd, 1:38 p.m.?

A. Yes.

Q. So, you went out and found a lawyer within less than 24 hours; yes or no?

A. Yes.

Q. Ms. Miller, I still am confused, because at 5:00 p.m. on May 21st, you told Debo, "Y'all make these repairs, then we'll continue on our relationship," correct?

A. Yes.

Q. Well, what happened between 5:00 p.m., may 21st and 1:38 p.m., May 22nd?

A. Kris pressed us for $59,300.

Q. How did he do that?

A. By contacting us directly and that -- there was no indication he was going to make the repairs. He told

us, "We'll make some of the repairs, but we won't make all of them."

Q. This all happened between 5:00 p.m., May 21st and 1:38 p.m., May 22nd? That's all I'm asking about.

A. Well, I don't know if it all happened that evening, but we were contacted that evening, asked for the money.

Q. So, one thing that happened to shatter your confidence between 5:00 p.m., May 21st and 1:38 p.m., may 22nd, was one phone call from Kris?

A. I don't know if it was just one phone call.

Q. What else was it?

A. Our confidence -- I don't know, but he continued to ask for the money, when we asked for them to stop continuation and start making repairs, and they continued with the process -- with the building, they continued moving on with the building instead of going -- fixing problems that had already occurred.

Q. Ms. Miller, I'm just asking about between 5:00 p.m., May 21st and 1:38 p.m., May 22nd. So, you're saying all that happened between that span of time? Because a lot happened. You went and got an attorney and told Debo to stop working. I just want to figure out what made that switch. What changed? That one phone call from Kris?

A. I don't know if it was just one phone call. I just know, rather than take our continued problems and continue asking for them to fix the problems seriously, they just wanted us to pay.

Q. Ms. Miller, you testified earlier today that Kris texted you a demand for payment.

A. Yes.

Q. Well, let's look at those text messages. Now, I would like to go through all these, because I think it establishes what relationship you had with Kris. Would you agree?

A. Sure.

Q. Would you mind reading the first one from April 17th, 3:37 p.m.?

A. Sure. "Kris, was thinking about cabinets. We didn't choose them, prefer cherry versus maple or walnut, et cetera. I know you said they would be the same as the home we were in, but what about the bathrooms, laundry room, et cetera? We prefer natural wood, same as kitchen, not painted wood. Thanks, Lori & Ellie."

Q. How about that response from Kris? What did it say?

A. He says, "I have to put some type of finish on them."

Q.   And y'all's response?

A.   And I wrote, "Yes, was referencing the cherry cabinets in the kitchen we saw versus paint."

Q.   And you clarified?

A.   And "My misuse of the word 'natural,' my meaning is didn't want painted.  We like cherry wood.  Sorry if it was confusing to you, Lori."

Q.   Then Kris responded?

A.   "Okay.  Light or dark?"  And "I think dark prettier.  Your thoughts?"  "Walnut Creek home has dark, doesn't it?"  And he wrote, "Medium.  Dark is real nice."  "Dark would be good then, nice contrast for the light granite, too.  Thank you so much."

Q.   So, it seems at this point y'all talked about some specific things you wanted in the home right?

A.   Yes.

Q.   And Kris said, you know, we'll stain it however you want it, right?

A.   Yes.

Q.   Okay.  Let's move on to the next one there at the top of the page.

A.   I wrote, "Good morning, Kris.  Wanted to make sure my mom got things right with you yesterday.  The bathrooms are going to have to cherry cabinets with granite tops too, right?"  From Ellie.

He wrote, "No. Just the kitchen will have cherry but it will have granite."

So, then we wrote, "What color in the bathrooms? Can you please call me because I'm driving?"

Q. And what did y'all discuss, or was there a phone call after that?

A. I have to suppose so, because the next text isn't for a few days.

Q. Do you recall what y'all talked about on the 18th?

A. I'm going to just figure we talked about colors and stuff.

Q. Okay. How about that one?

A. "Thanks for lunch. Have you found out the dimensions for the fridge space? Was wondering what kind of height there was for washer and dryer."

He says, "Just go buy it and send me dimensions, and we will build around it."

"Very cool, thanks."

Q. So, y'all went to lunch?

A. We did.

Q. So, Kris took y'all to lunch, and y'all had a pleasant afternoon, I guess?

A. It was.

Q. How does it -- go on right here. What's that

read?

A. "Washer and dryer, stacking washer is 27 width by."

Then he wrote, "They won't fit." So, okay, then we rewrote it.

Q. You just clarified the dimensions?

A. Yes.

Q. Is it fair to say that these text messages were either from you or your daughter?

A. Yes. Depending on who was driving at the time, the opposite person was texting. We don't text and drive.

Q. Well, very good, but these are both your representations, correct?

A. Yes.

Q. Okay. How about that text message?

A. The one at the top?

Q. Yes, ma'am.

A. He says, "Just buy them and bring them to me or have them delivered to my main office" on F.M. 2977.

Q. And y'all are talking about the washer and dryers?

A. I believe it was just all the appliances, actually. It was just going to be all the appliances delivered to the house.

Q.   Okay.   How about the next one?

A.   Okay.   "Don't want them delivered" -- and he says, "Free delivery included."

And he wrote, "What?"

"We are on our way."

"Okay, I'm not there.   Open the gate and get them."

"Okay.   Are you at the office?   We have the ceiling fans."

"Just leave them at my main office."

"Okay."

"Thanks for the boxes, left fans at your office."

"Okay."

"Did you remember to mark them accordingly?"

"Yes, with the name, address and room."

"Okay."

Q.   Okay.   So, you bought some fans, and you took them to Debo's office?

A.   Yes.

Q.   And you paid for those out of your own pocket?

A.   We did.

Q.   And Debo installed them in the house?

A.   Evidently, they did, from what we could see.

Q. Those are those specific fans you wanted, right? You chose the model, the style?

A. We bought them. Well, we bought two of the three. One was a gift from my dad.

Q. But those are fans you wanted in the house?

A. Yes.

Q. Okay. Let's start back up here.

A. "Good morning, sorry we missed your call earlier."

"Kris, didn't get pic."

"What's your e-mail?"

"Got it this time."

"Oh, got the one we picked?"

"Well, they were sent at the same time, so it will show up."

"Got it. Looks nice, tricolor."

"Okay. I'll order it then."

"Thanks."

"Do you have an e-mail I can send pics to? Too much for my phone to send. Thanks."

"Will you meet me at the house this morning?"

Q. Real quick, before we move on, what were y'all talking about? Pictures there, that you mentioned sending the picture and tricolor, what were y'all

talking about?

A. Roof colors.

Q. And y'all chose a gray roof, I believe?

A. No.

Q. What color was it?

A. The original roof color that we chose was like kind of a medium to dark brown. It was like a tricolor.

Q. So, you're saying that that's the color you wanted on the home, was sort of a brown color?

A. Yeah, it was sort of a brown, a medium to dark brown, the original roof color that we chose.

Q. Okay. Then we get in some texts about the inspection. Mind reading this?

A. Sure. "Good morning. Please let us know when they man to put in the sheetrock and insulation. Our inspector, Mr. Kneuppel, needs to go through the house again before it is installed. Thanks."

Kris wrote, "Okay. Tell him to be there Monday."

"Okay. Thanks, I will."

"Mr. Kneuppel would like to see the house after insulation and before the sheetrock. When do you think that will be? Still Monday? Appreciate you working with us on this."

"He has until Monday to complete his part

because we're sheetrocking Tuesday."

"Okay. Thanks so much."

Q. Would you mind going on?

A. "No worries." "Happy Mother's Day."

"Thanks, appreciate the wishes."

"Do you know if they got the insulation completed yet? Thanks."

"All I was told that they started between 2:00 and 3:00, and that's it. I know they will finish today, but not a time of completion."

"Okay. Thanks for info. Have a good evening."

Q. Okay. Here's another set of text messages. So, there's one from your daughter's phone and one from your phone?

A. Um--

Q. Because these start --

A. I suppose so.

Q. Okay. So, let's go ahead and go down each of them.

A. Okay. "The back door with the window will not fit our dog door. The space is only three feet. We need three feet, eight inches. We would like a door without a window."

"Noticed the hot water heater was

installed. I never got a price for a tankless hot water heater" -- "tankless water heater. Please let me know why."

"Good morning. Did you get my message about the water heater? The difference is $900."

"Thanks for the quote. I'm thinking it through. I've decided against the tankless water heater. Since the hot water heater is already installed, we will need floored access to the water heater. Thanks again."

"Don't worry about the other water heater. That was my bosses fault. We can put in the tankless water heater. He apologized for the mistake."

"It's okay to leave the hot water heater. Because of this heater's location, I would prefer to have the attic floored for easier access. Thanks."

"Okay."

Q. Okay. Let's go on.

A. "Please let me know when the insulation is completed. I would like to come out to the house tonight."

"They will start at 2:00 and will be finished today," 5/13.

"Thanks."

"No worries."

892

"Talked about the garage being climate controlled. Noticed there wasn't insulation in the garage. What can we do to fix it?"

"Garage has to be insulated. How much would it cost?"

"I'll ask and tell you tomorrow."

"Thanks."

"Have you found out how much it will cost to install insulation?"

"Waiting on a call back from the owner." "$400."

"Okay. And this price includes attic over garage, too?"

"I'm sorry, I thought you just wanted ceiling done, but you want all the walls, it will be $800."

"That seems high. Going to check some prices. We'll get back with you."

"Well, they're going to sheetrock the house tomorrow. The reason it's a little high because they have to go back to the house. It would have been cheaper were if it" -- something.

Q. I think it continues on.

A. Oh, sorry. "If it had been scheduled a week prior." He says, "Can you please call me because they

are showing up today and not tomorrow to sheetrock the house. My boss said he'll knock off a hundred dollars if you want to do it."

Q. And that's all the text messages, correct?

A. Yes.

Q. Well, where in that does it say Kris is demanding payment from you?

A. He called us.

Q. No, you just said to this jury that he texted you.

A. I said he contacted us.

Q. Your testimony on that record says that he texted you a demand for payment. Is that not true?

A. He did contact us. He contacted us. I know he called us with demand for payment. He contacted us.

Q. But he didn't text you; yes or no?

A. I don't see it there.

Q. Now, Ms. Miller, before you retired, you were an accountant?

A. Not a CPA.

Q. Have you had any formal training in construction?

A. No.

Q. Have you ever been taught how to identify construction defects?

A.  No.

Q.  So, you admitted that a lot of these construction issues are simply beyond your expertise?

A.  I just know things didn't look right.  That's why I hired an inspector.

Q.  And reviewing the construction of a new home, that's something new to you, right?

A.  Not brand new.

Q.  I think you said you had a home built for you up in Ohio a few years ago?

A.  Yeah.  Back in the Eighties, yes.

Q.  But it's not an everyday or common occurrence for you to participate in the home building process?

A.  That's true.

Q.  Now, during the contract negotiations, whether we're talking about the first contract or the second contract, you only spoke to Kris?

A.  Yes.

Q.  And yesterday and today, I believe you said that you only met with Kris twice?

A.  That's not -- no.  What I said was we met twice to sign the original contract.

Q.  What's the rest of that story?

A.  Well, we met with him many more times, whether it was to pick colors or to pick granite tops or look at

problems, or even just for lunch. We met many, many times. I can't count how many.

Q. So, probably more than a dozen?

A. That's possible.

Q. And it took, you know, about a dozen times or more or less to finally decide on a contract that you were happy with, right?

A. No, not to decide on a contract, to make all those choices. There's many choices to make in a home, whether you want this color of paint on the walls or that -- that kind of facade, whether you want the hip to go this way or that way. There's just so many choices. So, you meet with your builder or your representative of the builder to make those choices, and he invites you to do that as many times as you need.

Q. That's fair. You had a lot of questions, you asked questions from A to Z?

A. Yes.

Q. Because you wanted to be personally comfortable with what you were signing?

A. And he did that at the first -- those two meetings, those first two meetings.

Q. So, the first two meetings were different from the other meetings that happened after?

A. Well, those first two meetings had to do with

just the initial contract.

Q. Now, you weren't rushed into signing either the contract we've seen in Exhibit 1 or this other contract that we learned about today?

A. I -- I felt a little bit almost -- because, I, mean, he wanted to get go. He just kept saying, "We can get you a great house." I wanted to get the financing. We couldn't get the financing because I'm on a fixed income, and my daughter is commission only. So, with the new financing laws, they wouldn't approve us. They knocked us out from the get-go. And we've got a great credit score, but that doesn't matter anymore. So, at that point, we sat down and talked about it, and he knew that I had this money put away for all these years, and he said, "Oh, no, we can work out -- we can work this out. We sell all these homes." And I did feel pressured into buying right away with this three-tiered, three-phase program.

Q. Do you ever remember testifying differently?

A. I may have. I might not have remembered then.

Q. As I mentioned before, the deposition, May 8th, correct?

A. Yes.

Q. Do you remember I asked you, "Were you rushed into signing it at all, you know, coerced into signing

this at all?" Your answer was no. You disagree with that?

A. I was not rushed into signing the financing contract.

Q. So, it was different from the other contract?

A. Well, that one moved quite quicker. That one seemed to -- in my recollection, it moved a little quicker.

Q. And you also said that you signed the finance contract?

A. Yes.

Q. Freely and openly?

A. Yes.

Q. Different for the cash one?

A. Well, I signed that freely, but he answered -- he had all the right answers. We were getting exactly what was in the model, we were getting the exact AC unit, exact cabinets. Everything was exact.

Q. Well, you testified before that you had Stan, your friend, who was also a realtor?

A. Yes.

Q. He read over the financing contract, we'll call it, completely, right?

A. Yes.

Q. Did he do the same with the other contract?

A. No, he wasn't there with us.

Q. Now, you've alleged that Kris made numerous representations to you during the contract negotiations and after the contract was signed?

A. Yes.

Q. Whether it be the financing contract or the cash one?

A. Yes.

Q. And Kris promised you, you said, that he'd give you a house you'd be comfortable with?

A. Yes.

Q. He said Debo would fix what needed to be fixed?

A. He said we'd fix everything.

Q. Kris promised that the home was 100 percent guaranteed; that's according to your testimony?

A. Yes.

Q. And you've previously testified that that was it, that's all he said to you as far as representations and warranties, correct?

A. I may have. I'm not sure.

Q. Those, I think, four things I just said?

A. Okay.

Q. That's all you told me before. But now you're telling us about a lot more representations here in this courtroom today, correct?

A. You're asking more questions, different questions.

Q. No. The question is what representations and warranties did Debo make to you? Now, I asked you that question in your deposition. Do you remember?

A. Yes.

Q. And you responded he said -- you said that Kris said he represented that you'd get a home that you'd be 100 percent guaranteed, personally satisfied, comfortable with, that he'd fix what needed to be fixed, and that's it. those are the only representations you identified, right?

A. Okay.

Q. Well, then why are we having these new representations brought up in court today? Why didn't you tell me back then?

A. You didn't ask to identify what -- what 100 percent completely satisfied means.

Q. Well, that's not what I'm getting at. I want to know what Kris said to you. However you interpret it, that's not what I'm asking. That's up to you. I just want to know what Kris said.

A. He said they would have high quality. He said that they would have high-quality work. He told us that they would have supervised -- that there would be

supervised -- they would be supervised while they're there, and he explained that there would be inspections, building inspections along the way, and he told us if there was any problems, they'd be fixed before the next phase. That's what he told us.

Q. And those are warranties?

A. Yes.

Q. Well, do you ever remember testifying differently?

A. I may have.

Q. And why is that?

A. Because I couldn't recall at that time. I was asked a lot of questions.

Q. Well, it's a little inconvenient that I took your deposition for almost six hours, and I expected to get the full truth about all the facts in this case. I come here today, it's August 20th, and I get a different answer. Is that fair?

A. I don't think it's a different answer. It's what I recall.

Q. So, your memory's gotten better in May to August, even though all the events happened spring of '13?

A. Actually, yes, because I was going through menopause, and I'm taking black cohosh. It helps.

Q.   Ms. Miller, how can you expect Debo to prepare a defense if they really don't know what's coming?

A.   I don't know.  I'm not a lawyer.

Q.   I'm trying my best.

THE COURT:  Counsel, we don't need any side-bar remarks.

MR. MARTINEZ:  Yes, Judge.

Q.   (BY MR. MARTINEZ) Now, did Debo fix all things that you wanted them to fix before June 3rd?

A.   All things?

Q.   Correct.

A.   No.

Q.   How do you know that?

A.   Because when we walked around the property, we could see there were still things that weren't right. We walked around the property prior to inspection, and there was still a couple of things that were still -- that didn't look exactly right from -- we didn't go inside, because the building was -- you know, the house was closed.  And this was in July.  But there were still a couple of things that didn't look right to us.

Q.   Okay.  So, you walked around the house in July?

A.   Yes.

Q.   Do you recall a better date?

A.   No.  It was just prior to when would he thought

our building inspector or building expert was going to be getting out there.

Q. Well, you were there in July. When was the time that you were there previously to that? When was the last time?

A. End of May, after the 22nd.

Q. Because that's when your lawyer sent the e-mail telling Debo to stop?

A. Possibly. No -- I don't -- I don't believe so. I'm not sure.

Q. So, you don't know when the last time you were at the home before the time you were there in July?

A. Not really, no.

Q. Well, if your lawyer told them to stop, told Debo to stop working on May 22nd, how do you know they didn't stop working?

A. I had been out there in the beginning of June. We -- and they continued. I apologize.

Q. So, you were there in June?

A. Yes.

Q. Can you give me a better date?

A. No. I really can't give you an exact date.

Q. Well, what did you see when you went there in June?

A. They were continuing construction.

Q. Well, that date is sort of important, Ms. Miller, because there will be testimony in this case about when construction restarted.

A. It was -- I believe they -- they may have stopped for a couple of weeks, maybe two weeks, and then they continued again.

Q. Do you remember testifying differently?

A. I don't recall.

Q. Well, earlier today you said that Debo did not stop construction.

A. Okay.

Q. Now, you're saying they did stop construction. Isn't that what was said?

A. Yes.

Q. So, you hired this Mr. Harold Kneuppel, correct?

A. Yes.

Q. Because you wanted a different point of view about how things were going?

A. Yes.

Q. If you wouldn't mind just letting me finish the whole question, then answer.

A. (Nodding.)

Q. So, you just wanted an additional point of view on how construction was going?

A. Yes.

Q. In fact, you wanted another point of view outside of Mr. Kneuppel, didn't you?

A. Well, I wanted Mr. Kneuppel, because I saw things that weren't right, and I'm not an expert. And I thought, well, if it doesn't look right to me, I need somebody who may be not an expert but an inspector to say -- to verify what I'm seeing and tell me that what I'm seeing is actually right or wrong.

Q. Ms. Miller, my question is a little different.

A. Yes.

Q. I was asking whether or not you wanted another point of view besides Mr. Kneuppel's?

A. Yes.

Q. Another inspector?

A. Yes. We -- after Mr. Kneuppel's inspections were done, we wanted a building expert to come in and take a look, who actually is -- knows all about construction and soundness and all that.

Q. Well, isn't it true that you wanted another point of view because you didn't agree with Mr. Kneuppel about everything?

A. No. I don't think you can -- I liked what Mr. Kneuppel said about everything. He brought things to my attention that I would have never seen, because he -- he

saw -- he saw things that were a revelation to me. And I liked what he said. I don't -- I just know he -- even what he even told me, what he can do is limited. He has limitations on his expertise, and then we just felt we needed somebody else to go a step further.

Q. Well, Ms. Miller, isn't it just true that you wanted someone to agree with all your opinions about the construction?

A. No. I like diverse opinions. I like to hear from different people to know what's going on. That's why I brought in Mr. Kneuppel in the first place, because I sure didn't know what was going on and whether -- whether it was right or wrong. That's why I invited Kris to come to the inspections, so Kris could see and know what we were get -- looking at and whether it could be fixed, whether -- what needed to be fixed. And Kris got the reports from Mr. Kneuppel, and I wanted everybody involved. I wanted everybody's input, not -- not just mine. I knew mine was the lowest lay person that there was.

Q. Debo never restricted your access to the property, did they?

A. They did not. They restricted our conversations with workers. We didn't --

MR. MARTINEZ: I'll object as

nonresponsive.

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Did Debo ever prevent you from taking pictures of the home?

A. They did not.

Q. Did Debo ever tell you that you're not allowed to have an inspector go in the home?

A. They did not.

Q. So, you were free to send an inspector to go look at the home?

A. I didn't understand your question.

Q. You were free to send an inspector to go look at the home, correct?

A. Yes, we could.

Q. Was Mr. Kneuppel ever restricted during his inspection of the home?

A. No, he wasn't. He wasn't restricted.

Q. Did Debo ever protest or try and prevent Mr. Kneuppel from coming in and looking at the home?

A. I don't believe they did, no.

Q. Let's talk a little about your home choice, about the specifics of your home. Now, you were free to choose whatever type of home you wanted?

A. Well, within -- it had to be one of their floorplans. It could be modified, not whatever -- I

mean, build a round home or something.

Q. It wasn't an A frame or something like that?

A. Yes.

Q. But you were free to pick and choose what type of lights you wanted, what type of roof, all that?

A. Yes, as long as it fell within their -- with their choices.

Q. Let's look at those choices, so we can get a better idea of what you chose here. Is that the home you chose?

A. Yes.

MR. MARTINEZ: That's Exhibit 3, for the record.

Q. (BY MR. MARTINEZ) Why did you choose that home?

A. Because it looked low maintenance, and it just -- just I didn't want to have a lot of maintenance with painting or a lot of debris like in gutters or -- just something simple that we could maintain ourselves.

Q. And we're talking about this one, right?

A. The top one, yes. The one that's circled.

Q. The one on top. Did Debo pressure you into choosing that home?

A. No, no, we chose that. We liked the style.

Q. All right. What do we have here in this picture?

A. The floorplan that we -- with a couple of modifications.

Q. Some of those modifications, like you chose to put a dome light in the breakfast room?

A. Yes.

Q. And you chose to increase the square footage? That may not be in there, but --

A. No, I don't see that at all.

Q. But you did choose to increase the square footage at one point?

A. It is -- it's out the back a little bit, and we made the back porch a lot bigger.

Q. That area? (Indicating.)

A. Yes.

Q. You also chose to put a sink in the garage, right?

A. Yes.

Q. That was so y'all could, I think, bathe your dogs in the garage?

A. That would be a dog washing area.

Q. So, you wouldn't have to do them in your home?

A. Right, so I wouldn't have to drag them through the house when they run around.

Q. Also, you wanted a window put there in the garage?

A. Yes.

Q. Why was that?

A. Oh, so that we could put an AC unit in, so we could climate control the garage for the dogs. We were going to put individual kennels. In fact, we already bought them. Put individual, like eight-by-eight kennels. We were going to turn the garage into like just a little dog run for them, so that -- so the dogs could kind of stay out there. So, they were just going to enjoy a lot of running room out there. I mean, they're performance dogs. They've got a lot of energy.

Q. What type of dogs are they specifically?

A. We've got a couple of Schnauzers, a standard poodle and a Welsh terrier.

Q. So, that would be their home, the garage?

A. Well, no. The land would be their home. The whole home would be their home, but that's their sleeping area, and their -- I guess their siesta area. But it would be a lot nicer than just a little small box that we have now in our current home.

Q. And that's why you went to Debo, because they could do something like that for you?

A. Well, that's what they promised.

Q. You also wanted tile throughout the entire home, correct?

A. Yes.

Q. And you were again allowed to choose these things on your own free will?

A. Yes.

Q. You also made a complaint that the square footage of the home was actually short?

A. Yes.

Q. Well, what happened there?

A. Nothing.

Q. Are you alleging that Debo gave you a home or was constructing a home with less square footage than you agreed to?

A. We questioned it. We never heard whether it was or wasn't. We just asked a question, but we thought it was.

Q. Well, do we know if it's correct or not?

A. I don't know. We weren't allowed back in the house. We had a no-trespassing order against us.

Q. I'm talking about up until May 22nd. When did you believe that the square footage was incorrect?

A. When we saw that brick wall that was at the edge of the foundation and then the actual frame of the house was inches in.

Q. So, that's the only part that was cut off?

A. Around the whole house.

Q. You mean the brick wall around the entire house?

A. The frame is inches in. The frame is inches in from the foundation, then they made the wall to the edge of the foundation. So, we just questioned whether -- why there's this big gap between the wall, the brick wall and the frame. And so if you're three-plus inches in, that means you must be losing square footage inside the home. We just questioned it. We just wanted these questions answered.

Q. Well, isn't it true that that's common in construction, where you put the brick on the edge of the foundation?

A. I don't know. I'm not -- yes, but it usually is attached to the frame. There's not a gap of a fist or so -- (indicating) -- from what I've noticed. I'm not a construction expert.

Q. Now, you agree that after you told Debo about the issues they needed to repair in the home, that they could have repaired them?

A. Yes, they could have.

Q. And you told Kris about these concerns and problems?

A. Yes. Yes, we did.

Q. And Debo did, indeed, repair them, didn't they?

A. They repaired some. I don't believe they repaired all of them.

Q. You don't believe they repaired all of them, or do you know they didn't repair all of them?

A. Well, I can't know, because they drywalled it.

Q. So, you're saying that there are hidden things behind that drywall?

A. There may be. I don't know. They drywalled it.

Q. Ms. Miller, you understood that when you brought these concerns to Debo, the home was still under construction?

A. Yes.

Q. And you understood that Debo still had work to do?

A. Yes.

Q. You understand that they're not saying that the home was done and not capable of being fixed?

A. I do.

Q. And according to the contract, I believe either one, Debo is allowed to take until June 3rd to make those repairs?

A. Yes.

Q. And you have no evidence or opinion on whether or not there is any defect in that home today?

A.   Today, like right today?

Q.   Right, today, any day after.

A.   Well, we weren't allowed to bring our home inspector in.  It was drywalled over, so I can't know.

Q.   So, you can't know.  You're not telling the jury that you know there's a defect in the home?

A.   No.  We weren't -- we weren't allowed to -- I can only tell you what we saw.

Q.   Let's talk about that other inspector real quick.  Now, you said that you agreed with Debo to go out there on a certain date?

A.   Yes.

Q.   And when was this supposed to be?

A.   It was at the end of July.

Q.   Okay.  There's no e-mail showing that, is there?

A.   I had told Kris.

Q.   There's no text message showing that you'd be there on that date, is there?

A.   I don't believe so.

Q.   There's no letter showing that you would be there on that date?

A.   (Nodding.)

Q.   Is that correct?

A.   I didn't -- I don't believe so.

Q.   Now, you wanted to stop all communications with Debo around May 22nd because you felt harassed for payment?

A.   Yes.

Q.   And how many times was that?

A.   I don't know the exact number.

Q.   Now, you weren't at the home site, or were you at the home site every day after you signed the contract?

A.   Not every day, no.  It was impossible to be there every day.  I was definitely there once or twice a week.

Q.   Do you know the superintendent's name?

A.   No.  It's -- no, but I know what he looks like.

Q.   Do you know if he speaks English?

A.   I don't believe he does.  He may speak a little English, but I know he speaks Spanish.

Q.   Because earlier you testified that --

A.   Yes.

Q.   -- you couldn't talk to the superintendent and the other workers on the home?

A.   We weren't -- we were asked specifically not to speak -- Kris asked us not to speak with them.  It had nothing to do with language barrier.

Q.   Well, perhaps it was.

A.    It wasn't.

Q.    Now, you contend that Debo's not entitled to take of $10,000 from your damages because they had to sell the home to someone else.  You're saying Debo doesn't get those damages?

A.    Well, they had an opportunity to pay us back long before.

Q.    I just want to know whether you think Debo is entitled to receive $10,000 because they had to sell the home at a smaller price to someone else?

A.    But it wasn't the same house anymore.  They changed things.  It wasn't all tile.  They put carpet in.

MR. MARTINEZ:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.    (BY MR. MARTINEZ) Ms. Miller, I'm just asking you whether or not it's your opinion that Debo should be refunded $10,000?

A.    No.

Q.    Even though, as we can see in the exhibit on the screen, this was a custom home, correct?

A.    Yeah.  Yeah, it was -- it was customized for us.

Q.    There's also another page showing the other features in the home, correct?

A. Yes.

Q. And it shows there you wanted a ceiling fan on the patio?

A. Yes, we talked about putting a ceiling fan, an outside ceiling fan out on that back patio to keep the air moving, which we planned on using that a lot, and at least having it -- and I believe we even bought the outdoor ceiling fan. We bought the ceiling fan for it. That was one of the three.

Q. What do we have here on this page?

A. That was the choices we made.

Q. What were some of those choices on that, on this list?

A. Okay. For example, no carpet, black appliances, bronze fixtures, patio lights, two doors for the fence, an oval -- a half-oval front door, tile in the bedrooms, and the choice of which tile and which grout, the tankless water heater, that we wanted to get the price for a tankless water heater, the Painted Desert shingles and to get the self-cleaning oven price.

Q. When it says shingles and Painted Desert, are we talking the roof?

A. Yes.

Q. That would have been what color?

A. That was like a medium to dark brown. We found

out later it was unavailable, that it had been discontinued or something. So, we didn't get our original choice.

Q. What did you end up choosing?

A. Something that Kris had sent us a picture of on the computer.

Q. Can you tell us what color that was?

A. It was like a medium -- it was like a light brown. It was nice. It would reflect the sun real well, wouldn't make it too hot to run up your AC bill.

Q. You understand that Debo purchased the lot on which this home sits?

A. I'm sorry?

Q. You understand that Debo purchased the lot on which this home sits?

A. Yes, yes. They purchased it?

Q. Yes. You agree with that?

A. They purchased it from us?

Q. No, the lot, the vacant land for them to develop.

A. Oh, yes.

Q. And you only paid them one payment of $60,300?

A. Correct, yes.

Q. And that payment essentially gets Debo through the foundation work and the framing work, correct?

A.   No.   It gets the foundation, framing, electrical, plumbing, all the way through the insulation.

Q.   But before drywall?

A.   Before -- yeah, it stops at the drywall.

Q.   So, if anything continues past that, Debo would have to finance it out of their own pocket if you didn't make another payment, correct?

A.   I don't know.   I thought it stops at drywall, and then I pay them, and then they continue.   I don't really know.   I don't know the construction business.   It's not my business.   It wasn't --

Q.   Did Debo --

A.   I'm sorry.

Q.   Were you finished?   I'm sorry.

A.   No, I'm done.

Q.   And Debo themselves, they paid all the trades, the framers, the foundation people, correct?

A.   Yes.

Q.   So, even though Debo made this home for you with these custom choices, they had to finance the project out of their own pocket, you still think that entitles them to receive $10,000 in damages?

A.   No, because they -- they wouldn't work with us. They ignored all the pleadings and all the times we

wanted them to help us. They just kept snowballing through, and they were not going to stop until it was done. They were not -- they wouldn't listen to us. They wouldn't look and see the broken beams. They wouldn't -- they just wouldn't listen until we had to get attorneys involved, and that was not something we wanted to do.

THE COURT: Counsel, let's go ahead and take our lunch break at this time.

Ladies and gentlemen of the jury, I'm going to ask you to be back in the jury room at 1:30. Remember the instructions I've given you: That is, do not talk about this case with anyone, even amongst yourselves while you're out at lunch. Have a good lunch, and we'll see you back at 1:30.

(Jury out)

THE COURT: Counsel, see y'all back at 1:30.

(Lunch break)

(Jury in)

THE COURT: Be seated. You may continue.

MR. MARTINEZ: Thank you, Judge.

Q. (BY MR. MARTINEZ) Ms. Miller, earlier today, you said that Debo made representations to you about rebar insulation or wire mesh insulation in the

driveway?

A. Yes.

Q. Do you ever remember testifying differently?

A. I do remember.

Q. And you recall when that was?

A. When my testimony was, or when they made the representations?

Q. When you had the different testimony.

A. Different than what? I'm sorry, can you rephrase the question?

Q. Sure. Earlier today, you said that Debo represented that they installed either wire mesh or rebar in your driveway?

A. Yes.

Q. I asked you, do you remember testifying differently about that?

A. No.

Q. You remember your deposition May 8th at your lawyer's office?

A. Yes, it was six hours long. I remember it.

Q. And you remember me asking you a question about rebar installation?

A. Yes.

Q. You remember me asking you -- the question was: "Did they make any representations about the rebar in

the driveway, whether it would be there or not be there?" Your answer was no. Why is it different today?

A.   Because when I asked Kris -- later on, when I asked Kris about it, he told us there's mesh in the driveway.

MR. MARTINEZ:  Judge, may I display the excerpt?

THE COURT:  Yes, sir.

MR. MARTINEZ:  Thank you.

Q.   (BY MR. MARTINEZ) Ms. Miller, you see the highlighted portion?

A.   Yes.

Q.   My question is why you told me no, Debo made absolutely no representations about the rebar in the driveway, but today you're telling us they did?

A.   That was within the six-hour context of a deposition. Kris told us later on, when I questioned why there wasn't any rebar, that you had to pay extra for rebar, that was something we had to bring out up front. He told us that it would be mesh, like a wire mesh in the driveway.

Q.   So, you admit that your answer in the deposition was incorrect?

A.   No. The question talks about rebar.

Q.   So, you're saying the representation was wire

mesh?

A. He told us there would be wire mesh.

Q. Then why did you talk about rebar this morning during your direct examination?

A. Because I asked him about both. I had asked him about rebar, because I had observed rebar being put up on my street when I came home that day. So, that was an awakening for me. So, I called him, I said when I saw the driveway being put in, I saw nothing but concrete, no rebar. And he said, "We don't put up rebar, we put wire mesh down." And I didn't understand him.

I said, "What's the difference?" He said, "Well, wire mesh isn't quite as good as rebar, but you get wire mesh."

I said nothing was put in, and he said nothing.

Q. Because when you were negotiating the contract with Debo, you never asked them about wire mesh or rebar, correct?

A. I never -- no.

Q. Earlier, we talked about how -- or you mentioned that there were, indeed, two different contracts?

A. Yes.

Q. Well, this is the contract that's been produced in this case, that's Exhibit 1. And right here, you'll see there's a whole section called "Financing." Correct?

A. Yes.

Q. Well, you're telling the jury that this is a financing contract, so why isn't that section filled out then?

A. I don't know, but B, says "Sum of all financing, 118,700.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Ms. Miller, if this is a financing contract, why are there no checks about third-party financing, you know, or promissory notes?

A. Because we hadn't gone to a mortgage company yet. We hadn't chosen a mortgage company yet. We were seeking approval from -- whether it was Chase or whomever to approve us.

Q. Why isn't there an addenda or addendum to this contract saying this is what the financing's going to be?

A. I don't know. This is what we were given.

Q. And this is the only contract in this case, correct?

924

A.    No.

Q.    Ms. Miller, you also said that you have a friend, Stan, the realtor?

A.    Yes.

Q.    And that he reviewed this contract for you, only this one?

A.    Yeah, he came with us that day.

Q.    Which day would that be?

A.    The day we signed this, April 13th.

Q.    So, he came with you and met with Kris and reviewed this contract the day you signed it?

A.    Yes.

Q.    I'm looking at this page here.  It talks about broker information.  Is Jan -- I can't read that name.

A.    Pascovsky.

Q.    Pascovsky?

A.    Right.

Q.    Is that the broker for Stan, the realtor?

A.    Yeah.  Stan and Jan, they're the spouses who sell houses.  And so Stan's Jan's husband, and Stan -- we're just more -- we're just better friends with Stan, so he came with us.  But that's their -- they're in business together.

Q.    So, he signed this April 13th?

A.    Yes.

Q.   And you're alleging that Debo never let you take this contract home?

A.   This particular one?

Q.   Uh-huh, yes.

A.   No, we have that one.

Q.   I mean before you signed it on April 13th, did Debo allow you to take it home and review it?

A.   They did not.

Q.   Earlier, you mentioned that your May 21st e-mail told Debo to stop construction.

A.   Yes.

Q.   Well, I'm just curious where in there it says that.  Is it on the first page?

A.   (Reading.)  No.

Q.   Can you point out to us where it says that on the second page?  Take your time.

A.   (Reading.)  Well, in the final line, "We expect Debo Homes to have completed all of these repairs prior to us submitting any more funds to you."

Q.   Does that say stop construction?

A.   Yes, because the next -- the next payment was due prior, at the time of sheetrock.

Q.   Would you mind just reading those two lines real quick?

A.   "We expect Debo Homes to have completed all of

926

these repairs prior to us submitting any more funds to you."

Q. Thank you. Now, earlier you said that you were dumbstruck that when you showed up at the homesite, you saw a "For Sale" sign?

A. Yes.

Q. Could you describe that feeling a little bit more for us?

A. Yes. We were just very surprised to see that the house was for sale, and it had been completed, and not to our specifications. We just -- we just were very surprised, because we weren't informed. We weren't aware that it had been put up. We thought we were still onboard for the next inspection.

Q. But you've testified also that that was fine, Debo was free to sell to someone else?

A. It was in the contract under negotiations. It could be negotiated.

Q. But Ms. Miller, you've testified before in your deposition that it did not bother you that they sold to someone else. Is that true?

A. That was part of the negotiation process.

Q. Well, Ms. Miller, I was asking whether or not you agree that you previously testified that you did not have a problem with Debo selling the home to someone

else?

A. That's true.

Q. Ms. Miller, your attorney showed you some pictures of the home. I think one of those pictures had a table -- this one right here. (Indicating.)

A. Yes.

Q. Well, you testified that, I think it was June, you said you went by the house and looked at the outside?

A. Yes.

Q. Well, how did you get this picture of the inside?

A. Through the window.

Q. This is through the window?

A. Yes, sir, with my phone camera, through the back window.

Q. Was there a grate there or anything?

A. No, there was no screens. All the pictures we took of the interior of the house was through the windows. We never stepped inside of the house.

Q. So, I'm looking at, you know, this window across the way. It's hard to see, but there are -- you know, there's grate around it. Did the window that you took the picture through have those grates, you know, crossbars, what have you?

A. I don't know. We might have took it through the back door. I'm not sure. I know we took them through the windows. I put the camera right up on the window.

Q. Ms. Miller, you understand that by the time your attorney sent that e-mail on May 22nd telling Debo to stop construction, and between the time we, as lawyers for Debo, sent a response in late August, that had been a couple of months, right?

A. Yes.

Q. Is it fair to say that there are some costs incurred by Debo during those few months?

A. There might be. I don't think so, though.

Q. Well, if Debo had to finance the rest of the construction, wouldn't they have had to pay that out of their own pocket?

A. They should have stopped construction.

Q. Ms. Miller, that's not my question. My question is: If they had to finance it out of their own pocket, wouldn't they have had to pay incurred costs?

A. They were asked to stop construction.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Sustained. Answer the question.

Q. (BY MR. MARTINEZ) Ms. Miller, I'm just asking

you whether it's reasonable that if Debo had to pay to finish construction on the home, that they would incur some costs?

A. If they continued, yes.

Q. Well, if they had to take out, you know, a loan to finance the rest of the construction so they could sell it to someone else, isn't it true that there's interest on that loan?

A. There might be.

Q. Well, isn't it true that if they had to put the home back on the market, they'd have to pay for various marketing costs?

A. I don't know what their marketing costs would be.

Q. But it's fair that they would incur some?

A. I don't know. They -- they have signs everywhere anyway.

Q. What I'm getting at, Ms. Miller, is Debo sent you a letter on May 29th, this letter that we've seen before, and towards the bottom it says that Debo will refund you a hundred percent of the money, correct?

A. Yes.

Q. Well, this is May 29th.

A. Yes.

Q. Before the home was finished, correct?

A.    Yes.

Q.    Before Debo had to pay the rest of the trades to finish the home?

A.    Yes.

Q.    Before Debo had to put the home back on the market and pay for marketing?

A.    Yes, except it was already just about done at that point.  We gave them 90 days at that point to sell the house, and we never heard back.

Q.    I'm going to go to the top real quick, so we can see what we're talking about.  This is a letter from our firm on August 30th, correct?

A.    Yes.

Q.    And at the bottom, it says that you will receive your money back, but minus the costs that Debo incurred.  Is that fair?

A.    No.

Q.    Well, I'm just asking if that's what the letter says.

A.    That is what the letter says.  That's not fair.

Q.    Well, that's not my question.  My question is that we just talked about how Debo, if they had to pay for the rest of the trades, you know, pay to hire us, and pay to finance the rest of the construction, it's different from May 29th to August 30th.  There's a

difference, isn't there?

A. They didn't have to pay to hire you. They could have given us the money. We gave them an opportunity to sell the house.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Ms. Miller, I just want to know whether or not it's fair to say that at the time Debo sent you that letter on May 29th that we just looked at where they offered you 100 percent back, in between that time on May 29th to August 30th, Debo incurred costs, and, therefore, they had to reduce the payment they could give you back. Is that fair?

A. No.

Q. Ms. Miller, also you said something earlier. You said that you had to deal with Debo's lawyers in May?

A. This past.

Q. Oh, 2014, not '13?

A. Yes, sir.

Q. Okay. I just wanted to clear that up. Earlier, you said that Debo never actually offered you the money back, isn't that right? Earlier today --

A. Yes.

Q. -- you said that Debo did not offer you your

money back. Do you recall saying that?

A. They offered it in the letter. Then we gave them 90 days to sell the house. We never heard anything back from them until we got the letter from their attorney.

MR. MARTINEZ: Judge, I'll pass the witness.

MR. CROCKETT: Short redirect, Judge.

THE COURT: Yes, sir.

## REDIRECT EXAMINATION

Q. (BY MR. CROCKETT) Ms. Miller, in that letter that Debo Homes sent, did you see the rest of the part that Debo Homes' lawyer didn't highlight, which was to pay you back "whenever we sell the home"?

A. No, not right now. I mean, I did, at first when I read it, yes.

Q. When you first were buying the house, did you agree to give Debo Homes a loan of $60,300 for as long as they want?

A. No, not -- there was -- can you rephrase that the question?

Q. Yeah. Did you just hear Debo Homes' lawyer say, "Well, isn't it fair that we offered to give back your money whenever we sold the home"?

A. No, there has to be a time limit. I mean, they

can't keep my -- our money forever and never give it back.

Q.    How long have they kept $60,300?

A.    A year and a few months.

Q.    Until really just Monday?

A.    Yes.

Q.    Before they were talking to you about the deposition and Debo Homes' lawyer showed you just one segment of it.  They didn't show you the entire six hours, did they?

A.    No, not at all.

Q.    During that six hours, did you get asked the same question again and again and again?

A.    Yes.

MR. MARTINEZ:  I'll object to misconstruing the evidence.

THE COURT:  Overruled.

Q.    (BY MR. CROCKETT) Did you get asked the same questions again and again and again?

A.    Yes.  They continually asked identical or near identical questions.

Q.    Did you testify during your deposition that the payment was due before the drywall went in?

A.    Yes.

Q.    When you were asked when the specific date you

were supposed to pay was, did you know?

A.    No.    There was not a date.    I said I don't know.    They said, "When is the next payment due?"    I said I don't know, because there was never a specific date.

Q.    When Debo Homes' lawyer asked you about the representations, did he ever add context to it, like representations during the first contract, or representations during construction, or did he basically just say, "Tell me every single representation that Kris told you whenever"?

A.    It was -- it was open-ended.    It was -- it was whenever.    It was -- there was no Phase 1, Phase 2.    It was just, "We want to know it all, and if it's not all, then it doesn't count."

Q.    One of the things I was going to ask you about is the text messages.    When the text messages were sent in Exhibit No. 3, do you know what date the texts ended, at least in the exhibit?

A.    Looked like around maybe -- was it the 12th, 13th or something like that?    I don't know the exact date, no, if I'm not looking at it.

Q.    The last date of any of the text messages, May 14th.

A.    Okay.

935

Q. Did Kris keep contacting you after that?

A. Yes, he did.

Q. Is it kind of hard to say, "Well, show me where it's at," when you know it's not even all of them?

A. Yes.

Q. And one of the things, Debo Homes' lawyer asked you about if you had any evidence that there were any defects in the home. On May 9th, did you see problems during the inspection with Mr. Kneuppel?

A. Yes, yes. We saw many problems.

Q. In May 13th, on the second inspection, did you see problems at the home?

A. Yes, we saw even additional problems.

Q. When was that second inspection at? Was it in the afternoon or the evening-time?

A. It was in the afternoon, late afternoon, after the workers were all done.

Q. By May 14th, the next day when they drywalled everything up, based on what you had seen from their work, was there any way that they actually fixed everything?

MR. MARTINEZ: Objection, speculation and expert testimony.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Do you believe that all of

the things that you saw on May 9th and May 13th were done before May 14th?

A.   I don't believe it could have been, because we were there after hours, and they started drywalling the next morning.  I don't know how they could have possibly fixed all of it in time.

Q.   Is there any way to show the evidence of the house when you drywall over the evidence?

A.   No one has showed me how.

Q.   Is it hard to go back and inspect a home after you sell it to somebody else?

MR. MARTINEZ:  Objection, this is speculation.

THE COURT:  Overruled.

A.   We haven't been able to.  That's why we peeked through the window and took pictures, just -- and we were unable -- you can't see.  It's covered up.

Q.   (BY MR. CROCKETT) Thank you, Ms. Miller.

MR. CROCKETT:  Pass the witness, Judge.

MR. MARTINEZ:  Judge, short recross.

THE COURT:  Yes, sir.

**RECROSS-EXAMINATION**

Q.   (BY MR. MARTINEZ) Well, Ms. Miller, if those aren't all the text messages, where are the rest?

A.   I don't know.  The phone I used to have got

stolen.

Q. How did you get some of them, not the others?

A. I didn't -- I don't know. Those --

Q. So, you said that it was inappropriate for Debo to wait until December to sell the home; that it was too long?

A. Well, what I -- can you rephrase that, please, ask it again?

Q. Yeah. You sort of were getting at that, you know, Debo didn't really tell you when they would ultimately sell the home?

A. Yes.

Q. That's just an open window, that could be whenever. Is it your testimony that it's inappropriate for them to not get to that until December, 2013?

A. Well, it would have been nice for us to know.

Q. Are you saying that was too long, it took them too long to resell it?

A. I don't know if that's too long. We didn't know. We weren't given opportunity to know about it.

Q. Ms. Miller, I think you'd agree that $60,300 is a lot of money?

A. It's a whole lot of money when I get very little per month.

Q. And wouldn't you agree that if Debo used that

60 grand to buy the lot, do the foundation, framing, electric, that uses -- that can use the 60 grand?

A. Well, it can. (Nodding.)

Q. So, then how is Debo supposed to get all that money back and give it to you if they already put it into the house?

A. Well, they offered it back once they sold it, so we needed a timetable. They offered it back.

Q. Are you complaining that it took Debo too long to actually put that money in the registry of the court?

A. Yes. They -- they had -- they sold the house in October, closed in December. They never gave us anything back.

Q. Isn't it true since October there's been an ongoing lawsuit?

A. Yes.

Q. Ms. Miller, you said that during your deposition I asked you the same question again and again and again. Which question was that?

A. Many, many questions. It was six hours long.

Q. Well, Ms. Miller, your attorney went over that I asked you about what representations were made, and you acknowledged that you did not disclose all the representations in your deposition, correct?

A. I probably -- I'm sure I didn't.

Q. Well, Ms. Miller, do you remember me asking you did Debo make any other express warranties besides the ones in the contract that we've seen? You remember that question?

A. Yes.

Q. And then you responded, you said, "Kris promised us we'd get a house we would be happy with, comfortable with and love, even after I brought an array of concerns and questions, and he answered every one exactly within my comfort zone." Does that sound familiar?

A. Yes.

Q. And then I asked, "Were there any other warranties that Kris or anyone else at Debo ever made to you before you signed this contract?"

Your answer was: "I don't recall."

Is it fair to say that I gave you an opportunity to give me more representations and more facts?

A. At that time, yes, maybe. Yes.

Q. Also, in your deposition, I went over your pleadings because the question I asked was, "Well, what numerous representations did Debo make to induce you to purchase the home specifically?" And you gave me a long list, and I think we've gone over those, like, you know,

he had the right answers, he said we'd have a home we'd love, and if we're not happy, it's a hundred percent guaranteed. And you gave me your full answer, correct?

A. It may not have been the full answer.

Q. Well, where else in this deposition did I ask you that question again?

A. I don't know, but within the deposition, you asked a lot of questions over and over. It was six hours long.

Q. Can you give me another example?

A. Not right now.

Q. Ms. Miller, earlier you said that the drywall covers up, you know, any defects, right?

A. I didn't say any. I said it covers up a lot of defects, covers up a lot of the defects we were looking at.

Q. Okay. And this is a picture that y'all took of the house, right?

A. Yes.

Q. And there's some drywall put up, right?

A. Yes.

Q. Can't you still see the studs?

A. Not -- not really. Only partial, only the bottom part, some of them.

Q. Well, is there anything blocking you from going

into the wall and checking things out?

A. That's not the complete drywall. That's only part of the drywall.

Q. I'm asking you if it's possible for you to go into this wall and look at things?

A. Some things.

Q. Ms. Miller, also you said that -- one last question. You said that Debo represented to you that they'd insulate the pipes in the home?

A. Yes.

Q. So, you thought that Debo would install insulation on the pipes?

A. That they would wrap the pipes, yes.

Q. You remember testifying differently?

A. They would wrap the pipes that needed to be wrapped.

Q. I'm asking whether or not you remember testifying differently about what Debo represented about the pipe insulation.

A. I don't recall.

Q. And in that deposition, I asked you, "Is that why you took the picture?" And I'm talking about the picture we saw earlier with the pipe. Let me see if I can get it. No. -- there we go. I think this was the picture, right? This is the pipe without insulation?

A. Yes.

Q. So, I asked, "Is that why you took the picture, that picture, because there was no insulation?"

And your response was, "I was" -- "Yes. I was -- I didn't know if it was supposed to or not. I took pictures of things I had questions about?

A. Yes, that's exactly true. I took pictures of things I had questions about, so our inspector could verify them.

Q. But you weren't sure whether or not this was supposed to have insulation?

A. That's right. I'm not a construction expert.

Q. Well, you told me that Debo represented to you that it would be covered.

A. That the ones that needed to be wrapped. The hot pipes, from what I learned, needed to be wrapped, but the cold ones don't. But that's their job to know which ones need to be wrapped and which ones don't. So, I took pictures of ones, does it or doesn't it. I'm not an expert. I took pictures of everything that looked unusual.

Q. Ms. Miller, was it fair for me today to rely upon your deposition in asking you questions?

A. Yes.

MR. MARTINEZ: Nothing further, thank you.

MR. CROCKETT:  No further questions, Judge.

THE COURT:  You may step down.

\* \* \* \* \* \* \* \* \* \* \*

THE STATE OF TEXAS §

COUNTY OF FORT BEND §

I, Karen Romeo Rothman, Official Court Reporter in and for the 400th District Court of Fort Bend County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $780.00 and will be paid by Defendant.

WITNESS MY OFFICIAL HAND this, the 17th day of September, 2014.

_____
Karen Romeo Rothman, CSR, CRR
Texas CSR 1510
Official Court Reporter
400th District Court
Fort Bend County, Texas
301 Jackson
Richmond, Texas 77469
Telephone: 281.341.4421
Expiration: 12/31/2014

# EXHIBIT 4: DEBO'S TRIAL EXHIBIT 2- CHECKS FROM LAUREL MILLER

**LAUREL N. MILLER**
2906 COLONIAL DR.
SUGARLAND, TX 77479

313

DATE 4/16/13

PAY TO THE ORDER OF DEBO Homes ............ $59,300.00

FIFTY NINE THOUSAND THREE HUNDRED AND 00/100 DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
Dallas, Texas 75201
www.Chase.com

MEMO 1115 LEAH ELIZABETH NEEDVILLE

⑈⑈⑈1000614⑈ 709267355⑈0313

EXHIBIT
2

DEBO-HMS00013

947

**LAUREL N. MILLER**
2906 COLONIAL DR.
SUGARLAND, TX 77479

314

DATE 4/16/13

PAY TO THE
ORDER OF DEBO Homes

$ 1,000.00

One Thousand and 00/100 DOLLARS

**CHASE ○**
JPMorgan Chase Bank, N.A.
Dallas, Texas 75201
www.Chase.com    11/16 Leather Rush
MEMO FOR 1830 4H

⑈111000614⑈     709267355⑈0314

DEBO-HMS00014
948

# EXHIBIT 5: DEBO'S TRIAL EXHIBIT 6- MPS INSPECTION REPORTS



**Mortgage Property Services, Inc.**
**J. R. SULLIVAN**
**CODE ENFORCEMENT OFFICER**
**Office (281) 324-3852**          mortgagepropserv@yahoo.com          **Fax (281) 324-2138**

REQUEST # Kay3465

# ON SITE FOUNDATION, INSPECTION REPORT

These inspections and reports are for the sole purpose of Mortgage Property Services Inc., the home builder and their requirements. The buyer or other parties involved in this property have other rights to inspections for their purposes and protection. This report is a professional opinion and is not a guaranty or warranty.

BUILDER __Debo Hms__          PROP ADDRESS __11115 Leah Elizabeth__

DATE OF INSPECTION __4/25/13__          SUBDIVISION __Rosswind__

LOT __5__ BLK __8__ SEC __1__          INSPECTOR __Jim Sullivan__

☑ PRE-PLACEMENT   PLAN # _____          ☐ PLACEMENT   PLAN DATE _____

**THIS REPORT IS FOR ON SITE AND INTER-OFFICE COMMUNICATIONS ONLY. THE OFFICIAL INSPECTION REPORT AND CERTIFICATIONS MUST BE OBTAINED FROM MORTGAGE PROPERTY SERVICES, INC. OR THE BUILDER.**

**FOR INSPECTIONS CALL (281) 324-3852** mortgagepropserv@yahoo.com

**LIST ALL SUBSTANTIAL, NON-COMPLIANCE WITH PLANS, SPECS AND RELATED CODES.**

A. ☐ NO NON-COMPLIANCE OBSERVED.

B. ☐ MINOR NON-COMPLIANCE OBSERVED AND LISTED. BUILDER SHALL COMPLY AND PROCEED

C. ☐ SERIOUS NON-COMPLIANCE LISTED. BUILDER SHALL CORRECT AND CALL FOR REINSPECTION.

### BEAMS

A. DEPTH SHOWN ON PLANS __26__ " (EXTERIOR)

B. DEPTH SHOWN ON PLANS __24__ " (INTERIOR)

C. WIDTH SHOWN ON PLANS __12__ "

D. FIELD MEASURED DEPTH __26__ " (EXTERIOR)

E. FIELD MEASURED DEPTH __26__ " (INTERIOR)

F. FIELD MEASURED WIDTH __12__ "

### REINFORCING STEEL

A. STEEL SHOWN ON DETAIL SHEET ☑ YES ☐ NO

B. IF "YES", WAS STEEL INSTALLED PER PLANS? ☑ YES ☐ NO

C. __5__ SIZE OF REBAR __N/A__ SIZE OF WIRE MESH

_complete float_
_tie cables at intersections_
_and top rebar_
_mystic pipes_

_work in progress_

__✓__ CORRECT AND PROCEED

_____ RECALL FOR REINSPECTION

__[signature]__
INSPECTOR'S SIGNATURE

DEBO-HMS00048

950

**Mortgage Property Services, Inc.**
**J. R. SULLIVAN**
**CODE ENFORCEMENT OFFICER**
**Office (281) 324-3852**

mortgagepropserv@yahoo.com

REQUEST # 164706

Fax (281) 324-2138

## ON SITE FRAMING INSPECTION REPORT

These inspections and reports are for the sole purpose of Mortgage Property Services Inc., the home builder and their requirements. The buyer or other parties involved in this property have other rights to inspections for their purposes and protection. This report is a professional opinion and is not a guaranty or warranty.

BUILDER **Debo Homes**     PROP ADDRESS **11115 Leah Elizabeth**

DATE OF INSPECTION **5/10/13**     SUBDIVISION **Redwind**

LOT **5** BLK **8** SEC **1**     INSPECTOR **Jim Sullivan**

PLAN # _____ PLAN DATE _____

**THIS REPORT IS FOR ON *SITE AND INTER-OFFICE* COMMUNICATIONS ONLY. THE OFFICIAL INSPECTION REPORT AND CERTIFICATIONS MUST BE OBTAINED FROM MORTGAGE PROPERTY SERVICES, INC. OR THE BUILDER.**

### FOR INSPECTIONS CALL (281) 324-3852 mortgagepropserv@yahoo.com

## LIST ALL SUBSTANTIAL, NON-COMPLIANCE WITH PLANS, SPECS AND RELATED CODES.

A. ☐ NO NON-COMPLIANCE OBSERVED.

B. ☑ MINOR NON-COMPLIANCE OBSERVED AND LISTED. BUILDER SHALL COMPLY AND PROCEED

C. ☐ SERIOUS NON-COMPLIANCE LISTED. BUILDER SHALL CORRECT AND CALL FOR REINSPECTION.

Protect elec. wires at copper pipes at master bath lavatory

Add joist hangers at family room, attic drop stairs
Block roof deck joints within 24" of ridge
above family room

☐ CORRECT ITEMS NOTED ABOVE AND PROCEED     ☑ CORRECT ITEMS NOTED ABOVE RECALL FOR REINSPECTION

INSPECTOR'S SIGNATURE

**MORTGAGE PROPERTY SERVICES, INC. • 23402 FM 2100 • HUFFMAN, TEXAS 77336**

DEBO-HMS00049

951



# MPS INSPECTION REQUEST

| REQUEST NUMBER MUST BE ON ALL INSPECTION REPORTS UPPER RIGHT CORNER | REQUEST_NUMBER | 166539 |
|---|---|---|

Tuesday, August 06, 2013      11:34:54

| | | | |
|---|---|---|---|
| STREET NUMBER | 11115 | REQUEST DATE | 8/6/2013 |
| STREET NAME | LEAH ELIZABETH DRIVE | | |
| CITY | NEEDVILLE | | |
| ZIPCODE | | | |
| COUNTY | FORT BEND | LOCATION | |
| INSPECTION TYPE | FINAL NW | SUBDIVISION | ROSEWIND |
| BUILDER | DEBO HOMES | CALLED IN BY | JUAN CARLOS |
| LOT | 5 | # OF STORIES | |
| BLOCK | 3 | SQ FOOTAGE | |
| SECTION | 1 | RE-INS | ☐ RE-2 ☐ RE-3 ☐ |
| INSP DATE | 8/7/2013 | PHOTO'S NEEDED | ☐ |
| PLANS | | | |

No authorized plans found on file for this property.

| | | | |
|---|---|---|---|
| ASSIGNED INSPECTOR | JIM SULLIVAN | CONTACT PERSON | JUAN CARLOS |
| CONTACT PHONE NUMBER | 8323447120 | KEY MAP | |
| FHA Case No | | FHA FileName | |

SPECIAL INSTRUCTIONS

MILEAGE ADDED

☑ Passed
☐ Hold
☐ Failed
Initials

DEBO-HMS00050

952

# EXHIBIT 6: OFFICIAL RECEIPT FOR DEBO'S DEPOSIT INTO THE REGISTRY OF COURT FOR $60,300.00

# OFFICIAL RECEIPT



OFFICE OF
ANNIE REBECCA ELLIOTT
DISTRICT CLERK
FORT BEND COUNTY
1422 EUGENE HEIMANN CIRCLE
RICHMOND, TEXAS 77469

| Payor | Receipt No. |
|---|---|
| The Welscher Law Firm | **2014-41064-DCLK** |
| 1111 N Loop west | |
| STE 702 | Transaction Date |
| Houston, TX 77008 | 08/14/2014 |

| Description | Amount Paid |
|---|---|
| On Behalf Of Debo Homes LLC | |
| 13-DCV-209822 | |
| Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant. | |
| DEBO HOMES LLC | |
| Registry Deposit | 60,300.00 |
| SUBTOTAL | 60,300.00 |

| | PAYMENT TOTAL | 60,300.00 |
|---|---|---|

| | |
|---|---|
| Cashier's Check (Ref #1632618) Tendered | 60,300.00 |
| Total Tendered | 60,300.00 |
| Change | 0.00 |

400th - Deposit into the Registry of Court.

| 08/14/2014 | Cashier alizahid | Audit |
|---|---|---|
| 03:22 PM | Station DCR18 | 5022554 |

# OFFICIAL RECEIPT

954

Filed
9/25/2014 11:20:44 AM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

## NO. 13-DCV-209822

| | | |
|---|---|---|
| **LAUREL AND ELIANA MILLER** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **FORT BEND COUNTY, TEXAS** |
| | § | |
| **DEBO HOMES, LLC** | § | |
| **Defendant.** | § | **400ᵀᴴ JUDICIAL DISTRICT** |

### ORDER

On this day, came on to be heard Defendant's Motion to Disregard the Jury's Answer to Question Number One of the Jury's Charge. The Court having considered the pleading, Plaintiff's response, if any, and finds Defendant's Motion is without merit and should be DENIED, in its entirety.

**ORDERED, ADJUDGED and DECREED** that Defendant Debo Homes, LLC's Motion to Disregard the Jury's Answer to Question Number One of the Jury's Charge is DENIED.

SIGNED on this the 29ᵗʰ day of _Sept_, 2014.

_____
JUDGE PRESIDING

1

971

**APPROVED AS TO FORM AND SUBSTANCE:**

*CROCKETT LAW, PC*

By: _Brian H. Crockett_
Brian H. Crockett
CROCKETT LAW, P.C.
10565 Katy Fwy, Ste 400
Houston, Texas 77024
(713) 779-3476 - Telephone
(888) 779-3237 – Facsimile
brian@crockettlawtx.com

**ATTORNEYS FOR PLAINTIFFS
LAUREL AND ELLIE MILLER**

2

972

Filed
12/19/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

Cause No. 13-DCV-209822

| | | |
|---|---|---|
| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | OF FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC, | § | |
| DEFENDANT. | § | 400TH JUDICIAL DISTRICT |

**DEFENDANT DEBO HOMES, LLC'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE JURY VERDICT**

**COMES NOW**, Defendant, DEBO HOMES, LLC ("Debo" or "Defendant"), and files this, their Response to Plaintiffs Laurel Miller ("Laurel") and Eliana Miller's ("Eliana") (collectively, the "Millers" or "Plaintiffs") Motion for Judgment on the Jury Verdict (hereinafter referred to as the "Motion") and in support respectfully shows the Court as follows:

## I.   INTRODUCTION AND FACTS

1. On October 7, 2013, Plaintiffs filed suit against Defendant in this cause of action, asserting claims for fraud and fraudulent inducement to contract, fraud in the sale of real estate, the Texas Deceptive Trade Practices Act, and breach of contract. The Plaintiffs also requested attorney's fees and exemplary damages. Those causes of action stemmed from the Plaintiffs' agreement with Defendant to have Defendant build a new home for them. Plaintiffs deposited Sixty Thousand Three Hundred and 00/100 Dollars ($60,300.00) with Defendants to begin the construction.

2. On August 14, 2014, Defendant deposited Sixty Thousand Three Hundred and 00/100 Dollars ($60,300.00) into the Registry of Court in the Fort Bend County District Clerk's Office. *See* Ex. A. On December 12, 2014, Defendant deposited Three Hundred Fifty and 00/100 Dollars ($350.00) into the Registry of the Court in the Fort Bend County District Clerk's Office. *See* Ex. B.

1

1115

3. On August 19, 2014, the above-captioned case came on for trial. On August 22, 2014, a twelve-member jury signed a mixed verdict, neither entirely in favor of either Plaintiffs or Defendant. *See* Ex. C. By a vote of ten of the jurors, the Jury found Defendant engaged in a false, misleading, or deceptive act or practice against the Plaintiffs and awarded Plaintiffs a total of Sixty Thousand Six Hundred Fifty and 00/100 Dollars ($60,650.00). *See* Ex. C. The Jury simply gave the Plaintiffs their deposit money back.

## II.  PLAINTIFFS SHOULD NOT RECOVER PREJUDGMENT INTEREST

4. Since Defendant has deposited Sixty Thousand Six Hundred Fifty and 00/100 Dollars ($60,650.00) into the Registry of the Court, the same amount of money awarded by the jury, the Plaintiffs are not entitled to collect any interest on those funds.

5. "[P]rejudgment interest should not be assessed on funds that were deposited into the registry of the court." *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 648 (Tex. App.- Austin 2000, pet. denied); *see, Hoeffner, Bilek & Eidman, L.L.P. v. Guerra*, 2004 Tex. App. LEXIS 4792, 29 (Tex. App.- Corpus Christi 2004, pet. denied) ("As a general rule, prejudgment interest should not be assessed on funds that were deposited into the registry of the court.") (citing *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 125 (Tex. App.- Corpus Christi 1999, pet. denied)).

6. It is uncontroverted that Defendant has deposited the entire amount of the jury's verdict into the Registry of the Court. *See* Exs. A and B. As such, prejudgment interest should not be assessed on those funds. *Browning Oil Co.*, 38 S.W.3d at 648.

2

1116

## III. PLAINTIFFS SHOULD NOT RECOVER POSTJUDGMENT INTEREST

7. Like prejudgment interest, the Defendant's tender of Sixty Thousand Six Hundred Fifty and 00/100 Dollars ($60,650.00) into the Registry of the Court prohibits the collection of postjudgment interest.

8. An unconditional tender of the amount owed under a judgment terminates the accrual of postjudgment interest. *Hopkins v. State*, 2006 Tex. App. LEXIS 3530, 24 (Tex. App.- Austin 2006, pet. denied) (citing *Miga v. Jensen*, 96 S.W.3d 207, 212 (Tex. 2002)). "A tender into the registry of the trial court of all sums due under the judgment is a means of halting post-judgment interest." *Breault v. Psarovarkas*, 2003 Tex. App. LEXIS 2049, 20 (Tex. App.- Houston [1st Dist.] 2003, pet. denied) (citing *St. Paul Mercury Ins. Co. v. Billiot*, 342 S.W.2d 161, 164 (Tex. App.- Beaumont 1960, writ ref'd)).

9. Defendant has deposited the entire amount due and owing under the Jury's verdict- Sixty Thousand Six Hundred Fifty and 00/100 Dollars ($60,650.00). Therefore, the Plaintiffs are not entitled to any postjudgment interest. *See Miga*, 96 S.W.3d at 212.

## IV. PLAINTIFFS SHOULD NOT BE AWARDED COSTS

10. The successful party to this lawsuit should recover their taxable costs from the opposite party. TEX. R. CIV. P. R. 131. The Plaintiffs are not the successful party to this lawsuit and therefore should not recover their taxable costs.

11. The Plaintiffs paid Defendant a down payment of Sixty Thousand Three Hundred and 00/100 Dollars ($60,300.00) for Defendant to begin construction on their home. Soon thereafter, the relationship between Plaintiffs and Defendant soured. In an attempt to resolve the situation, Defendant offered back the full $60,300.00 to Plaintiff. *See* Ex. D.[1] However, the Plaintiffs

---

[1] Exhibit D was also admitted into evidence at trial as Defendant's Exhibit 9.

3

1117

rejected that offer, instead pursuing this lawsuit in hopes of collecting thousands more in attorney's fees and punitive damages.

12. As discussed in the previous sections, Defendant tendered the full amount that the Plaintiffs paid into the Registry of the Court, effectively surrendering control of those funds. *See* Exs. A and B. It is no victory for the Plaintiffs to obtain what they were offered back on May 29, 2013. *See* Ex. D. It was a waste of all of the parties' time and a waste of judicial resources for Plaintiffs to pursue $60,300.00 when they were offered that same amount over a year and a half ago. *See* Ex. D. It is antithetical to the Plaintiffs' pleadings, post-trial motions,[2] causes of action, and demands for them to be now labeled the "successful party" under Rule 131. *See* TEX. R. CIV. P. R. 131.

13. Instead, the Defendant is the successful party and at worst, both Plaintiffs and Defendant are both unsuccessful. *See, e.g., Prize Energy Res. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 587 (Tex. App.- San Antonio 2011, no pet.); *Building Concepts, Inc. v. Duncan*, 667 S.W.2d 897, 905-06 (Tex. App.- Houston [14th Dist.] 1984, writ ref'd n.r.e.). As such, this Court is free to apportion costs between the parties. *See Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 612 (Tex. App.- Houston [14th Dist.] 2006, pet. denied).

## V.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Debo Homes, LLC prays that the Honorable Court not award Plaintiffs prejudgment interest, postjudgment interest, and costs.

---

[2] The Plaintiffs have challenged the Jury's findings in their JNOV and Motion for New Trial, not asserting that they are in any way successful.

1118

Respectfully submitted,

**THE WELSCHER LAW FIRM**

*/s/ Nicholas Martinez /s/*

Craig Welscher
TBN: 21167200
Nicholas Martinez
TBN: 24087986
1111 North Loop West, Suite 702
Houston, Texas 77008
Phone No.: (713) 862-0800
Facsimile No.: (713) 862-4003
Email: nmartinez@welscherlaw.com
ATTORNEYS FOR DEBO

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded to all known counsel of record in the manner required by the Texas Rules of Civil Procedure, on this the 19th day of December, 2014.

*Via Electronic Service and/or Email: brian@crockettlawtx.com*

Brian H. Crockett
Crockett Law, PC
10565 Katy Fwy., Ste. 400
Houston, Texas 77024

*/s/ Nicholas Martinez /s/*
Nicholas Martinez

1119

Filed
12/19/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

Cause No. 13-DCV-209822

| | | |
|---|---|---|
| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | OF FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC, | § | |
| DEFENDANT. | § | 400TH JUDICIAL DISTRICT |

## BUSINESS RECORDS AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared JUAN CARLOS HERNANDEZ, JR., who, being by me duly sworn, deposed as follows:

My name is JUAN CARLOS HERNANDEZ, JR. I am of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated.

I am the custodian of records and Vice President for Defendant DEBO HOMES, LLC. Attached hereto are Two (2) pages of records (Exhibits A and B). These said Two (2) pages of records are kept by me in my regular course of business, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonable soon thereafter. The records attached hereto are the original or exact duplicates of the original.

_____
Juan Carlos Hernandez, Jr.

SWORN TO AND SUBSCRIBED before me on the ___18___ day of December, 2014.



_____
Notary Public In and For the State of Texas

1 of 2

1120

Filed
12/19/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

# OFFICIAL RECEIPT



OFFICE OF
## ANNIE REBECCA ELLIOTT
## DISTRICT CLERK
## FORT BEND COUNTY
## 1422 EUGENE HEIMANN CIRCLE
## RICHMOND, TEXAS 77469

Payor
The Welscher Law Firm
1111 N Loop west
STE 702
Houston, TX 77008

Receipt No.
**2014-41064-DCLK**

Transaction Date
08/14/2014

| Description | Amount Paid |
|---|---|
| On Behalf Of Debo Homes LLC | |
| 13-DCV-209822 | |
| Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant. | |
| DEBO HOMES LLC | |
| Registry Deposit | 60,300.00 |
| SUBTOTAL | 60,300.00 |

PAYMENT TOTAL | 60,300.00

| | |
|---|---|
| Cashier's Check (Ref #1632618) Tendered | 60,300.00 |
| Total Tendered | 60,300.00 |
| Change | 0.00 |

400th - Deposit into the Registry of Court.

| 08/14/2014 | Cashier alizahid | Audit |
| 03:22 PM | Station DCR18 | 5022554 |

OFFICIAL RECEIPT



EXHIBIT
_A_

1121

Filed
12/19/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

# OFFICIAL RECEIPT



## OFFICE OF
## ANNIE REBECCA ELLIOTT
## DISTRICT CLERK
## FORT BEND COUNTY
## 1422 EUGENE HEIMANN CIRCLE
## RICHMOND, TEXAS 77469

Receipt No.
**2014-61851-DCLK**

Payor
Debo Homes LLC
1108 FM 2977 Road
Richmond, Texas 77469
Phone #281-342-3528

Transaction Date
12/12/2014

Amount Paid

| Description | | |
|---|---|---|
| On Behalf Of Debo Homes LLC | | |
| 13-DCV-209822 | | |
| Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant. | | 350.00 |
| DEBO HOMES LLC | | 350.00 |
| Registry Deposit | | |
| SUBTOTAL | | |

PAYMENT TOTAL | **350.00**

Check (Ref #3077) Tendered | 350.00
Total Tendered | 350.00
Change | 0.00

400th - Deposit into the Registry of Court.

| 12/12/2014 | Cashier alizahid | Audit |
|---|---|---|
| 11:47 AM | Station DCR18 | 5149319 |

## OFFICIAL RECEIPT



EXHIBIT
C

1122

Filed
PAGE 2/18/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz



13-DCV-209822
0H00
Charge of the Court
9182708

NO. 13-DCV-209822

| LAUREL AND ELIANA MILLER | § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiffs, | § | |
| | § | |
| VS. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC | § | |
| Defendant. | § | 400TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during your deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.     Do not let bias, prejudice or sympathy play any part in your decision.

2.     Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.



EXHIBIT
C

1123

3.      You are to make up your own mind about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.      If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.      All the questions and answers are important. No one should say that any question or answer is not important.

6.      Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted into evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.      Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.      Do not answer questions by drawing straws or by any method of chance.

9.      Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

2

1124

The charge uses the following term(s):

1. "Millers" mean Eliana and Laurel Miller.

2. "Debo" means Debo Homes, LLC

3. The Agreement shall refer to the New Home Contract signed between Debo Homes, LLC on August 13, 2013.

4. The "Home" shall refer to 11115 Leah Elizabeth Dr., Needville, Texas 77461.

## INSTRUCTIONS

1.     A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts.

3

1125

**QUESTION 1:**

Did Debo engage in any false, misleading, or deceptive act or practice that the Millers relied on to their detriment and that was a producing cause of damages to the Millers?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means any of the following:

1. Representing the Home, construction, supervision or Agreement had sponsorship, approval, characteristics, uses, or benefits or qualities that it did not have; or

2. Representing the Home, construction, supervision or Agreement were a particular quality, if it was of another; *oR* *O/*

3. Representing that the Agreement confers or involves rights that it did not have or involve; or

4. Failing to disclose information about the Home, construction, supervision, performance or agreement that was known at the time of the transaction with the intention to induce the Millers into a transaction they otherwise would not have entered into if the information had been disclosed.

Answer "Yes" or "No."

Answer: ~~No~~ Yes

Y N

Y NO.

Mike Zanghi

MAnvel Roberts

10  2

4

1126

**QUESTION 2:**

Did Debo engage in any unconscionable action or course of action that was a producing cause of damages to the Millers.

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Answer "Yes" or "No."

Answer:  _____NO_____  UNANIMOUS

5

1127

If you answered "Yes" to Question 1 or Question 2, then answer the following question. Otherwise do not answer the following question.

**QUESTION 3:**

Did Debo engage in such conduct knowingly?

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person act with actual awareness.

In answering this question, consider only the conduct that you have found was a producing cause of damages to the Millers.

Answer "Yes" or "No."

Answer: ___No___ Unanimous

6

1128

If you answered "Yes" to Question 1 or Question 2, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 4:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents, if any:

    a.   Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer:    _____1,000.00_____

    b.   Any money, if any, paid by the Millers to Debo as Installment payment.

Answer:    _____59,800.00_____

    c.   Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer:    _____350.00_____

Unanimous

7

1129

**QUESTION 5:**

Did Debo fail to comply with the Agreement?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonably expected;
2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;
5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No."

Answer:    _NO_   Unanimous



8

1130

**QUESTION 6:**

Did the Millers fail to comply with the Agreement?

Answer "Yes" or "No."

Answer: _____No_____ ~~Violations~~

Y          N          11 - 1

~~Wyatt Shaw~~

~~Zhag~~

Mike Zanghi

9

1131

*N/A*

If you answered "Yes" to both Question 5 and Question 6, then answer Question 7. Otherwise, do not answer Question 7.

**QUESTION 7:**

Who failed to comply with the agreement first?

Answer "Debo" or the "Millers."

Answer: _____

10

1132

*N/A*

If you answered "Yes" to Question 5, than answer the following question. Otherwise, do not answer the following question.

**QUESTION 8:**

Was Debo's failure to comply excused?

Failure to comply by Debo is excused by the Millers' previous failure to comply with a material obligation of the Agreement.

Failure to comply by Debo is excused by the Millers' prior repudiation of the Agreement. A party repudiates an agreement when he indicates, by his words or actions, that he is not going to perform his obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

Failure to comply by Debo is excused if compliance is waived by the Millers. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Failure to comply by Debo is excused if the Millers committed fraud against Debo. Fraud occurs when-

1. a party makes a material misrepresentation, and
2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
3. the misrepresentation is made with the intention that it should be acted on by the other party, and
4. the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means

    a. a false statement of fact, or
    b. a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or
    c. a statement of opinion based on a false statement of fact, or
    d. a statement of opinion that the maker knows to be false.

Answer "Yes" or "No."

Answer: _____

11

1133

**QUESTION 9:**

Did Debo substantially perform under the terms of the Agreement?

"Substantial performance" means that there has been no willful departure from the terms of the agreement and no omission in essential points and that the agreement has been honestly and faithfully performed in its material and substantial particulars and the only variance from the strict and literal performance consists of technical or unimportant omissions or details.

Answer "Yes" or "No."

Answer: __Yes__ ~~Unanimous~~ Unanimous

12

1134

*N/A*

If you answered "Yes" to Question 5, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 10:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents, if any:

    a.   Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____

    b.   Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____

    c.   Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____

13

1135

*N/A*

If you answered "Yes" to Question 6, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 11:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Debo for their damages, if any, that resulted from such conduct?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents, if any:

    a. The difference between the amount paid to Debo by the Benges for Debo's building of the Home and the amount the Millers had agreed to pay Debo for building the Home

Answer: _____

    b. Reasonable and necessary expenses incurred in attempting to market and sell the Home to another party besides the Millers.

Answer: _____

    c. Reasonable and necessary costs to keep the Home maintained during that period and interest payments made.

Answer: _____

14

1136

**QUESTION 12:**

Did Debo commit fraud in the sale of real estate against the Millers?

Fraud in the sale of real estate occurs when:

a. there is a false representation of a past or existing material fact, and

b. the false representation is made to a person for the purpose of inducing that person to enter into the Agreement, and

c. the false representation is relied on by that person in entering into the Agreement.

Answer "Yes" or "No."

Answer: ___NO___ Unanimous

15

1137

N/A

If you answered "Yes" to Question 12, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 13:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Millers for their damages, if any, that resulted from such fraud in the sale of real estate?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find the Millers could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents, if any:

    a.  Any money, if any, paid by the Millers to Debo as Earnest Money.

Answer: _____

    b.  Any money, if any, paid by the Millers to Debo as Installment payment.

Answer: _____

    c.  Any money, if any, paid by the Millers for fixtures installed in the Home.

Answer: _____

16

1138

*N/A*

Answer the following question only if you answered "Yes" to Question 12. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following Question.

**QUESTION 14:**

Do you find by clear and convincing evidence that the harm to the Millers resulted from fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Fraud occurs when-

    a.    there is a false representation of a past or existing material fact, and

    b.    the false representation is made to a person for the purpose of inducing that person to enter into the Agreement, and

    c.    the false representation is relied on by that person in entering into the Agreement.

Fraud does not include the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interest.

Fraud does not include breaches that the law condemns as "fraudulent" merely because they *tend* to deceive others, violate confidence, or cause injury to public interest, the actor's mental state being immaterial.

    Answer "Yes" or "No."


    Answer: _____

17

1139

If you answered "Yes" to Question 1, Question 2, Question 5, or Question 12, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 15:**

What is a reasonable fee for the necessary services of the Millers' attorney, stated in dollars and cents?

Answer with an amount for each of the following:

      a.     For representation in the trial court.

Answer: _____ 0 _____

      b.     For representation through appeal to the Court of Appeals.

Answer: _____ 0 _____

      c.     For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____ 0 _____

      d.     For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: _____ 0 _____

      e.     For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____ 0 _____

Unanimous

18

1140

*N/A*

If you answered "Yes" to Question 6, then answer the following question. Otherwise, do not answer the following question.

**QUESTION 16:**

What is a reasonable fee for the necessary services of Debo's attorney, stated in dollars and cents?

Answer with an amount for each of the following:

  a.  For representation in the trial court.

Answer: _____

  b.  For representation through appeal to the Court of Appeals.

Answer: _____

  c.  For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____

  d.  For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: _____

  e.  For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____

19

1141

<u>PRESIDING JUROR:</u>

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

    a. Have the complete charge read aloud if it will be helpful to your deliberations;

    b. Preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c. Give written questions or comments to the bailiff who will give them to the judge;

    d. Write down the answers you agree on;

    e. Get the signatures for the verdict certificate; and

    f. Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

<u>INSTRUCTIONS FOR SIGNING THE VERDICT CERTIFICATE:</u>

1. You may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. That means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2. If ten jurors agree on every answer, those ten jurors sign the verdict. If eleven jurors agree on every answer, those eleven jurors sign the verdict. If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4. There are some special instructions before Question 14 explaining how to answer Question 14. Please follow that instruction. If all twelve of you answer Yes to Question 14, you will need to complete a second verdict certificate for Question 14.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the Judge of this fact.

When you have answered all the questions you are required to answer under the

1142

instructions of the Judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

Do you understand these instructions? If you do not, please tell me now.

_____
JUDGE PRESIDING

FILED

AUG 2 2 2014

AT_____

Clerk District Court, Fort Bend Co., TX

21

1143

## VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____        _____
Signature of Presiding Juror                    Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below

___✓___ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below

PRINT:                              SIGN:

1. David Scott Stripling
2. NORBERT BURCH
3. ALYISSA SPENCER
4. Rolanda Bailey
5. PETER CAWTHORNE
6. Stephanie Kusck
7. Angela P Reeves
8. Gregory Prihoda
9. CAROL Leverett
10. Wyatt Shaw
11.
12.

**FILED**

AT _____ AUG 22 2014 5:12 PM

Clerk District Court, Fort Bend Co., TX

22

1144

## ADDITIONAL CERTIFICATE

I certify that the jury was unanimous in answering "Yes" to the following question. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

**QUESTION 14**

_____           _____
Signature of Presiding Juror                David Scott Stripling
                                            Printed Name of Presiding Juror

All Answers remain the same. Signed in error.

23

1145



# ÐEBØ HOMES

Filed
12/19/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

1108 FM 2977 Richmond, TX 77469         Office: 281-342-3528                    Fax: 281-342-1088

May 29, 2013

Laurel and Ellie Miller:

Based off the contract made on April 13, 2013, Debo Homes LLC has an obligation to construct your new home at 11115 Leah Elizabeth Drive in Needville, TX. We have built and sold over 160 houses and have a strict construction standard in every one of our homes. It's come to my attention that you have concerns about the quality of construction and materials going into your home. I'm sorry that you feel that way, but I can assure you that the quality of construction and materials in your home has met our quality control standard. Throughout the construction of every one of our homes we schedule three inspections from a 3rd party (Mortgage Property Services) hired by Debo Homes to assure quality. A foundation inspection is done before we pour concrete, frame inspection is done before we insulate and install drywall, and finally a final inspection is done at the completion of the house. In addition, we also have our super-intendent on site supervising all subcontractors hired by Debo Homes. Also, you hired another inspector to inspect the frame of the house and we fixed the minor issues he requested.

We have a reputation of going above and beyond to meet our customer's satisfaction, if there is something we can do to accommodate your needs, please let us know. If you have any questions or doubts about the way we do a certain job, please ask us and in turn give us the opportunity to diligently answer you. We are professionals and were hired to provide our expertise in all aspects throughout the construction process; I believe that is why you decided to hire us to build your home. If you are not happy with our service, you are free to terminate the contract with Debo Homes and we will refund you 100% of the money you have given us after we sell the house. However, we are confident that we can reach an agreement and move forward with building your new house.

Juan Carlos Hernández
**President**
**Debo Homes LLC**



EXHIBIT
D

1146

Filed
12/19/2014 2:57:28 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

# THE WELSCHER LAW FIRM

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

──────── ★ ────────

CRAIG WELSCHER
SHAREHOLDER

1111 North Loop West, Suite 702
Houston, Texas 77008

Tel: (713) 862-0800
Fax: (713) 862-4003

December 19, 2014

*Via ProDoc Filing*
Dianne Wilson
Fort Bend County Clerk

Re: No: <u>13-DCV-209822</u>; *Laurel and Eliana Miller v. Debo Homes, LLC; In the District Court of Fort Bend County, Texas 400th Judicial District*

Honorable Clerk:

Enclosed for filing please find the following document:

1. *Defendant Debo Homes, LLC's Response to Plaintiff's Motion for Entry of Judgment*

2. *Business Record Affidavit*

3. *Defendant Debo Homes, LLC's Notice of Hearing for Entry of Judgment set for December 22, 2014*

Should you have any questions regarding the attachments, please contact our office. Thank you for your assistance in this matter.

Very truly yours,

THE WELSCHER LAW FIRM

*Connie Gilbert /s/*

Connie Gilbert
Paralegal to Craig Welscher
service@welscherlaw.com

CCG//ntm
Enclosures: as stated
cc:
*Via Facsimile: (888) 779-3237 and/or*
*Via Email: brian@crockettlawtx.com*
Brian H. Crockett
Crockett Law, PC
10565 Katy Fwy., Ste. 400
Houston, Texas 77024

1147

Filed
12/17/2014 1:36:49 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ashley Alaniz

Cause No. 13-DCV-209822

| | | |
|---|---|---|
| LAUREL AND ELIANA MILLER, | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | OF FORT BEND COUNTY, TEXAS |
| | § | |
| DEBO HOMES, LLC, | § | |
| DEFENDANT. | § | 400TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On August 19, 2014, this case was called for trial. All parties appeared through their representatives and attorneys of record and announced ready for trial. A jury of 12 properly qualified jurors was impaneled and sworn. Following the seating of the jury, the parties presented the evidence admitted by the Court. After the close of the evidence, the Court submitted its charge to the jury. In response to the jury charge, the jury made certain findings that the court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are on file with the Court and incorporated by reference. Thereafter, Plaintiffs moved the Court for Judgment Notwithstanding the Verdict, which was denied on September 29, 2014. Plaintiffs moved the Court for Motion for New Trial, which was denied on October 20, 2014.

Based upon denial of Judgment Notwithstanding the Verdict and denial for Motion for New Trial, the Court makes the following rulings based on the jury's verdict, the evidence admitted at trial and the arguments of counsel:

1. Plaintiffs, LAUREL AND ELIANA MILLER, should recover of and from Defendant DEBO HOMES, LLC the amount of $1,000.00 in accordance with the answer to jury question 4(a) with pre-judgment interest on such amount at the rate of 5.00% per annum calculated from October 7, 2013 until the date this

1148

judgment is entered; the amount of $59,300.00 in accordance with the answer to jury question 4(b) with pre-judgment interest on such amount at the rate of 5.00% per annum calculated from October 7, 2013, until the date this judgment is entered; the amount of $350.00 in accordance with the answer to jury question 4(c) with pre-judgment interest on such amount at the rate of 5.00% per annum calculated from October 7, 2013, until the date this judgment is entered; post judgment interest on the total sum at the rate of 5.00% per annum, compounded annually, calculated from the date this judgment is entered; and all taxable court costs

2. Defendant, DEBO HOMES, LLC, should take nothing from Plaintiffs, LAUREL AND ELIANA MILLER by reason of this suit.

3. It is therefore, **ORDERED, ADJUDGED AND DECREED** that Plaintiffs, LAUREL AND ELIANA MILLER, should recover of and from Defendant DEBO HOMES, LLC the total amount of $60,650 with pre-judgment interest in the amount of $3,663.92, which was calculated at the rate of 5.00% per annum from October 7, 2013 until December 22, 2014 (441 days).

4. Post judgment interest on the total sum, $64,313.92, at the rate of 5.00% per annum, compounded annually, calculated from the date this judgment is entered; and all taxable court costs. It is further,

## POST JUDGMENT INTEREST

5. It is further, **ORDERED, ADJUDGED AND DECREED** that in accordance with §304.003 of the Texas Finance Code, this judgment shall bear post judgment interest at

the rate of 5.00% per annum, compounded annually, which interest shall accrue from the date of this judgment until it is paid.

## COURT COSTS

6. It is further, **ORDERED, ADJUDGED AND DECREED** that all taxable court costs are taxed against Defendant DEBO HOMES, LLC, therefore, it is,

7. **ORDERED, ADJUDGED AND DECREED** Plaintiffs, LAUREL AND ELIANA MILLER recover of and from Defendant DEBO HOMES, LLC $1,574.40 as their taxable court costs.

## FINALITY OF JUDGMENT

This judgment is intended by the Court to be a full and final judgment disposing of all claims, causes of action, counter-claims, cross-claims, and third party claims by the parties. As a result, any relief not specifically granted herein is denied. This is an appealable final judgment.

## EXECUTION

This judgment is fully executable. Therefore, it is **ORDERED, ADJUDGED AND DECREED** that all writs, processes, liens and other vehicles necessary for the enforcement of this judgment shall issue.

ENTERED ON THIS THE 22 DAY OF ___December___, 2014.

_____
JUDGE PRESIDING

1150

**APPROVED AS TO SUBSTANCE AND ENTRY:**

*CROCKETT LAW, PC*

By: _Brian H. Crockett_

Brian H. Crockett
State Bar No. 24074094
10565 Katy Fwy, Ste 400
Houston, Texas 77024
(713) 779-3467 - Telephone
(888) 779-3237 – Facsimile
brian@crockettlawtx.com

**ATTORNEY FOR PLAINTIFFS**
**LAUREL AND ELIANA MILLER**

1151

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
2/20/2015 3:47:35 PM
CHRISTOPHER A. PRINE
Clerk

LAUREL MILLER AND          )     IN THE DISTRICT COURT OF
ELIANA MILLER              )
                          )
VS.                        )     FORT BEND COUNTY, TEXAS
                          )
DEBO HOMES, LLC            )     400TH JUDICIAL DISTRICT

_____

**JURY TRIAL**

_____

On the 19th day of August, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Clifford J. Vacek, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

Mr. Brian H. Crockett
Texas Bar No. 24074094
Mr. William G. Kanyha
Texas Bar No. 24087827
Crockett Law, PC
10565 Katy Freeway, Suite 400
Houston, TX  77024
Telephone:  713.779.3476
Counsel for Plaintiffs


Mr. Nicholas T. Martinez
Texas Bar No. 24087986
Mr. Craig Welscher
Texas Bar No. 21167200
The Welscher Law Firm
1111 North Loop West, Suite 702
Houston, TX  77008
Telephone:  713.862.0800
Counsel for Defendants

**VOLUME 2**

**JURY TRIAL**

**August 19, 2014**

                                                    **PAGE VOL.**

Opening Statement by Mr. Crockett .................4   2

Opening Statement by Mr. Martinez ................14   2

PLAINTIFFS' WITNESS:

| Laurel Miller | Direct | Cross | V.Dire |
|---|---|---|---|
| By Mr. Crockett | 27 v2 | | |

Reporter's Certificate ..........................49   2

**ALPHABETICAL INDEX OF WITNESSES**

| | Direct | Cross | V.Dire |
|---|---|---|---|
| Miller, Laurel | 27 v2 | | |

**EXHIBITS OFFERED BY PLAINTIFF**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Contract | 30 v2 | 31 v2 |
| 2 | Photographs | 39 v2 | 39 v2 |

27

MR. CROCKETT: Your Honor, Plaintiffs call Laurie Miller.

**LAUREL MILLER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

Q. (BY MR. CROCKETT) Laurie, can you go ahead and introduce yourself to the jury?

A. Yes. My name is Laurel Miller.

Q. And Laurie, who's the other Plaintiff in this case?

A. That's my daughter. Her full name is Eliana, but we all call her Ellie.

Q. Now, this home that you were going to buy from Debo Homes, who was it for?

A. It was for my daughter and myself.

Q. Was there a reason you wanted to be in that area?

A. Yes. We really -- we really liked being out in the country, like the Needville area, and we wanted to be out there. And that neighborhood afforded us a lot more land for the price and a little out of the city area a little bit.

Q. I know that you have a bunch of dogs.

A. Yes, we do. We love our dogs.

Q. What was it about being in this area that was

also important to you?

A. We weren't tied down to an HOA. Right now, we're kind of in a subdivision where there's an HOA, and we have a small back yard. And my daughter's a dog groomer, and we were trying to get a house where she could do grooming in the garage and really made a nice custom house so she could have -- do her dog grooming in the garage and have a nice back yard where the dogs could -- and not a business, per se, just for our personal dogs -- and have the dogs run around in the back yard and have a nice -- this was going to be like a half acre, a little more than a half acre, just a nice size for the two of us and our few dogs, and run around with them. And we also -- we played fly ball with them and dock dogs, a couple of dog sports that's like a hobby for us with the dogs. We just enjoy them a whole lot, and it's just -- this would have afforded a whole lot of extra fun. And it was a little smaller home with a bigger -- with a bigger yard for us. And being a newer home, we were pretty excited about getting into it.

Q. Now, was there a reason you were looking for a new home versus a used home or an older home?

A. Yes. Neither myself nor my daughter know how to make any repairs. We're in an older home now, and

it's just repair after repair. And we know that's just a matter of what it is. We've been in the home ten years now, and it's just when it rains, the back yard floods. It's typical. When it needs paint, it needs -- it just needs this and that, normal upkeep for a 35-year-old home, and we just thought a new home would just give us peace of mind that we wouldn't have to do these things. And once we -- plus, being on a fixed income, I couldn't afford, once we paid out, to keep paying on these repairs and pay on a mortgage and pay on taxes, et cetera. So, it just -- it gets very expensive, all these extra payments, and I just can't do these things myself, you know, always having to hire out.

MR. CROCKETT: Your Honor, permission to approach the witness?

THE COURT: Yes, sir.

Q. (BY MR. CROCKETT) Ms. Miller, I'm showing you what's been marked as Plaintiff's Exhibit No. 1.

A. Yes.

Q. Do you recognize this?

A. Yes. That's the sales contract that Debo Homes, Kris Dominguez and Ellie and I got into back in April of '13.

Q. Now, in this contract, were y'all purchasing

the house with the cash payment plan, or was this the finance plan?

A. No, sir. That was -- that was financing. We wanted to get financing with just a small -- like $1,000 down or something they said we could get, and we could go to the bank and get financing, because the interest rates were so darn low. So, we wanted to get in on that.

Q. If you can look through Exhibit No. 1 --

A. Yes.

Q. -- can you confirm that this contract is the initial contract that y'all signed?

A. (Referring to document.)

Q. And the signatures at the end, is that yours and your daughter's?

A. Yeah.

Q. Go back to it.

A. Yes.

Q. Okay.

MR. CROCKETT: Your Honor, the Plaintiffs would ask that we can admit Exhibit No. 1.

MR. MARTINEZ: Judge, we believe it's been pre-admitted already, so no objections.

THE COURT: There have been no exhibits that have been pre-admitted. Do you have any objection

to Plaintiff's Exhibit 1?

MR. MARTINEZ: No, Judge.

THE COURT: Plaintiff's Exhibit 1 is admitted.

Q. (BY MR. CROCKETT) Now, Ms. Miller, on Exhibit No. 1, who was this contract between?

A. It was between me and my daughter and Debo Homes.

Q. And what was the purchase price for this home?

A. The full purchase price is $178,000.

Q. And on Part B, it talks about the financing of that home. How much were you trying to finance?

A. (No response.)

Q. I'm sorry, it's actually on your screen, might be easier to see there.

A. No, it's not.

Q. No?

THE COURT: Your screen is not on?

THE WITNESS: No.

THE COURT: Sheriff, can you turn that screen on?

THE WITNESS: That's why I'm trying to see.

Q. (BY MR. CROCKETT) I'm sorry.

A. No, I apologize.

(Bailiff turned on screen)

THE WITNESS: Thank you.

Q. (BY MR. CROCKETT) What was the amount that y'all were going to try to finance?

A. Yes, $118,700.

Q. Did y'all qualify for financing?

A. No, sir, we didn't qualify.

Q. When Kris Dominguez learned that y'all didn't qualify for financing, what did he tell you about their cash installment plan?

A. Yes. He told us that they have cash clients that just pay cash. They come in -- he said they have lots of people that do that, and they do it in three phases. Phase 1 starts the process. Phase 2 is where -- is right at the drywall, and Phase 3 is at the closing.

Q. Tell us, what was your hesitation about entering into a cash installment plan?

A. Well, I had -- I'm a very frugal person, so I saved and saved for -- really forever. And so here was just pretty much everything just being emptied out into this home. Just it really scared me. And just to make three lump sum payments like this, whereas, had it been financed, it would be a slow trickle out, an easy way to pay over the course of very many years. And just having

a fixed income, disability income, it was very scary to me not to have that reserve money in the bank should something catastrophic happen.

Q.   Had you already been down the road with a bunch of repairs in a home?

A.   Yes, in my current home, only because it's an older home.  That's what we could afford now, and -- well, back ten-plus years ago.  So -- and I didn't want to buy into another home that needed continual repairs.  That's why we were looking at a new home.

Q.   So, when Kris Dominguez learned about your retirement money, what did he tell you about Debo Homes' subcontractors?

A.   Well, he told us they hired the highest quality subcontractors that there are, just the highest quality.

Q.   Are you aware of the other types of homes that Debo Homes builds?  Do they only build small single-family homes?

A.   No, they -- they build single-family homes like we were looking at, and homes smaller than we were looking at, all the way up to million-dollar homes.  And we drove by them, and we saw them.

Q.   And they looked nice?

A.   They did.  I couldn't afford them.

Q.   What did Kris Dominguez tell you about who

would be supervising those subcontractors?

A. He told us that there would be onsite supervision at all times overseeing the project.

Q. What did Kris Dominguez tell you about who would also be checking Debo Homes' work?

A. He said there would be third-party, independent inspections of the homesite at -- building inspections at various stages of the building while it was going up.

Q. Now, when you were having these conversations with Kris, I think the defense lawyer alluded earlier that this was a very long process of saying we had a lot of questions, didn't we?

A. We -- we actually met with Kris twice, but on the second occasion, we signed the contract. The first time, we were there a good couple of hours asking a lot of questions. Then we came back a second time and signed the contract because we asked so many questions. I wanted to know exactly what we were getting into, what appliances, what A/C unit, what -- just what exactly was going to be in our house versus the model house.

Q. Did Kris tell you every single thing you wanted to hear?

A. He did. He said -- when I asked if I'm going to get -- we actually went up in the attic, and I said, "Am I going to get this A/C unit?" And he said yes.

Because that one looked efficient, because the house we're in, being older, it's not efficient. My A/C bill is crazy for the home we're in. It's just -- you know, I was comparing now to then. And I asked about the stove, and I asked about the hot water heater because I didn't want an attic hot water heater. I asked about fixtures and just various things that just popped in my head at those times. And he said -- every answer was what's in this model home, and really, he had exactly what I wanted to hear at every step of that moment.

Q. And even after that, what did -- what did Kris tell you about, if there were any problems after the first payment, what safeguard did you have?

A. Well, the next payment wouldn't be needed until the drywall is going in. So, there would be -- if there were any problems, we wouldn't have to give him the next payment until then. And he said any problems, all problems would be fixed along the way.

Q. Did Kris ever tell you all problems that Debo Homes decides to fix is what they'd fix?

A. He did not tell us that, no. He said all problems would be fixed.

Q. These promises or these representations that Kris Dominguez told y'all, did you rely on them?

A. Absolutely. He was the person that -- he was

the go-to person.  In fact, he told us, Kris told us that we were not allowed to speak to anyone else onsite, that we were not to disturb the workers, we were not to disturb anyone else, and we held up to that.  We did not want to disturb them.  We did not want to stop their work.  We left everyone else alone, and if we saw anything unusual, then we contacted Kris personally.

Q.   Based on what Mr. Dominguez told you, did you pay Debo Homes $60,300?

A.   Yes, we did.  We were excited to get that house going.

Q.   Did you start packing up your house?

A.   We did.  Not only did we start packing up the house, we still have things in boxes we haven't unpacked.

Q.   Once you paid Debo Homes the $60,300, did you go back out and look at the highest quality subcontractors work on the framing?

A.   Yeah.  Well, we -- we went out to the site, and we looked around.  They were -- a couple of weeks later, they were doing the framing, and I just -- I just started looking around, you know, looking -- okay, here's the -- trying to identify which room's which.  And I looked up, and I saw split boards, like broke in half, and other boards bowedbowed out and other boards

that just didn't look right, and cracked things here and there.  And I contacted Kris to tell him that it looked like these were issues, what I had seen.  I told him what I had seen.

Q.  How long did you stay out there and watch the framers work?

A.  Oh, I can't say for sure, but maybe -- maybe an hour or so, maybe a couple of hours.

Q.  In that time period, did you look across the street and see Debo Homes' superintendent apparently working on another house next-door?

A.  No.  Actually, there were no other houses being constructed around that whole block.  Ours was the only house on the whole block being constructed.

Q.  Did you ever see anyone from Debo Homes out there?

A.  I never saw anyone from Debo Homes.  I only saw the actual workers, the subcontractors out there.

Q.  So, you contacted Kris Dominguez, told him that -- you told him what, exactly?

A.  I told him I saw some problems out there that I need to address with him.  I saw some broken boards.  I saw a pipe that didn't look attached.  I saw -- I just saw some things that didn't look right.  I'm just -- I'm not a construction expert or anything.  I just saw

                                                                          38

things that didn't look right.  So, he told me he would meet me out there, I don't recall whether it was the next day or the following.  So, we met, and he looked at it all with me, and he handed me a can of red spray paint and asked me to spray the areas that looked unusual.

Q.   Did that seem odd to you, that the salesman's telling you to find the defects in the house?

A.   I don't know if it felt unusual.  I just felt like, oh, I guess we're working together at this point. I just was happy that we were working together right then and there.

MR. CROCKETT:  Your Honor, you want me to keep asking to approach?

THE COURT:  Just go ahead.

MR. CROCKETT:  Thank you, Your Honor.

Q.   (BY MR. CROCKETT) Ms. Miller, I'm showing you what's been marked as Plaintiff's Exhibit No. 2.

A.   Uh-huh.

Q.   It is a bunch of photographs.  Have you seen these photographs before?

A.   Yes.

Q.   Are these photographs photographs that were taken of different problems at the home throughout construction?

A.   (Referring to documents.)  Yes.

Q.   Do these photographs fairly and accurately represent the things that you saw during the construction?

A.   A lot of the problems, I'm not going to say all of the problems.  Yeah.

Q.   Thank you.

MR. CROCKETT:  Your Honor, we'd ask that Plaintiff's Exhibit No. 2 be admitted.

THE COURT:  For the record, how many photos are there?

MR. CROCKETT:  Your Honor, it is 33.

THE COURT:  Any objection?

MR. MARTINEZ:  Yes, Judge.  Hearsay, expert report, improper predicate, all three.

THE COURT:  Overruled.  Plaintiff's Exhibit 2, consisting of 33 photos, is admitted.

Q.   (BY MR. CROCKETT) Ms. Miller, you talked about some of the problems you were seeing in the house.  I will eventually learn how to use this thing.  Now, what was the issue that you saw with this?

A.   Well, that was at the top of the garage, and that just -- when I walked into the garage, and I just went straight in the garage and looked up, I said, oh, my goodness, that board is just split square in half,

and that's going to hold up the whole roof, the garage area to the roof. And I just thought that's not supposed to be split like that.

MR. MARTINEZ: Objection, Judge. This is expert testimony about what beam is going to hold up what part of the roof.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Now, here we've got a picture of a beam, Ms. Miller. What was the problem that you saw here?

A. Well, it looked there that there were no ties. There's supposed to be metal ties on the bottom of that --

MR. MARTINEZ: Objection, Judge. How would she know whether or not a tie is supposed to be there? She's not a construction expert.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Actually, Ms. Miller, I'm talking about as far as the beams here -- it doesn't show very well -- do you see any issues with the cracks against the beams?

A. Yes.

Q. Were you concerned about that?

A. Yes. They should not be cracked. They should be flush. They should be cut flush.

MR. MARTINEZ: Objection, this is all expert testimony about what should be what in the construction.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Did you see broken beams and boards throughout the framing?

A. Yes, I did.

MR. MARTINEZ: Objection, leading.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Did you see broken beams and boards?

A. Yes, I did.

Q. Throughout the home?

A. Yes, I did.

Q. Did you tell Kris Dominguez about these broken beams and boards?

A. Immediately.

Q. And this red spray paint, this is the spray paint you put on there?

A. Yes, it is.

Q. Ms. Miller, do you know what this is? (Indicating.)

A. Yes, that's a pipe. That's like a vent pipe. It's a vent pipe.

Q. When you looked at the home and the framing,

did you wonder why some of the vents and the pipes weren't connected to anything?

A. Yes. I just had an awful lot of questions, so when Kris asked me to spray paint things that didn't look right that I had questions about, that's exactly what I did.

Q. Do you know who wrote on the beams when they weren't even?

A. Yes.

Q. Who did that?

A. Mr. Kneuppel.

Q. Okay. Did you notice -- well, what was the issue with the beams being uneven?

MR. MARTINEZ: Judge --

MR. CROCKETT: Judge, I'm not asking for an expert opinion. I'm just saying did she see beams that were uneven.

MR. MARTINEZ: That question's okay.

MR. CROCKETT: Okay. I'm sorry.

Q. (BY MR. CROCKETT) Did you see uneven beams throughout the home?

A. Yes, I did.

Q. When you mean uneven, were there beams that were actually shorter than the other beams that were doing the same job?

43

MR. MARTINEZ: Objection, leading.

THE COURT: Overruled.

A. There were beams shorter and unattached at the base.

Q. (BY MR. CROCKETT) Let me show you -- do you know what this picture is of, Ms. Miller?

A. Yes.

Q. Where is this at in your house -- or what was your house -- what part of the house?

A. In the attic, I believe.

Q. Is this piece of wood in the attic connected to the support beam?

A. No, sir.

Q. When you were out there, did you see wood that was just floating, not connected to anything?

A. Yes, sir.

Q. Did you have some concerns about that?

A. Absolutely.

Q. We talked about short boards. Did you see things like that throughout the house?

A. Yes.

Q. Now, is this board right here nailed into this board that's too short?

A. I believe so. I believe so.

Q. This board, when you were looking at it, was it

actually sitting on a beam just part of the wood? Did you have concerns about that?

A. I had a lot of concerns. It just -- like I said, it just didn't look right, and I know I can't fix these things myself.

Q. How would you describe the wood that you saw as the frame? What did it look like to you?

A. It just --

MR. MARTINEZ: Objection, opinion.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) What did the wood that was framing your house look like?

A. Looked like scrap lumber, like -- it just looked like it was picked off the scrap pile.

Q. Do you know what's in this picture, Ms. Miller?

A. Yes.

Q. What is it?

A. It's two boards that don't meet that's supposed to meet.

MR. MARTINEZ: Objection. "Supposed to meet," how does she know that?

THE COURT: Sustained.

Q. (BY MR. CROCKETT) When we talked before about boards that were shorter --

A. Yes.

Q.   -- and had other boards attached to them.

A.   Yes.

Q.   Is that the kind of thing you were talking about right here?

A.   Yes.  It's just -- yes.

Q.   What about this vent?

A.   Yes.  That's the vent for the dryer, the dryer vent.  That's the utility room like right below that, and it's crushed, and it would have been a fire hazard.

MR. MARTINEZ:  Objection as to being a fire hazard.

THE COURT:  Sustained.

Q.   (BY MR. CROCKETT) Did you have concerns about the vent being crushed?

A.   Absolutely.

Q.   Let me talk to you about the A/C unit.

A.   Yes.

Q.   Is that the A/C unit that you saw in the model home?

A.   No, not at all.

Q.   Did it look anything like that?

A.   No, sir.

Q.   Did the A/C unit have a drip pan that was about half the size of the actual A/C unit?

A.   No.  No, sir.

Q. Did you tell Kris Dominguez about your concerns that the A/C unit wasn't the same?

A. Yes.

Q. What did Kris tell you?

A. He said -- he really didn't say anything. He just said, "We'll get to it, we'll see."

Q. Did Kris ever get to any of these things?

A. He got to some, but not all.

Q. Do you know what this picture is? It's kind of hard to make it out. Did you have expectation that you'd have insulated pipes in your home?

A. Yes, yes.

Q. Does the pipe here look like it's actually insulated?

A. No. That -- that brought -- I looked up, and there were a lot of uninsulated pipes here and there, so I took pictures.

Q. Kris told you they were going to get to it?

A. He did. He said maybe. He said -- he did tell me they're not going to get to everything, they wouldn't do everything.

Q. When you saw these photographs, did you end up hiring somebody to come and look at the house?

A. I did. I hired -- I hired a home inspector, because I was very concerned, because I knew I was

uncomfortable with what I saw, and I didn't really know exactly what I was looking at. So, I hired a home inspector to come and take a look at the house.

THE COURT: Counsel, let's go ahead and break for the day.

Ladies and gentlemen, I'm going to ask that you be back at 8:45 in the morning. We cannot get started until all 12 of you here, so please leave your home in plenty of time to get here, get parked, get in the jury room at 8:45. We will start promptly at 9:00 o'clock in the morning.

Remember the instructions that I've given you: That is, do not discuss this case with anyone, even amongst yourselves, until after you've heard all of the evidence and received the Court's charge and heard the attorneys' arguments.

You may bring bottled water into the courtroom. However, keep the cap on it when you're not drinking. We will normally take a 15-minute break in the morning at about 10:30. We'll go until noon. We'll normally take an hour and a half for lunch we'll resume at 1:30 we'll take a 15 minute break somewhere around 3:00, 3:15, and we'll generally go until 5:00 o'clock every day.

So, with that, have a good evening. And

we'll see y'all back at 8:45 in the morning.

(Jury out)

THE COURT: Counsel, see y'all at 8:45 in the morning.

* * * * * * * * * *

**REPORTER'S RECORD**
**VOLUME 3 OF 6 VOLUMES**
**TRIAL COURT CAUSE NO. 13-DCV-209822**
**APPELLATE COURT CAUSE NO. 14-15-00004-CV**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
2/20/2015 3:47:35 PM
CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| LAUREL MILLER AND ELIANA MILLER | ) | IN THE DISTRICT COURT OF |
| | ) | |
| VS. | ) | FORT BEND COUNTY, TEXAS |
| | ) | |
| DEBO HOMES, LLC | ) | 400TH JUDICIAL DISTRICT |

_____

**JURY TRIAL**

_____

On the 20th day of August, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Clifford J. Vacek, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

Mr. Brian H. Crockett
Texas Bar No. 24074094
Mr. William G. Kanyha
Texas Bar No. 24087827
Crockett Law, PC
10565 Katy Freeway, Suite 400
Houston, TX   77024
Telephone:   713.779.3476
Counsel for Plaintiffs


Mr. Nicholas T. Martinez
Texas Bar No. 24087986
Mr. Craig Welscher
Texas Bar No. 21167200
The Welscher Law Firm
1111 North Loop West, Suite 702
Houston, TX   77008
Telephone:   713.862.0800
Counsel for Defendants

VOLUME 3

JURY TRIAL

August 20, 2014

PAGE VOL.

PLAINTIFF'S WITNESSES:

| | Direct | Cross | V.Dire |
|---|---|---|---|
| Laurel Miller | | | |
| By Mr. Crockett | 13 v3 | | |
| By Mr. Martinez | | 53 v3 | |
| By Mr. Crockett | 127 v3 | | |
| By Mr. Martinez | | 132 v3 | |
| | | | |
| Harold Knueppel | | | |
| By Mr. Crockett | 140 v3 | | |
| By Mr. Martinez | | 143 v3 | |
| By Mr. Crockett | 145 v3 | | |
| By Mr. Martinez | | 145 v3 | |
| | | | |
| Kris Dominguez | | | |
| By Mr. Crockett | | 146 v3 | |
| By Mr. Martinez | 181 v3 | | |
| By Mr. Crockett | | 195 v3 | |
| By Mr. Martinez | 196 v3 | | |
| | | | |
| Brian Crockett | | | |
| By Mr. Kanyha | 197 v3 | | |
| By Mr. Martinez | | 210 v3 | |
| By Mr. Kanyha | 221 v3 | | |
| By Mr. Martinez | | 222 v3 | |
| | | | |
| Juan Carlos Hernandez | | | |
| By Mr. Crockett | | 223 v3 | |

Reporter's Certificate .........................248   3

THE COURT: Mr. Crockett, you may continue your examination of the witness.

MR. CROCKETT: Thank you, Judge.

**DIRECT EXAMINATION (CONTINUED)**

Q. (BY MR. CROCKETT) Now, Ms. Miller, yesterday we talked about the contract that y'all had entered into, the initial contract. Then we had the other agreement as far as the cash installment plan. You saw construction happen. We went through the photographs. What we're going to talk about now is basically after you saw these photographs, what happened, what did you see, what did you do. Okay?

A. (Nodding.) Yes.

Q. When we were looking at the photographs in Exhibit No. 2, the broken boards, broken beams, the areas that you had concerns, you brought that to the attention of Kris Dominguez?

A. Immediately, yes. Yes.

Q. I'm going to show you Exhibit No. 3, which is the text messages between yourself and Kris Dominguez. Did you tell Kris that you wanted him to see what you had saw out at the construction?

A. Yes, because I saw things I wasn't comfortable with, and I wanted him to see exactly what I was looking at.

Q. Did Kris agree to meet you?

A. He did.

Q. When Kris got there, you told Kris an inspector was coming? You told Kris that there was the inspector coming on May 9th?

A. Yes.

Q. And Kris was there with the inspector?

A. Yes.

Q. Okay. Who was the inspector you hired?

A. I hired a man named Harold Knueppel.

Q. Why did you hire Mr. Knueppel?

A. I looked up on the Internet and -- under home inspectors, and I -- he had credentials. He had -- he had done home inspections all over the United States and outside the United States. He was an older gentleman. He also lived in Fort Bend County for, my gosh, a very long time, and I just thought here's a man who --

MR. MARTINEZ: Objection, Judge, a lot of this is hearsay about his credentials, posings on the web site.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Ms. Miller, my question with you is --

A. Yes.

Q. -- why did you feel like you had to hire Mr.

Kneuppel? Why couldn't you just tell Kris Dominguez and Kris Dominguez would have it fixed?

A. Because Kris was telling me that they were going to fix some things, but they weren't going to fix everything.

Q. When you went to -- when you had this meeting with Kris -- and Kris was present the entire time and he saw everything that you saw, right?

A. Yes.

Q. What response did he have as far as all of the issues you saw?

A. He kind of looked up and went, looked around and -- (looking different directions) -- he -- he did hand me a can of red spray paint and asked me to spray things that I thought was unusual.

Q. Did Mr. Knueppel issue a report about all of his findings?

A. He did.

MR. MARTINEZ: Judge, objection, expert report and hearsay.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Did Mr. Kneupple issue a report with all of the things that he found?

A. Yes, he did.

Q. Did you give that report to Kris Dominguez?

A.    Yes, I did.

Q.    Did you have a meeting with Kris Dominguez at your house about that report?

A.    Yes, we did.

Q.    Who was -- who else was at that meeting?

A.    My daughter, Ellie, and myself, Kris, and I believe a friend of mine, Stan.

Q.    Okay.  Did you see anybody who was a superintendent from Debo Homes during that meeting?

A.    Yes, yes.  The superintendent -- yes, and that was the first time I had -- I had met him, the superintendent.

Q.    You didn't see him all those days that he was there every day across the street?

A.    No.  Across the street, no, because this was the only house being built in that whole block.

Q.    Did the inspector -- let me say it this way: Did Debo Homes' superintendent come and talk to you about the problems that you saw?

A.    No, he did not talk with me at all.  He and Kris went to another part of the house and talked privately.

Q.    At any time did anyone from Debo Homes, other than Kris, come and talk to you about the problems in the house?

A.   No.   And we were specifically instructed by Kris not to talk with anyone else.   We were only to talk with Kris about the house.

Q.   Did you want to talk to the superintendent about all the problems that you saw?

A.   I would have liked to know what the superintendent was saying about what the fixes were going to be and what the remedies were, yes.

Q.   After Kris went in the other room and came back, what did Kris tell you the superintendent had agreed to?

A.   Nothing specific.   He just said -- he said, "We're going to fix some things.   We're not going to fix everything."

Q.   Was that the first time that there was a change in how Kris was talking to y'all?

A.   Yes.   Prior to that, he was, "Oh, we've got this covered, we're going to make you happy, we're going to do whatever you want."   And at that point, his demeanor changed, and he said, "We're just not going to fix everything."   He was very curt.

Q.   After that meeting, did Debo Homes tell you that they wanted to start putting the drywall in?

A.   It was very soon, very soon after that meeting.

Q.   Debo Homes start asking you for anything else?

A. Right after that, they started asking for the next payment.

Q. How much was the next payment?

A. $59,300.

Q. Now, did Kris just ask once or twice?

A. No. He asked multiple times through texts, through phone calls, just to the point where I -- I wasn't -- couldn't even take his calls anymore.

Q. Did you tell Kris that you weren't going to make another payment until you knew that the repairs were complete?

A. Yes, yes. I told him that the next payment wasn't due until the next phase, that was the drywall, when the drywall was actually going in, and that all the problems -- the problems were supposed to be fixed prior to the drywall, and another inspection was supposed to be done prior to the drywall. Everything prior to the drywall. But he just kept going on about, "You owe the next payment, you owe the next payment."

Q. Did you have Mr. Knueppel come back and do another inspection?

A. I did. He came back for a second -- it was after the insulation went in and prior to the drywall.

Q. In between the time that the first inspection happened and the second inspection, did Debo Homes keep

constructing the house?

A. Yes, they never stopped. It was -- it was like just being in a whirlwind.

Q. When you went out to the second time, did you ask Kris Dominguez to be there?

A. Yes, he was invited at every step. I wanted them part of it. This was going to be our home. I wanted them -- they were our builder. I wanted them part of the process. This was -- this was not something that I felt that they should be left out of.

Q. Did Kris Dominguez show up at the second inspection?

A. He did not.

Q. In the second inspection, were there problems with the new work that Debo Homes had been doing over the last four days?

A. Yes, there were additional problems on top of the original problems that hadn't been fixed.

Q. Did Kris tell you he wanted money again?

A. Yes. That -- that did not stop. The continual asking for the $59,300 just did not stop.

Q. So, we had the May 9th inspection. On May 11th, did you tell Debo Homes that you wanted to have another inspection to confirm that all of the problems had been fixed?

A.   Yes, I did.

Q.   Did you actually text Kris on May 11th that you wanted to have Mr. Knueppel come back again -- this thing will eventually catch.  Did you tell him you wanted him to come back again and confirm that the repairs were done?

A.   Yes.

Q.   You told Kris, and he knew that you wanted him to come back again?

A.   Yes, yes.

Q.   And that inspection was going to happen before or after the drywall went in?

A.   Before the drywall.  Mr. Knueppel specifically said after the insulation --

MR. MARTINEZ:  Objection, hearsay as to what Mr. Knueppel said.

THE WITNESS:  He said it to me.

THE COURT:  Sustained.

Q.   (BY MR. CROCKETT) Did you tell Debo Homes that you wanted Mr. Knueppel to come back out before the drywall got installed?

A.   Yes.

Q.   Did Debo Homes understand from the message you sent -- did Kris ever say, "I don't understand why you want to come back out again before it gets installed"?

21

A.    Kris understood from my texts.

Q.    Later that day, what did Kris tell you about the drywall?

A.    He said they were supposed to be -- he said he has until Monday to complete his part, because we're sheetrocking on Tuesday.  That's what Kris wrote.

Q.    5-13, this was after the second inspection, and Kris texted y'all that all that he was told was that they started at 2:00 to 3:00, and that's it, and that they're going to finish today?

A.    (Nodding.)  Yes.

Q.    Were you ever aware that -- other than that day, that they were just going to start drywalling?

A.    No.

Q.    Did you make the $59,300 payment?

A.    No, I never made the second payment.

Q.    But they started drywalling anyway?

A.    They did.

Q.    Here's the text message here about them starting on 5-14, May 14th.

        MR. MARTINEZ:  Can we get a date from the previous one?

        MR. CROCKETT:  May 13.

Q.    (BY MR. CROCKETT) The previous one is May 13th. May 14th, at 10:51 a.m., Kris told y'all for the very

first time that they were going to drywall at 2:00 to 3:00?

A.    (Nodding.)

Q.    Or tomorrow, right?

A.    Yes.

Q.    So, did you think that they were going to drywall May 15th, if he wrote you that on May 14th?

A.    Yes.

Q.    Had you been able to get Mr. Knueppel back out to do the inspection?

A.    If we had a whole day?  I don't know.  It's possible, if we had --

MR. MARTINEZ:  Object to speculation.

THE COURT:  Sustained.

Q.    (BY MR. CROCKETT) And then actually an hour later, about an hour and a half later, Kris texts you "Can you please call me, because they're showing up today and not tomorrow to sheetrock the house.  My boss will knock a hundred dollars off."

MR. MARTINEZ:  That assumes facts not in evidence and misconstrues the evidence there.  That's talking about insulation, not sheetrock.

THE COURT:  Overrule the objection.

Q.    (BY MR. CROCKETT) Did they install the drywall on May 14th?

A.   They did.

Q.   When you went out to the house on May 15th, did you see that they had already drywalled over a bunch of things?

A.   Yes, yes, the drywall was in.

Q.   Why did you take these pictures?

A.   To show that the drywall was in.  I was shocked.  I couldn't believe -- we were supposed to still be in frame and insulation.

THE COURT:  Counsel, I see some people coming in the courtroom.  Are these witnesses?

MR. CROCKETT:  No, they're not.

THE COURT:  Okay.  I'm going to depend on you to let me know if any come in, so that I can instruct them.

Q.   (BY MR. CROCKETT) We've got drywall up here.  Were you surprised to see the drywall up throughout the house?

A.   Yes, yes.

Q.   Were these areas that you were planning to inspect?

A.   Oh, yes.

Q.   When Debo Homes put the drywall in, before they put it in, is there anything that you ever said to tell Debo Homes, "You can't make the repairs"?  Did they ever

tell you, "Why won't you let us make the repairs?"

A.    I'm sorry?

Q.    Bad question.  Before the drywall got put in, did anyone from Debo Homes come to you and say, "Why aren't you letting us repair the problems with the house?"

A.    No.

Q.    Would you have given Debo Homes as much time as they needed to make the repairs before the drywall went in?

A.    Absolutely.  We -- we wanted -- wanted a great house.  We wanted a solid house without problems.  We wanted a house that we didn't have to worry about fixing up, and we would give them as much time as they needed prior to even thinking about moving in.  We were in no rush to move in.

Q.    After this happened, did you walk away from the contract like Debo Homes' lawyer said?

A.    No.

Q.    Let me talk to you about the continued construction that you saw afterwards.  After the drywall went in, did you have a chance to see Debo Homes working on your roof?

A.    Yes, absolutely.

Q.    How many people from Debo Homes were out there?

A.   I saw two people.

Q.   Did you see any superintendents or anyone from Debo Homes?

A.   I did not.  There were just two, two men.

Q.   And what were they doing?

A.   One man was on the roof, and another worker was on the ground.  The man on the roof called down to the man on the ground --

MR. MARTINEZ:  Objection, hearsay.

MR. CROCKETT:  Judge --

THE COURT:  I haven't heard any statements yet.  Overruled.

A.   He called down to the man on the ground.  Then the man on ground cut -- cut a board, handed it up to the man on the roof.  The man on the roof set it on the roof.  It was like a -- like a piece of the solid base of the roof board, not like a shingle, just like a main board for the roof -- and then kind of moved it back and forth, shook his head, threw it off the roof.  Then called down to the man on the ground a second time.  The man on the ground cut a second board, handed it up to the man on the roof.  The man on the roof tried to place it again.  The man on the roof threw it down, called down to the man on the ground a third time.  A third board was cut, handed up, the man on the roof tried to

place it again. Still didn't work, threw it down. A fourth time the man on the roof called down, a fourth board was cut, handed it up, wiggled it this way and that way, got it to fit and then moved on.

Q. (BY MR. CROCKETT) Does that sound like the highest quality subcontractors that Kris promised you?

A. I was -- I just went -- I was just shocked. I was (indicating). I just couldn't believe it.

Q. Did that give you some concern about all the uneven boards you saw before on the frame?

A. It just kind of brought everything home.

Q. Right then and there, did you walk away from the contract, like Debo Homes' lawyer said?

A. No, I didn't. We still stuck with it. I don't run away from things.

Q. Let me talk to you about the driveway. Did you see Debo Homes pour your driveway?

A. Yes, I did.

Q. Did you see that the driveway was framed with wood around it?

A. Yes. Yes, it was.

Q. Was there anything -- in the actual forms where they were pouring the concrete, was there any mesh, was there any rebar, was there anything?

A. No, just the dirt, just the base dirt that they

flattened out.

Q. Have you ever seen drywall -- not drywall -- a driveway after this or a sidewalk be poured?

MR. MARTINEZ: Objection, relevance, other sidewalks not near this house.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) After you saw your driveway poured, did you ask Kris Dominguez why there was no rebar or mesh inside the driveway?

A. I did.

Q. What did Kris tell you about the mesh?

A. He told me -- I asked him why there was no rebar in the driveway, and he told me that, had we wanted rebar, we would have had to specify that at the time of the signing of the contract.

Q. Did Kris tell you that they put mesh in the driveway?

A. He did tell us that they automatically put mesh in the driveway.

Q. What did you tell Kris about what you had saw?

A. I told him I saw that there was no -- neither mesh nor rebar, there was just plain cement, and he insisted that it had to have mesh, after I told him it didn't because I saw it being poured.

Q. What explanation did Kris give you?

A. He gave me no explanation. He just (indicating) was quiet.

Q. Let me ask you, when you saw the driveway being poured, how many people from Debo Homes were there?

A. There were no people from Debo Homes. It was just the contractors.

Q. After you saw the driveway being poured and the responses back from Kris, did you run away from the contract, like Debo Homes' lawyers told us?

A. I did not.

Q. Did you have a chance to see your fence being installed?

A. Yes. Yes, we did.

Q. Tell us what you saw about your fence being installed.

A. Okay. They were digging the holes, and while they were digging the holes, all of a sudden a bunch of neighbors decided to come from around, from behind the house and next door. And all of a sudden -- excuse me -- we wondered what was going on, why all of a sudden we're meeting the neighbors. Well evidently, they had cut the power, cut the lines upon digging the holes.

Q. Did that sound like the highest quality subcontractors that Kris promised you?

A. No. I would think they'd know where the lines

were.

Q. Did you run away from the contract after you saw that, like Debo Homes' lawyer said you did?

A. No, we didn't. We still stuck with it.

Q. This was that driveway you were talking about, right?

A. Yes, that's it.

Q. Why did you take a picture of that driveway again?

A. Because I watched it being poured, and there was no rebar, no mesh. There was nothing other than concrete to hold it together, and --

MR. MARTINEZ: Objection, getting into expert testimony about holding driveways together. She doesn't know what rebar is for.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) You can answer the question.

A. Okay. There was nothing but plain cement to hold it together.

Q. Your next-door neighbors, do they have a driveway?

A. Yes, they do.

MR. MARTINEZ: Objection, same objection as earlier, relevance about other driveways, other sidewalks.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Your neighbors next-door, did they have a driveway?

A. Yes, the neighbors next-door had a driveway.

Q. Did Debo Homes build that house?

A. Yes, they did.

Q. How did that driveway look?

A. It was very broken up.

Q. How old was that house?

A. About five years old, at the most.

Q. Did you have some concerns after seeing your driveway get poured and then seeing the neighbor's driveway?

A. Yes, yes. We looked over at the neighbor's driveway, and we said that's what ours is going to look like in a couple of years. That's --

MR. MARTINEZ: Objection, speculation.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Let me talk to you about some of the other things about the repairs Debo Homes said you didn't let them do.

MR. CROCKETT: I'm sorry, can I -- bailiff, how do I get rid of this green thing that I've accidentally written on there?

BAILIFF: Touch the bottom right on the

screen.

MR. CROCKETT: Thank you.

Q. (BY MR. CROCKETT) Now, on here, Debo Homes said that they were going to put the waterproofing on this foundation, right?

A. Yes.

Q. When Debo Homes said they were going to make some repairs, is that the repair that they made?

A. That is exactly it.

Q. Did you have some concerns about the waterproofing that was the repair job?

A. Yes, yes.

Q. Did you run away from the contract, like Debo Homes' lawyer said you did?

A. No. We still -- we still kept going.

Q. Had Debo Homes started doing the brick facade of your house?

A. Yes.

Q. What happened to the waterproofing?

A. I really don't know. it's gone.

Q. How did that make you feel about how good the repairs were being done?

A. Well, pretty upset. It was there, and now it's gone. So, what else was there and then it's gone?

Q. Now, talk to me about this brick wall.

A. Yes. It was free-standing. I could put my fist inside between the framing and the brick wall.

Q. You're talking about right here? (Indicating.)

A. Yes, sir. And we actually looked in there with a flashlight, and there was no -- there was nothing holding that wall to the frame. It was just free-standing. And I leaned on it, and it started to move. And it was very disturbing. Plus, it shrunk in the rest of the house. The house was not all the way to the edge.

Q. What do you mean by that?

A. Well, if the house was in a good three inches or so, that means the room sizes were smaller.

Q. Did you tell Kris Dominguez about the brick facade?

A. Yes, immediately.

Q. Did Kris tell you, "We're going to repair it"?

A. He said, "We'll take care of it."

Q. Talk to me about the windows where the brick facade was at compared to the window holes that they made of the house.

A. Yes. They didn't line up. The holes that were cut into the frame were not the same holes for the brick. So, they were -- they were off. And when I brought that to their attention, they said, oh, that

would work out, that just works itself out.

Q. Did you tell them that they had to repair it right now, or that you were going to run away from the contract?

A. I never said that. We just wanted the house fixed so we could enjoy living there.

Q. Now, the window here, what was going on with this window?

A. I don't know how it got broken, but it's -- it's -- inside, it's a broken master bedroom window.

Q. Did Kris tell you, "We're going to get it replaced right away"?

A. He never said -- he said, "We'll fix it."

Q. Did you get that a lot?

A. Yes.

Q. When you add up all of the things that you saw and you look at all of the responses that Debo Homes gave you, did you ultimately say, "I want to confirm all the repairs are actually going to be done before I pay you any more money"?

A. That's exactly what was said.

Q. Did you ever see those repairs happening?

A. We saw some repairs happening. We didn't see enough repairs happening.

Q. Did you see the construction of the house keep

going, though?

A. The construction never stopped.

Q. On May 21st, did you write an e-mail to Kris Dominguez telling him that you wanted them to stop construction?

A. I did.

Q. Did you outline all of the things that you saw or had an issue with with Debo Homes?

A. I did.

Q. Did construction stop?

A. It did not.

Q. You told Debo Homes, "We expect Debo Homes to complete all of these repairs prior to us submitting any more funds"?

A. Yes.

Q. So, you didn't pay them anything more, and the construction kept going?

A. That's correct.

Q. Ultimately, did you have to ask us to tell them to stop?

A. Ultimately, yes. It was not something we wanted to do. It was something we had to do.

Q. Now, this letter was made on May 22nd. Did Debo Homes stop after we sent our letter?

A. They did not.

35

Q. You know that Debo Homes told us that they were going to let us inspect the house, right?

A. Yes, they did.

Q. Did we have an inspection scheduled for July?

A. We did.

Q. Let me ask you this: After Debo Homes knew that you had hired lawyers, did they keep calling you directly?

A. They did.

Q. Now, were they calling you to say, "Ms. Miller, let's try to work this out, let's do the repairs"?

A. No. No.

Q. What did Kris Dominguez keep calling you about?

A. $59,300.

Q. At that point, when he kept calling and calling, did you say, "Talk to my lawyers"?

A. That's exactly -- prior to that, I wouldn't have had to. I didn't have lawyers.

Q. Wasn't how the defense lawyer had said earlier, which was right from the start, you said, "Talk to my lawyers." Did Debo Homes send you this letter directly?

MR. MARTINEZ: I object to what counsel said. There's no question. He was making a statement.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Did Debo Homes write you a

letter, directly to you, May 29th, 2013?

A.   Yes.

Q.   And it's supposed to be from Juan Carlos Hernandez, the President of Debo Homes?

A.   Yes.

Q.   On May 29th, Mr. Hernandez said, "It's come to my attention that you have some concerns about the quality of the construction and the materials that go into your home."  Did you have some concerns?

A.   (Nodding.)  Yes, we had a lot of concerns.

Q.   Now, when you first met with Kris Dominguez, he told y'all that they had a third-party independent inspector inspect the entire work from Debo Homes, almost a check the checker?

A.   Yes.  They had -- that's exactly what he told us -- third-party independent inspectors throughout the building process.

Q.   Mr. Hernandez's letter was the first time that you knew that there was only three inspections?

A.   Yes.

Q.   Did you learn for the first time that they also have onsite supervising all of the subcontractors' work?

A.   Yes.

Q.   Did you actually ever see that?

A.   No, we did not see that.

Q.   You couldn't even talk to the guy, if you wanted to?

A.   No, we were -- we were specifically told not to talk with the workers.

Q.   Now, this part is really interesting.  At the end of it, Juan Carlos Hernandez told y'all, "If you are not happy with our service, you are free to terminate the contract with Debo Homes, and we'll refund you a hundred percent of the money you gave us after we sell the house."  Are you surprised now that they're actually suing you, saying you breached the contract?

A.   Yes.

Q.   Did they say a lot of things to you and then say something different later?

A.   Unfortunately, that's exactly what happened.

Q.   Now, Debo Homes' lawyer said that they offered you a hundred percent of the money whenever they sold the house.  Did you ask him for a specific date?

A.   Well, we tried to work it out that it would happen within 90 days.

Q.   Did you ever hear a single thing from Debo Homes or its lawyers?

A.   We never heard anything.  It just -- everything got silent at that point.

Q.   A week before the inspection that was

scheduled, did you go out to the house to see whether or not anything had been changed or altered?

A. Yes. We wanted to make sure everything was -- was okay for the building inspector to get out there and keep going. We still hadn't pulled out.

Q. Is this what you saw when you got there? (Indicating.)

A. That's exactly what we saw.

Q. Were you shocked that your home was available for sale?

A. We were dumbstruck.

Q. Now, you bought some fans, some fixtures for your new house, right?

A. Yes, we did.

Q. Did you see Debo Homes installed them?

A. Yes. We -- we specifically wanted extra ceiling fans for the rooms because it keeps energy costs down. You know, this way we could keep the AC a little higher and put the fans on, a little nicer. And Kris told us just drop them off at his office, he'll make sure they get in the house.

Q. They got in there, didn't they?

A. They did.

Q. Were you surprised to see the sales table out there?

39

A. Yes. Evidently, looks like they're -- they've got a nice little office going on in there.

Q. Let me ask you this: Your home, what was the floor supposed to be?

A. It's supposed to be all tile, a hundred percent. We didn't want carpet because of the dogs. We have carpet now, and it just gets eaten up.

Q. This back corner here and in the other parts in the house, what did they install?

A. They put carpet throughout the bedrooms.

Q. They built the house cheaper?

A. Yes, they did.

Q. They're not asking for a reduction off of their lost profits, even though they saved money making it cheaper, are they?

MR. MARTINEZ: Objection, it assumes facts not in evidence about the cost of tile and carpet.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Did Debo Homes tell you that they would give you your money back for the money that they saved building a cheaper home?

MR. MARTINEZ: Objection, same objection.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) When we asked Debo Homes what was going on, and we went to the house and saw that it

40

was completed, what did they tell you?

A. They told us we were trespassing. We didn't go in the house, we went around the outside of the house. They told us it's not our house, and that we were trespassing, and that we don't have any right to be on -- on the property at all.

Q. Did you feel like they were intimidating you?

A. Intimidating, and just we couldn't understand how a house we owned a third of already --

MR. MARTINEZ: Objection, it's a legal conclusion about --

THE COURT: Sustained.

Q. (BY MR. CROCKETT) What did Debo Homes' lawyers tell you about that $60,300, how much of that were they going to give you back?

A. They were going to -- they were going to give it minus the attorney's fees, broker's fees, interest, any and all costs.

Q. Is that what Juan Carlos Hernandez said in Exhibit No. 6?

A. No.

Q. That he was going to seek all lost profits, pay for all my attorney's fees, my interest? Did he ever tell you that?

A. No, not at all.

Q.   Now, you know that -- Exhibit No. 8 -- Debo Homes ultimately sold your house to someone else?

A.   Yes.

Q.   Sold it for $168,000?

A.   Yes.

Q.   They signed that contract on October 19, 2013. See that?

A.   Yes.

MR. MARTINEZ:  Objection, leading.

THE COURT:  Overruled.

Q.   (BY MR. CROCKETT) Did you hear Debo Homes' lawyer said that they actually didn't close on the house until December?

A.   Yes, and we didn't find out about it until May in the deposition.

Q.   So, you waited two months for them.  How long did they wait for you?

A.   A couple of days.

Q.   After Debo Homes sold your house, did Debo Homes pay you back the money that Juan Carlos Hernandez --

A.   They paid us nothing.

Q.   -- promised he would do?

A.   Yes.

Q.   You heard Debo Homes' lawyer tell you they put

$60,300 in the Court's registry?

A.   Yes, I heard that.

Q.   Do you know when they did that?

A.   Yes.  We found out that they put it in just last week, but we found out on Monday, this past Monday.

Q.   Over the last year and a half, what changed, other than 12 jurors?

A.   Nothing.

Q.   How long have we been in this lawsuit?

A.   Since the end of May, 2013.  2013.

MR. MARTINEZ:  Objection, that assumes facts not in evidence.  This was filed in October.

THE COURT:  Overruled.  You can cross-examine her.

Q.   (BY MR. CROCKETT) How long have you had to deal with Debo Homes and their lawyers?

A.   Since the end of May, 2013.

Q.   During that entire time, have they ever said anything to you other than you're going to pay our lost profits, or attorneys fees, our lost interest, and anything else that we come up with?

A.   No.

Q.   That's all you've ever heard?

A.   Yes.

Q.   If Kris Dominguez would have told you this is

43

the way that Debo Homes was going to do business with y'all, would you have handed over $60,300?

A.   Never.

Q.   Did Debo Homes make promises, representations to y'all that as of today you know weren't true?

A.   Yes.

Q.   What did Debo Homes tell y'all, what did they promise y'all about their subcontractors?

MR. MARTINEZ:   Objection, asked and answered many times.

THE COURT:   Overruled.

A.   They promised that they would be the highest quality subcontractors.

Q.   (BY MR. CROCKETT) What did Debo Homes tell you about their supervision of those highest quality subcontractors?

MR. MARTINEZ:   Same objection.

THE COURT:   Overruled.

A.   That there would be continual onsite supervision at the jobsite, at the home.

Q.   (BY MR. CROCKETT) What did Debo Homes tell you about the third-party inspectors?

A.   That there would be multiple building inspections of the structure and at various phases --

Q.   What did Debo Homes tell you --

44

A.    -- by a third-party inspector.

Q.    What did Debo Homes tell you about the next time you'd have to pay $59,300?

A.    That that would not have to happen until we go into sheetrock, and that all problems would be fixed before we paid the next phase.

Q.    What did Kris Dominguez tell you about the AC unit and the appliances that were going to be installed in your house?

A.    That they would be the same ones that we saw in the model house.

Q.    Were any of those a hundred percent true?

A.    No, not at all.

Q.    Now, Debo Homes' lawyers talked earlier about saying that this was the contract; regardless of whatever we told you, the contract says that we don't have to follow that.

MR. MARTINEZ:  Objection, counsel is making a statement?

THE COURT:  Sustained.

Q.    (BY MR. CROCKETT) In this contract, when was this contract signed, Exhibit No. 1?  Was this signed -- let me ask a better question.  Exhibit No. 1, when this was signed, were you doing the cash installment plan or were you doing the financing?

A. This was the financing. This was when we tried to get financing. We went in with that -- with that mind-set.

Q. And y'all signed this April 13th?

A. Yes.

Q. Is that what you remember?

A. Yes.

Q. And when you came back to meet with Kristopher Dominguez, when you didn't qualify for financing -- I think I need a better one. How many days later from the original contract did y'all write a check to Debo Homes for $59,300 and a thousand dollars in earnest money?

A. I believe it was three days later.

Q. April 16th, 2013. And you paid them that money, correct?

A. Yes.

Q. And the agreement was the cash installment plan?

A. Yes.

Q. After you made that agreement, did Kris Dominguez tell you, "Well, we're still going to hold you to this other agreement that says whatever we just told you right now, we're going to ignore that, and we're going to say that that doesn't apply"?

A. No, he never said that.

Q. Other than after this lawsuit was filed, did you ever hear from anyone at Debo Homes, other than their lawyers, that they weren't going to honor any agreement that wasn't in writing?

A. Can you rephrase the question?

Q. Before this lawsuit was filed --

A. Yes.

Q. -- did anyone from Debo Homes ever tell you, "Well, we're going to hold you to the old contract and all these representations we just made, we're not going to honor"?

A. No.

Q. Once this lawsuit happened, did you find out that was the defense?

A. Yes.

Q. During your deposition, is that when you found out Debo Homes was saying, "Well, No. 19 says we don't have to honor anything that's not in writing, no warranties, no promises"?

A. That's exactly when I found out.

Q. In your agreement with Debo Homes, is anywhere in this contract that talks about the cash installment plan?

A. No, because that contract is all about the financing.

Q.   Is anywhere in this contract that Debo Homes put in writing that you didn't have to make a payment until before the problems had been fixed?

A.   That contract -- no, because, again, that's about the financing.

Q.   Did Kris Dominguez tell you a different story?

A.   He did.

Q.   Debo Homes lawyer said that y'all were here asking for treble damages and all this excess damages because you just wouldn't take your money back when they offered it to you.  Did they ever offer your money back?

A.   Not really.  They offered it minus this, minus attorney fees, minus the costs and other fees, and so it never came down to just our money back.

Q.   Are you suing Debo Homes just about this incident?  Is this all about just you?

A.   No.  It's not about me.  Because if they can build me a home like this, they can build anybody a home like this.  If they can take my money, they can take anybody's money.  They can -- it's very upsetting that I and my daughter have had to go through this, but they can do this to anyone.

Q.   Ms. Miller, if you wouldn't have been out on that jobsite, if you wouldn't have been there and saw the work that was done, you think that any of the

48

repairs would have been done?

MR. MARTINEZ: Objection, speculation.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) If you wouldn't have been there to see the crushed vent pan, you think it would have been fixed?

MR. MARTINEZ: Same objection.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Based on the work that Debo Homes did or what you witnessed, you think that you would be doing a bunch of repairs after you paid off this house?

MR. MARTINEZ: Objection, speculation.

THE COURT: Overruled.

A. Yes, I think we would. And I think we'd be paying very high AC bills based on the air conditioning unit they put in versus the one they promised us. I think we'd have a wet ceiling based on the pan being too small for the AC unit.

MR. MARTINEZ: Objection. This is getting into the cost of electricity, the ceiling pan from the AC unit.

THE COURT: What's your legal objection, counsel?

MR. MARTINEZ: Speculation and expert

testimony.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Ms. Miller, I want to talk to you about the construction timeline.

MR. CROCKETT: Judge, I have a demonstrative that I've talked to defense counsel about. I think they're looking for your ruling on my timeline.

MR. MARTINEZ: We object to the -- he's making statements in that demonstrative there, expert opinion, hearsay.

MR. CROCKETT: Judge, it's all things that she's already testified about.

MR. MARTINEZ: Some of which was expert testimony, which I've objected to.

MR. CROCKETT: I can show Your Honor.

THE COURT: Bring it up.

(Bench conference)

MR. MARTINEZ: The portion that we're objecting to, all the words in writing and that sort of stuff.

THE COURT: This is it?

MR. CROCKETT: That's it, Judge.

MR. MARTINEZ: If I may, Judge, they changed a little bit --

MR. CROCKETT: It says stop construction.

MR. MARTINEZ: This is repetitive, and it's confusing.

MR. CROCKETT: You can delete it. I'm just trying to get the timeline in here.

MR. MARTINEZ: Yeah. We're fine with that.

THE COURT: Okay.

(End of bench conference)

Q. (BY MR. CROCKETT) Ms. Miller, I want to talk to you about this timeline, because it's a big deal in this construction timeline. At the very left side, April 16th, 2013, is that when you entered into your cash installment agreement?

A. Yes.

Q. And what were the representations, the promises that Kris Dominguez told y'all?

A. That we would get the same things that were in the model home; that we would have quality superior quality workers; that they would be supervised at all times; that they --

Q. Let me ask you this.

A. Yes.

Q. On May 9th and 13th --

A. Yes.

Q. -- when Mr. Knueppel did the report --

51

A.   Yes.

Q.   -- are those pictures of what you saw?

A.   Yes.

Q.   Does that sound like, what you saw, anything like Mr. Knueppel gave y'all, or what Debo Homes promised y'all?

A.   It's nothing what they promised.

Q.   May 14th, we talked about those text messages, is Kris Dominguez demanding more money from y'all?

A.   Absolutely.

Q.   In fact, on the inspection from May 13th, in these photographs you already saw that they had all the drywall waiting to be thrown up?

A.   Yes.

Q.   When you did the inspection on May 13th, how late at night was it?

A.   Oh, it was -- it was after hours.  There were no more workers there.

Q.   And May 14th, all the drywall went up?

A.   Yes.

Q.   May 21st and the 22nd, was Debo told to stop construction?

A.   Yes.

Q.   Did you ever pay them the money for the drywall?

A.   I did not.

Q.   In fact, did construction ever really stop?

A.   It did not.  It just kept going and going like a snowball going downhill.

Q.   May 29th, is it accurate that Debo Homes, the president of the company, told you that you're free to terminate the contract, have no liability to us, and we'll give you your money back when we sell the house?

A.   Yes, he did.

Q.   Was any of that true?

A.   It turned out not to be true.

Q.   June 3rd was the closing date.  Did you ever tell Debo that if they're not done with the home and the repairs by June 3rd, that you were walking from the contract?

A.   Never.

Q.   July 24th, your home was complete?

A.   (Nodding.)  Yes.

Q.   Is there anywhere in this entire timeline that you told Debo Homes, "We're not going to let you make the repairs"?

A.   Never.  We wanted them to make the repairs.

Q.   Do you have any idea how Debo Homes was going to make the repairs like their lawyer said, when the home was complete?

A.   We couldn't have -- no.   Not once the drywall went up, we didn't know how it was possible.

MR. CROCKETT:   Thank you, Ms. Miller.

THE WITNESS:   Thank you.

MR. CROCKETT:   Your Honor, I pass the witness.

MR. MARTINEZ:   Judge, may I proceed?

THE COURT:   You may.

MR. MARTINEZ:   I apologize, one moment to get my computer back up.

THE WITNESS:   Sir, may I have water?

THE COURT:   I'm sorry?

THE WITNESS:   May I have water?   I have water there.

THE COURT:   Yes, ma'am.

THE WITNESS:   Thank you.

MR. CROCKETT:   (Handing.)

THE WITNESS:   Thank you.

**CROSS-EXAMINATION**

Q.   (BY MR. MARTINEZ) Good morning, Ms. Miller.

A.   Good morning.

Q.   I'm a little confused.   Now, I thought throughout this whole transaction you were relying upon that contract we've seen here in Exhibit 1 signed April 13th.   Is that not correct?

A.   That's the contract for financing.

Q.   So, you're not suing Debo for breach of contract based upon that contract?

A.   Correct.

Q.   So, you're saying that contract has nothing to do with this case?

A.   Correct.  That's not the contract -- that's not the contract that we're -- that's in question.

Q.   Where is the other contract that's in question?

A.   We don't have a copy of it.

Q.   So, why did we just go through a bunch of questions about this contract, if this is irrelevant to you?

A.   I don't know.

Q.   Then why are you suing my client for breach of contract when there's no contract?

A.   I don't know.  They asked us -- they had a three-tier payment program that Kris came up with, and he had it written down, he had it in writing.

Q.   Where is that three-tier payment program in writing?

A.   I don't know.

Q.   You just said it was in writing.

A.   It was.

Q.   Where is it?

A.   I don't know.

Q.   So, are you telling the ladies and gentlemen of the jury that they should disregard that contract entirely?

A.   I suppose so.

Q.   So, you're suing Debo based upon an oral contract, then, if there's no contract in writing?

A.   I'm not sure.

Q.   Well, Ms. Miller, I'm sorry, but I do need you to be sure.

A.   I'm not a lawyer.

Q.   Well, if you're not relying on that contract, then what are you relying on?  Because you're suing Debo Homes for breach of contract.  Where is the contract?

A.   Kris had it.

Q.   That's the first time I've heard that, Ms. Miller.

A.   Kris wrote down the three-tier program.  He came up with three payments, and he had written them down on a contract.

Q.   Like that?  (Indicating.)

A.   It was similar, yes, like that.

Q.   And you signed it?

A.   We did.

Q.   You realize that in Texas, you have to have a

written contract to sue for issues involving property?

A. No, I'm not aware --

MR. CROCKETT: I'm going to object to a lot of the legalese that Debo Homes' lawyer is trying to ask about.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Ms. Miller, if I started asking you questions about this contract, you're telling the ladies and gentlemen of the jury that I really shouldn't be doing that?

A. (No response.)

Q. You understand the question?

A. Not really. Can you rephrase it?

Q. I know your lawyer went through the contract at length, so is it unfair for me to go through the contract and ask you questions as well?

A. I'm not sure.

Q. Ms. Miller, I'm not sure either. I'm just confused, because I don't understand why we went through that whole direct examination --

A. Yes.

Q. -- talking about the contract, when you are telling me right now that that is not the contract.

A. It's not. It's -- that one is in reference to the financing.

Q.   When was this other contract signed?

A.   Three days later, on the 16th.

Q.   Ms. Miller, I asked you in your deposition before, did you read this contract fully, this one, Exhibit 1.

A.   Yes.

Q.   And you fully understood its terms?

A.   Yes.

Q.   Since I don't have a copy of this other contract, what terms are different between that and this other contract?

A.   The way the money is proportioned.

Q.   Is that the only difference?

A.   From what I -- from what I can recall, possibly.

Q.   So, is it fair for me to talk about this contract and say it's the same as this other contract, as long as I don't talk about that part, the sales price portion?  Is that the only difference, that circled part?

A.   That's one difference.  I'm not sure if it's the only difference.

Q.   Well, Ms. Miller, I need to know, because this is the first time I've heard this.  I'm a little bit surprised, and I'd like to be able to tell the ladies

and gentlemen of the jury what you signed and what you're suing Debo for. Is that fair?

A. Yes, it's fair.

Q. Ms. Miller, would you care to look at Exhibit 1 in full and please tell us what's different between this contract and this other contract signed three days later?

A. Like I said, I believe it's primarily the money.

Q. Okay. But I'm offering you the contract, if you'd like to look it over and perhaps tell us what's different, because this is the first time I've heard this. I didn't get to discuss it in deposition, so this is my only shot.

A. I can't -- after a year and a half, I can't -- I can't tell you each and every aspect that might be different, but I believe it's primarily just the money aspect.

Q. Okay. Well, let's go ahead and break it down then and see if we can figure out what's different and what's new right here, today in this courtroom for the very first time.

Now, Ms. Miller, your attorney went over this section with you a while ago, isn't that correct, No. 19?

A.   Yes.

Q.   Is this the same in both contracts?

A.   I believe so.

Q.   Now, is it true that says that all representations and warranties must be in writing?

A.   It does say that.

Q.   So, you've been talking a lot today about how Kris and Debo made a lot of oral representations to you during the negotiation phase, correct?

A.   Yes.

Q.   Well, then why did you sign a contract with that clause in there, if you were relying upon oral representations?

A.   Because when you choose your items for a home, they're not in that contract.  You go through and you choose a stove.  That's not in there.  And that's why they have a model, so you can choose a stove, and efficient HVAC, high-energy AC unit, and so they can show you what they offer.  So, you know what you're going to get in your home, or they wouldn't show you a model home.  And when they tell you this is this and this is that.  And then they show you tile samples and they show you other samples, and when you ask, "Am I going to get that," and they say yes, you expect to get exactly that.

Q.   I think my question is a little bit different. I agree that, you know, if you choose a stove or a color of roof, that's a separate, you know, detailed home selection chart.  I'm asking you about those representations that Kris made to you, like you'll love the home; we'll have a superintendent there at all times; you know, we'll fix everything immediately. Where is that written down?

A.   (Reading.)  It's not in there.

Q.   Well, is it true?

A.   I do know Debo advertises that they use the highest quality workers.

MR. MARTINEZ:  I'll object as nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. MARTINEZ) Well, Ms. Miller, you said you read this contract from A to Z, or you read through the entire thing, correct?

A.   Yes.

Q.   And you understood it?

A.   Yes.

Q.   And you accepted all of its terms?

A.   Yes.

Q.   And you had a realtor there to look it over for you?

A.   Yes, who is a friend, yes, a friend.

Q.   But you did have a realtor read over the contract and explain some things to you?

A.   Yes.

Q.   That leads me to my question, Ms. Miller:  Why are you relying upon oral statements, oral statements? If you had a realtor read it over to you, you read the whole thing, you understood it and you're relying upon those representations, then why did you agree to that clause, No. 19?

A.   (Reading.)  Because it says -- we never expected --

Q.   I'm sorry?

A.   We trusted Kris.  At that point, he still had our trust.  We trusted everything he was telling us.  We asked questions, he said everything right.  We asked -- we had -- I had a long page of questions.  He gave us all the right answers.  Our friend, Stan, the realtor, asked questions.  He gave him all the right answers.

Q.   Ms. Miller, also there's another thing in paragraph 19 I'd like to point out.  I didn't mean to write over that.  Would you mind reading the underlined portion?

A.   It says, "Seller may continue to show the property and receive, negotiate and accept backup

offers."

Q.   And you agreed to that condition?

A.   Yes.

Q.   Twice, actually?

A.   Yes.

Q.   And you fully understood what that meant?

A.   Yes.

Q.   So, why are we now in this court having you complain about Debo selling the home to someone else, if you agreed to that?

A.   We're here because we weren't offered our money back at the point --

MR. MARTINEZ:  I'll object to nonresponsive, Judge.

Q.   (BY MR. MARTINEZ) My question is:  Why are you complaining about the home being sold to someone else when it's in the contract that they're allowed to do that?

A.   (No response.)

THE COURT:  Can you answer the question?

A.   I'm sorry, can you rephrase?

Q.   (BY MR. MARTINEZ) Sure.  The question is:  Why are you complaining that Debo Homes sold the house to the Benges and not you when this contract explicitly says Debo may do that?

A. We're here because we were never given an opportunity to fix the problems, to get to that point, to even negotiate to that point. As I see, this says negotiate and accept backup offers. We were never given that opportunity to negotiate. We were never given opportunity whether that was a backup or a go-ahead. We were never given opportunities.

Q. Ms. Miller, my question is: Why wasn't Debo allowed to talk to the Benges or anyone else in the community about selling this home?

A. They were allowed.

Q. Then what's the problem with Debo selling the home to the Benges?

A. We just didn't know about it until this past May, and then they still kept our money.

MR. MARTINEZ: I'll object as nonresponsive to the "kept our money."

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Ms. Miller, you're complaining that -- now, you're complaining that you didn't know that the home was sold to someone else until May?

A. Yes.

Q. And who did you expect to tell you that information?

A. Well, we would have liked for Debo to tell us.

Q. I agree, but as of the time the contract was agreed to with the Benges, which is October, and the time that the home was finally sold to the Benges, which was New Year's Eve, 2013, at that point, isn't it true that you had already filed this lawsuit?

A. Yes.

Q. Well, isn't it also true that you told Debo, "Don't contact me"?

A. Yes.

Q. Well, then how do you expect them to tell you what happened to the home?

A. I would expect them to tell our attorney.

Q. To tell your attorney, not you?

A. Yes.

Q. I want to make that clear.

A. Thank you.

Q. So, Ms. Miller, you had no problem with Debo selling the home to the Benges, a third party, right?

A. Not after all the -- not after all that time had gone by.

Q. So, it's perfectly fine that they sold it to someone else for a lower price?

A. Not after they didn't make the house the way we wanted it, put carpet in it.

Q. Ms. Miller, I just wanted to know whether or not you're going -- if you're telling the jury is it okay for Debo to sell the home to someone else. Is it okay or not, according to you?

A. Because it wasn't the house we wanted anymore, yes, it's okay, later on.

Q. Ms. Miller, I'd like to talk about the default provision in this contract. Well, first of all, take your time reading it. Is it different from this contract and from this other contract you just told us about?

A. I don't know for sure. I'd have to -- I can guess it might be the same.

Q. Well, would you mind reading it to the jury?

A. No, I don't mind. "If buyer fails to comply with this contract, buyer will be in default, and seller may: A, enforce specific performance, seek other relief as may be provided by law, or both; or B, terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from the contract. If seller fails to comply with this contract, seller will be in default, and buyer may: A, enforce specific performance, seek such other relief as may be provided by law, or both; or B, terminate this contract and receive the earnest money, thereby releasing both

parties from this contract."

Q. Now, having read that, do you have a better recollection of whether that's the same in this contract as well as in the other one?

A. I'll say it's the same.

Q. Okay. You understand that if Debo's found to be in breach or you're found to be in breach, the breaching party has to forfeit the earnest money, correct?

A. Yes.

Q. And how much was the earnest money?

A. $1,000.

Q. We touched upon this topic a little bit, but I think it would be helpful if you wouldn't mind reading Section F to the jury.

A. "Completion of repairs, treatments and improvements. Unless otherwise agreed in writing, seller shall complete all agreed repairs, treatments and improvements," parentheses work, "prior to the closing date. All required permits must be obtained and work must be performed by persons who are licensed or otherwise authorized by law to provide such work. At buyer's election, any transferable warranties received by seller with respect to the work will be transferred to buyer at buyer's expense. If seller fails to

complete any agreed work prior to the closing date, buyer may exercise remedies under Paragraph 15 or extend the closing date up to 15 days, if necessary, for seller to complete work."

Q. Do you recall if this section is the same in this contract as well as this other contract?

A. I don't recall exactly, but it may be.

THE COURT: Ladies and gentlemen of the jury, let's go ahead and take our morning break at this time. If you would please be back in the jury room at 10:45.

(Jury out)

THE COURT: Counsel, see y'all back at 10:45.

(Short break)

(Jury in)

THE COURT: Be seated. You may continue.

MR. MARTINEZ: Thank you, Judge.

Q. (BY MR. MARTINEZ) Ms. Miller, before we took a break, I believe we were talking about Section F, about completion of repairs, treatments and improvements. I believe you just read that section to the jury, then we took a break. And do you recall whether or not that section is the same in this contract as well as the other contract?

A.   I believe it's probably the same.

Q.   So, then Debo was allowed to repair any problems before closing?

A.   Yes.  It says they shall complete the problems.

Q.   Correct.  Now, Ms. Miller, earlier today you testified that there's a three-tiered payment structure?

A.   Yes, it was three phases, three phases, three-tier payments, that was written down in -- that Kris wrote up for us in the contract, yes.

Q.   Ms. Miller, do you ever remember testifying differently about that?

A.   About the three different --

Q.   About how the payment structure works?

A.   No.  We first went for financing.  We didn't get it.  And when we couldn't get the financing, we went back and --

          MR. MARTINEZ:  I object as nonresponsive.

Q.   (BY MR. MARTINEZ) My question was just whether you remember testifying differently, yes or no.

A.   Can you rephrase the question then?

Q.   Sure.  My question was:  First, you testified earlier today that -- and yesterday that there was a three-tier payment structure.

A.   Yes, I did.

Q. Now, do you ever remember testifying differently about how that structure was set up?

A. I don't recall.

Q. Do you recall that on May 8th, 2014, we took your deposition in your lawyer's former office?

A. Yes.

Q. Do you remember me asking you how the second payment was going to be?

A. Yes, I remember that.

Q. And what was your response?

A. I believe I said we were set to pay at the time of drywall.

MR. MARTINEZ: Judge, at this point, I'd like to show her deposition excerpt, and it does contradict that testimony.

THE COURT: You may.

Q. (BY MR. MARTINEZ) Ms. Miller, the question was: "So, when was the second payment supposed to be?"

Your answer: "I'm not sure."

So, why did you just tell the ladies and gentlemen of the jury that you told me in your deposition about the payment structure?

A. Well, I knew we had an agreement about payment structure. We had talked about how much to pay and how much I was going to pay in which phases.

Q.   Ms. Miller, did you not understand the question when I asked it on May 8th?

A.   I did.

Q.   Then why did you not tell me about how the payment structure was supposed to work?

A.   I'm not sure.

Q.   You're not sure?

A.   No.

MR. CROCKETT:   Judge, we would just object as far as mischaracterizing.  If we can get some time context about the question, was he asking when during the exact time period was the second payment supposed to be made, or this is when the contract says?  I can clear it up on the other side, but here he's actually saying when during the construction.

MR. MARTINEZ:   That's not what it says.  I asked her if she understood the question.  She said yes.

MR. CROCKETT:   All right.  We'll clear it up.

THE COURT:   Overrule the objection.

Q.   (BY MR. MARTINEZ) So, Ms. Miller, why are you giving the jury different testimony?

A.   I don't believe I am.

Q.   Well, you testified back then that you didn't know the payment structure.  You testified yesterday and

today that you knew the payment structure. Then you just told the jury that that's really not what you said in your deposition. So, are you not being truthful?

A. I am being truthful.

Q. Well, maybe it's just the fact that your lawyer's been telling you what to say at trial?

A. That's not true. I'm not sure if on that -- during the deposition, they were asking me for a specific date, and I might have thought you were asking me for a specific date, because there was no specific date set up.

Q. So, now you're telling me that you were confused about that question, based on what your lawyer just objected to?

A. You were asking an awful lot of questions.

MR. CROCKETT: We object to the --

MR. MARTINEZ: She's changing her testimony based upon what he just said to the Court.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) You just heard your lawyer say that you may have been confused and you may not have understood that question. You heard him say that?

A. Yes.

Q. And you heard me ask you whether or not you understood that question, and you said yes, right?

A. Yes.

Q. Now, you're telling me that, well, maybe that question meant something else. Didn't you just say that?

A. It depends what it was -- what the prior questions were in reference to.

Q. Isn't that what your lawyer just said? Is it?

A. It is.

MR. MARTINEZ: I object to side-bar, Judge.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Now, Ms. Miller, on May 21st, 2013, you told them in an e-mail what repairs they needed to make?

A. Yes.

Q. Let's go ahead and get that e-mail. Ms. Miller is that indeed the e-mail you sent Debo on May 21st, or a portion of it?

A. That's part of it, yes.

Q. And that's the rest of it, correct?

A. Yes, yes.

Q. Now, in that e-mail, you specifically pointed out what repairs you wanted Debo to make?

A. Yes.

Q. And you told Debo that you wouldn't give them

anymore money before they made those repairs?

A. Those, and then I wrote, "The above are a quick list and may not include all of the problems. Therefore, we will not be limited to these lists." And it's right there in that paragraph below, right in the --

MR. MARTINEZ: I'll object as nonresponsive.

Q. (BY MR. MARTINEZ) My question was, yes, whether or not you said once you make these repairs, you'll submit more funds?

A. No, that's not.

Q. That's not what it says?

A. No, there's more.

Q. Okay. I agree, but I'm just asking you whether or not you told Debo that once they make the repairs in those lists, along with other repairs, then you would submit more funds?

A. On this note, there's more.

Q. More repairs?

A. Well, it depends -- we have to check to make sure everything -- that it's done.

Q. Because it says here you will not be limited to those lists, right?

A. Yes.

Q.   That's what you mean?

A.   Yes.

Q.   Okay.  I'm just getting at, once those repairs are made, whatever repairs are made, you agreed to give Debo the second payment?

A.   Not those repairs.  It has to be -- the house has to be done and checked, and then we would agree.

Q.   So, now the house has to be completely done before you give another payment?

A.   I didn't say completely done.

Q.   Ms. Miller, I just want to know when would you be submitting the second payment?

A.   Just prior to drywall, just as the drywall was ready to go in.

Q.   And once repairs were made?

A.   Yes.

Q.   Okay.  But the very next day, May 22nd --

A.   Yes.

Q.   -- your lawyer told Debo to cease construction completely.

A.   Yes.

Q.   How can they make repairs if they're not working?

A.   They weren't working -- they weren't making repairs all along.

Q. No, my question is: If you tell them to stop working completely, how are they supposed to go in the house and make the repairs?

A. We needed to get an inspection.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Ms. Miller, your attorney told Debo to stop working on May 22nd.

A. Yes.

Q. The day after you told Debo to make repairs.

A. Yes.

Q. When was Debo supposed to make those repairs, then, if you told them to not do any more construction?

A. I don't know. The drywall had already gone in.

Q. Well, isn't that a little contrasting? On one hand, you're asking Debo to make repairs immediately, and you'll pay them. Now, on the other hand, your lawyer's telling them to stop, don't do anything.

A. I agree it is contrasting, because they weren't supposed to get put the drywall in until they got paid to put the drywall in.

Q. I'm still getting mixed signals. Which is it, repair and go on, or stop?

A. They were already past the point that they were supposed to be --

Q.   I'm sorry.

A.   -- so we had to tell them to stop.

Q.   So, you're saying that one day difference is what matters?  That on May 21st, you're saying repair it, but on May 22nd, they were past the deadline to make repairs?

A.   They wouldn't listen to me, so I had to involve an attorney.

Q.   Over the span of -- so, you sent your e-mail, let's see, 5:38 p.m., May 22nd, correct?

A.   Yes.

Q.   And your lawyer sent his e-mail the very next day, May 22nd, 1:38 p.m.?

A.   Yes.

Q.   So, you went out and found a lawyer within less than 24 hours; yes or no?

A.   Yes.

Q.   Ms. Miller, I still am confused, because at 5:00 p.m. on May 21st, you told Debo, "Y'all make these repairs, then we'll continue on our relationship," correct?

A.   Yes.

Q.   Well, what happened between 5:00 p.m., may 21st and 1:38 p.m., May 22nd?

A.   Kris pressed us for $59,300.

Q.   How did he do that?

A.   By contacting us directly and that -- there was no indication he was going to make the repairs.  He told us, "We'll make some of the repairs, but we won't make all of them."

Q.   This all happened between 5:00 p.m., May 21st and 1:38 p.m., May 22nd?  That's all I'm asking about.

A.   Well, I don't know if it all happened that evening, but we were contacted that evening, asked for the money.

Q.   So, one thing that happened to shatter your confidence between 5:00 p.m., May 21st and 1:38 p.m., may 22nd, was one phone call from Kris?

A.   I don't know if it was just one phone call.

Q.   What else was it?

A.   Our confidence -- I don't know, but he continued to ask for the money, when we asked for them to stop continuation and start making repairs, and they continued with the process -- with the building, they continued moving on with the building instead of going -- fixing problems that had already occurred.

Q.   Ms. Miller, I'm just asking about between 5:00 p.m., May 21st and 1:38 p.m., May 22nd.  So, you're saying all that happened between that span of time?  Because a lot happened.  You went and got an attorney

and told Debo to stop working.  I just want to figure out what made that switch.  What changed?  That one phone call from Kris?

A.   I don't know if it was just one phone call.  I just know, rather than take our continued problems and continue asking for them to fix the problems seriously, they just wanted us to pay.

Q.   Ms. Miller, you testified earlier today that Kris texted you a demand for payment.

A.   Yes.

Q.   Well, let's look at those text messages.  Now, I would like to go through all these, because I think it establishes what relationship you had with Kris.  Would you agree?

A.   Sure.

Q.   Would you mind reading the first one from April 17th, 3:37 p.m.?

A.   Sure.  "Kris, was thinking about cabinets.  We didn't choose them, prefer cherry versus maple or walnut, et cetera.  I know you said they would be the same as the home we were in, but what about the bathrooms, laundry room, et cetera?  We prefer natural wood, same as kitchen, not painted wood.  Thanks, Lori & Ellie."

Q.   How about that response from Kris?  What did it

say?

A. He says, "I have to put some type of finish on them."

Q. And y'all's response?

A. And I wrote, "Yes, was referencing the cherry cabinets in the kitchen we saw versus paint."

Q. And you clarified?

A. And "My misuse of the word 'natural,' my meaning is didn't want painted. We like cherry wood. Sorry if it was confusing to you, Lori."

Q. Then Kris responded?

A. "Okay. Light or dark?" And "I think dark prettier. Your thoughts?" "Walnut Creek home has dark, doesn't it?" And he wrote, "Medium. Dark is real nice." "Dark would be good then, nice contrast for the light granite, too. Thank you so much."

Q. So, it seems at this point y'all talked about some specific things you wanted in the home right?

A. Yes.

Q. And Kris said, you know, we'll stain it however you want it, right?

A. Yes.

Q. Okay. Let's move on to the next one there at the top of the page.

A. I wrote, "Good morning, Kris. Wanted to make

sure my mom got things right with you yesterday. The bathrooms are going to have to cherry cabinets with granite tops too, right?" From Ellie.

He wrote, "No. Just the kitchen will have cherry but it will have granite."

So, then we wrote, "What color in the bathrooms? Can you please call me because I'm driving?"

Q. And what did y'all discuss, or was there a phone call after that?

A. I have to suppose so, because the next text isn't for a few days.

Q. Do you recall what y'all talked about on the 18th?

A. I'm going to just figure we talked about colors and stuff.

Q. Okay. How about that one?

A. "Thanks for lunch. Have you found out the dimensions for the fridge space? Was wondering what kind of height there was for washer and dryer."

He says, "Just go buy it and send me dimensions, and we will build around it."

"Very cool, thanks."

Q. So, y'all went to lunch?

A. We did.

Q. So, Kris took y'all to lunch, and y'all had a

pleasant afternoon, I guess?

A. It was.

Q. How does it -- go on right here. What's that read?

A. "Washer and dryer, stacking washer is 27 width by."

Then he wrote, "They won't fit." So, okay, then we rewrote it.

Q. You just clarified the dimensions?

A. Yes.

Q. Is it fair to say that these text messages were either from you or your daughter?

A. Yes. Depending on who was driving at the time, the opposite person was texting. We don't text and drive.

Q. Well, very good, but these are both your representations, correct?

A. Yes.

Q. Okay. How about that text message?

A. The one at the top?

Q. Yes, ma'am.

A. He says, "Just buy them and bring them to me or have them delivered to my main office" on F.M. 2977.

Q. And y'all are talking about the washer and dryers?

A.   I believe it was just all the appliances, actually.  It was just going to be all the appliances delivered to the house.

Q.   Okay.  How about the next one?

A.   Okay.  "Don't want them delivered" -- and he says, "Free delivery included."

And he wrote, "What?"

"We are on our way."

"Okay, I'm not there.  Open the gate and get them."

"Okay.  Are you at the office?  We have the ceiling fans."

"Just leave them at my main office."

"Okay."

"Thanks for the boxes, left fans at your office."

"Okay."

"Did you remember to mark them accordingly?"

"Yes, with the name, address and room."

"Okay."

Q.   Okay.  So, you bought some fans, and you took them to Debo's office?

A.   Yes.

Q.   And you paid for those out of your own pocket?

A. We did.

Q. And Debo installed them in the house?

A. Evidently, they did, from what we could see.

Q. Those are those specific fans you wanted, right? You chose the model, the style?

A. We bought them. Well, we bought two of the three. One was a gift from my dad.

Q. But those are fans you wanted in the house?

A. Yes.

Q. Okay. Let's start back up here.

A. "Good morning, sorry we missed your call earlier."

"Kris, didn't get pic."

"What's your e-mail?"

"Got it this time."

"Oh, got the one we picked?"

"Well, they were sent at the same time, so it will show up."

"Got it. Looks nice, tricolor."

"Okay. I'll order it then."

"Thanks."

"Do you have an e-mail I can send pics to? Too much for my phone to send. Thanks."

"Will you meet me at the house this morning?"

Q. Real quick, before we move on, what were y'all talking about? Pictures there, that you mentioned sending the picture and tricolor, what were y'all talking about?

A. Roof colors.

Q. And y'all chose a gray roof, I believe?

A. No.

Q. What color was it?

A. The original roof color that we chose was like kind of a medium to dark brown. It was like a tricolor.

Q. So, you're saying that that's the color you wanted on the home, was sort of a brown color?

A. Yeah, it was sort of a brown, a medium to dark brown, the original roof color that we chose.

Q. Okay. Then we get in some texts about the inspection. Mind reading this?

A. Sure. "Good morning. Please let us know when they man to put in the sheetrock and insulation. Our inspector, Mr. Knueppel, needs to go through the house again before it is installed. Thanks."

Kris wrote, "Okay. Tell him to be there Monday."

"Okay. Thanks, I will."

"Mr. Knueppel would like to see the house after insulation and before the sheetrock. When do you

think that will be?  Still Monday?  Appreciate you working with us on this."

"He has until Monday to complete his part because we're sheetrocking Tuesday."

"Okay.  Thanks so much."

Q.   Would you mind going on?

A.   "No worries."  "Happy Mother's Day."

"Thanks, appreciate the wishes."

"Do you know if they got the insulation completed yet?  Thanks."

"All I was told that they started between 2:00 and 3:00, and that's it.  I know they will finish today, but not a time of completion."

"Okay.  Thanks for info.  Have a good evening."

Q.   Okay.  Here's another set of text messages. So, there's one from your daughter's phone and one from your phone?

A.   Um--

Q.   Because these start --

A.   I suppose so.

Q.   Okay.  So, let's go ahead and go down each of them.

A.   Okay.  "The back door with the window will not fit our dog door.  The space is only three feet.  We

need three feet, eight inches.  We would like a door without a window."

"Noticed the hot water heater was installed.  I never got a price for a tankless hot water heater" -- "tankless water heater.  Please let me know why."

"Good morning.  Did you get my message about the water heater?  The difference is $900."

"Thanks for the quote.  I'm thinking it through.  I've decided against the tankless water heater.  Since the hot water heater is already installed, we will need floored access to the water heater.  Thanks again."

"Don't worry about the other water heater. That was my bosses fault.  We can put in the tankless water heater.  He apologized for the mistake."

"It's okay to leave the hot water heater. Because of this heater's location, I would prefer to have the attic floored for easier access.  Thanks."

"Okay."

Q.   Okay.  Let's go on.

A.   "Please let me know when the insulation is completed.  I would like to come out to the house tonight."

"They will start at 2:00 and will be

finished today," 5/13.

"Thanks."

"No worries."

"Talked about the garage being climate controlled.  Noticed there wasn't insulation in the garage.  What can we do to fix it?"

"Garage has to be insulated.  How much would it cost?"

"I'll ask and tell you tomorrow."

"Thanks."

"Have you found out how much it will cost to install insulation?"

"Waiting on a call back from the owner."  "$400."

"Okay.  And this price includes attic over garage, too?"

"I'm sorry, I thought you just wanted ceiling done, but you want all the walls, it will be $800."

"That seems high.  Going to check some prices.  We'll get back with you."

"Well, they're going to sheetrock the house tomorrow.  The reason it's a little high because they have to go back to the house.  It would have been cheaper were if it" -- something.

Q. I think it continues on.

A. Oh, sorry. "If it had been scheduled a week prior." He says, "Can you please call me because they are showing up today and not tomorrow to sheetrock the house. My boss said he'll knock off a hundred dollars if you want to do it."

Q. And that's all the text messages, correct?

A. Yes.

Q. Well, where in that does it say Kris is demanding payment from you?

A. He called us.

Q. No, you just said to this jury that he texted you.

A. I said he contacted us.

Q. Your testimony on that record says that he texted you a demand for payment. Is that not true?

A. He did contact us. He contacted us. I know he called us with demand for payment. He contacted us.

Q. But he didn't text you; yes or no?

A. I don't see it there.

Q. Now, Ms. Miller, before you retired, you were an accountant?

A. Not a CPA.

Q. Have you had any formal training in construction?

A.   No.

Q.   Have you ever been taught how to identify construction defects?

A.   No.

Q.   So, you admitted that a lot of these construction issues are simply beyond your expertise?

A.   I just know things didn't look right.  That's why I hired an inspector.

Q.   And reviewing the construction of a new home, that's something new to you, right?

A.   Not brand new.

Q.   I think you said you had a home built for you up in Ohio a few years ago?

A.   Yeah.  Back in the Eighties, yes.

Q.   But it's not an everyday or common occurrence for you to participate in the home building process?

A.   That's true.

Q.   Now, during the contract negotiations, whether we're talking about the first contract or the second contract, you only spoke to Kris?

A.   Yes.

Q.   And yesterday and today, I believe you said that you only met with Kris twice?

A.   That's not -- no.  What I said was we met twice to sign the original contract.

90

Q.    What's the rest of that story?

A.    Well, we met with him many more times, whether it was to pick colors or to pick granite tops or look at problems, or even just for lunch.  We met many, many times.  I can't count how many.

Q.    So, probably more than a dozen?

A.    That's possible.

Q.    And it took, you know, about a dozen times or more or less to finally decide on a contract that you were happy with, right?

A.    No, not to decide on a contract, to make all those choices.  There's many choices to make in a home, whether you want this color of paint on the walls or that -- that kind of facade, whether you want the hip to go this way or that way.  There's just so many choices. So, you meet with your builder or your representative of the builder to make those choices, and he invites you to do that as many times as you need.

Q.    That's fair.  You had a lot of questions, you asked questions from A to Z?

A.    Yes.

Q.    Because you wanted to be personally comfortable with what you were signing?

A.    And he did that at the first -- those two meetings, those first two meetings.

Q.   So, the first two meetings were different from the other meetings that happened after?

A.   Well, those first two meetings had to do with just the initial contract.

Q.   Now, you weren't rushed into signing either the contract we've seen in Exhibit 1 or this other contract that we learned about today?

A.   I -- I felt a little bit almost -- because, I, mean, he wanted to get go.  He just kept saying, "We can get you a great house."  I wanted to get the financing. We couldn't get the financing because I'm on a fixed income, and my daughter is commission only.  So, with the new financing laws, they wouldn't approve us.  They knocked us out from the get-go.  And we've got a great credit score, but that doesn't matter anymore.  So, at that point, we sat down and talked about it, and he knew that I had this money put away for all these years, and he said, "Oh, no, we can work out -- we can work this out.  We sell all these homes."  And I did feel pressured into buying right away with this three-tiered, three-phase program.

Q.   Do you ever remember testifying differently?

A.   I may have.  I might not have remembered then.

Q.   As I mentioned before, the deposition, May 8th, correct?

A. Yes.

Q. Do you remember I asked you, "Were you rushed into signing it at all, you know, coerced into signing this at all?" Your answer was no. You disagree with that?

A. I was not rushed into signing the financing contract.

Q. So, it was different from the other contract?

A. Well, that one moved quite quicker. That one seemed to -- in my recollection, it moved a little quicker.

Q. And you also said that you signed the finance contract?

A. Yes.

Q. Freely and openly?

A. Yes.

Q. Different for the cash one?

A. Well, I signed that freely, but he answered -- he had all the right answers. We were getting exactly what was in the model, we were getting the exact AC unit, exact cabinets. Everything was exact.

Q. Well, you testified before that you had Stan, your friend, who was also a realtor?

A. Yes.

Q. He read over the financing contract, we'll call

it, completely, right?

A.   Yes.

Q.   Did he do the same with the other contract?

A.   No, he wasn't there with us.

Q.   Now, you've alleged that Kris made numerous representations to you during the contract negotiations and after the contract was signed?

A.   Yes.

Q.   Whether it be the financing contract or the cash one?

A.   Yes.

Q.   And Kris promised you, you said, that he'd give you a house you'd be comfortable with?

A.   Yes.

Q.   He said Debo would fix what needed to be fixed?

A.   He said we'd fix everything.

Q.   Kris promised that the home was 100 percent guaranteed; that's according to your testimony?

A.   Yes.

Q.   And you've previously testified that that was it, that's all he said to you as far as representations and warranties, correct?

A.   I may have.  I'm not sure.

Q.   Those, I think, four things I just said?

A.   Okay.

Q.   That's all you told me before.   But now you're telling us about a lot more representations here in this courtroom today, correct?

A.   You're asking more questions, different questions.

Q.   No.   The question is what representations and warranties did Debo make to you?   Now, I asked you that question in your deposition.   Do you remember?

A.   Yes.

Q.   And you responded he said -- you said that Kris said he represented that you'd get a home that you'd be 100 percent guaranteed, personally satisfied, comfortable with, that he'd fix what needed to be fixed, and that's it. those are the only representations you identified, right?

A.   Okay.

Q.   Well, then why are we having these new representations brought up in court today?   Why didn't you tell me back then?

A.   You didn't ask to identify what -- what 100 percent completely satisfied means.

Q.   Well, that's not what I'm getting at.   I want to know what Kris said to you.   However you interpret it, that's not what I'm asking.   That's up to you.   I just want to know what Kris said.

A.   He said they would have high quality.   He said that they would have high-quality work.   He told us that they would have supervised -- that there would be supervised -- they would be supervised while they're there, and he explained that there would be inspections, building inspections along the way, and he told us if there was any problems, they'd be fixed before the next phase.   That's what he told us.

Q.   And those are warranties?

A.   Yes.

Q.   Well, do you ever remember testifying differently?

A.   I may have.

Q.   And why is that?

A.   Because I couldn't recall at that time.   I was asked a lot of questions.

Q.   Well, it's a little inconvenient that I took your deposition for almost six hours, and I expected to get the full truth about all the facts in this case.   I come here today, it's August 20th, and I get a different answer.   Is that fair?

A.   I don't think it's a different answer.   It's what I recall.

Q.   So, your memory's gotten better in May to August, even though all the events happened spring of

'13?

A.   Actually, yes, because I was going through menopause, and I'm taking black cohosh.  It helps.

Q.   Ms. Miller, how can you expect Debo to prepare a defense if they really don't know what's coming?

A.   I don't know.  I'm not a lawyer.

Q.   I'm trying my best.

THE COURT:  Counsel, we don't need any side-bar remarks.

MR. MARTINEZ:  Yes, Judge.

Q.   (BY MR. MARTINEZ) Now, did Debo fix all things that you wanted them to fix before June 3rd?

A.   All things?

Q.   Correct.

A.   No.

Q.   How do you know that?

A.   Because when we walked around the property, we could see there were still things that weren't right. We walked around the property prior to inspection, and there was still a couple of things that were still -- that didn't look exactly right from -- we didn't go inside, because the building was -- you know, the house was closed.  And this was in July.  But there were still a couple of things that didn't look right to us.

Q.   Okay.  So, you walked around the house in July?

A.   Yes.

Q.   Do you recall a better date?

A.   No.  It was just prior to when would he thought our building inspector or building expert was going to be getting out there.

Q.   Well, you were there in July.  When was the time that you were there previously to that?  When was the last time?

A.   End of May, after the 22nd.

Q.   Because that's when your lawyer sent the e-mail telling Debo to stop?

A.   Possibly.  No -- I don't -- I don't believe so. I'm not sure.

Q.   So, you don't know when the last time you were at the home before the time you were there in July?

A.   Not really, no.

Q.   Well, if your lawyer told them to stop, told Debo to stop working on May 22nd, how do you know they didn't stop working?

A.   I had been out there in the beginning of June. We -- and they continued.  I apologize.

Q.   So, you were there in June?

A.   Yes.

Q.   Can you give me a better date?

A.   No.  I really can't give you an exact date.

Q.   Well, what did you see when you went there in June?

A.   They were continuing construction.

Q.   Well, that date is sort of important, Ms. Miller, because there will be testimony in this case about when construction restarted.

A.   It was -- I believe they -- they may have stopped for a couple of weeks, maybe two weeks, and then they continued again.

Q.   Do you remember testifying differently?

A.   I don't recall.

Q.   Well, earlier today you said that Debo did not stop construction.

A.   Okay.

Q.   Now, you're saying they did stop construction. Isn't that what was said?

A.   Yes.

Q.   So, you hired this Mr. Harold Knueppel, correct?

A.   Yes.

Q.   Because you wanted a different point of view about how things were going?

A.   Yes.

Q.   If you wouldn't mind just letting me finish the whole question, then answer.

A.    (Nodding.)

Q.    So, you just wanted an additional point of view on how construction was going?

A.    Yes.

Q.    In fact, you wanted another point of view outside of Mr. Knueppel, didn't you?

A.    Well, I wanted Mr. Knueppel, because I saw things that weren't right, and I'm not an expert.  And I thought, well, if it doesn't look right to me, I need somebody who may be not an expert but an inspector to say -- to verify what I'm seeing and tell me that what I'm seeing is actually right or wrong.

Q.    Ms. Miller, my question is a little different.

A.    Yes.

Q.    I was asking whether or not you wanted another point of view besides Mr. Knueppel's?

A.    Yes.

Q.    Another inspector?

A.    Yes.  We -- after Mr. Knueppel's inspections were done, we wanted a building expert to come in and take a look, who actually is -- knows all about construction and soundness and all that.

Q.    Well, isn't it true that you wanted another point of view because you didn't agree with Mr. Knueppel about everything?

A.   No.   I don't think you can -- I liked what Mr. Knueppel said about everything.   He brought things to my attention that I would have never seen, because he -- he saw -- he saw things that were a revelation to me.   And I liked what he said.   I don't -- I just know he -- even what he even told me, what he can do is limited.   He has limitations on his expertise, and then we just felt we needed somebody else to go a step further.

Q.   Well, Ms. Miller, isn't it just true that you wanted someone to agree with all your opinions about the construction?

A.   No.   I like diverse opinions.   I like to hear from different people to know what's going on.   That's why I brought in Mr. Knueppel in the first place, because I sure didn't know what was going on and whether -- whether it was right or wrong.   That's why I invited Kris to come to the inspections, so Kris could see and know what we were get -- looking at and whether it could be fixed, whether -- what needed to be fixed.   And Kris got the reports from Mr. Knueppel, and I wanted everybody involved.   I wanted everybody's input, not -- not just mine.   I knew mine was the lowest lay person that there was.

Q.   Debo never restricted your access to the property, did they?

A.   They did not.  They restricted our conversations with workers.  We didn't --

MR. MARTINEZ:  I'll object as nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. MARTINEZ) Did Debo ever prevent you from taking pictures of the home?

A.   They did not.

Q.   Did Debo ever tell you that you're not allowed to have an inspector go in the home?

A.   They did not.

Q.   So, you were free to send an inspector to go look at the home?

A.   I didn't understand your question.

Q.   You were free to send an inspector to go look at the home, correct?

A.   Yes, we could.

Q.   Was Mr. Knueppel ever restricted during his inspection of the home?

A.   No, he wasn't.  He wasn't restricted.

Q.   Did Debo ever protest or try and prevent Mr. Knueppel from coming in and looking at the home?

A.   I don't believe they did, no.

Q.   Let's talk a little about your home choice, about the specifics of your home.  Now, you were free to

102

choose whatever type of home you wanted?

A.    Well, within -- it had to be one of their floorplans.  It could be modified, not whatever -- I mean, build a round home or something.

Q.    It wasn't an A frame or something like that?

A.    Yes.

Q.    But you were free to pick and choose what type of lights you wanted, what type of roof, all that?

A.    Yes, as long as it fell within their -- with their choices.

Q.    Let's look at those choices, so we can get a better idea of what you chose here.  Is that the home you chose?

A.    Yes.

              MR. MARTINEZ:  That's Exhibit 33, for the record.

Q.    (BY MR. MARTINEZ) Why did you choose that home?

A.    Because it looked low maintenance, and it just -- just I didn't want to have a lot of maintenance with painting or a lot of debris like in gutters or -- just something simple that we could maintain ourselves.

Q.    And we're talking about this one, right?

A.    The top one, yes.  The one that's circled.

Q.    The one on top.  Did Debo pressure you into choosing that home?

A.    No, no, we chose that.  We liked the style.

Q.    All right.  What do we have here in this picture?

A.    The floorplan that we -- with a couple of modifications.

Q.    Some of those modifications, like you chose to put a dome light in the breakfast room?

A.    Yes.

Q.    And you chose to increase the square footage? That may not be in there, but --

A.    No, I don't see that at all.

Q.    But you did choose to increase the square footage at one point?

A.    It is -- it's out the back a little bit, and we made the back porch a lot bigger.

Q.    That area?  (Indicating.)

A.    Yes.

Q.    You also chose to put a sink in the garage, right?

A.    Yes.

Q.    That was so y'all could, I think, bathe your dogs in the garage?

A.    That would be a dog washing area.

Q.    So, you wouldn't have to do them in your home?

A.    Right, so I wouldn't have to drag them through

the house when they run around.

Q.  Also, you wanted a window put there in the garage?

A.  Yes.

Q.  Why was that?

A.  Oh, so that we could put an AC unit in, so we could climate control the garage for the dogs.  We were going to put individual kennels.  In fact, we already bought them.  Put individual, like eight-by-eight kennels.  We were going to turn the garage into like just a little dog run for them, so that -- so the dogs could kind of stay out there.  So, they were just going to enjoy a lot of running room out there.  I mean, they're performance dogs.  They've got a lot of energy.

Q.  What type of dogs are they specifically?

A.  We've got a couple of Schnauzers, a standard poodle and a Welsh terrier.

Q.  So, that would be their home, the garage?

A.  Well, no.  The land would be their home.  The whole home would be their home, but that's their sleeping area, and their -- I guess their siesta area.  But it would be a lot nicer than just a little small box that we have now in our current home.

Q.  And that's why you went to Debo, because they could do something like that for you?

105

A.   Well, that's what they promised.

Q.   You also wanted tile throughout the entire home, correct?

A.   Yes.

Q.   And you were again allowed to choose these things on your own free will?

A.   Yes.

Q.   You also made a complaint that the square footage of the home was actually short?

A.   Yes.

Q.   Well, what happened there?

A.   Nothing.

Q.   Are you alleging that Debo gave you a home or was constructing a home with less square footage than you agreed to?

A.   We questioned it.  We never heard whether it was or wasn't.  We just asked a question, but we thought it was.

Q.   Well, do we know if it's correct or not?

A.   I don't know.  We weren't allowed back in the house.  We had a no-trespassing order against us.

Q.   I'm talking about up until May 22nd.  When did you believe that the square footage was incorrect?

A.   When we saw that brick wall that was at the edge of the foundation and then the actual frame of the

house was inches in.

Q. So, that's the only part that was cut off?

A. Around the whole house.

Q. You mean the brick wall around the entire house?

A. The frame is inches in. The frame is inches in from the foundation, then they made the wall to the edge of the foundation. So, we just questioned whether -- why there's this big gap between the wall, the brick wall and the frame. And so if you're three-plus inches in, that means you must be losing square footage inside the home. We just questioned it. We just wanted these questions answered.

Q. Well, isn't it true that that's common in construction, where you put the brick on the edge of the foundation?

A. I don't know. I'm not -- yes, but it usually is attached to the frame. There's not a gap of a fist or so -- (indicating) -- from what I've noticed. I'm not a construction expert.

Q. Now, you agree that after you told Debo about the issues they needed to repair in the home, that they could have repaired them?

A. Yes, they could have.

Q. And you told Kris about these concerns and

problems?

A. Yes. Yes, we did.

Q. And Debo did, indeed, repair them, didn't they?

A. They repaired some. I don't believe they repaired all of them.

Q. You don't believe they repaired all of them, or do you know they didn't repair all of them?

A. Well, I can't know, because they drywalled it.

Q. So, you're saying that there are hidden things behind that drywall?

A. There may be. I don't know. They drywalled it.

Q. Ms. Miller, you understood that when you brought these concerns to Debo, the home was still under construction?

A. Yes.

Q. And you understood that Debo still had work to do?

A. Yes.

Q. You understand that they're not saying that the home was done and not capable of being fixed?

A. I do.

Q. And according to the contract, I believe either one, Debo is allowed to take until June 3rd to make those repairs?

A.   Yes.

Q.   And you have no evidence or opinion on whether or not there is any defect in that home today?

A.   Today, like right today?

Q.   Right, today, any day after.

A.   Well, we weren't allowed to bring our home inspector in.  It was drywalled over, so I can't know.

Q.   So, you can't know.  You're not telling the jury that you know there's a defect in the home?

A.   No.  We weren't -- we weren't allowed to -- I can only tell you what we saw.

Q.   Let's talk about that other inspector real quick.  Now, you said that you agreed with Debo to go out there on a certain date?

A.   Yes.

Q.   And when was this supposed to be?

A.   It was at the end of July.

Q.   Okay.  There's no e-mail showing that, is there?

A.   I had told Kris.

Q.   There's no text message showing that you'd be there on that date, is there?

A.   I don't believe so.

Q.   There's no letter showing that you would be there on that date?

A.    (Nodding.)

Q.    Is that correct?

A.    I didn't -- I don't believe so.

Q.    Now, you wanted to stop all communications with Debo around May 22nd because you felt harassed for payment?

A.    Yes.

Q.    And how many times was that?

A.    I don't know the exact number.

Q.    Now, you weren't at the home site, or were you at the home site every day after you signed the contract?

A.    Not every day, no.  It was impossible to be there every day.  I was definitely there once or twice a week.

Q.    Do you know the superintendent's name?

A.    No.  It's -- no, but I know what he looks like.

Q.    Do you know if he speaks English?

A.    I don't believe he does.  He may speak a little English, but I know he speaks Spanish.

Q.    Because earlier you testified that --

A.    Yes.

Q.    -- you couldn't talk to the superintendent and the other workers on the home?

A.    We weren't -- we were asked specifically not to

speak -- Kris asked us not to speak with them. It had nothing to do with language barrier.

Q. Well, perhaps it was.

A. It wasn't.

Q. Now, you contend that Debo's not entitled to take of $10,000 from your damages because they had to sell the home to someone else. You're saying Debo doesn't get those damages?

A. Well, they had an opportunity to pay us back long before.

Q. I just want to know whether you think Debo is entitled to receive $10,000 because they had to sell the home at a smaller price to someone else?

A. But it wasn't the same house anymore. They changed things. It wasn't all tile. They put carpet in.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Ms. Miller, I'm just asking you whether or not it's your opinion that Debo should be refunded $10,000?

A. No.

Q. Even though, as we can see in the exhibit on the screen, this was a custom home, correct?

A. Yeah. Yeah, it was -- it was customized for

us.

Q.    There's also another page showing the other features in the home, correct?

A.    Yes.

Q.    And it shows there you wanted a ceiling fan on the patio?

A.    Yes, we talked about putting a ceiling fan, an outside ceiling fan out on that back patio to keep the air moving, which we planned on using that a lot, and at least having it -- and I believe we even bought the outdoor ceiling fan.  We bought the ceiling fan for it.  That was one of the three.

Q.    What do we have here on this page?

A.    That was the choices we made.

Q.    What were some of those choices on that, on this list?

A.    Okay.  For example, no carpet, black appliances, bronze fixtures, patio lights, two doors for the fence, an oval -- a half-oval front door, tile in the bedrooms, and the choice of which tile and which grout, the tankless water heater, that we wanted to get the price for a tankless water heater, the Painted Desert shingles and to get the self-cleaning oven price.

Q.    When it says shingles and Painted Desert, are we talking the roof?

A. Yes.

Q. That would have been what color?

A. That was like a medium to dark brown. We found out later it was unavailable, that it had been discontinued or something. So, we didn't get our original choice.

Q. What did you end up choosing?

A. Something that Kris had sent us a picture of on the computer.

Q. Can you tell us what color that was?

A. It was like a medium -- it was like a light brown. It was nice. It would reflect the sun real well, wouldn't make it too hot to run up your AC bill.

Q. You understand that Debo purchased the lot on which this home sits?

A. I'm sorry?

Q. You understand that Debo purchased the lot on which this home sits?

A. Yes, yes. They purchased it?

Q. Yes. You agree with that?

A. They purchased it from us?

Q. No, the lot, the vacant land for them to develop.

A. Oh, yes.

Q. And you only paid them one payment of $60,300?

A. Correct, yes.

Q. And that payment essentially gets Debo through the foundation work and the framing work, correct?

A. No. It gets the foundation, framing, electrical, plumbing, all the way through the insulation.

Q. But before drywall?

A. Before -- yeah, it stops at the drywall.

Q. So, if anything continues past that, Debo would have to finance it out of their own pocket if you didn't make another payment, correct?

A. I don't know. I thought it stops at drywall, and then I pay them, and then they continue. I don't really know. I don't know the construction business. It's not my business. It wasn't --

Q. Did Debo --

A. I'm sorry.

Q. Were you finished? I'm sorry.

A. No, I'm done.

Q. And Debo themselves, they paid all the trades, the framers, the foundation people, correct?

A. Yes.

Q. So, even though Debo made this home for you with these custom choices, they had to finance the project out of their own pocket, you still think that

entitles them to receive $10,000 in damages?

A.   No, because they -- they wouldn't work with us. They ignored all the pleadings and all the times we wanted them to help us.  They just kept snowballing through, and they were not going to stop until it was done.  They were not -- they wouldn't listen to us. They wouldn't look and see the broken beams.  They wouldn't -- they just wouldn't listen until we had to get attorneys involved, and that was not something we wanted to do.

THE COURT:  Counsel, let's go ahead and take our lunch break at this time.

Ladies and gentlemen of the jury, I'm going to ask you to be back in the jury room at 1:30. Remember the instructions I've given you:  That is, do not talk about this case with anyone, even amongst yourselves while you're out at lunch.  Have a good lunch, and we'll see you back at 1:30.

(Jury out)

THE COURT:  Counsel, see y'all back at 1:30.

(Lunch break)

(Jury in)

THE COURT:  Be seated.  You may continue.

MR. MARTINEZ:  Thank you, Judge.

Q.   (BY MR. MARTINEZ) Ms. Miller, earlier today, you said that Debo made representations to you about rebar insulation or wire mesh insulation in the driveway?

A.   Yes.

Q.   Do you ever remember testifying differently?

A.   I do remember.

Q.   And you recall when that was?

A.   When my testimony was, or when they made the representations?

Q.   When you had the different testimony.

A.   Different than what?  I'm sorry, can you rephrase the question?

Q.   Sure.  Earlier today, you said that Debo represented that they installed either wire mesh or rebar in your driveway?

A.   Yes.

Q.   I asked you, do you remember testifying differently about that?

A.   No.

Q.   You remember your deposition May 8th at your lawyer's office?

A.   Yes, it was six hours long.  I remember it.

Q.   And you remember me asking you a question about rebar installation?

A.   Yes.

Q.   You remember me asking you -- the question was: "Did they make any representations about the rebar in the driveway, whether it would be there or not be there?"  Your answer was no.  Why is it different today?

A.   Because when I asked Kris -- later on, when I asked Kris about it, he told us there's mesh in the driveway.

MR. MARTINEZ:  Judge, may I display the excerpt?

THE COURT:  Yes, sir.

MR. MARTINEZ:  Thank you.

Q.   (BY MR. MARTINEZ) Ms. Miller, you see the highlighted portion?

A.   Yes.

Q.   My question is why you told me no, Debo made absolutely no representations about the rebar in the driveway, but today you're telling us they did?

A.   That was within the six-hour context of a deposition.  Kris told us later on, when I questioned why there wasn't any rebar, that you had to pay extra for rebar, that was something we had to bring out up front.  He told us that it would be mesh, like a wire mesh in the driveway.

Q.   So, you admit that your answer in the

deposition was incorrect?

A. No. The question talks about rebar.

Q. So, you're saying the representation was wire mesh?

A. He told us there would be wire mesh.

Q. Then why did you talk about rebar this morning during your direct examination?

A. Because I asked him about both. I had asked him about rebar, because I had observed rebar being put up on my street when I came home that day. So, that was an awakening for me. So, I called him, I said when I saw the driveway being put in, I saw nothing but concrete, no rebar. And he said, "We don't put up rebar, we put wire mesh down." And I didn't understand him.

I said, "What's the difference?" He said, "Well, wire mesh isn't quite as good as rebar, but you get wire mesh."

I said nothing was put in, and he said nothing.

Q. Because when you were negotiating the contract with Debo, you never asked them about wire mesh or rebar, correct?

A. I never -- no.

Q. Earlier, we talked about how -- or you

mentioned that there were, indeed, two different contracts?

A. Yes.

Q. Well, this is the contract that's been produced in this case, that's Exhibit 1. And right here, you'll see there's a whole section called "Financing." Correct?

A. Yes.

Q. Well, you're telling the jury that this is a financing contract, so why isn't that section filled out then?

A. I don't know, but B, says "Sum of all financing, 118,700.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Overruled.

Q. (BY MR. MARTINEZ) Ms. Miller, if this is a financing contract, why are there no checks about third-party financing, you know, or promissory notes?

A. Because we hadn't gone to a mortgage company yet. We hadn't chosen a mortgage company yet. We were seeking approval from -- whether it was Chase or whomever to approve us.

Q. Why isn't there an addenda or addendum to this contract saying this is what the financing's going to be?

119

A.   I don't know.  This is what we were given.

Q.   And this is the only contract in this case, correct?

A.   No.

Q.   Ms. Miller, you also said that you have a friend, Stan, the realtor?

A.   Yes.

Q.   And that he reviewed this contract for you, only this one?

A.   Yeah, he came with us that day.

Q.   Which day would that be?

A.   The day we signed this, April 13th.

Q.   So, he came with you and met with Kris and reviewed this contract the day you signed it?

A.   Yes.

Q.   I'm looking at this page here.  It talks about broker information.  Is Jan -- I can't read that name.

A.   Pascovsky.

Q.   Pascovsky?

A.   Right.

Q.   Is that the broker for Stan, the realtor?

A.   Yeah.  Stan and Jan, they're the spouses who sell houses.  And so Stan's Jan's husband, and Stan -- we're just more -- we're just better friends with Stan, so he came with us.  But that's their -- they're in

business together.

Q. So, he signed this April 13th?

A. Yes.

Q. And you're alleging that Debo never let you take this contract home?

A. This particular one?

Q. Uh-huh, yes.

A. No, we have that one.

Q. I mean before you signed it on April 13th, did Debo allow you to take it home and review it?

A. They did not.

Q. Earlier, you mentioned that your May 21st e-mail told Debo to stop construction.

A. Yes.

Q. Well, I'm just curious where in there it says that. Is it on the first page?

A. (Reading.) No.

Q. Can you point out to us where it says that on the second page? Take your time.

A. (Reading.) Well, in the final line, "We expect Debo Homes to have completed all of these repairs prior to us submitting any more funds to you."

Q. Does that say stop construction?

A. Yes, because the next -- the next payment was due prior, at the time of sheetrock.

Q.   Would you mind just reading those two lines real quick?

A.   "We expect Debo Homes to have completed all of these repairs prior to us submitting any more funds to you."

Q.   Thank you.  Now, earlier you said that you were dumbstruck that when you showed up at the homesite, you saw a "For Sale" sign?

A.   Yes.

Q.   Could you describe that feeling a little bit more for us?

A.   Yes.  We were just very surprised to see that the house was for sale, and it had been completed, and not to our specifications.  We just -- we just were very surprised, because we weren't informed.  We weren't aware that it had been put up.  We thought we were still onboard for the next inspection.

Q.   But you've testified also that that was fine, Debo was free to sell to someone else?

A.   It was in the contract under negotiations.  It could be negotiated.

Q.   But Ms. Miller, you've testified before in your deposition that it did not bother you that they sold to someone else.  Is that true?

A.   That was part of the negotiation process.

Q. Well, Ms. Miller, I was asking whether or not you agree that you previously testified that you did not have a problem with Debo selling the home to someone else?

A. That's true.

Q. Ms. Miller, your attorney showed you some pictures of the home. I think one of those pictures had a table -- this one right here. (Indicating.)

A. Yes.

Q. Well, you testified that, I think it was June, you said you went by the house and looked at the outside?

A. Yes.

Q. Well, how did you get this picture of the inside?

A. Through the window.

Q. This is through the window?

A. Yes, sir, with my phone camera, through the back window.

Q. Was there a grate there or anything?

A. No, there was no screens. All the pictures we took of the interior of the house was through the windows. We never stepped inside of the house.

Q. So, I'm looking at, you know, this window across the way. It's hard to see, but there are -- you

know, there's grate around it.  Did the window that you took the picture through have those grates, you know, crossbars, what have you?

A.    I don't know.  We might have took it through the back door.  I'm not sure.  I know we took them through the windows.  I put the camera right up on the window.

Q.    Ms. Miller, you understand that by the time your attorney sent that e-mail on May 22nd telling Debo to stop construction, and between the time we, as lawyers for Debo, sent a response in late August, that had been a couple of months, right?

A.    Yes.

Q.    Is it fair to say that there are some costs incurred by Debo during those few months?

A.    There might be.  I don't think so, though.

Q.    Well, if Debo had to finance the rest of the construction, wouldn't they have had to pay that out of their own pocket?

A.    They should have stopped construction.

Q.    Ms. Miller, that's not my question.  My question is:  If they had to finance it out of their own pocket, wouldn't they have had to pay incurred costs?

A.    They were asked to stop construction.

MR. MARTINEZ:  Objection, nonresponsive.

THE COURT: Sustained. Answer the question.

Q. (BY MR. MARTINEZ) Ms. Miller, I'm just asking you whether it's reasonable that if Debo had to pay to finish construction on the home, that they would incur some costs?

A. If they continued, yes.

Q. Well, if they had to take out, you know, a loan to finance the rest of the construction so they could sell it to someone else, isn't it true that there's interest on that loan?

A. There might be.

Q. Well, isn't it true that if they had to put the home back on the market, they'd have to pay for various marketing costs?

A. I don't know what their marketing costs would be.

Q. But it's fair that they would incur some?

A. I don't know. They -- they have signs everywhere anyway.

Q. What I'm getting at, Ms. Miller, is Debo sent you a letter on May 29th, this letter that we've seen before, and towards the bottom it says that Debo will refund you a hundred percent of the money, correct?

A. Yes.

Q.   Well, this is May 29th.

A.   Yes.

Q.   Before the home was finished, correct?

A.   Yes.

Q.   Before Debo had to pay the rest of the trades to finish the home?

A.   Yes.

Q.   Before Debo had to put the home back on the market and pay for marketing?

A.   Yes, except it was already just about done at that point.  We gave them 90 days at that point to sell the house, and we never heard back.

Q.   I'm going to go to the top real quick, so we can see what we're talking about.  This is a letter from our firm on August 30th, correct?

A.   Yes.

Q.   And at the bottom, it says that you will receive your money back, but minus the costs that Debo incurred.  Is that fair?

A.   No.

Q.   Well, I'm just asking if that's what the letter says.

A.   That is what the letter says.  That's not fair.

Q.   Well, that's not my question.  My question is that we just talked about how Debo, if they had to pay

for the rest of the trades, you know, pay to hire us, and pay to finance the rest of the construction, it's different from May 29th to August 30th. There's a difference, isn't there?

A. They didn't have to pay to hire you. They could have given us the money. We gave them an opportunity to sell the house.

MR. MARTINEZ: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. MARTINEZ) Ms. Miller, I just want to know whether or not it's fair to say that at the time Debo sent you that letter on May 29th that we just looked at where they offered you 100 percent back, in between that time on May 29th to August 30th, Debo incurred costs, and, therefore, they had to reduce the payment they could give you back. Is that fair?

A. No.

Q. Ms. Miller, also you said something earlier. You said that you had to deal with Debo's lawyers in May?

A. This past.

Q. Oh, 2014, not '13?

A. Yes, sir.

Q. Okay. I just wanted to clear that up. Earlier, you said that Debo never actually offered you

127

the money back, isn't that right?  Earlier today --

A.  Yes.

Q.  -- you said that Debo did not offer you your money back.  Do you recall saying that?

A.  They offered it in the letter.  Then we gave them 90 days to sell the house.  We never heard anything back from them until we got the letter from their attorney.

MR. MARTINEZ:  Judge, I'll pass the witness.

MR. CROCKETT:  Short redirect, Judge.

THE COURT:  Yes, sir.

**REDIRECT EXAMINATION**

Q.  (BY MR. CROCKETT) Ms. Miller, in that letter that Debo Homes sent, did you see the rest of the part that Debo Homes' lawyer didn't highlight, which was to pay you back "whenever we sell the home"?

A.  No, not right now.  I mean, I did, at first when I read it, yes.

Q.  When you first were buying the house, did you agree to give Debo Homes a loan of $60,300 for as long as they want?

A.  No, not -- there was -- can you rephrase that the question?

Q.  Yeah.  Did you just hear Debo Homes' lawyer

128

say, "Well, isn't it fair that we offered to give back your money whenever we sold the home"?

A. No, there has to be a time limit. I mean, they can't keep my -- our money forever and never give it back.

Q. How long have they kept $60,300?

A. A year and a few months.

Q. Until really just Monday?

A. Yes.

Q. Before they were talking to you about the deposition and Debo Homes' lawyer showed you just one segment of it. They didn't show you the entire six hours, did they?

A. No, not at all.

Q. During that six hours, did you get asked the same question again and again and again?

A. Yes.

MR. MARTINEZ: I'll object to misconstruing the evidence.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Did you get asked the same questions again and again and again?

A. Yes. They continually asked identical or near identical questions.

Q. Did you testify during your deposition that the

payment was due before the drywall went in?

A. Yes.

Q. When you were asked when the specific date you were supposed to pay was, did you know?

A. No. There was not a date. I said I don't know. They said, "When is the next payment due?" I said I don't know, because there was never a specific date.

Q. When Debo Homes' lawyer asked you about the representations, did he ever add context to it, like representations during the first contract, or representations during construction, or did he basically just say, "Tell me every single representation that Kris told you whenever"?

A. It was -- it was open-ended. It was -- it was whenever. It was -- there was no Phase 1, Phase 2. It was just, "We want to know it all, and if it's not all, then it doesn't count."

Q. One of the things I was going to ask you about is the text messages. When the text messages were sent in Exhibit No. 3, do you know what date the texts ended, at least in the exhibit?

A. Looked like around maybe -- was it the 12th, 13th or something like that? I don't know the exact date, no, if I'm not looking at it.

Q. The last date of any of the text messages, May 14th.

A. Okay.

Q. Did Kris keep contacting you after that?

A. Yes, he did.

Q. Is it kind of hard to say, "Well, show me where it's at," when you know it's not even all of them?

A. Yes.

Q. And one of the things, Debo Homes' lawyer asked you about if you had any evidence that there were any defects in the home. On May 9th, did you see problems during the inspection with Mr. Knueppel?

A. Yes, yes. We saw many problems.

Q. In May 13th, on the second inspection, did you see problems at the home?

A. Yes, we saw even additional problems.

Q. When was that second inspection at? Was it in the afternoon or the evening-time?

A. It was in the afternoon, late afternoon, after the workers were all done.

Q. By May 14th, the next day when they drywalled everything up, based on what you had seen from their work, was there any way that they actually fixed everything?

MR. MARTINEZ: Objection, speculation and

expert testimony.

THE COURT: Sustained.

Q. (BY MR. CROCKETT) Do you believe that all of the things that you saw on May 9th and May 13th were done before May 14th?

A. I don't believe it could have been, because we were there after hours, and they started drywalling the next morning. I don't know how they could have possibly fixed all of it in time.

Q. Is there any way to show the evidence of the house when you drywall over the evidence?

A. No one has showed me how.

Q. Is it hard to go back and inspect a home after you sell it to somebody else?

MR. MARTINEZ: Objection, this is speculation.

THE COURT: Overruled.

A. We haven't been able to. That's why we peeked through the window and took pictures, just -- and we were unable -- you can't see. It's covered up.

Q. (BY MR. CROCKETT) Thank you, Ms. Miller.

MR. CROCKETT: Pass the witness, Judge.

MR. MARTINEZ: Judge, short recross.

THE COURT: Yes, sir.

**RECROSS-EXAMINATION**

Q.    (BY MR. MARTINEZ) Well, Ms. Miller, if those aren't all the text messages, where are the rest?

A.    I don't know.  The phone I used to have got stolen.

Q.    How did you get some of them, not the others?

A.    I didn't -- I don't know.  Those --

Q.    So, you said that it was inappropriate for Debo to wait until December to sell the home; that it was too long?

A.    Well, what I -- can you rephrase that, please, ask it again?

Q.    Yeah.  You sort of were getting at that, you know, Debo didn't really tell you when they would ultimately sell the home?

A.    Yes.

Q.    That's just an open window, that could be whenever.  Is it your testimony that it's inappropriate for them to not get to that until December, 2013?

A.    Well, it would have been nice for us to know.

Q.    Are you saying that was too long, it took them too long to resell it?

A.    I don't know if that's too long.  We didn't know.  We weren't given opportunity to know about it.

Q.    Ms. Miller, I think you'd agree that $60,300 is

133

a lot of money?

A. It's a whole lot of money when I get very little per month.

Q. And wouldn't you agree that if Debo used that 60 grand to buy the lot, do the foundation, framing, electric, that uses -- that can use the 60 grand?

A. Well, it can. (Nodding.)

Q. So, then how is Debo supposed to get all that money back and give it to you if they already put it into the house?

A. Well, they offered it back once they sold it, so we needed a timetable. They offered it back.

Q. Are you complaining that it took Debo too long to actually put that money in the registry of the court?

A. Yes. They -- they had -- they sold the house in October, closed in December. They never gave us anything back.

Q. Isn't it true since October there's been an ongoing lawsuit?

A. Yes.

Q. Ms. Miller, you said that during your deposition I asked you the same question again and again and again. Which question was that?

A. Many, many questions. It was six hours long.

Q. Well, Ms. Miller, your attorney went over that

I asked you about what representations were made, and you acknowledged that you did not disclose all the representations in your deposition, correct?

A. I probably -- I'm sure I didn't.

Q. Well, Ms. Miller, do you remember me asking you did Debo make any other express warranties besides the ones in the contract that we've seen? You remember that question?

A. Yes.

Q. And then you responded, you said, "Kris promised us we'd get a house we would be happy with, comfortable with and love, even after I brought an array of concerns and questions, and he answered every one exactly within my comfort zone." Does that sound familiar?

A. Yes.

Q. And then I asked, "Were there any other warranties that Kris or anyone else at Debo ever made to you before you signed this contract?"

Your answer was: "I don't recall."

Is it fair to say that I gave you an opportunity to give me more representations and more facts?

A. At that time, yes, maybe. Yes.

Q. Also, in your deposition, I went over your

pleadings because the question I asked was, "Well, what numerous representations did Debo make to induce you to purchase the home specifically?" And you gave me a long list, and I think we've gone over those, like, you know, he had the right answers, he said we'd have a home we'd love, and if we're not happy, it's a hundred percent guaranteed. And you gave me your full answer, correct?

A. It may not have been the full answer.

Q. Well, where else in this deposition did I ask you that question again?

A. I don't know, but within the deposition, you asked a lot of questions over and over. It was six hours long.

Q. Can you give me another example?

A. Not right now.

Q. Ms. Miller, earlier you said that the drywall covers up, you know, any defects, right?

A. I didn't say any. I said it covers up a lot of defects, covers up a lot of the defects we were looking at.

Q. Okay. And this is a picture that y'all took of the house, right?

A. Yes.

Q. And there's some drywall put up, right?

A. Yes.

Q. Can't you still see the studs?

A. Not -- not really. Only partial, only the bottom part, some of them.

Q. Well, is there anything blocking you from going into the wall and checking things out?

A. That's not the complete drywall. That's only part of the drywall.

Q. I'm asking you if it's possible for you to go into this wall and look at things?

A. Some things.

Q. Ms. Miller, also you said that -- one last question. You said that Debo represented to you that they'd insulate the pipes in the home?

A. Yes.

Q. So, you thought that Debo would install insulation on the pipes?

A. That they would wrap the pipes, yes.

Q. You remember testifying differently?

A. They would wrap the pipes that needed to be wrapped.

Q. I'm asking whether or not you remember testifying differently about what Debo represented about the pipe insulation.

A. I don't recall.

Q. And in that deposition, I asked you, "Is that

why you took the picture?"  And I'm talking about the picture we saw earlier with the pipe.  Let me see if I can get it.  No. -- there we go.  I think this was the picture, right?  This is the pipe without insulation?

A.    Yes.

Q.    So, I asked, "Is that why you took the picture, that picture, because there was no insulation?"

And your response was, "I was -- yes.  I was -- I didn't know if it was supposed to or not.  I took pictures of things I had questions about"?

A.    Yes, that's exactly true.  I took pictures of things I had questions about, so our inspector could verify them.

Q.    But you weren't sure whether or not this was supposed to have insulation?

A.    That's right.  I'm not a construction expert.

Q.    Well, you told me that Debo represented to you that it would be covered.

A.    That the ones that needed to be wrapped.  The hot pipes, from what I learned, needed to be wrapped, but the cold ones don't.  But that's their job to know which ones need to be wrapped and which ones don't.  So, I took pictures of ones, does it or doesn't it.  I'm not an expert.  I took pictures of everything that looked unusual.

Q. Ms. Miller, was it fair for me today to rely upon your deposition in asking you questions?

A. Yes.

MR. MARTINEZ: Nothing further. Thank you.

MR. CROCKETT: No further questions, Judge.

THE COURT: You may step down.

You may call your next witness.

MR. CROCKETT: Your Honor, the Plaintiffs call Harold Knueppel.

MR. MARTINEZ: And, Judge, before he even gets to the stand, we have an objection to him testifying at all. First, if I may --

THE COURT: Ladies and gentlemen, I ask that you step back in the jury room for just a few minutes.

(Jury out)

THE COURT: Be seated.

MR. MARTINEZ: Judge, my objection was that -- and we talked about this before -- Mr. Knueppel is a home inspector, and they have not designated him as an expert. He's not qualified to testify about construction issues. All he can do is say, you know, that's a picture of a broken stud, but Ms. Miller

already did that.  The photos are already in evidence. Under Rule of Evidence 403, that is redundant, that is cumulative, that is confusing.  It's already been presented.  He is just a duplicate witness for what we already just saw.

MR. CROCKETT:  Judge, you specifically said that he can testify to what he saw, and our plan is to just ask him what he saw.  He's also a witness as far as the time lines of what happened.  It's not duplicative of anything.  In fact, oftentimes you'll have five to eight witnesses all testify about the same thing.  He's talking about duplicative, meaning we're putting on expert after expert after expert who are doing the exact same thing, and we're not.  We're allowed to put as many fact witnesses as we want, as long as it's not something where one witness gets up and says the exact same thing and another one gets up and says the exact same thing and another one gets up.  I'm talking about two people, Your Honor.  That's it.  It's not duplicative.  The reason they want him off is they don't want the jury to ever see him and argue anything that someone else can match the time line.

THE COURT:  Well, I'm going to allow him to testify, but carefully phrase your questions, and you'd better caution him that he should not be giving

opinions, particularly expert opinions.

MR. CROCKETT: Yes, sir.

THE COURT: If he does, I'm going to stop the testimony and escort him out of the courtroom.

MR. CROCKETT: Yes, Judge.

THE COURT: Okay?

MR. MARTINEZ: Thank you.

THE COURT: If you'll give me a moment, I'll tell him that.

THE COURT: Okay. Tell him to just answer the question.

(Discussion off the record)

MR. CROCKETT: I think we're good, Judge.

THE COURT: Bring them in.

(Jury in)

THE COURT: Be seated.

BAILIFF: Sir, please stand before the clerk to be sworn.

(Witness sworn)

**HAROLD KNUEPPEL,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

Q. (BY MR. CROCKETT) Mr. Knueppel, could you please state your name for the record?

A. Harold Knueppel.

Q.   Okay.  Mr. Knueppel, did you get called out to look at a house that Ms. Miller had purchased?

A.   Yes, sir.

Q.   All right.  I'm going to show you some of the photographs, and I just want to confirm that you saw the things that are in here.  Okay?

A.   Yes.

Q.   All right.  Now, when you went out there -- you went out there May 9th?

A.   Yes, sir, uh-huh.

Q.   When you went out there May 9th, did you see broken boards?

A.   Pardon?

Q.   When you went out there on May 9th, did you see broken boards?

A.   I'm not sure who you're talking about there.  I misunderstood you there.

Q.   Okay.  When you went out there to see Laurie's home on May 9th, 2013, did you see broken boards?

A.   Yes, uh-huh, absolutely.

Q.   Did you see broken boards, just one or two, or throughout the entire house?

A.   Several.

Q.   Did you see boards that weren't cut even?

A.   Yes.

Q. Did you see boards that weren't connected to anything?

A. Yes.

Q. See boards nailed into other boards?

A. Yes, uh-huh.

Q. See a crushed vent?

A. Yes.

Q. When you came back out a second time -- I believe it was May 13th?

A. Yes, sir, uh-huh.

Q. Did you see that there was new work done on the house?

A. There was some work done, yes.

Q. Did you see issues and take pictures of the new work that was done?

A. I did not take pictures of new work. I took pictures of what other things I saw there, yeah.

Q. Okay. When you went out on May 13th, did you plan on coming out again and looking at whether any progress had been made?

A. No, not unless I was asked to, uh-huh.

Q. Normally, whenever you look at something, take pictures of it, are you ever asked to look at those things later?

A. Yes.

MR. MARTINEZ: Objection as to what he normally does during his job, expert.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Mr. Knueppel, did you see this AC unit installed at the Millers' house?

A. Yes.

Q. Have you ever seen an AC unit like that in your life?

MR. MARTINEZ: Objection, Judge. It's getting into what he does as an inspector professionally.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Mr. Knueppel, have you ever seen an AC unit in the attic that looked like that?

A. No.

MR. CROCKETT: No further questions. Pass the witness, Judge.

(Off the record discussion between Messrs. Martinez and Welscher.)

MR. MARTINEZ: Judge, just a few.

**CROSS-EXAMINATION.**

Q. (BY MR. MARTINEZ) You just saw a bunch of pictures of some broken studs, correct?

A. That's some of the pictures, yes.

Q. Did Debo ever deny that there was a broken

144

stud?

A. Not that I'm aware of.

Q. Did they ever try to hide it when you were there?

A. Did they ever try to what?

Q. To hide any of these pictures we just saw when you were there.

A. Not that I'm aware of, no.

Q. Did they ever prevent you from inspecting the home?

A. No.

Q. Now, after you walked through the house, isn't it true you had a discussion with Ms. Miller?

A. Sure.

Q. In fact, she was arguing with you?

A. No, no arguing.

Q. Well, she raised her voice to you; she was upset?

A. She was upset, yes, but not at me.

Q. And you were out there May 13th, right?

A. Yes.

Q. And the sheetrock was installed the very day after, the 14th?

A. I don't know when it was installed.

MR. MARTINEZ: Nothing further, Judge.

MR. CROCKETT: One last question, Judge.

**REDIRECT EXAMINATION**

Q. (BY MR. CROCKETT) Mr. Knueppel, whenever you look at a house -- let me say it this way: Are you able to look at the studs and the beams or anything behind that drywall?

A. No.

MR. MARTINEZ: Objection as to what he looks to normally.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Are you able to see the studs or the beams or the broken boards or anything once we have this drywall and everything's walled in?

A. No.

Q. Thank you, sir.

MR. MARTINEZ: I have one question about that, Judge.

**RECROSS-EXAMINATION**

Q. (BY MR. MARTINEZ) Mr. Knueppel, would you mind taking a look at that picture?

A. Okay.

Q. Isn't it true that you can still see studs?

A. Some studs, yeah.

Q. Isn't it true that if you went into the wall, you could see the rest of the studs?

A.   I don't remember seeing this picture here.

MR. MARTINEZ:  Nothing further, Judge.

MR. CROCKETT:  That's it, Your Honor.

THE COURT:  May this witness be excused and released?

MR. CROCKETT:  Yes, Judge.

MR. MARTINEZ:  Yes, Judge.

THE COURT:  Thank you, sir.  You may step down.  You're excused and released.

(Witness out)

MR. CROCKETT:  Your Honor, Plaintiffs call Kris Dominguez.

(Witness sworn)

**KRIS DOMINGUEZ,**

having been first duly sworn, testified as follows:

**CROSS-EXAMINATION**

Q.   (BY MR. CROCKETT) Good morning, Mr. Dominguez. Can you please state your name for the record?

A.   Kris Dominguez.

Q.   Now, Kris, what's your position at Debo Homes?

A.   Sales.

Q.   How many other salesmen are there other than you?

A.   Just me.

Q.   Okay.  And you have the ability to bind Debo

Homes to any agreements, correct?

A. Yes.

Q. You're the only one that talks to the customers?

A. No.

Q. As far as the sales?

A. Yes.

Q. Okay. Now, obviously, you were involved in the sale of the home to the Millers?

A. Yes, sir.

Q. Okay. Now, you remember that in Exhibit No. 1, the Millers initially came, signed an agreement with you, in behalf of Debo Homes, to purchase the house? Do you remember that they originally tried to finance the home?

A. I'm sorry?

Q. Originally, did they try to finance the home?

A. No.

Q. They never tried to finance the home?

A. No.

Q. There was always a cash installment plan?

A. Yes.

Q. Okay. Now, before you testified here today, I notice that you had a chance to talk to Juan Carlos Hernandez and his son. Did they tell you to say

anything today?

A.   No.

Q.   What did you talk about?

A.   Today at lunch?

Q.   Well, the 15 minutes when we were on break that you were talking to them and then over lunch.

A.   We were just talking about business.

Q.   Never mentioned anything about the case or the testimony here today?

A.   No.

Q.   All right.  They never asked you about a second contract?  Did anyone ever ask you about --

MR. WELSCHER:  Object.  This is getting into attorney-client privilege.  I was with Kris at lunch in meetings.

THE COURT:  Can you rephrase your question?

MR. CROCKETT:  Yes.

Q.   (BY MR. CROCKETT) Outside of being present with the Debo Homes lawyer, did anybody tell you or ask you about a second contract?

A.   Can you repeat that again?  I'm sorry.

Q.   Did anyone, outside of when you were talking with your lawyers, mention a second contract?

A.   Yes.

Q. Okay. Who?

A. Mr. Hernandez.

Q. All right. So, you talked about a second contract, right?

A. Yes.

Q. And you said what?

A. There isn't one.

Q. Okay. So, you did talk about the testimony that was at the trial, right?

A. Just that specific question.

Q. Nothing else over the 15-minute break where you were talking out in the hallway after Ms. Miller's testimony or at lunch, right?

MR. WELSCHER: Judge, he needs to be more specific about who was there, because I was there at lunch the whole time.

Q. (BY MR. CROCKETT) Did you ever talk with him outside of the lawyer being there? I can't talk to you about that. Did they ever come in and ask you questions out in the hallway for that 15 minutes or during lunch about the testimony here today?

A. No.

Q. Did you know before you got on the stand I'd be asking you about a second contract?

A. I'm sorry, what?

Q. Before you got on the stand, did you know that I was going to ask you about a second contract?

A. I wouldn't know what you would ask, sir.

Q. Okay. Let me ask you this: Whenever you do a cash installment plan, tell the jury how that plan is divided up. How does that work?

A. It's talked about, so it's different, depending on the customer, how they want to pay. It's either half and half or thirds.

Q. So, you do do it by a third, right?

A. Yes.

Q. Is there three phases to that?

A. Yes.

Q. Tell me about those phases.

A. I don't set up the phases. Mr. Hernandez tells me when to initially collect the first phase, and then he'll call and tell me when the next part of the money is due.

Q. With the Millers, when was the second payment due?

A. Date-wise or construction-wise?

Q. Well, that's a good point. If you don't ask, then it makes it kind of confusing. Let me ask you this: Construction-wise, when was the second payment due?

A.   Near or close to sheetrocking.

Q.   Right.  The drywall is kind of a universal thing about that system, right?

A.   I'm sorry, I don't understand the question.

Q.   Yeah.  The cash installment plan, when you do 50-50 --

A.   Uh-huh.

Q.   -- first 50, start.  Second 50 is when?

A.   That's based upon when I'm told to ask for it. I don't determine that.

Q.   You don't know?

A.   No.

Q.   All right.  But you do know specifically that with the Millers' cash plan, the first third was due, and the second payment was due before drywall or after drywall, sometime with drywall, right?

A.   I can't say specifically.  I was just -- that's when I can remember when it was due, when the owner asked me to ask for it.

Q.   Okay.  So, normally whenever Mr. Hernandez says go collect the money, you go collect the money?

A.   Yes.

Q.   All right.  Do you have any idea why the Millers met with you and gave you another check, or actually two checks for $59,300, and another one for a

thousand dollars on April 16th, 2013?

A. That's to initially begin construction. One is a down payment, and one is earnest money.

Q. Right. Well, why did they come back after apparently there was only this contract? Why did they have to come back and then write you a check?

A. I can't remember.

Q. You sell a lot of homes, right?

A. I try to, sir.

Q. Do you remember everything you tell people?

A. I'm sorry?

Q. Do you remember every promise or representation you tell your customers?

A. I mean, we take notes, so I don't just make promises. We make notes and write stuff down.

Q. Do you remember the promises you made to the Millers?

A. They're written down. I didn't make any promises other than what was written down as far as the construction of the house.

Q. Okay. During construction, how early on in construction did the Millers tell you that they had concerns about the construction of their house?

A. Again, is that date-wise or like process?

Q. We'll keep it with construction.

A. Okay. I mean, they had a couple of questions, but nothing that couldn't be fixed.

Q. How early on?

A. I think after the frame and the roof was put in.

Q. Remember giving Ms. Miller a red spray can and telling her to spray whatever they had problems with?

A. Yes.

Q. Okay. Do you normally do that?

A. Never.

Q. What was different about this time?

A. She called me at 8:00 in the morning concerned about the wood framing, but I reiterated to her that the superintendent hadn't punched the house yet. So, he hadn't -- the superintendent hadn't had a chance to walk the house and mark it hisself (sic), which he does with spray paint. But since she insisted on it, I told her I would go buy the paint and meet her at the house, and she could paint or mark what she thought needed to be fixed.

Q. Did you ultimately get to meet with the superintendent?

A. Sir?

Q. Did you meet with the superintendent and talk about Ms. Miller's or the Millers' complaints?

A. Yes.

Q. Tell me about that conversation.

A. About the wood?

Q. Well, you said you met with the superintendent to talk about the Millers' complaints.

A. Well, that was the first complaint, that was the wood. I talked to him about -- specifically about the red paint. He was at the house, and I told him that what she had marked. And he said to me again, "Kris, I haven't walked the house, but have her mark it. I'll come back, mark it, and we'll replace what we have to get fixed."

Q. Okay. Did y'all fix everything that the Millers spray painted or had an issue with?

A. I don't fix it, so I don't know if it was fixed, everything. That's not part of my job.

Q. Okay.

A. So, I couldn't say yes or no to that question.

Q. Well, let me ask you an easier way. After you get the contract signed, what more do you have involved with the actual construction?

A. Nothing.

Q. So, you do still talk to the customers, but you don't have any involvement or knowledge about construction, right?

A.    Yes.

Q.    So, when the Millers told you those complaints, it goes from you right to the superintendent, correct?

A.    No.

Q.    Who does it go to?

A.    Goes to my boss, Mr. Hernandez, and then he or whoever else directs it to Michael.  And sometimes I do talk to Michael, but not all the time.

Q.    So, it goes at least to either Mr. Hernandez or it goes up to Michael, and is there any follow-up by you to discuss with the Millers what decisions were made, what would be done?

A.    Well, what I do is I take it to the proper channel.  Then they come back and let me know if it had been fixed, but they don't go into detail with me.

Q.    Is it fair to say that you don't really know whether or not there were repairs made?

A.    I know there were repairs made, because I went back, and the red paint was gone.

Q.    Okay.  You know every repair that was made?

A.    No, I said on the red paint.  We're talking about the red paint, what I'm talking about.

Q.    I'm just talking about all the complaints.

A.    That was the one complaint that I got from them, was the red paint issue with the split

two-by-fours.

Q. All right. Now, you mentioned something about promises or representations. You would agree with me that any promises that you made during the sales process, that Debo Homes has to honor those, correct?

A. Again, sir, if I make -- if I make a note to give them something, I write it down. When you say promises, I don't understand what you're saying. Can you give me one example of what you say I said?

Q. Yeah. Well, let me ask it even easier. If you make a representation, a promise during sales, do you believe that you have to honor that as Debo Homes?

A. I'm conflicted with the word promise, because I write it down, I make a note. If they said they want brick, stone, accent, granite color, this, I write it down. So, I don't understand promise. Like if they ask for something specifically, like a door or a French door, I make notes of it. So, I don't understand, other than, you know, closing the contract and making a date to close.

Q. Let me ask you if you agree with me. In exchange for $178,000, Debo Homes was going to build the Millers a home in accordance with the plans and specifications. You agree with that?

A. Yes.

Q.   Do you agree with me that Debo Homes was going to build a home in accordance with anything that's in the contract or any representations made to the Millers?

A.   Can you repeat that again?

Q.   Yeah.  Would you agree with me that Debo Homes was going to build the home in accordance with anything that's in the contract or any representations made to them?

A.   Not 100 percent of what you said.  What's in the contract, yes.

Q.   Okay.  Now, you remember we did your deposition, right?

A.   Yes.

Q.   You didn't say that before.

A.   Uh-huh.

Q.   Before, you just said yes.  You remember saying yes, that the representations you made to them --

MR. WELSCHER:  Objection, improper impeachment.  He never gave him the opportunity to even identify what we're talking about.

THE COURT:  Overruled.

Q.   (BY MR. CROCKETT) Do you remember in your deposition, you said that, yes, the representations and the words in the contract were binding on Debo Homes?

A.   I don't understand when you say

representations. Represent -- what did I represent?

Q. Let me read it to you.

A. Okay.

MR. MARTINEZ: Line and page, Brian?

MR. CROCKETT: It is page eight.

MR. MARTINEZ: Line what?

MR. CROCKETT: Line 14.

Q. (BY MR. CROCKETT) Here, I asked you: "You guys were all going to build the home in accordance with anything that's in the contract or any representations made to them, correct?"

A. Yes.

Q. And you said, "Yes"?

A. Yes.

Q. Okay. You understood that question?

A. Yes.

Q. Okay. The representations that you made during the sales then, you would agree -- or at least you used to agree that Debo Homes had to honor that, correct?

A. Yes.

Q. Okay. Do you remember attending an inspection with a Mr. Knueppel?

A. I know I was there with an inspector. I can't remember his name.

Q. Why were you there?

A.   I just happened to be there when he was there.

Q.   So, it was just by luck?

A.   I was -- I was at my job, walking the house, and he just -- he was there.  I don't know if it was by luck, or coincidence, I guess.

Q.   Well, you don't have any involvement in the construction, right?  That's what you said.

A.   I don't have any involvement in the construction, no.

Q.   So, you were walking out there.  What were you doing, just looking around?

A.   Sir?

Q.   You were just looking around?

A.   Just working.

Q.   Helping with construction?

A.   No.

Q.   Just walking the grounds?

A.   I have to give my customers updates if someone calls and asks me what stage the house is, because I write on the contract a closing date.  So, I just go by when I'm working, walk by.  I don't involve myself with telling someone how to work.  I just walk the house.  I don't stop or intrude on them.

Q.   Is it pretty common that your customers have to hire home inspectors?

A. Fifty percent of our customers hire their own inspectors.

Q. Okay. And you don't meet with those inspectors or find out any of their thoughts or conclusions or anything?

A. I've met with some in the past.

Q. Did the Millers give you a report from Mr. Knueppel?

A. I think he sent it to me.

Q. Okay. Then what did you do with it?

A. Forwarded it to the proper people.

Q. Did you have any other involvement, other than forwarding it to someone else?

A. No.

Q. Did you get another inspection -- you're aware there was another inspection May 13th, right, four days later?

A. No.

Q. You weren't aware of that?

A. Huh-uh.

Q. Is that a no?

A. By the same Mr. Knueppel, or another company?

Q. No, same guy.

A. Yeah, he came back and did something else.

Q. Did the Millers invite you to that? Did the

Millers invite you to come out?

A. No.

Q. Would you have wanted to be there?

A. Sir?

Q. Would you have wanted to be there?

A. No.

Q. It doesn't really concern you, right?

A. I wouldn't say it doesn't concern me, but I was there the first time by coincidence. By chance, I was there again, but I don't intrude on his work. I don't know what he does. I'm not fluent in that part of the construction, so I wouldn't interfere. I wouldn't know what to say.

Q. So, that was May 13th, though, right?

A. I know it was in May, but I don't know the exact date.

Q. Let me ask you, as far as that inspection, the second one, you got a report forwarded to you again, right?

A. Yes.

Q. And then what did you do?

A. Just forwarded it to the proper people.

Q. And you had no further involvement after that?

A. No.

Q. Who made the decision to start drywalling the

day after Mr. Knueppel's inspection?

A.   I don't know who made that call.  I'm not involved in that.

Q.   I show you Exhibit No. 3.  These are the text messages back and forth between you and the Millers. This one is May 14th at 10:51 a.m.  Do you remember this text message?

A.   Yes.

Q.   When did y'all say you were going to do the drywall?

A.   I think it was on the weekend -- or, no, it was Tuesday.

Q.   Then it looks like about an hour or so after you told them, the Millers, that you were going to sheetrock tomorrow, you said, "No, actually, we're going to sheetrock today."  Right?

A.   Yes.

Q.   Who told you to tell the Millers, "No, we're going to sheetrock today," plans changed?

A.   My boss.

Q.   Who?

A.   Mr. Hernandez.

Q.   Okay.  Mr. Hernandez told you that, "We're going to sheetrock on May 14th, 2013"?

A.   Yes.

Q. And you had already sent Mr. Hernandez two reports?

A. Yes.

Q. Did you ask Mr. Hernandez, "Well, are we going to fix the issues with the home?"

A. I didn't have that -- I didn't know that information, so I wouldn't have asked him that.

Q. That's not your lane?

A. No, sir.

Q. I'm showing you Exhibit No. 4, and we've seen this e-mail before, Mr. Dominguez. Do you remember getting a letter from the Millers on May 21st, 2013 with a list of concerns that they had?

A. Yes.

Q. What did you do with this e-mail?

A. I forwarded it to the proper people.

Q. What did you do after that? What more did you have involved with this?

A. Just waiting to see if they were going to correct the issues, or if there were issues even to be corrected.

Q. Okay. But you, yourself, didn't have any further involvement?

A. With correcting the issues?

Q. Well, just this. Once you forwarded it on,

that's the extent of your involvement?

A. Yes, sir.

Q. All right. When you got this e-mail from the Millers, did you talk to Mr. Hernandez?

A. No.

Q. Did you tell him -- even when they said, "We're not going to make another payment until we've confirmed these repairs have been made," did you talk to Mr. Hernandez about that?

A. I don't remember having a conversation with him about this list after I forwarded it to him, because I knew he would fix them.

Q. Did Mr. Hernandez tell you to call the Millers because it was time to pay $59,300?

A. Yes.

Q. Did you call them once?

A. Yes.

Q. That was the only time you called them?

A. I called her once.

Q. Okay. When?

A. When he asked me to call them. I don't know exact date.

Q. Was it before or after the drywall had gone in?

A. I can't recall.

Q. Did you call and ask for the money after the

drywall went in?

A. I can't recall when -- when -- what phase the house was in when he called me and asked me to ask for the money.

Q. So, you asked them one time, and what was the Millers' response?

A. They asked me to call you.

Q. When was that?

A. They retained you, I guess, after that, they had issues with the house.

Q. So, they told you to call me?

A. Through e-mail or text message, I believe.

Q. Did you call me?

A. Yes, I called you.

Q. When did you call me?

A. I don't know the exact date, but I called you, and then you said you were having your inspector come from Corpus to inspect the house, for us to cease on the house and not do any more work.

Q. Did you have an issue with us telling you we wanted to have an inspector from Corpus Christi?

A. No issue at all. Just wanted to know what day and time you were going to bring him.

Q. And did we tell you it was going to be July?

A. You told me July, but you never gave me a date.

Q.   Did you ever ask for a follow-up?

A.   Yes, I asked several times.

Q.   How many times did you call me?

A.   I think once or twice.  But I asked more than once as to when you were going to send your inspector, and I also asked you why he had to come from Corpus.

Q.   Have you had inspectors come from different parts of Texas?

A.   No.

Q.   First time?

A.   Yeah.  Houston's a big city, they got a lot of inspectors.  You wanted that one from Corpus.

Q.   Right.  You had a problem with that?

A.   No, just wanted to know the date when he was coming.

Q.   Have you ever been involved with construction defect litigation?

A.   No.

Q.   You don't know anything about it?

A.   No.

Q.   In May, you got a letter from me.  What did you do with this letter that said stop construction?

A.   I didn't do anything with the letter but forward it to Mr. Hernandez.

Q.   That was the extent of your involvement?

A.    (Nodding.)

Q.    Yes?

A.    Yes.

Q.    All right.  Now, you knew that we had told you that we were going to do a July inspection and that an expert was going to come from Corpus, right?

A.    Yes.

Q.    When did Mr. Hernandez tell you to start construction again or start selling the home?

A.    Those are two -- that's a two-part question.

Q.    All right.

A.    I don't start construction.

Q.    Let me ask you this:  When did you find out that Debo Homes was going to start construction again after we asked them to stop?

A.    I didn't know.

Q.    You never knew?

A.    I wouldn't say I never knew.  I just didn't know when he decided to do that.  You'd have to ask him that.

Q.    You have no idea what date that would be from when you learned?

A.    No, sir.

Q.    When did Mr. Hernandez tell you to start marketing the house to sell to someone else?

A. August? I think August.

Q. Now, talk to me about that time period between when the Millers said to stop and August. Did you ever ask Mr. Hernandez what happened to the Miller agreement?

A. No.

Q. That's not your lane, right?

A. No.

Q. Mr. Hernandez says sell the house to someone else, you sell the house to someone else, right?

A. It's not that simple.

Q. Well, walk me through it.

A. Well, I mean, you guys told us to stop. Your inspector never came. We asked. July came, no one ever came.

Q. Well, did you see the photographs from July?

A. I never seen anyone come, so I'm selling other houses.

Q. Well, let me ask you this: You've never been involved in construction defect litigation, right?

A. Huh-uh, no, sir.

Q. How hard is it to inspect for construction defects when the house is done?

MR. MARTINEZ: Objection. He wouldn't know, he's not an inspector.

THE COURT: Overruled.

169

Q. (BY MR. CROCKETT) Mr. Dominguez, how hard is it to inspect for construction defects when the house is completely done?

A. I wouldn't know, sir. I'm not an inspector.

Q. Would you be surprised that you'd actually have to take down all the drywall, pretty much deconstruct the entire house? Would that surprise you?

MR. MARTINEZ: Objection. He's saying what an inspector would do to inspect the house.

THE COURT: Overruled.

Q. (BY MR. CROCKETT) Does it surprise you that you'd have to deconstruct a finished house to find a construction defect?

A. No.

Q. Would it make any sense to deconstruct a house when just that alone would cost more than the house?

A. I wouldn't know the cost, sir.

Q. Did you ever see this letter of May 29th by Mr. Hernandez?

A. Yes.

Q. Did he tell you to send this to the Millers?

A. I didn't send it, no.

Q. Did Mr. Hernandez ever tell you that Debo Homes had agreed to give all their money back and just sell the house to someone else?

A.    Yes.

Q.    He did, right?

A.    Yes.

Q.    Do you know if they've ever given any of the money back, ever?

A.    I don't write the checks, sir.  I wouldn't even know.

Q.    After the Millers told y'all to stop construction, they didn't make a payment, you didn't have any further contact with them, is that right?

A.    With the Millers?

Q.    Right.

A.    No.

Q.    That was done?

A.    Sir?

Q.    That was done, right?

A.    You told me in your e-mail not to contact them.  You told me to contact you.

Q.    Did you ever see the letter that the Millers received from Debo Homes' lawyers?

A.    No.

Q.    Did Mr. Hernandez ever tell you that, "Mr. Dominguez, if you're ever out there on the property again and you see the Millers, let us know, because we want to vigorously prosecute them" --

A.   No.

Q.   -- "for trespass"?

A.   No.

Q.   Have you ever prosecuted or threatened to prosecute anyone for trespass that's bought a home from y'all?

A.   No.

Q.   First time?

A.   Yes.

Q.   Were you surprised that that's what Mr. Hernandez told the Millers?

A.   Am I surprised that that's what he told them?

Q.   Yeah.

A.   I mean, I don't know.  I don't know how to answer that question.  That's him personally.  You know, I work with him.  I don't know personally what he would do, so I don't know how to answer that question.

Q.   Okay.  Did Mr. Hernandez ever tell you that Debo Homes was not going to pay the Millers back the full amount of their money after you, yourself, said that he told you he would?

A.   No, he never told me he wouldn't pay them back.

Q.   Okay.  So, this is the first time, in Exhibit No. 7, or when this lawsuit got filed, that anyone from Debo Homes, to your knowledge, has ever said anything

about not paying them back a hundred percent of their money?

A. Yes.

Q. And you weren't aware that Debo Homes was suing the Millers now for any lost profits or their attorney's fees or interest or mortgage rates?

A. That's not part of my business, so no.

Q. How many potential buyers came to buy the Millers' house?

A. I can't recall.

Q. Ten, 20, one?

A. Two, maybe three.

Q. And the Benges offered $168,000, and you sold them the house, right?

A. Yes.

Q. Now, you know that the house that the Millers were buying was different than the house you sold the Benges, right?

A. It was different?

Q. Yes.

A. How so?

Q. Well, do you remember that the Millers' house was supposed to have tile throughout?

A. Yes.

Q. Did the Benges' house have tile throughout?

A. Sir, I've sold about 30 houses from that time. I can't recall what they had in that house.

Q. You just make the sales, right?

A. (No response.)

Q. You just make the sales, right?

A. I sell homes, yes, sir.

Q. Okay. And you've seen all the photographs that we sent over to your lawyers?

A. I don't know if I've seen all of them.

Q. Are these the types of homes that you sell? Whenever you've gone to look at them, do they always look like this: Broken boards, crushed vents, boards nailed together, hanging on the edge, boards that are uneven?

A. Do you see the orange paint?

Q. Yeah. What's that?

A. Those are marks. Like I gave the can of red paint to Mrs. Miller, because the framers are human and make mistakes. So, the superintendent walks behind them and marks everything that needs to be corrected. So, those red paints and the orange are defects. So, the superintendent walked the house, so the framer comes back and corrects it.

Q. In all those houses that you've looked at and sold, do they always look like these pictures?

A.   You'd have to ask the superintendent.  I don't walk every house.

Q.   Well, the ones that you have walked, tell me that, did they all look like that?

A.   I don't look at all the houses' frames, sir. If it's brought to my attention, then I'll take a look at it.

Q.   And if it's not brought to your attention, what happens?

A.   Then the superintendent does his job and marks them.

Q.   But you don't know that, right?

A.   Sir?

Q.   You don't know that; you're not involved with it, right?

A.   No.

Q.   Did you ever promise the Millers that Debo Homes would use the highest quality subcontractors?

A.   No.

Q.   You would never say that, right?

A.   I wouldn't ever say never.

Q.   Well, do you know if you told that to the Millers or not?

A.   That I said the highest quality contractors?

Q.   Yeah.

A.   I never said that.

Q.   Okay.  You would never tell the Millers that y'all partner with only the highest quality vendors subcontractors and artisans in the industry, right?

A.   That's not my part -- that's not part of my job, to hire vendors and contractors.  So, I would never say that, because I don't know if they are or not.

Q.   Well, let me ask you this:  Did you ever promise the Millers that they could be assured that, not only will you have a quality, well-built custom home, but that the buyers would be engaged in a process that is truly customer first; building a home is indeed process and one that is best meticulously managed?

A.   I never use those words.

Q.   Do you ever tell your customers to go to your web site?

A.   Yes.

Q.   But what you say on your web site, that doesn't matter?

A.   Sir?

Q.   What you say on your web site --

A.   You asked me if I said that.

Q.   Let me ask you this:  What's on your web site doesn't matter.  Is that true?

A.   I have to get back to that.  You asked me if I

had said that. What did you say, meticulously this? You were directing that to me. I thought you said if I said that. I never said that. Now, if it's on my web site, then it's on my web site. Those are two different things.

Q. Well, do you tell customers that the project needs to be managed, supervised, and that Debo Homes is going to do that?

A. I don't tell my customers that it's going to be managed.

Q. Do you tell your customers that the vendors and the subcontractors are going to be good, great, average, whoever is there that day?

A. I don't discuss that process with my customers, unless they ask me specifically about the framing or the roofing or this -- or the windows. And if I don't have the answer, then I talk to the professional, which is my boss, and he'll tell me what they asked. It's depending on customer to customer, what specifically they ask me about. I mean, I'll build a quality home. If they ask if they should get an inspector, I gladly tell them, "Yes, get one, so you can have peace of mind because you're spending a lot of money, so I want you to be happy with it."

Q. Well, I mean, you tell your customers that Debo

Homes' process of home buying from start to finish must meet every one of our customers' expectations, right?

A.   That's impossible.

Q.   So, you tell people to go to your web site, but you're not going to follow through with that?

A.   If you look at my contract -- and you can put up the contract -- it says -- when there's a part on possession, it says the customer will take possession of home upon funding and closing of the loan and with everyday wear and tear.

Q.   Right.

A.   So, there are some issues with the home that will be corrected, but that's what's on the contract.  I wouldn't say anything other than what would be on the contract.  That's why I go over the contract with the customer.  I don't over-promise and under-deliver.

Q.   So, promises or representations that you make to your customers that aren't in writing, you agree with me that you have no intent, no -- I guess you can say you're never going to honor those, right?

A.   No.  No, I wouldn't say that.

Q.   Well, are you going to honor them, the representations, the promises that you make?

A.   We promise to build a good house, quality. We're human beings, we make mistakes.  That's why we ask

if they want to get it inspected, they can hire an inspector to come check our work.

Q.   I just want to ask you three things, though: You know that you -- if you ever represent or promise something, and it's not in the contract, you know that you're not going to honor that, right?

A.   No.

Q.   You don't know that?

A.   No.   It's -- it just depends on the customer. If they specifically ask me for something, then I'll talk to the owner, then he'll do it.   Sometimes those are above and beyond what customers ask.

Q.   You remember the Millers asked a whole lot of questions, didn't they?

A.   We made a lot of notes, yes.   We changed walls and stuff for them.

Q.   The Millers asked you about the subcontractors, people who were going to be building their house?

A.   Did they ask me about them?

Q.   Yeah.

A.   Like what?   Like what did they ask?   What did they ask me?

Q.   What did they ask you?

A.   I don't know.

Q.   You don't remember what you told them either,

right?

A. If they used -- if we used professional contractors? If they asked if they're people who were licensed for their field, yeah, they are, but we have our house inspected along the way as well.

Q. And talk to me about that. Who inspects the home during that process?

A. An inspection company.

Q. And you tell your potential buyers about that third-party inspection, don't you?

A. They ask if the house will be inspected, yes.

Q. And what do you tell them?

A. It will be inspected.

Q. Do you tell them how many times?

A. No.

Q. Do you tell them your relationship with that inspection company?

A. I don't have a relationship with them.

Q. Well, who inspects all of Debo Homes' houses?

A. You'd have to ask Mr. Hernandez what the name of that company is.

Q. You don't know?

A. No.

Q. You just know that a third-party, independent inspector inspects it during the construction process,

right?

A. Yes.

Q. And that's what you tell your customers?

A. Yes.

Q. Do you ever remember telling the Millers that, before they ever had to pay another payment, that any problems in the home would be fixed?

A. Yes.

Q. And you believe here today that you have done that, right?

A. Yes.

Q. And you would have never done anything differently than what you did, right?

A. As far as the selling process or the construction process?

Q. Either. Would you do --

A. I don't do the construction process. I do the sales. I did a great job selling, selling them a home.

MR. CROCKETT: Pass the witness. Thank you, sir.

THE COURT: Ladies and gentlemen, let's go ahead and take our afternoon break at this time. If you would please be back in the jury room at 3:30.

(Jury out)

THE COURT: See y'all back at 3:30.

181

(Short break)

(Jury in)

THE COURT:  Be seated.

Mr. Martinez, you may continue.

MR. MARTINEZ:  Thank you, Judge.

**DIRECT EXAMINATION**

Q.    (BY MR. MARTINEZ) Good afternoon, Kris.

A.    Good afternoon.

Q.    What do we have here in Exhibit 1?

A.    A new home contract.

Q.    Well, where is the other contract?

A.    There is no other contract.

Q.    Isn't this a financing contract?

A.    No, it's cash.

Q.    Kris, how long have you been with Debo?

A.    This November will be ten years.

Q.    And how many homes have you sold over that time?

A.    Several hundred, I believe, maybe.

Q.    So, how do you approach the sale of a home with a customer?

A.    Just greet them, talk to them, find out what they're looking for and see if I can accommodate what they -- what they describe to me.

Q.    Has it ever been the case where a customer came

to you, and they didn't end up wanting to buy a home from Debo?

A. Yes.

Q. Now, when did you first meet the Millers?

A. I can't remember. Last year sometime.

Q. And how was it working with them? How would you describe that?

A. It was good. I had a great experience working with them.

Q. How many times did you meet with them?

A. More than ten.

Q. How about before y'all signed Exhibit 1 here?

A. More than ten times.

Q. Not just two?

A. No.

Q. How many times did you meet after you signed Exhibit 1 here?

A. A lot more times.

Q. More than ten?

A. Yes.

Q. What did they ask about before they signed Exhibit 1 here?

A. They had a lot of changes they wanted to make to a current plan I had. So, we changed walls, added a sink, did a lot of different things to accommodate what

they wanted in a house that would fit their needs.

Q. Did you give them a chance to look over this contract here in Exhibit 1?

A. Yes. They took it home.

Q. Well, that's not what Ms. Miller said. She said you wouldn't let her take it home.

A. I don't see why I wouldn't let her take it home.

Q. She also said that Stan -- I believe you met Stan?

A. Yes.

Q. Who is he?

A. Their Realtor.

Q. Was he there with you April 13th when y'all signed Exhibit 1?

A. No.

Q. When did you meet him?

A. After, I believe.

Q. So, if his signature is on the end of Exhibit 1, when did it get signed by him?

A. When they took it home.

Q. Did the Millers ever tell you that they were using all of their retirement money to purchase this home?

A. No.

Q. Where did they tell you they got the money from?

A. I believe it was an inheritance.

Q. Did the Millers ever tell you that they simply wouldn't have any money to make repairs of the home?

A. No.

Q. Did you --

A. But I told them they wouldn't need any, because it's a brand new house, and it has a warranty on it. So, whatever the amount of house that was sold for, for the time after, it would be warranted (sic), so they wouldn't need any extra money.

Q. That was my next question: Does Debo send its customers who buy a new home a bill for repairs?

A. No.

Q. I know we've seen a lot of pictures. I think you saw a few of them.

A. Uh-huh.

Q. Did Debo send a bill to the Millers for a split two-by-four?

A. No.

Q. Does Debo ever?

A. No.

Q. Did the Millers ever describe you what their personal level of satisfaction was?

A. No.

Q. What were the Millers actually responsible for paying for during construction?

A. Nothing.

Q. What about upgrades?

A. If they wanted to get upgrades and add additional stuff opposed to the contract, we could make an amendment, and then they would be charged accordingly to whatever the fee was.

Q. And that was the only thing that they'd be charged for out of pocket?

A. Yes.

Q. Let's look at that home selection sheet that you mentioned. You recognize Exhibit 3 here?

A. Yes.

Q. And what is this?

A. That's the elevations for the home.

Q. And which one did the Millers pick?

A. The first one.

Q. And when did they decide on this?

A. In the office, while we were talking at one of our meetings.

Q. This is before or after they signed Exhibit 1?

A. It was before.

Q. How about the second page there?

A.    Are the changes of the wall and the back patio and the window in the garage, so forth.

Q.    How did that happen?  What was happening at this meeting when you sat down with them and went through this?

A.    They were telling me how they wanted the home changed and configured to fit their needs, and we made the notes and did so.

Q.    How about that page, the third page of Exhibit 3?

A.    Yeah, she had wrote those notes with her concerns about the square footage and size of her rooms.

Q.    And what about this, this note up here, if you can read that?

A.    She wrote that.

Q.    What's that about?

A.    I think she was -- the approximate square footage of the house on the changes.

Q.    Did she want to increase it?

A.    Yeah, she increased it from 1,614 by pushing out the back wall, changing some other things in the house.

Q.    Was that a problem with Debo?

A.    No.

Q.    Is that normal in your home-selling experience?

A.   Yeah, sometimes.

Q.   Did they come to you with any features that you said, no, we won't do that?

A.   No.

Q.   Now, we've also seen some text messages here today.  Why did you text with the Millers?

A.   They were texting me back and forth.  Sometimes customers will call me, text me or e-mail me.

Q.   Well, why did you have lunch with them?

A.   Like I say, when you asked how the experience was, it was a great experience.  We went out and had lunch and talked about their house and other topics.

Q.   What else did you do to make this experience, you know, memorable in a good way for the Millers?

A.   Accommodated all their questions on their house and the notes they picked for the changes they wanted for the dogs and the door, back door.  They wanted a back door where they can accommodate a big electric doggy door.  They wanted to add a sink in the garage.  They wanted to put a wall -- open a wall up and put a window, so they could put a window unit, so when she was cleaning her dogs or grooming her dogs, they'd be comfortable in there.

Q.   Did you tell the Millers when the sheetrock was going to be installed on this house?

A. Yes.

Q. Did you give them a chance to inspect --

A. Yes.

Q. -- before it was put in?

A. Oh, yes.

Q. Now, what problems did the Millers express to you about the construction?

A. Split boards, I guess the square footage of the house they felt was incorrect. Just some smaller -- small issues, really.

Q. And what did you do to address those concerns?

A. I passed the information down to the correct people to get it fixed.

Q. Well, why did you just pass it down, instead of taking care of it yourself?

A. Because I don't do construction. I sell homes.

Q. About how many times did you actually visit the home in question with the Millers?

A. A couple of times.

Q. And when was the last conversation you had with the Millers before anything that was said today?

A. Around that last year, that time when they told me to call their attorney.

Q. And when was that?

A. I can't remember the month.

Q. You can't remember?

A. Yeah, I can't remember.

Q. So, when you called them, what was said?

A. For me not to contact them anymore; that if I had any other questions, to call their attorney.

Q. But you called them multiple times demanding payment.

A. No.

Q. You were aggressive, Kris.

A. No.

Q. So, when were the Millers supposed to make their second payment?

A. When my boss asked, so I guess it was prior to sheetrocking.

Q. And how did you contact them for that second payment?

A. I believe I called her and asked for the money.

Q. Is there a text message for that?

A. I don't remember.

Q. How was your demeanor when you asked for the payment?

A. Extremely nice. I'm asking for almost $60,000.

Q. Is that a big decision?

A. It's a lot of money, yes. I respect that.

Q. I believe you said earlier you started

marketing the home in August?

A.   Yes.

Q.   Was it an easy resale on this home?

A.   I mean, a couple of issues, I mean, with the house, but -- it was a little rough, what the customer had, because it had a brown roof and a couple of changes that they had made.

Q.   What do you mean by that, little issues, brown roof?  Why did you mention that?

A.   Well, because they specifically asked -- we mostly sell most of the houses with a black shingle roof, but since they customized the house, we went and did what they wanted, expecting they were going to buy the house from me.  So, we put a brown shingle roof on it, changed out the back, put a bigger patio, which normally we don't do because it's an upgrade.  So, I couldn't sell the house the way it was for what I wanted to sell it for.

Q.   How did you market this house after the Millers walked away or didn't want to buy it?

A.   We put it on -- a sign in the front, made fliers and passed out fliers, maintained the grass and the landscaping, and we had to put a desk and Internet. I mean, I had to sit there and market the house for resale.

Q.   So, ultimately, who did you sell the house to?

A.   To Benge, a family named Benge.

Q.   And why would they only pay ten grand less than what the Millers originally agreed to?

A.   Because they didn't want to pay for the upgrades as far as the size of the house and the extra patio.  I normally don't put sinks in the garage.  So, things like that.

Q.   Is that house still standing today?

A.   Yeah.  They're very happy with it.

Q.   Any complaints from them?

A.   No.

Q.   Have you ever had a situation like what we've gone through with the Millers in this case?

A.   No.

Q.   Well, did you try and resolve the situation with the Millers?

A.   Oh, yes.

Q.   How so?

A.   By trying to figure out how we could fix it or make them happy, because they did sit down with me at length and had a lot of meetings and spoke about what they wanted to do and make the house how they wanted it. They were happy with the lot size and the yard and their animals would be happy there.  I wanted them to be happy

with the house.

Q.    Kris, this is the contract again.

A.    Yes.

Q.    Here, there's a portion that says -- we'll start with three.  It says sales price?

A.    Yes.

Q.    What's it say in letter A?

A.    Cash portion of sales price payable by buyer at closing.

Q.    And how much?

A.    59,300.

Q.    How about the line below that?

A.    The sum of all financing described below, excluding any loan funding fee or mortgage insurance premium, which is 118,700.

Q.    How much is the total price?

A.    Sales price is the sum of A and B, is 178.

Q.    Well, if this is a cash deal, why does it say financing on Line B?

A.    Oh, because if it's going to be financing, then you would mark one of the boxes that were going to be financed.

Q.    Are you referring to Section 4?

A.    Yes.

Q.    So, why is there no box marked here in Section

4?

A. Because it's not financing. It's a cash house.

Q. Where is the addenda to this financing contract?

A. There isn't any.

Q. Why not?

A. There's no box marked.

Q. Kris, you recognize this contract?

A. Yes.

Q. What's this here in Exhibit 14?

A. This is the Benges' contract.

Q. All right. Let's go over the same sections. What do we have there in Section 3, sales price?

A. Same thing, cash portion of sale payable by buyer at closing is zero.

Q. What about B?

A. Sales price of sum of all financing described below, excluding any loan funding fee or mortgage insurance premium, which is $168,000. Total for C is A and B combined, which is 168.

Q. Is this the financed home purchase?

A. Yeah, this is the boxes, finance.

Q. Are you referring to these boxes?

A. Yeah, paragraph four.

Q. Kris, whenever the home buyer signs a contract,

do they always deliver you a check on the same day?

A. No. Sometimes it will be the next day or a week later a couple of days later. Depending on how the meeting goes, they'll decide, you know, "Okay, well, we'll sign the contract today. Oh, but I wasn't ready, I don't have a check today." I'm like, that's fine, you can bring a check the next day or a couple days later.

Q. Why did you call Mr. Crockett multiple times?

A. Oh, because I was told not to contact the Millers anymore.

Q. What did you ask him about when you called him?

A. Oh, he had said that they were going to have an inspector come out, and I called him and asked him when he was coming.

Q. Did you ever get a firm answer?

A. No. I got a broad one, July, but never a date.

Q. When did you put those -- you mentioned earlier that you put like fliers and a sign up on the house, correct?

A. Yeah. A sign, yes.

Q. When did you put those up?

A. In August.

Q. Is this Plaintiff's Exhibit 2 what you're talking about?

A. Yes.

Q.   How about that one?

A.   Yes.

Q.   When was that put up?

A.   The same time.

Q.   And that little sign right there?

A.   Yes, same time, August.

Q.   Real quick, since you mentioned this earlier, is this the -- are these the other homes in the neighborhood?

A.   Yes, sir.

Q.   What color are those roofs?

A.   Black.

Q.   Is that the Millers' home right there?

A.   Yes.

Q.   And what color is the roof there?

A.   Brown.

MR. MARTINEZ:  Nothing further.  I pass.

MR. CROCKETT:  Short redirect, Your Honor, or recross.

**RECROSS-EXAMINATION**

Q.   (BY MR. CROCKETT) Mr. Dominguez, when you were selling the home to the Benges, did you tell them about the Millers' construction defect claim?

A.   No.

Q.   Think that would have stalled the sale?

A. No.

Q. You just did a good job selling to them, right?

A. No.

Q. You didn't sell good to the Benges?

A. They could have hired an inspector.

MR. CROCKETT: No further questions, Judge.

MR. MARTINEZ: One quick question.

**REDIRECT EXAMINATION**

Q. (BY MR. MARTINEZ) Kris, is this the -- in Exhibit 8, is this the home that you sold to the Benges?

A. Yes, sir.

Q. What do we see there?

A. The back of the home.

Q. How about that?

A. Yeah, that's the house.

Q. What's that?

A. Ants.

Q. How about this?

A. That's the inside.

Q. How about these pictures?

A. Yes, sir, that's it.

Q. Is that carpet in the bedroom?

A. Yes.

Q. How about these?

197

A. It's the bathroom, bedroom, carpet on the floor.

Q. How about that one?

A. That's the attic.

MR. MARTINEZ: Nothing further, Judge.

MR. CROCKETT: No questions, Your Honor.

THE COURT: May this witness be excused and released?

MR. MARTINEZ: Yes, Judge.

MR. CROCKETT: Yes, Judge.

THE COURT: Thank you, sir. You may step down. You're excused and released.

THE WITNESS: Thank you.

(Witness out)

MR. KANYHA: Your Honor, the Plaintiffs would like to call Brian Crockett.

**BRIAN CROCKETT,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

Q. (BY MR. KANYHA) Mr. Crockett, I'm going to ask you a few questions about the work that you and I have put in this case, but before I begin to ask you these questions, could you introduce yourself to the jury?

A. My name is Brian S. Crockett. Obviously, before I was a lawyer, I spent a long time in the

223

were just getting the bottled water filled up so he could have it on the stand.

MR. CROCKETT:  May we begin, Your Honor?

THE COURT:  Yes, sir.

**JUAN CARLOS HERNANDEZ,**

having been first duly sworn, testified as follows:

**CROSS-EXAMINATION**

Q.   (BY MR. CROCKETT) Mr. Hernandez, can you please state your name for the jury?

A.   Yeah, Juan Carlos Hernandez.

Q.   Mr. Hernandez, you are the president, the owner of Debo Homes?

A.   Yes, sir.

Q.   Okay.  Now, are you aware of all of the promises or representations that Kris Dominguez makes to its potential buyers?

A.   Yes, sir.

Q.   Okay.  What do you tell him to say?

A.   Excuse me?

Q.   What do you tell him to say?

A.   Well, when he come to me, it's me and my son, and we going to make decisions.  And I always trying to get together and fix them up, you know.  But it's no way -- it's nothing to fix over here, because she don't want to deal with us.  The first time I asked her is

when I seen you sent us a letter, and she said construction. I said what does that mean, you know? I'm just trying to work it out nice with this lady, make a house. And, you know, we make a house, and I see people cry in the closing and everybody happy, you know. And that's why I want to talk to them, but she -- after you sent the letter, that's it.

Q. After you received our letter, you found out about the -- at least the concerns that Ms. Miller had, correct?

A. Yes, sir.

Q. All right. And you saw the photographs that Ms. Miller had provided to y'all, right?

MR. WELSCHER: Excuse me, Your Honor. May I approach the witness with the bottled water?

THE COURT: Yes, sir.

MR. WELSCHER: Thank you. (Handing.)

Q. (BY MR. CROCKETT) Exhibit No. 2, do you remember seeing this photograph, sir?

A. Yeah, I seen that picture.

Q. And you would agree with me that that's not a big deal, right?

A. That's correct. You know, it's -- those things can be fixed easy. You know, you put another stud together, and it's done.

Q.   How do you fix it again?

A.   You just put another stud together and you -- not take out that one, you just put a strong, good one, and you're done with it, very easy.

Q.   So, you nail another piece of wood into that one?

A.   No, another straight two-by-four, replace that for a new one.  That's it, that's easy.

Q.   Tell me about this here.  What was the issue here, Mr. Hernandez?

A.   Well, that house is not finished, you know.  That's why when I listen, you know, these things, the house is not even finished.  It's not even working by the superintendent.  At the last minute, we got an inspector coming, we got procedures in the construction, you know.  This right there, they got the new stud and the glue in and everything.  They don't even know what's going on there, you know.  After you can turn, you can see the stud right there.  You got to put joists, and every joist is right there, you know.  But we're still not in the procedure.  That house, it's not finished framing.  It's a procession that you got to finish step by step.

Q.   Talk to me about what you're pointing at over here.  What is that?  Is that the beam that supports the

house?

A. No. The beam is on the bottom, and this is the joist. That beam support the joists, and you got to put the joist hanger right there, tie the joist into the beam.

Q. What's this one called?

A. This is a joist. It's not a beam.

Q. Okay. What's this one called?

A. A beam, yes.

Q. All right. I think we're getting there. So, you're saying that each one of these joists --

A. Yes.

Q. -- should have basically a hanger that ties into the beam?

A. Yes, it's a joist hanger, that's correct.

Q. Now, why isn't there joist hangers?

A. Because the framing haven't finished.

Q. How do the joys hangers get put in?

A. Do you know what is a joist hanger?

Q. I do.

A. What is it?

Q. The issue is your joist hangers, is if you already don't have them in, don't you connect them back into the beams?

A. Yes, sir. We do the -- we fix all the stuff.

Even my superintendent, he mark it and paint it and everything. And when the framer coming, he punching out the whole house.

Q. So, you put your hangers, your joist hangers over the top of the nails?

A. That's the way it's supposed to be.

Q. Okay. So, you nail it in first, then you put your joist hangers over the top?

A. You put the joist hangers on it, and they got like five holes in every one, nail it together even in the joist hanger.

Q. Got you. Now, you know these pictures were taken May 9th, 2013, right?

A. That's correct. I don't know when they took it out, you know. I see the pictures later on, you know, when they coming to me, you know.

Q. Now, you mentioned an inspection. When does that inspection happen, Mr. Hernandez? This company, tell us about it.

A. I don't remember when the superintendent called for the inspection. You know, they call for an inspection, and, you know, I'm in -- I'm the person in the construction and my superintendent got to call when it's ready. When he feels it ready, he call for inspection.

Q. Tell us about that company that comes out and inspects it.

A. It's Mortgage Property Service. It's an inspector company, inspect houses, different builders, you know, and they do three inspections. They do the foundation inspection, they do the framing inspection, and they do the final inspection.

Q. Do you know when MPS did this inspection for the framing?

A. It's not yet. The framing is not even finished. How he going to inspect it? When Michael call him, he show up the next day. You call over there, and they say, "What time do you want the inspection, in the morning or the afternoon?" And that's when he's ready.

Q. And every time that the inspection place comes out, you get a bill for $103.72, right?

A. I don't pay the bills. We just -- whatever bill they send to us, that's what we pay for.

Q. All right. So, I'm going to show you Plaintiff's Exhibit No. 10. This is the actual cost list, and that's how you keep track of your actual costs, right?

A. That's correct.

Q. Now, you see right there where it says MORTGAGE

Property Services, Inc.?

A.   Yes.

Q.   And it says $103.72?

A.   That's correct.

Q.   So, after each inspection that he does, he charged you $103.72?

A.   That's correct.

Q.   Okay.  Does he ever come back for free?

A.   Excuse me.  Does he work for free?

Q.   Yeah.

A.   You work for free?

Q.   No.  My question is:  Does he work for free?

A.   No.  No one --

Q.   That's right.  No one will work for free, right?

A.   You confuse the question.

Q.   Now, after the Mortgage -- or MPS comes out and inspects it --

A.   Yes.

Q.   -- then he writes a report, and he makes recommendations, correct?

A.   That's correct.

Q.   All right.  Showing you what's been marked as Defendant's Exhibit No. 6.  This is one of Mr. Sullivan's reports.

MR. MARTINEZ: Well, Judge -- never mind. Sorry.

MR. CROCKETT: It's your exhibit.

A. Yes, it is.

Q. (BY MR. CROCKETT) The foundation is the first inspection, right?

A. That's correct.

Q. At this stage, Mr. Sullivan identified these issues to be taken care of, and that when they were, work is to proceed, right?

A. That's correct.

Q. All right. How long have y'all been using MPS?

A. Since we started building houses.

Q. And do they inspect all your houses?

A. Yes, sir.

Q. Okay. Do you know Mr. Sullivan pretty well?

A. No. I know the company.

Q. You know the company well?

A. I mean, sometimes, when it's in the field, and I shake hands, and that's it.

Q. After he does an inspection, if it is a minor issue, he'll say correct and proceed, right?

A. That's correct.

Q. Okay. The date of this inspection -- I don't know. Can you see that? It says --

A.    4-25-13.

Q.    4-25-13?

A.    Yes, correct.

Q.    April 25th.  So, at that point in time, the foundation is completely done?

A.    The makeup done.  The foundation got a different process, okay?  It's not for pouring the concrete.

Q.    I follow you.

A.    Okay.

Q.    After the second inspection gets over with --

A.    Uh-huh.

Q.    -- the drywall goes in, right?

A.    That's correct.

Q.    If there's any problems with the home, it needs to be fixed before the drywall goes in, right?

A.    That's correct.

Q.    Why is that?

A.    They always fix it.  When the inspector say something wrong, they fix it and they're ready for drywall.  After they finish the framing, the insulation came.

Q.    Right.

A.    When the insulation is done, we make sure all the plumbing, electrical, alarm and everything is

232

complete. Even we do -- we put termite inspection on the house system and everything is done. And we proceed on that. Superintendent proceed in the system. We got a system that everybody follow. Michael follow the system, and we use it for almost 15 years.

Q. In that system, all the problems need to be fixed before drywall comes on because of what?

A. Because if the inspector say -- the inspector give us the okay, go ahead, it's ready. When he come inspect it, we fix it. We sheetrock, we put drywall. If we don't fix any things that the inspector say, we cannot put the drywall.

Q. Right. If the inspector says it's not fixed, you can't do anything as far as putting the drywall, right?

A. The inspector, yes.

Q. Now, you've seen these photographs. Is that how y'all build your AC units, like this?

A. Well, all the AC units is different. It's a brand new unit. You know, what is it, the bar around here? This is the base of the boards, and this is the dampers going into the system to the houses, and it's all filled in with special things that they do. And they're professional, you know. It's the way they do the system. I know this company. They do the AC unit,

you know.

Q. Let me ask you this: You see this drip pan that's supposed to catch the water?

A. Yes.

Q. What's catching the water that comes out this way?

A. It's another drain that they got in case something -- problems with the house, it's another drain they got that go to the water. It's a drain for -- if something happen, it's a secondary drain.

Q. What if the water drips off of here, though, it goes --

A. No, they got a drain. There's a pipe going to the outside, to the side.

Q. Show me where that drain's at on here.

A. It's on the other side. The inspector check it out. The drain is on the other side. If you want to see the house, you can take a look at it. They don't pass if you don't got the secondary drain, you know. It's normally for everybody. The inspector can take good pictures.

Q. Let me ask hyou this: This foundation here, why do you put Tyvek on the outside of a home? What is Tyvek?

A. What does it mean, Tyvek?

Q.    Tyvek, Tyvek.

A.    Oh, it's Tyvek, it's protection for the plywood.  We do all the plywood houses, and we put a protection for the plywood.

Q.    Right.  What happens if water gets on the actual frame or the plywood?

A.    That water seeping, they get to the weep holes of the brick.  The weep holes, what she saying infestation over there, it's the weep holes.  It's where the houses got two inches between the wall and the brick.  That way, you get a drain over there.  When the brick is sweating, that water is coming to the weep holes.  But a lot of people, they don't know construction.  But that's what it is.  All the houses in Houston, the brick is five and a half inches.

Q.    Right.

A.    You got to go between the brick and the wall. You don't want to put the brick up against the wall.

Q.    Well, you agree with me that the actual exterior of the wall, if you're in construction, you know that water is always going to get through that Hardiplank, that brick, whatever.  It's going to get behind that wall.

A.    But you got the water, it coming in the drain.

Q.    That's why you've got this Tyvek, right?

A.   No.   That is to protect the plywood.   You see this black ply?   Going 18 inches -- 16-inch poly, they wrap it -- before they put the Tyvek, they go 16 inches under the Tyvek and wrap it up to the edge of the foundation.   That way, if you got a leak, they drip onto the poly, this black poly right here.

Q.   What happens if this --

A.   Fix it.   The brick guys coming, they wrap up the poly, take another one and fix them up.   And always my superintendent is there to watch it, you know.

Q.   Well, that's a good question.

A.   But this foundation is not even -- this house is not even finished.   That's why these people, you know, I never understand.   When they take pictures, she want to take pictures, and the house is not even finished.

Q.   Let me show you some of the repairs here.   Is that how you do the repairs, is that -- where you hang the other piece off of it?

A.   This is not a repair.   I think somebody coming -- they got a lot of those in the subdivision. Maybe they come in and drag the poly, because when the brick is going to be done, it's going to fix it, you know.

Q.   Okay.   Well, let's look at when the brick goes

on.  Is that the picture we're talking about right here?

A.  Yeah.  You see the brick and the poly is already wrapping to the other side, and this shrink over there, this shrinking is not on.  When they go in this section, they put another piece of poly and drop it down, and later on, they got the poly to the edge of the foundation.

Q.  That's a good-looking job right there, right?

A.  No, it's not.  It's not finished.  You see, when that brick is done is when you got the house finished.  That's why they work on the house until the end, you know.

Q.  How do you get back there and add the waterproofing behind the brick?

A.  You tear down this Tyvek, pull it out and put another poly underneath and drop it down.  It's very easy and simple.

Q.  Mr. Hernandez, when did y'all make the decision that you were not going to sell the home to the Millers anymore?  When did you say, "Hey, you know what, they don't own it"?

A.  Well, you sent us a letter on the 22nd, right, cease work, and the contract expire on June 3rd.  And after June 3rd, they don't have no more contract with us.  I asked lawyer -- I told my son to call the lawyer

and see if we can continue to the house, because we spent a lot of money already in the house, and we need to continue and get our money back. That's when they call us, you know, when we can do it. And after the contract expiring June 3rd is when we stopped it for almost two weeks and a half, and we continued to work after the contract terminated.

Q. So, June 3rd, you said that that's a done deal, they don't own it?

A. Monday? I never say that.

Q. Well, June 3rd, you said was the closing.

A. June 3rd. Yes, June 3rd.

Q. Yes.

A. Yes.

Q. Okay.

A. I talked to my lawyers. I ask my lawyers when we can continue house, to keep on going, and that's what we do.

Q. All right. Why didn't you ever tell us that you were just going to finish the house?

A. What did you tell us in your letter? Don't talk to anybody until you, you know.

Q. Well, you knew about the July inspection, right?

A. No.

Q.   Kris never told you that?

A.   No.   How did you know we continue, because you leave the house on the 22nd, don't -- you know, don't do any construction.   So, that mean I think you terminate the contract or something.   Then we just -- I wait until you let us know, you know.

Q.   Well, you got -- you got my letter, and you said that that was it, done deal.   But then you wrote the Millers a letter May 29th.   You remember -- you remember this letter?

A.   I'm trying what I do in my good faith.   I'm a very professional and honest people in my life.   I got 35 years in construction.   I always trying to negotiate with them and see if they want to work with me.   I never even ever meet her.   I never seen them.   So, maybe she come in to me and see if we can deal together and keep on going, because I know she want the house, and I was trying to be fair.   If she want to continue the house, let's go fix the problems and we can go for it.   But she never saw the house.   After that, they say, you know what, on the 22nd, "Don't talk to us."   I tell my son, send a letter on the 29th, if she want to work out something to remedy the problem.   I think it's very easy to fix.

Q.   In order to fix this problem, did they need to

pay you $59,300?

A. Excuse me?

Q. In order to fix this problem, did they have to pay you $59,300?

A. What do you mean pay me?

Q. Wasn't that the next payment?

A. Yeah, that's correct. That's correct.

Q. Right. When you do cash installments, it's before the drywall, right?

A. Yes. Do you know how much money you spend from the buy the lot and do the foundation, the framing and everything? You know how much money is in it? I don't think you have no idea.

Q. Well, by looking at your cost sheet here --

A. Uh-huh.

Q. -- to build the entire Miller home, just the actual cost -- this is just your hard costs, right?

A. Yeah. Yes.

Q. So, this sheet here that says -- vendor summary, it says $44,140.99, right?

A. Yes.

Q. And then you hired the trades, and the trades come in, and they do work, the trades, subcontractors?

A. That's correct.

Q. Right?

A.   Yes.

Q.   And each one of these subcontractors is listed here?

A.   Yes.

Q.   And you paid those trades, it says, $86,359.79?

A.   That's correct.

Q.   Who is the trade that you paid the most money?

A.   It's the -- it's the frame material, the foundation and the -- it's the frame material, foundation and framing cost.

Q.   Let me ask a you a little bit different question.  What subcontractor do you pay the most amount of money on this contract?

A.   I think it's the foundation.

Q.   The foundation?

A.   Because it's a turnkey.

Q.   Because what I counted up the most is J. C. Hernandez Construction.

A.   It's the foundation.

Q.   Is that your company?

A.   Yes.  It's another company.  We got the construction company on the house.

Q.   So, the most expensive subcontractor is your other company?

A.   Excuse me?

Q.    The most expensive subcontractor --

A.    It's the cost of the foundation.  The most important is the foundation.

Q.    It's your other company, though, right?

A.    We run another company.  I do foundations all my life.  35 years, I do foundation.  So, I used to do a lot of foundations.

Q.    And in this cost sheet, Kris Dominguez got two commissions here, commissions here, and this breakdown says there was three other commissions.

A.    Excuse me?

Q.    Did Kris get multiple commissions for each sale of this home?

A.    Sir, Kris Dominguez got an advance check every Friday, advance.  At the end, when we are done, we calculate the commissions.  He made 2 percent -- 2.5 percent commission, and we only paid four weeks in advance, which is $2,100.  We just counted, paid the rest of the money.  But sometimes he want to keep and save the money and pay when we do us another house. That's the way he work.  At the end of the year, we total the amount.  If we owe him some money, we give him a check for the total.

Q.    You've already sold this home to the Benges, right?

A.    That's correct.

Q.    And you've already got the money from that sale, right?

A.    That's correct.

Q.    And in your letter of May 29th --

A.    Yes.

Q.    -- you told the Millers that, as soon as that house was sold, you'd pay them a hundred percent of their money back?

A.    Yeah, that's correct.  I don't want to keep money that's not mine, you know.

Q.    You would agree with me that the $60,300 is not yours?

A.    That's correct, it's not.  It's their money. It's their money.  I never say I'm going to keep her money, you know.  I know she need the money, and we need the money.  So, I never -- right here I think is something that really I never -- I never keep somebody's money that's not mine, you know.  I'm very honest people than to keep somebody else money.

Q.    And you'd agree as you sit here now, you're not suing the Millers for $10,000 or your attorney's fees or anything, correct?

A.    Well, it's what we put right there.  She won't agree when we selling the house, we giving the money

back. She don't lose -- I lose money, because I need to have my lawyer, and she lose money because she had to hire a lawyer, I think it's a fair deal then we can working together. She never respond. "Talk to my lawyer." She always say, "Talk to my lawyer," which is you.

Q. My question, though, was: You're not here today asking this jury for $10,000, are you?

A. Well, if we working together, to me, I prefer to give them the $60,300, and that's fine to me. At this moment, even my attorney right now, he's here, you know. Yes, correct.

Q. Right. You're not seeking your attorney's fees or your $10,000, right?

A. No.

Q. Mr. Hernandez, earlier you told me that if your inspector came back and told you that the framing was not done, you should never and would never continue with construction by putting the drywall and covering up those defects, correct?

A. That's correct.

Q. Have you seen the May 10th inspection report from your inspector?

A. No. My superintendent seen it. I don't see the inspection report.

Q.   Well, this was done the day after those photos where you were talking about those joist hangers. Remember that?  You said it's not done yet, it's not done at all.

A.   You know about the frame?

Q.   Yeah.

A.   The frame, the frame punch-out takes about four or five hours to do it.

Q.   This one right here, remember, we talked about this?

A.   Yes, that's correct.

Q.   This is May 9th.

A.   Yes.

Q.   Talked all about the joist hangers and all that, right?

A.   Uh-huh, yes, sir.

Q.   If you don't install joist hangers, what happens?

A.   In the future, probably the joist hanger -- maybe 10, 15 years, the joist hangers fall down, because the nails -- depends how many nails the framer putting in.  That's why the safety, the joist hangers, that's why they put them in, you know.

Q.   You see here on May 10th --

A.   Uh-huh.

Q.   -- your inspector said, "Add the joist hangers at the family room."

A.   Uh-huh.

Q.   See that?

A.   Yes.

Q.   You know what he told you after that, or your superintendent?

A.   I don't know.

Q.   Says right there, says --

A.   Correct.  And proceed, that's correct.

Q.   No, no.  It says, "Correct items noted above, call for reinspection."  He was saying it didn't pass go.  He said it needed to be reinspected.

A.   I don't know.  I don't see that one.  I don't see that one.  But I think Michael did call him again, and he come back and check it out.

Q.   Well, I wanted to make sure.  That's why I asked you earlier.

A.   Well, I don't know.  I don't see that one, you know.

Q.   Nobody works for free, right?

A.   That's correct.

Q.   Let's work this one out together.  You got May 10th.  You see that one?

A.   Uh-huh.

Q. That's when he didn't work for free?

A. Uh-huh.

Q. And then what have we got next? Looks like August 7th, 2013?

A. That's correct. That's the final.

Q. Let me show you -- on August 7th, 2013, show me the joist hangers, Mr. Hernandez.

A. How you going to show it when it's already sheetrock over, please? When I turn around the sheetrock, I bet you it's there. You can do it, you know.

Q. Let me ask you this, though --

A. The joist hangers takes only about one hour, two hours to put it in before we sheetrock.

Q. By August 7, when he came back out again, the house was done?

A. That's correct.

Q. There is no inspection that took place before y'all drywalled?

A. I don't remember if Michael call again to the inspector, so I can't answer that question.

Q. Maybe he did, maybe he didn't, right?

A. I don't know.

THE COURT: Counsel, let's go ahead and break for the day. Ladies and gentlemen, please

remember the instructions I've given you:  That is, do not talk about the case.  Do not do any research on your own.  Do not -- sir, sit down.  Sit down.

THE WITNESS:  Okay.

THE COURT:  Do not do any type of research on the Internet.  Don't talk to anybody about the case, even amongst yourselves.  Don't do any posting of this case on the Internet or any of the social web sites.

With that, have a good evening.  We'll see y'all back 8:45 in the morning.

(Jury out)

THE COURT:  Counsel, see y'all in the morning.

* * * * * * * * * * *

Trial Court Cause No. 13-DCV-209822

Appellate Cause No. 14-15-00004-CV

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
5/12/2015 1:48:51 PM
CHRISTOPHER A. PRINE
Clerk

LAUREL MILLER AND ELIANA MILLER )IN THE DISTRICT COURT

vs. )FORT BEND COUNTY, TEXAS

DEBO HOMES, LLC )400TH JUDICIAL DISTRICT

_____

TRIAL

_____

On the 21st day of August, 2014, the following proceedings came on to be heard in the above-entitled and numbered causes before the Honorable Clifford Vacek, Judge Presiding, held in Richmond, Fort Bend County, Texas:

Proceedings reported by Computerized Stenographic Method.

VANESSA C. OWENS, CSR
DEPUTY COURT REPORTER
FORT BEND COUNTY COURTHOUSE
RICHMOND, TEXAS 77469

**A-P-P-E-A-R-A-N-C-E-S**

MR. BRIAN H. CROCKETT
SBOT NO. 24074094
10565 Katy Freeway, Suite 400
Houston, Texas 77024
Telephone: 713-779-3467.
Fax: 888-779-3237
E-mail: Brian@crockettlawtx.com
ATTORNEY FOR PLAINTIFFS

MR. NICHOLAS MARTINEZ
SBOT NO. 24087986
MR. CRAIG WELSCHER
SBOT NO. 21167200
THE WELSCHER LAW FIRM
1111 North Loop West, Ste., 702
Houston, Texas 77008
Telephone: 713-862-0800
Fax: 713-862-4003
ATTORNEY FOR DEFENDANT

ALSO PRESENT:

INTERPRETER –
DIANE E. TEICHMAN
713-263-9237

**CHRONOLOGICAL INDEX OF EXAMINATIONS**

**VOLUME 4 of 6**

**TRIAL**

AUGUST 21, 2014                                    Page    Vol.

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | VOL. |
|---|---|---|---|
| JUAN HERNANDEZ | 8 | 9 | 4 |

Plaintiffs Rests......................... 74    4

Defendant's Motion for Instructed Verdict.. 74    4

Court's Ruling........................... 77    4

| DEFENDANT'S WITNESSES | DIRECT | CROSS | VOL. |
|---|---|---|---|
| EDUARDO CISNEROS | 79 | 96 | 4 |
| JUAN HERNANDEZ, JR. | 112,139 | 129 | 4 |
| CRAIG WELSCHER | 140 | | 4 |

Defendants Rests.......................... 148    4

Adjournment............................... 149    4

Court Reporter's Certificate.............. 150    4

**ALPHABETICAL INDEX**

| EDUARDO CISNEROS | 79 | 96 | 4 |
|---|---|---|---|
| JUAN HERNANDEZ | 8 | 9 | 4 |
| JUAN HERNANDEZ, JR. | 112,139 | 129 | 4 |
| CRAIG WELSCHER | 140 | | 4 |

that that was the contract.  So your request is denied.

MR. MARTINEZ:  Well, you find that that was the only contract, I believe.

THE COURT:  Right.

MR. MARTINEZ:  So there is no other contract, and they are suing under the contract, we haven't seen in the case, yet.  So if it's not in writing, which we haven't seen, then it's barred.

THE COURT:  Your request is denied.

Bring them in.

THE BAILIFF:  All rise.

(Jury in.)

THE COURT:  Be seated.

Mr. Crocket, you may continue.

MR. CROCKETT:  Your Honor, before we begin, I wanted to be able to admit Exhibit No. 6 into the record.

(Plaintiff's Exhibit 12 was offered.)

MR. MARTINEZ:  Judge, I believe counsel already showed it to the jury and showed it to everyone else.  So he waived it.

THE COURT:  What is Exhibit 6?

MR. CROCKETT:  It's the three inspection reports.  It's Defendant's Exhibit 6, Your Honor.

It's the MPS the foundation inspection, the framing, and we're not sure what that is, but it says it was the inspection.

THE COURT: I show Defendant's Exhibit 6 is a letter from the defendants to the Millers.

MR. CROCKETT: Then I might be out of the numbers. This is the original.

MR. MARTINEZ: Judge, this is our amended exhibit list. That's correct. It's Exhibit 6. Because originally when we admitted our exhibits we said we'll admit 1 through 5, and we skipped 6. I guess we didn't admit it. So we went after that to 7. So that's why there's a gap.

THE COURT: So you're offering Defendant's Exhibit 6?

MR. CROCKETT: Yes, Your Honor.

THE COURT: Then it's going to be Plaintiff's 12, I guess.

MR. CROCKETT: That will work for me.

THE COURT: And those are -- let me see what it is you're offering?

MR. CROCKETT: I can put a new sticker on that.

THE COURT: Any objection to Plaintiff's Exhibit 12?

MR. MARTINEZ: No, Judge.

THE COURT: Plaintiff Exhibit 12, which consist of three inspection reports, is hereby admitted.

(Plaintiff's Exhibit 12 was admitted.)

**CROSS-EXAMINATION**

**BY MR. CROCKETT:**

Q    Mr. Hernandez, this missing joist hangers, what were they over?

A    Excuse me?

Q    What was above -- what was below the joist hangers, the beams and the joist that were --

A    The joist, the joist hanger support the joists and they attached to the beam.

Q    What were they above? Were they above the family room?

A    Excuse me?

Q    Is that what it says, they were above the family room?

A    Yes.

Q    And if those were installed, over time they are going to fall, aren't they?

A    Yes, they installed.

MR. CROCKETT: No further questions, Your Honor. Pass the witness.

here.

THE COURT: You may proceed.

**EDUARDO MICHAEL CISNEROS,**

having been first duly sworn, testified as follows by

and through the interpreter:

**DIRECT EXAMINATION**

**BY MR. MARTINEZ:**

Q    Mr. Cisneros, would you please state your full name for the record?

A    Eduardo Cisneros Michael.

Q    So people usually call you Michael?

A    Yes.

Q    What is your job title with Debo Homes?

A    Superintendent.

Q    How long have you been working for Debo?

A    Ten years.

Q    How many homes have you worked on during your career?

A    An average of 60 or 70.

Q    If there is a problem during construction with the home, how do you address that problem?

A    I fix the problem.

Q    Now, are you familiar with the home at 11115 Leah Elizabeth in Needville, Texas?

A    Yes.

Q    Do you understand that to be the home in this lawsuit?

A    Yes.

Q    Now, how much were you there at this home during construction?

A    Everyday, and all day long.

Q    What time did you start in the morning?

A    At 7:00.

Q    What time did you finish in the afternoon or evening?

A    It depends, 8:00, 9:00.

Q    Were you working on another home in the same subdivision during this time?

A    Yes.

Q    Now while you're at the home in question, what did you supervise?

A    The entire process.

Q    Did you oversee the framers?

A    Yes.

Q    How about the foundation?

A    Also.

Q    Now, when you were supervising, about how many people were you supervising at one time?

A    It depends on the work group that came that day.

Q    What's the smallest number of people that you had to supervise and what's the largest?

A    Five to six.

THE INTERPRETER:  English.

A    Ten.

Q    (By Mr. Martinez) How were the trades or subcontractors scheduled?

A    It depended on their shift.

Q    Did you always have someone working on the home -- was there a day off or anything?

A    There's always people there.

Q    Now as of mid-May, 2013, how was construction going on the home?

A    It was stopped at the point of the plumbing.

Q    Could you explain that a little bit more?

A    After the first person comes in doing their shift work, after the framing is done.  Yes.

Q    Do you know who Laurel Miller is?

A    I don't know her because I've never spoken to her.

Q    Do you recognize who the plaintiff is in this lawsuit?

A    Yes.

Q    Would you mind pointing her out for us?

A    The woman who is to your right.

MR. MARTINEZ:  Ms. Miller, would you mind standing?

Q    (By Mr. Martinez) Is this who you identified?

A    That's she.

MR. MARTINEZ:  Please let the record reflect that Mr. Cisneros identified the plaintiff, Laurel Miller.

Thank you, Ms. Miller.

Q    (By Mr. Martinez) Now how often was she there?

A    During construction, on occasion I'd see her two to three times a day.

Q    Did you ever speak with her when she was there?

A    Never.

Q    Why is that?

A    Well, she never had questions for me.

Q    What did Ms. Miller do when she was at the construction site?

A    She looked at the construction and she would make marks with orange colored spray paint.

Q    When were you first told of repairs that needed to be made in the home?

A    The first time was the first few weeks of May.

Q    Did you walk -- excuse that.  While the framers were there, did you notice them making mistakes?

A    No.

Q    Isn't it true that there were split 2 by 4s?

A    Yes, but that's normal.

Q    How often do you see a split 2 by 4 during framing of a house?

A    With the frequency it's as common as you go all the way up to the point of a punch out.

Q    Would you mine explaining the punch for us?

A    The punch out is when you repair the 2 by 4s that are either cracked or damaged.  You remove the temporary wood.

Q    Mr. Cisneros, what do we have here in this picture, in Exhibit 2?

A    What you see here is when a nail was put in very much to the edge of the plywood.

Q    Why did it split?

A    Either it went in crooked or it was put in too far to the edge.

Q    Was this split repaired?

A    Yes.

Q    How was it repaired?

A    We have two options.  You can either remove the damaged part or put another one next to it.  So that there's two of them.

Q    Mr. Cisneros, what do we see here in this picture?

A    What you see here is that there's no joist hangers inserted or installed, and they do that -- they wait to do that until the framer comes to do the punch out.

Q    Were those joist hangers actually put there?

A    Yes, that's right.

Q    Did you see those joist hangers actually put there?

A    Yes.

Q    Mr. Cisneros, what do we see here in this picture?

A    That's the pipe to the dryer.  And it's pushing up against the plate that protects it from a nail or any nail.

Q    Is there anything wrong with it?

A    No.

Q    What do we see here in this picture?

A    That's a piece of wood that's there temporarily that the framers put up so that they could put up their scaffold.

Q    Why is it just temporary?

A    Because they only use it for when they are on the scaffolding or when they're putting up the joist in the ceilings.

Q    So was this eventually removed from the house?

A    Yes.  Correct.

Q    What do we see here in this picture?

A    It's a mark that's at the division of the two pieces of wood, and when the framers come to the point of the punch out, they install or put in a 2 by 4 right there in the middle.

Q    So this picture was taken before the punch out then?

A    That's right.

Q    Was the 2 by 4 you mentioned actually put in?

A    Yes, it's there now.

Q    What do we see here in this picture?

A    It's the 2 by 4 on the top there that's cracked or split.

Q    Why did that happen?

A    It's either because there is a whole bunch of people working there at the time or it arrives at the work site cracked or split.  It has to be replaced.

Q    Was it replaced?

A    It was replaced.

Q    Did you witness it being replaced?

A    Yes.

Q    What do we see here in this picture?

A    The same thing, 2 by 4s that are split.

Q    Were those fixed?

A    That's right.

Q    How were they fixed?

A    We removed the damaged wood.

Q    What do we see here in this picture?

A    It's a block that didn't reach the beams.

Q    And why did that happen?

A    The person -- because the person who installs the plywood adapted it like that to give more support.

Q    So does this need to be fixed?

A    Yes.  It was repaired.

Q    How were those repairs made?

A    Removing the support wood that didn't

quite reach the beam and replacing it with one that did reach the beam.

Q   What do we see here in this picture?

A   The drip pan did not -- was not positioned under the wooden box.

Q   What did you do to make sure that was positioned correctly?

A   The people who did the air work were brought back to do the job correctly.

Q   Did they do the job correctly?

A   That's right.

Q   What do we see here in this picture?

A   That is the honey comb, which is produced by air.

Q   Was that fixed?

A   Yes.

Q   How?

A   Putting more concrete on it.

Q   What about the black plastic, is there anything wrong with that?

A   No.

Q   Does it need to be pulled down eventually?

A   Yes, when the people who are putting in the brick work are there, they take care of the black plastic.

Q    Were you there when the brick people came?

A    That's right.

Q    Did you witness them correctly install the plastic?

A    Yes.

Q    What do we see here in this picture?  And let me make it more specific.  What about there?

A    Okay.  That's where the cable comes out, and the company that does the work is the one that puts the tension on it.  Those are the same people that cover or fill up the hole that's left.

Q    What do we see back there?

A    That's honey comb.

Q    Was that fixed?

A    It was fixed.  Yes.

Q    How do you know that?

A    Because at the time that the brick is installed it's repaired.

Q    So this was before the brick was installed?

A    Yes.

Q    What do we see here in this picture?

A    This is the counter, and the 2 by 4 that's covering it is cracked.

Q    Why was it cracked?

A    Probably the workers banged into it.

Q    How often does that happen with the 2 by 4?

A    It's very rare that it happens.

Q    How do you fix this issue?

A    You remove the 2 by 4 that's on top there.

Q    How long does it take to make that repair?

A    A day.

Q    Whose's blue paint is that there?

A    Those are the marks that I make for the punch out.

Q    Was this fixed?

A    That's right.

Q    Are you able to recognize anything in this picture?

A    I can't really see it very well.

Q    How about this one?

A    That's the window frame.  And it was bumped by accident.

That was repaired when the window company came to make adjustments.

Q    About when did that happen?

A    That's at the end.

Q    Why?

A    Because the company that makes the window

adjustments or adjustments to the windows comes normally around at the point of the construction being at 70 to 75 percent completed.

Q    What do we see here in this picture?

A    It's a pipe.

Q    Why is there no insulation on that pipe?

A    It depends.  If the pipe is in between the walls that are inside the house it doesn't need insulation, including the walls that are on the edge.  Those are the ones that have to have it.

Q    What do we see here in this photo?

A    These pictures you have to replace the 2 by 4s and the ones that you see that are double you have to replace them, the doubles, for more support.

Q    Why was there an issue in the first place?

A    Because these are things that are normally that -- these are normal things that are left to be dealt with until the end when there's a punch out.

Q    Where these issues here actually repaired?

A    That's right.

Q    Did you witness that?

A    Yes.

Q    Do you know what we're looking at here?

A    Yes.  I think that's wetness, moisture.

Q    What does that do to affect that board?

A    Normally it doesn't affect it.

Q    What do we see here in this picture, Michael?

A    That's concrete.

Q    What about the plastic?

A    That's the plastic that you put where you're going to have brick work.

Q    What do we see here?

A    You see a 2 by 4 here, and that's used by the people who are going to do the brick work. And they use that for the lines and so that the wall is installed straight. They use it like a level.

Q    Is it a temporary 2 by 4?

A    Oh, yes.

Q    Is there anything wrong with this here?

A    Nothing.

Q    This more -- how many, tell me, different angles?

A    Yes.

Q    Was that fixed?

A    Yes.

Q    Did you witness that?

A    That's right.

Q    Are you capable of seeing any issues in this picture?

A     No.

Q     I don't know if that helps at all?

A     Okay.  Right now you see the PVC pipes.
And it's -- you have to put the cap or hot cap on
it.  You can see a piece of wood there at the
aluminum cap which was cut to be able to put the
pipe in.

Q     Is there anything wrong here?

A     No.  Normal.

Q     Are you really capable of telling us what
that is?

A     That looks like Sheetrock.

Q     Can you see if there's any issues here?

A     No, there's no problem, because the
Sheetrock was just installed.  And the next thing
that happens is the people come to tape and float
it.

Q     Could you explain tape and float a little
bit more for us?

A     Yes.  Since it's a process, the first
thing you do is install the Sheetrock.  That's done
by different people, and then you got the people who
come and do the tape and float.

            The tape is done where you cover the
joints of the Sheetrock, and they also cover all the

nails.

Q   Did you witness all that being done in this house?

A   Yes, that's right.

Q   What are we looking at here?

A   A lot of things.

Q   Well, if -- are you capable of seeing any issues right now?

A   No, none.

Q   What about this picture?

A   The same.  That's the day the people are -- the people are there to install the Sheetrock.

Q   Wasn't there a gap in the Sheetrock there?

A   Yes, but that's normal.

Q   Is it a finished home have that gap?

A   No.  Never.

Q   When was the gap eventually filled?

A   The next day.

Q   Did you witness that?

A   Yes.

Q   Is this the same thing here?

A   Yes.

Q   What about here?

A   There you have the Sheetrock installed

only 80 percent.

Q    Anything wrong with it there?

A    No.

Q    What about this picture of the roof?

A    That's the man who puts up the shingles. He wasn't finished yet.  He still needed to nail that in.

Q    Did he eventually nail it in?

A    That's right.

Q    Is this the finished home?

A    Yes, that's right.

Q    How about that one?

A    The same.

Q    Do you remember a Mr. Knueppel, the inspector for Ms. Miller?

A    I saw him, yes, but I didn't know his name.

Q    Were you there when he was there?

A    That's right.

Q    Now isn't it true that he identified some things to be repaired in the home?

A    Yes.

Q    Were those fixed?

A    They were repaired.

Q    Do you remember stopping construction on

the home?

A    Yes.

Q    And when did y'all restart construction?

A    Like it was stopped and then it was started again like the first or second week of June.

Q    Now when construction was stopped, that interfered with the scheduling of the trades or subcontractors?

A    Of course.

Q    Well, did stopping put y'all behind schedule?

A    Yes.

Q    Do you remember when construction finally finished on the home?

A    Yes.

Q    You have a date?

A    Not exactly.

Q    Did you witness Ms. Miller talking to Mr. Knueppel, the inspector?

A    Yes.

Q    You don't really speak English that well, correct?

THE INTERPRETER:  English.

A    A little bit.

Q    (By Mr. Martinez) And what happened during

that conversation between Ms. Miller and Mr. Knueppel?

A   Before the inspector arrived the house was already marked with the color orange.  And the inspector made marks that were red, and mine were blue.

Q   And what did -- what happened between Ms. Miller and the inspector?

A   When the inspector started looking at the construction, he went along marking what he thought that needed repairs, and the lady would want him to mark something and the inspector would tell her it was normal.

Q   Was there any type of altercation between them?

A   Not exactly.  But you could tell by looking at the face of the inspector that he did not feel free to do his job.

MR. MARTINEZ:  Nothing further.  Thank you.

**CROSS-EXAMINATION**

**BY MR. CROCKETT:**

Q   Sir, how are you doing today?

THE INTERPRETER:  English.

A   I'm fine.

Q    (By Mr. Crockett) How many superintendents are there at Debo Homes?

A    One.

Q    Who is that?

A    Me, personally.

Q    Okay.  That's what I thought.

What's your job at Debo Homes as the superintendent?

A    It's the process of finishing the house.

Q    Is it your job to inspect or supervise all of the subcontractors?

A    Yes.

Q    And that's why you're there -- when do you start, again?

THE INTERPRETER:  English.

A    7:00.

Q    (By Mr. Crockett) So 7:00 in the morning you start?

A    That's right.

Q    And then you finish, I think you said, at 7:00 or 8:00 at night?

A    It depends.

Q    You work a lot of hours for Debo Homes, right?

A    If it's necessary.

Q How many houses were you supervising with the Millers' home?

A Two.

Q And during that time period, where did you spend most of your time?

A In the same neighborhood.

Q Same one?

A That's right.

Q Walk me through, how did you go back and forth between the one house and the other house?

A Because the house that was under construction was one street over.

Q I mean, did you walk across the street, then?

A No.

Q How did you go back and forth between one house and the other?

A In my car, the truck.

Q Now whenever you're supervising it, who's bringing the actual supplies, the actual construction supplies to the job site? Who coordinates that?

A The companies.

Q And who makes sure that the companies are coordinated at the right time for construction?

A    Because I'm the one that has the construction schedule, and I call the office when I need the next material.

Q    So the schedule you were talking about -- normally what is the standard for Debo Homes to complete a house, how many weeks?

A    It depends on the weather.  If you got bad weather or if it's raining, six, eight weeks.

Q    What's the fastest you ever constructed a Debo Home?

A    It could be six weeks.

Q    Now before you didn't have the pleasure of being here, during the time that the Millers' home had this stop, this break in construction, we're talking about June to August, y'all completed three other houses?

A    I don't remember.

Q    Sir, one of my questions would be, if you're there every single day, do you maintain any logs, anything whatsoever to show that you're actually there?

A    That's right.

Q    You have logs?

A    Not with me here.

Q    What do the logs say on them?

A    Who's the person doing their work.

Q    Do you ever include on those logs what you've inspected and what's been repaired?

A    Yes.

Q    Tell me, for the Millers' house, why weren't there any logs, at all, zero?

A    I don't understand the question exactly.

Q    Why was there any logs for the Millers' house?  Why didn't you do them for the Millers' house?

A    Once again, I don't understand the question exactly.

Q    Let me ask a different one:  Do you document the defects in the house and turn those over to anyone at Debo Homes?

A    Yes.

Q    Who?

A    At the headquarters.

Q    Where is that?

A    2977 F.M 1180 -- 18.

Q    Let me ask you this:  Do you remember the timeline when Mr. Knueppel started coming out to the house?

A    Yes.

Q    When was the first time you saw him?

A    When the concrete slab was put down.

Q    Did you get a report from Mr. Knueppel that you looked over?

A    Yes.

Q    And who read it to you?

A    At the office.

Q    Who?

A    The vice-President and the salesman.

Q    Who is the subman?

A    Kris Dominguez.

Q    The salesman?

A    Yes.

Q    You call him the subman.  What is that?

A    Sale man.

Q    Got you.  What did Debo Homes tell you to do with Knueppel's report?

A    To repair the damages.

Q    Okay.  And you're not sitting here today saying that that house didn't have problems in that report, you agree with that?

THE INTERPRETER:  The interpreter would like to request to have the question repeated.

THE COURT:  Repeat the question.

MR. CROCKETT:  Yes, sir.

Q   (By Mr. Crockett) Sir, as you sit here today, you agree that in the report you read there were defects in the home that needed to be repaired?

A   Yes.

Q   How long did it take you to do those repairs?

A   One day.

Q   One day.  If Mr. Knueppel came out May 9th, 2013, you were complete with all repairs by May 10th, 2013, correct?

A   Correct.

Q   Do you know that you actually repaired all of the items on May 10th, 2013?

A   Yes.

Q   There's no doubt in your mind that every repair in that house was completed on May 10th, 2013, right?

A   That's right.

Q   The hangers were hung on May 10th, 2013?

A   Yes.

Q   And you know that 100 percent right now?

A   That's right.

Q   It was not repaired on May 11th or 12th or 13th.  It was May 10th, 2013?

A   I don't remember.

Q    The reality is you don't know when the repairs were made, right?

A    Not exactly.

Q    You been with Mr. Hernandez for a very long time, haven't you?

A    That's right.

Q    How long have you been working for Mr. Hernandez or with his other construction companies?

A    When I started I was working with Mr. Hernandez on foundation for ten years.  Then he formed the company Debo Homes in the subdivision Los Pinos.  And he offered me the opportunity to hire me as a superintendent, with some other builders that worked for Newmark.  So I've worked for the company Debo Homes for ten years.

Q    You owe Mr. Hernandez a lot, don't you?

A    Partly.

Q    He's been good to you and your family, has he not?

A    Of course.  If not I wouldn't still be with him here.

Q    You're hoping to stay with Mr. Hernandez's company for a very long time, aren't you?

A    As long as he doesn't fire me I'll still

be there.

Q    That's often how it works.

When did Mr. Hernandez tell you that guys were no longer stopping work and that you were to start again?

A    At the end of May.

Q    So in May you already knew that you were moving forward with construction again?

A    Yes.

Q    Did you ever ask if the issues with the Millers had been resolved?

A    No.

Q    That's not your lane, right?

A    That's right.

Q    When Mr. Hernandez tells you to start working you start working?

A    Yes.

Q    Now when you're working, are you also swinging hammers, doing the manual labor yourself?

A    If it's a matter of doing that, yes, but it's very rare.

Q    Let me ask you this:  You said you were there everyday for the construction of the Millers' house, right?

A    Yes.

Q    How many times was Mr. Hernandez there during the construction of the house?

A    Regularly, the man is there at the house two times a day, at a minimum.

Q    Mr. Hernandez was there for the construction twice a day, right?

A    That's right.

Q    And you were there everyday, all day?

A    That's right.

Q    Now, all the photographs that Debo Homes lawyer had showed you, while all y'all were present, how did all of these problems happen?

A    Those are normal things that have to happen.

Q    And normally when do those get repaired? When do you fix those?

A    Minimum, maximum three days, or one day after finishing.

Q    Let me ask a better question.  During the construction process, as you call it, when do you make all the repairs to the frame?

A    It's at the end after the man or the plumbing company is finished, the AC people are finished, and the electricians are finished.

Q    Are you able to do any repairs to the

framing after the drywall is put in?

A It depends.

Q Well tell me how?

A If it's a matter of a plate that wasn't nailed in right, something simple.

Q Let me ask you a better question. If the frame behind this drywall is bent, broken, bowed, damaged, how do you repair it?

A You have to do that before you install the Sheetrock.

Q Tell me why?

A Why. Because if the 2 by 4 is either curved or crooked, the wall, once you Sheetrock it, is going to show that curve, and that doesn't look right.

Q Now if you were to make repairs after the drywall had already been put in, to the frame, do you have to take the drywall back off?

A I don't see why you would have to do repairs or make repairs if everything had already been corrected.

Q I agree. You wouldn't have to, right?

A That's right.

Q If the repairs weren't done before the drywall went in, you'd agree with me that that would

be absolutely wrong?

A    That's right.

Q    Now earlier you had told Debo Homes lawyer that you saw every repair made, correct?

A    That's right.

Q    Did you photograph it?

A    No.

Q    Did you document it?

A    Yes.

Q    How did you do that?

A    Because I have an inspector that comes from the company to check.

Q    Is that inspector from MPS?

A    I don't know, maybe.

Q    Do you rely on that inspector to clear the construction for drywall?

A    Yes.

Q    Before your deposition -- well, not before your deposition, before your testimony here today I noticed you had all these photographs you were carrying them around.

A    Yes.

Q    Did you talk to Mr. Hernandez and his son about --

MR. MARTINEZ:  This is getting into

attorney/client privilege again. We were with him with the photos.

THE COURT: Overruled.

Q (By Mr. Crockett) Did you talk to Mr. Hernandez and his son before your testimony today about the problems in the house and what your answers would be?

A No.

Q Why were you carrying around the photographs?

A Because those are the same pictures that I received to be able -- in order to make the repairs.

Q You had these photographs?

A I have them in the office.

Q The ones I made last week?

A No.

THE INTERPRETER: English.

A Of course not.

Q (By Mr. Crockett) Why were you carrying around the note pad right here on the lawyers' desk, while you were at lunch before you testified today?

A To ask me if I had received those photographs.

Q You did talk about these photographs, right?

A   No.

Q   So if I get this straight, you had photographs that you were carrying that you didn't talk about?

A   That's right.

Q   All right.  Just wanted to make sure I got that right.

Have you ever had it happen that a Debo Homes house did not sell to the customer and Mr. Hernandez told you to sell it to somebody else, keep building?

A   No, never.

Q   This is the first time, right?

A   That's right.

Q   That surprise you?

A   Yes.

Q   Did you ask Mr. Hernandez what happened?

A   No.

Q   Now make sure I'm clear.  You witnessed every repair made but you can't tell us what dates they were repaired?

A   That's right.

Q   Were there other repairs outside of these photographs that you had at lunch that you looked at, made sure that those were repaired?

A     Yes.

Q     And you fixed all of those?

A     Yes.

Q     Why do you use spray paint to mark the areas in the house?

A     To identify the damage.

Q     And what if it doesn't get spray painted?

A     We wouldn't know what needed to be repaired.

Q     And who tells y'all what needs to be repaired?

A     Nobody.

Q     When MPS came out and did the framing inspection, did you see MPS ever again until August when the house went through the final inspection?

A     Yes.

Q     When?

A     I don't remember exactly.

Q     You know the month?

A     Could be July.

Q     After the drywall had already been put in?

A     Would you please repeat the question?

Q     You saw MPS come out for the foundation?

A     Yes.

Q     You saw MPS come out for the framing?

A    That's right.

Q    You saw MPS come out after the drywall was put in?

A    Yes, at the end.

Q    And that's the only time that you saw MPS come out?

A    I saw them one more time.

Q    And when was that?

A    When he came to inspect the frame and he noticed or pointed out the repairs that needed to be made and he came back to check to make sure they had been made.

Q    And did he give you any documents to show that he had done another inspection?

A    No.

Q    He never gives you documents to show or confirm that inspections or repairs had been made, correct?

A    If they're basic things, no, because he comes back.

Q    And if they are big things, does he write a report and tell you to go ahead?

A    If they are basic things, no.

Q    And during your lunch break Mr. Hernandez didn't tell you to say that?

A      No.

MR. CROCKETT:  No further questions. Thank you, sir.

MR. MARTINEZ:  We'll pass the witness, and we're done with the interpreter.  You may excuse the interpreter and Mr. Cisneros.

THE COURT:  May this witness be excused and released?

MR. CROCKETT:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  You're excused and released.

Defense, you may call your next witness.

MR. MARTINEZ:  Judge, we'll call Mr. Juan Carlos Hernandez, Jr.

THE BAILIFF:  Please stand before the clerk.

(Witness sworn by the clerk of the court.)

THE BAILIFF:  You may take the stand.

**JUAN CARLOS HERNANDEZ, JR.**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. MARTINEZ:**

Q      Mr. Hernandez, would you please state your full name for the record?

A      Yes.  It's Juan Carlos Hernandez, Jr.

FILED IN
14th COURT OF APPEALS
HOUSTON, TX
02/20/2015
CHRISTOPHER A. PRINE,
CLERK

REPORTER'S RECORD
VOLUME 6 OF 6 VOLUMES
TRIAL COURT CAUSE NO. 13-DCV-209822
APPELLATE COURT CAUSE NO. 14-15-00004-CV

LAUREL MILLER AND          )      IN THE DISTRICT COURT OF
ELIANA MILLER              )
                           )
VS.                        )      FORT BEND COUNTY, TEXAS
                           )
DEBO HOMES, LLC            )      400TH JUDICIAL DISTRICT

_____

EXHIBITS

_____

# TRIAL COURT CAUSE NO. 13-DCV-209822

| | | |
|---|---|---|
| LAUREL MILLER AND ELIANA MILLER | ) | IN THE DISTRICT COURT OF |
| | ) | |
| VS. | ) | FORT BEND COUNTY, TEXAS |
| | ) | |
| DEBO HOMES, LLC | ) | 400TH JUDICIAL DISTRICT |

I, Karen Romeo Rothman, Official Court Reporter in and for the 400th District Court of Fort Bend County, State of Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the Jury Trial in the above-entitled and numbered cause as set out herein before the Honorable Clifford J. Vacek, Presiding Judge of the 400th District Court of Fort Bend County, State of Texas, and a trial beginning August 19, 2014.

I further certify that the total cost for the preparation of this Reporter's Record is $1,785.00 and was paid by Plaintiffs.

WITNESS MY OFFICIAL HAND on this, the 20th day of February, 2015.

/S/ Karen Romeo Rothman_____
Karen Romeo Rothman, CSR, CRR
Texas CSR 1510
Official Court Reporter
400th District Court
Fort Bend County, Texas
301 Jackson
Richmond, Texas 77469
Telephone: 281.341.4421
Expiration: 12/31/2016

# INDEX OF EXHIBITS

## EXHIBITS OFFERED BY PLAINTIFF

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Contract | 31 v2 | 31 v2 |
| 2 | Photographs | 39 v2 | 40 v2 |
| 3 | Printout of text messages | 7 v3 | 10 v3 |
| 4 | E-mail to Debo Homes from Millers | 8 v3 | 11 v3 |
| 5 | E-mail from Crockett to Debo Homes | 8 v3 | 11 v3 |
| 6 | Letter from Debo Homes to the Millers | 8 v3 | 11 v3 |
| 7 | Letter from Welscher to Millers | 8 v3 | 11 v3 |
| 8 | Documents from sale of home to the Benges | 8 v3 | 11 v3 |
| 9 | Settlement Agreement from Benge sale | 7 v3 | 10 v3 |
| 10 | Debo Homes costs of construction | 7 v3 | 10 v3 |
| 11 | Welscher Law Firm partial billing | 7 v3 | 10 v3 |
| 12 | Sullivan Inspection Report | v4 | |

## EXHIBITS OFFERED BY DEFENDANT

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Contract between Debo Homes and the Millers | 10 v3 | 12 v3 |
| 2 | Checks paid to Debo Homes by the Millers | 10 v3 | 12 v3 |
| 3 | Home selection documents | 10 v3 | 12 v3 |
| 4 | Blueprints for house | 10 v3 | 12 v3 |
| 5 | Construction permits for house | 10 v3 | 12 v3 |
| 7 | Printout of text messages | 10 v3 | 12 v3 |
| 8 | Photographs of house | 10 v3 | 12 v3 |
| 9 | E-mail regarding home construction | 11 v3 | 12 v3 |
| 10 | Crockett cease-and-desist letter | 11 v3 | 12 v3 |
| 11 | Letter from Debo Homes to Millers | 11 v3 | 12 v3 |
| 12 | Letter from Welscher Law Firm to Millers | 11 v3 | 12 v3 |
| 13 | Cost list, trades and list of contractors | 11 v3 | 12 v3 |
| 14 | New Home Contract - Benges | 11 v3 | 12 v3 |
| 19 | Fees - Welscher Law Firm | 11 v3 | 12 v3 |
| 20 | Receipt for deposit into court registry | 11 v3 | |

PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)    12-05-2011
# NEW HOME CONTRACT
### (Completed Construction)
NOTICE: Not For Use For Condominium Transactions or Closings Prior to Completion of Construction

**1. PARTIES:** The parties to this contract are _DEBO HOMES  L.L.C_
(Seller) and _ELIANA MILLER and LAUREL MILLER_ (Buyer). Seller agrees
to sell and convey to Buyer and Buyer agrees to buy from Seller the Property defined below.

**2. PROPERTY:** Lot _5_ , Block _8_ ,
_ROSEMEADOW_ Addition, City
of _NEEDVILLE_ , County of _FORT BEND_ ,
Texas, known as _1115 LEAH ELIZABETH  NEEDVILLE, TX 77461_
(address/zip code), or as described on attached exhibit, together with: (i) improvements,
fixtures and all other property located thereon; and (ii) all rights, privileges and appurtenances
thereto, including but not limited to: permits, easements, and cooperative and association
memberships. All property sold by this contract is called the "Property".

**3. SALES PRICE:**
A.  Cash portion of Sales Price payable by Buyer at closing .................. $ _59,300_
B.  Sum of all financing described below (excluding any loan funding
    fee or mortgage insurance premium) ............................................ $ _118,700_
C.  Sales Price (Sum of A and B) ....................................................... $ _178,000_

**4. FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check
applicable boxes below)
☐ A. THIRD PARTY FINANCING: One or more third party mortgage loans in the total amount of
    $_____ (excluding any loan funding fee or mortgage insurance premium).
    (1) Property Approval: If the Property does not satisfy the lenders' underwriting
        requirements for the loan(s), (including, but not limited to appraisal, insurability and
        lender required repairs), Buyer may terminate this contract by giving notice to Seller
        prior to closing and the earnest money will be refunded to Buyer.
    (2) Credit Approval: (Check one box only)
        ☐ (a)  This contract is subject to Buyer being approved for the financing described in the
               attached Third Party Financing Addendum for Credit Approval.
        ☐ (b)  This contract is not subject to Buyer being approved for financing and does not
               involve FHA or VA financing.
☐ B. ASSUMPTION: The assumption of the unpaid principal balance of one or more promissory
    notes described in the attached TREC Loan Assumption Addendum.
☐ C. SELLER FINANCING: A promissory note from Buyer to Seller of $_____ ,
    secured by vendor's and deed of trust liens, and containing the terms and conditions
    described in the attached TREC Seller Financing Addendum. If an owner policy of title
    insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

**5. EARNEST MONEY:** Upon execution of this contract by all parties, Buyer shall deposit
$ _1000_ as earnest money with _Debo Homes L.L.C_ ,
as escrow agent, at _____
(address). Buyer shall deposit additional earnest money of $_____ with escrow
agent within _____ days after the effective date of this contract. If Buyer fails to deposit the
earnest money as required by this contract, Buyer will be in default.

**6. TITLE POLICY AND SURVEY:**
A. TITLE POLICY: Seller shall furnish to Buyer at ☐ Seller's ☒ Buyer's expense an owner policy of
   title insurance (Title Policy) issued by _American Title Company_ .
   (Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer
   against loss under the provisions of the Title Policy, subject to the promulgated exclusions
   (including existing building and zoning ordinances) and the following exceptions:
   (1) Restrictive covenants common to the platted subdivision in which the Property is located.
   (2) The standard printed exception for standby fees, taxes and assessments.
   (3) Liens created as part of the financing described in Paragraph 4.
   (4) Utility easements created by the dedication deed or plat of the subdivision in which the
       Property is located.
   (5) Reservations or exceptions otherwise permitted by this contract or as may be approved by
       Buyer in writing.
   (6) The standard printed exception as to marital rights.
   (7) The standard printed exception as to waters, tidelands, beaches, streams, and related
       matters.
   (8) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary
       lines, encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's
       expense, may have the exception amended to read, "shortages in area".

Initialed for Identification by Buyer  _EM_ _LM_ and Seller _____ _____    TREC NO. 24-12

Plaintiffs' Ex.
Number
1

MILLER 0002

Contract Concerning _11115 LEAH ELIZABETH DR Needville, TX 77461_ Page 2 of 9  12-05-2011
(Address of Property)

B. **COMMITMENT:** Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier. If, due to factors beyond Seller's control, the Commitment and Exception Documents are not delivered within the time required, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

C. **SURVEY:** The survey must be made by a registered professional land surveyor acceptable to the Title Company and Buyer's lender(s). (Check one box only)
   □ (1) Within _____ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (T-47 Affidavit). **If Seller fails to furnish the existing survey or affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no-later than 3 days prior to Closing Date.** If the existing survey or affidavit is not acceptable to Title Company or Buyer's lender(s), Buyer shall obtain a new survey at □ Seller's □ Buyer's expense no later than 3 days prior to Closing Date.
   ☒ (2) Within _10_ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.
   □ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense shall furnish a new survey to Buyer.

D. **OBJECTIONS:** Buyer may object in writing to defects, exceptions, or encumbrances to title: disclosed on the survey other than items 6A(1) through (7) above; disclosed in the Commitment other than items 6A(1) through (8) above; or which prohibit the following use or activity: _____

Buyer must object the earlier of (i) the Closing Date or (ii) _____ days after Buyer receives the Commitment, Exception Documents, and the survey. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived by Buyer. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. **TITLE NOTICES:**
   (1) **ABSTRACT OR TITLE POLICY:** Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.
   (2) **MEMBERSHIP IN PROPERTY OWNERS ASSOCIATION(S):** The Property □is □is not subject to mandatory membership in a property owners association(s). If the Property is subject to mandatory membership in a property owners association(s), Seller notifies Buyer under §5.012, Texas Property Code, that, as a purchaser of property in the residential community identified in Paragraph 2A in which the Property is located, you are obligated to be a member of the property owners association(s). Restrictive covenants governing the use and occupancy of the Property and all dedicatory instruments governing the establishment, maintenance, and operation of this residential community have been or will be recorded in the Real Property Records of the county in which the Property is located. Copies of the restrictive covenants and dedicatory instruments may be obtained from the county clerk. **You are obligated to pay assessments to the property owners association(s). The amount of the assessments is subject to change. Your failure to pay the assessments could result in enforcement of the association's lien on and the foreclosure of the Property.** Section 207.003, Property Code, entitles an owner to receive copies of any document that governs the establishment, maintenance, or operation of a subdivision, including, but not limited to, restrictions, bylaws, rules and regulations, and a resale certificate from a property owners' association. A resale certificate contains information including, but not limited to, statements specifying the amount and frequency of regular assessments and the style and cause number of lawsuits to which the property owners' association is a party, other than lawsuits relating to unpaid ad valorem taxes of an individual member of the association. These documents must be made available to you by the property owners' association or the association's agent on your request.

Initialed for identification by Buyer _SM_ _TM_ and Seller _W_                     TREC NO. 24-12

Contract Concerning _11115 LEAH ELIZABETH DR Needville, TX 77461_ Page 3 of 9  12-05-2011
(Address of Property)

**If Buyer is concerned about these matters, the TREC promulgated Addendum for Property Subject to Mandatory Membership in a Property Owners Association should be used.**

(1) **STATUTORY TAX DISTRICTS:** If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(4) **TIDE WATERS:** If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

(5) **ANNEXATION:** If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(6) **PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER:** Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(7) **PUBLIC IMPROVEMENT DISTRICTS:** If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

(8) **TRANSFER FEES:** If the Property is subject to a private transfer fee obligation, §5.205, Property Code, requires Seller to notify Buyer as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

**7. PROPERTY CONDITION:**

A. **ACCESS, INSPECTIONS AND UTILITIES:** Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller at Seller's expense shall immediately cause existing utilities to be turned on and shall keep the utilities on during the time this contract is in effect.

B. **ACCEPTANCE OF PROPERTY CONDITION:** (Check one box only)
  ☐ (1) Buyer accepts the Property in its present condition.
  ☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments:_____
  _____(Do not insert general phrases, such as "subject to inspections," that do not identify specific repairs.)
  **NOTICE TO BUYER AND SELLER:** Buyer's agreement to accept the Property in its present condition under Paragraph 7B(1) or (2) does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

C. **WARRANTIES:** Except as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties. Seller shall assign to Buyer at closing all assignable manufacturer warranties.

D. **INSULATION:** As required by Federal Trade Commission Regulations, the information relating to the insulation installed or to be installed in the Improvements at the Property is:

Initialed for Identification by Buyer ___ ___ and Seller _____ _____                    TREC NO. 24-12

MILLER 0004

(check only one box below)
☐ (1) as shown in the attached specifications.
☐ (2) as follows:
   a) Exterior walls of improved living areas: insulated with _____
      insulation to a thickness of _____ inches which yields an R-Value of _____.
   b) Walls in other areas of the home: insulated with_____ insulation
      to a thickness of _____ inches which yields an R-Value of _____.
   c) Ceilings in improved living areas: insulated with_____
      insulation to a thickness of _____ inches which yields an R-Value of _____.
   d) Floors of improved living areas not applied to a slab foundation: insulated with_____
      _____ insulation to a thickness of _____ inches which yields an R-
      Value of _____.
   e) Other insulated areas: insulated with _____insulation to a
      thickness of _____ inches which yields an R-Value of _____.
   All stated R-Values are based on information provided by the manufacturer of the insulation.
E. LENDER REQUIRED REPAIRS AND TREATMENTS: Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs, which includes treatment for wood destroying insects. If the parties do not agree to pay for the lender required repairs or treatments, this contract will terminate and the earnest money will be refunded to Buyer. If the cost of lender required repairs and treatments exceeds 5% of the Sales Price, Buyer may terminate this contract and the earnest money will be refunded to Buyer.
F. COMPLETION OF REPAIRS, TREATMENTS, AND IMPROVEMENTS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs, treatments, and improvements (Work) prior to the Closing Date. All required permits must be obtained, and Work must be performed by persons who are licensed or otherwise authorized by law to provide such Work. At Buyer's election, any transferable warranties received by Seller with respect to the Work will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed Work prior to the Closing Date, Buyer may exercise remedies under Paragraph 15 or extend the Closing Date up to 15 days if necessary for Seller to complete Work.
G. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.
H. SELLER'S DISCLOSURE: Except as otherwise disclosed in this contract, Seller has no knowledge of the following:
   (1) any flooding of the Property which has had a material adverse effect on the use of the Property;
   (2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;
   (3) any environmental hazards or conditions materially affecting the Property;
   (4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;
   (5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or
   (6) any threatened or endangered species or their habitat affecting the Property.
I. RESIDENTIAL SERVICE CONTRACTS: Buyer may purchase a residential service contract from a residential service company licensed by TREC. If Buyer purchases a residential service contract, Seller shall reimburse Buyer at closing for the cost of the residential service contract in an amount not exceeding $_____ . Buyer should review any residential service contract for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

**8. BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

**9. CLOSING:**
   A. The closing of the sale will be on or before _____*June 3*_____, 20_*13*_, or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.
   B. At closing:
      (1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6 and furnish tax statements or certificates showing no delinquent taxes on the Property.
      (2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.
      (3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents reasonably required for the closing of the

Initialed for Identification by Buyer _____ and Seller _____ _____      TREC NO. 24-12

MILLER 0005

Contract Concerning _11115 LEAH ELIZABETH DR Needville, TX_____ Page 5 of 9  12-05-2011
(Address of Property)

sale and the issuance of the Title Policy.
(4) There will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing the payment of any loans assumed by Buyer and assumed loans will not be in default.

**10. POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition, ordinary wear and tear excepted: ☒ upon closing and funding ☐ according to a temporary residential lease form promulgated by TREC or other written lease required by the parties. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written lease will establish a tenancy at sufferance relationship between the parties. **Consult your insurance agent prior to change of ownership and possession because insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.**

**11. SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum, lease or other form has been promulgated by TREC for mandatory use.)

**12. SETTLEMENT AND OTHER EXPENSES:**
A. The following expenses must be paid at or prior to closing:
  (1) Expenses payable by Seller (Seller's Expenses):
    (a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.
    (b) Seller shall also pay an amount not to exceed $ _____ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Land Board or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.
  (2) Expenses payable by Buyer (Buyer's Expenses): Appraisal fees; loan application fees; adjusted origination charges; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; loan title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan; Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender; and other expenses payable by Buyer under this contract.
B. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Land Board or other governmental loan program regulations.

**13. PRORATIONS AND ROLLBACK TAXES:**
A. PRORATIONS: Taxes for the current year, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year.
B. ROLLBACK TAXES: If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property results in additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

Initialed for Identification by Buyer _HM_ _____ and Seller _____ _____          TREC NO. 24-12

MILLER 0006

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

**15. DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If Seller fails to comply with this contract Seller will be in default and Buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

**16. MEDIATION:** It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Subject to applicable law, any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☑will ☐will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

**17. ATTORNEY'S FEES:** A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

**18. ESCROW:**
A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.
B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may: (i) require a written release of liability of the escrow agent from all parties, (ii) require payment of unpaid expenses incurred on behalf of a party, and (iii) only deduct from the earnest money the amount of unpaid expenses incurred on behalf of the party receiving the earnest money.
C. DEMAND: Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.
D. DAMAGES: Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.
E. NOTICES: Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** All covenants, representations and warranties in this contract survive closing. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

**20. FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

Initialed for Identification by Buyer_____ and Seller _____ _____          TREC NO. 24-12

MILLER 0007

Contract Concerning _1115 LEAH ELIZABETH DR NEEDVILLE, TX 77461_ Page 7 of 9 12-05-2011
(Address of Property)

**21. NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

To Buyer at: _Eliana and Laurel Miller_
_2906 Colonial Dr_
_Sugarland, TX 77479_
Telephone: _(713) 261 2351_
Facsimile: _(713) 478 3521_
E-mail: _____

To Seller at: _Delta Homes L.L.C_
_1108 FM 2977_
_Richmond, TX 77469_
Telephone: _(281) 873 8814_
Facsimile: _( )_____
E-mail: _____

**22. AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

☐ Third Party Financing Addendum for Credit Approval

☐ Seller Financing Addendum

☐ Addendum for Property Subject to Mandatory Membership in a Property Owners Association

☐ Buyer's Temporary Residential Lease

☐ Loan Assumption Addendum

☐ Addendum for Sale of Other Property by Buyer

☐ Addendum for Reservation of Oil, Gas and Other Minerals

☐ Addendum for "Back-Up" Contract

☐ Addendum for Coastal Area Property

☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum

☐ Seller's Temporary Residential Lease

☐ Short Sale Addendum

☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway

☐ Other (list): _____
_____

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $_____ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _____ days after the effective date of this contract (Option Period). If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee to Seller within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐ will ☐ will not be credited to the Sales Price at closing. **Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

**24. CONSULT AN ATTORNEY:** TREC rules prohibit real estate licensees from giving legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's
Attorney is: _____

Telephone: ( ) _____

Facsimile: ( ) _____

E-mail: _____

Seller's
Attorney is: _____

Telephone: ( ) _____

Facsimile: ( ) _____

E-mail: _____

Initialed for identification by Buyer _LM_ _PM_ and Seller _____ _____    TREC NO. 24-12

MILLER 0008

Contract Concerning _11115 Leah Elizabeth Dr Woodville, TX 77461_ Page 8 of 9  12-05-2011
(Address of Property)

**EXECUTED the** _13_ **day of** _April_ _____, 20_13_ **(EFFECTIVE DATE).**
**(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)**

This contract is subject to Chapter 27 of the Texas Property Code. The provisions of that chapter may affect your right to recover damages arising from a construction defect. If you have a complaint concerning a construction defect and that defect has not been corrected as may be required by law or by contract, you must provide the notice required by Chapter 27 of the Texas Property Code to the contractor by certified mail, return receipt requested, not later than the 60th day before the date you file suit to recover damages in a court of law or initiate arbitration. The notice must refer to Chapter 27 of the Texas Property Code and must describe the construction defect. If requested by the contractor, you must provide the contractor an opportunity to inspect and cure the defect as provided by Section 27.004 of the Texas Property Code.

_____
Buyer

_____
Buyer

_____
Seller

_____
Seller

The form of this contract has been approved by the Texas Real Estate Commission.   TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, (512) 936-3000 (http://www.trec.texas.gov) TREC NO. 24-12. This form replaces TREC NO. 24-11.

TREC NO. 24-12

MILLER 0009

Contract Concerning _11115 Leah Elizabeth Dr Needville, TX 77461_ Page 9 of 9 12-05-2011
(Address of Property)

## BROKER INFORMATION

**Remax Heritage**
Other Broker Firm                License No.          Listing Broker Firm                License No.

represents  ☒ Buyer only as Buyer's agent          represents  ☐ Seller and Buyer as an Intermediary
            ☐ Seller as Listing Broker's subagent               ☐ Seller only as Seller's agent

Licensed Supervisor of Associate        Telephone    Licensed Supervisor of Associate        Telephone
**Jan Poscovsky  281 265-4545**
Associate                               Telephone    Listing Associate                       Telephone
**4675 Sweetwater Blvd**
Other Broker's Address                  Facsimile    Listing Broker's Office Address         Facsimile
**Sugar Land TX 77479**
City                    State       Zip              City                    State       Zip
**StanJan@StanJan.Com**
Associate Email Address                              Listing Associate's Email Address

                                                     Selling Associate                       Telephone

                                                     Selling Associate's Office Address      Facsimile

                                                     City                    State       Zip

                                                     Selling Associate's Email Address

Listing Broker has agreed to pay Other Broker **3%** of the total sales price when the Listing Broker's fee is received. Escrow agent is authorized and directed to pay other Broker from Listing Broker's fee at closing.

## OPTION FEE RECEIPT

Receipt of $_____ (Option Fee) in the form of _____ is acknowledged.

_____          _____
Seller or Listing Broker                 Date

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☐Contract and ☐$_____ Earnest Money in the form of _____
is acknowledged.
Escrow Agent: _____          Date: _____

By: _____

                                               _____
                                               Email Address

_____          Telephone (_____) _____
Address

_____          Facsimile: (_____) _____
City                State       Zip

TREC NO. 24-12

MILLER 0010





MILLER 0011

## DEBO HOMES
# MODEL # 1614



**KRIS DOMINGUEZ**
281.813.8814

SQ. FT. 1,614
3 BEDROOM

2 BATH
2 CAR GARAGE

MILLER 0012



**DEEO HOMES**

**MODEL # 1614**

FLOOR PLAN
*(elevation on opposite side)*

KRIS DOMINGUEZ
281.813.8874

SQ. FT. 1,614
3 BEDROOM

2 BATH
2 CAR GARAGE

MILLER 0013

# DEBO HOMES          MODEL #1614



7746!
Needville

Approx
1700

Ceiling
fan?

patch

4'

dome
light

Short
10.7 X 11.7

C

T

C

T

C

T    T

T

C

Fence

T    T

T

C

don't
only
10.7 X
11.7

patch

Krissdominguez@yahoo.com

**FLOOR PLAN**
(elevation on opposite side)

---

**KRIS DOMINGUEZ**          SQ. FT. 1,614        2 BATH
281.813.8814              3 BEDROOM          2 CAR GARAGE

Plans, prices, specifications subject to change without notice. See Sales Counselor for details.
All floor plans and exterior renderings are artist conceptuals. All dimensions are approximate. Floor plans, room sizes, exteriors and standard features may vary based on the elevation and options selected. Debo Homes, Inc. reserves the right to modify all plans and specifications without notice or obligation.

# DEBO HOMES L.L.C.

Buyers: ELI AND LAUREL

Lot: 5          BLK: 8        Plan #: 1614

Address: 11115 Leah Elizabeth

1. Brick: (ACME) STONEBRIAR    Mortar: White    QTY

2. Tile: TRANQUITA 17X17 Cermaic Tile    Color: #13 CAFE 45°    Port #: Thin grout lines

3. Granite: ST Secilia LT

4. Carpet: NO CARPET

5. Paint: SW 6108 LATTE (simi gloss through out house)

6. Appliances: Black

7. Light Fixtures: Nicket Bronze

8. Shower/ Bath Tube Surround

9. Door Patio: 9 Lite

10. 6' Fence in the Front: 2 Doors

11. Porch/Patio: Yes

12. (W/H)

13. Front Door: 1/2 OVAL

14. TILE IN BEDROOMS Summer Tile Noce' / Grout #53 Pebble Brown

15. ~~Bet feeted gas & Gas CART~~ TANKLESS WATE HEADER Get Price

Signature Required: [signature]        Date April 16, 2003

Shingles PAINTED DESERT
Find price for self cleaning OVEN!

## Selection Worksheet

MILLER 0015

## DEBO Homes L.L.C.
## 11115 Leah Dr.-Actual Cost Detail
### Vendors Summary

| Date | Vendor Name | Amount |
|---|---|---|
| 07/11/2013 | American Express | $2,500.00 |
| 06/04/2013 | Aqua Texas, Inc. | $0.00 |
| 07/03/2013 | Aqua Texas, Inc. | $330.43 |
| 08/05/2013 | Aqua Texas, Inc. | $206.09 |
| 09/05/2013 | Aqua Texas, Inc. | $152.95 |
| 10/03/2013 | Aqua Texas, Inc. | $96.25 |
| 11/04/2013 | Aqua Texas, Inc. | $96.25 |
| 04/19/2013 | Aqua Texas, Inc.-Water/Sewer Tap D | $1,500.00 |
| 04/29/2013 | Bison Building Material | $7,632.24 |
| 05/01/2013 | Bison Building Material | $883.32 |
| 05/01/2013 | Bison Building Material | $205.24 |
| 05/02/2013 | Bison Building Material | $4,555.95 |
| 05/03/2013 | Bison Building Material | $389.87 |
| 05/06/2013 | Bison Building Material | $207.84 |
| 05/09/2013 | Bison Building Material | $274.96 |
| 05/10/2013 | Bison Building Material | $310.99 |
| 05/20/2013 | Bison Building Material | $77.94 |
| 05/08/2013 | Builders First Source | $1,524.83 |
| 06/13/2013 | Central Turf Farms, Inc. | $1,416.57 |
| 08/01/2013 | Consolidated Communications | $177.59 |
| 05/17/2013 | Crossville Tile & Stone | $125.71 |
| 05/17/2013 | Crossville Tile & Stone | $2,254.24 |
| 05/30/2013 | Crossville Tile & Stone | $387.55 |
| 06/27/2013 | Crossville Tile & Stone | ($315.95) |
| 06/27/2013 | Crossville Tile & Stone | ($92.24) |
| 06/06/2013 | Decor Builders Hardware | $780.14 |
| 05/14/2013 | Elliott Electric Supply | $194.59 |
| 05/21/2013 | Elliott Electric Supply | $521.56 |
| 06/19/2013 | Floors Inc. | $979.29 |
| 05/15/2013 | Hardwood Products | $3,016.41 |
| 07/03/2013 | Kiva Kitchen & Bath | $1,544.73 |
| 05/23/2013 | Lowes Commercial Services | $539.36 |
| 05/02/2013 | Marathon Spa and Bath | $571.56 |
| 04/30/2013 | Master Brick, Inc. | $3,139.25 |
| 05/31/2013 | Pot-O-Gold Waste Service | $77.11 |
| 05/03/2013 | ProBuild | $379.96 |
| 05/08/2013 | ProBuild | $379.96 |
| 05/14/2013 | ProBuild | $284.14 |
| 05/17/2013 | ProBuild | $1,287.42 |
| 05/17/2013 | ProBuild | $1,264.93 |
| 05/20/2013 | ProBuild | $42.40 |
| 05/06/2013 | Project Lighting Company, Inc. | $617.78 |
| 05/06/2013 | Project Lighting Company, Inc. | $205.68 |
| 06/05/2013 | Project Lighting Company, Inc. | $47.63 |

Plaintiffs' Ex. Number 10

## DEBO Homes L.L.C.
## 11115 Leah Dr.-Actual Cost Detail
### Vendors Summary

| Date | Vendor Name | Amount |
|------|-------------|--------|
| 05/06/2013 | Southern Shingles | $3,368.47 |
| | | |
| | | $44,140.99 |
| | TOTAL | $44,140.99 |

36,221.26

35,217.24

DEBO-HMS00019

## DEBO Homes L.L.C.
## 11115 Leah Dr.-Actual Cost Detail
Subcontractors

| Date | Subcontractor | Job Description | Amount |
|---|---|---|---|
| 05/17/2013 | All Star Plumbing | Plumbing Top Out.-11115 Leah Dr | $2,150.50 |
| 06/28/2013 | All Star Plumbing | Plumbing Trim.-11115 Leah Dr. | $2,211.00 |
| 05/03/2013 | American Flyers Construction | Framing.-11115 Leah Dr. | $3,719.80 |
| 06/28/2013 | Better Homes Cleaning | Window Cleaning.-11115 Leah Dr. | $200.00 |
| 07/12/2013 | Better Homes Cleaning | Final Cleaning.-11115 Leah Dr. | $350.00 |
| 05/31/2013 | C-Los Construction | Brick Turnkey.-11115 Leah Dr. | $4,850.00 |
| 06/05/2013 | C-Los Construction | Brick.-11115 Leah Dr. | $50.00 |
| 06/06/2013 | C-Los Construction | Arch.-11115 Leah | $812.25 |
| 09/01/2013 | Consolidated Communications | 1115 LEah | $66.72 |
| 10/01/2013 | Consolidated Communications | 11115 Leah. | $23.66 |
| 11/01/2013 | Consolidated Communications | 11115 Leah Elizabeth | $57.98 |
| 07/19/2013 | Eduardo V. Cisneros | Misc Bonus.-11115 Leah | $1,100.00 |
| 05/17/2013 | Eugenio Aguilar | Garage Door.-11115 Leah Dr. | $440.00 |
| 06/28/2013 | Eugenio Aguilar | Garage Opener.-11115 Leah Dr. | $547.00 |
| 04/19/2013 | Fort Bend County | 11115 Leah Dr | $200.00 |
| 04/20/2013 | Harry Mitchell Design | Plans.-11115 Leah Dr. | $760.00 |
| 04/23/2013 | Harry Mitchell Design | Plans.-11115 Leah | $400.00 |
| 06/28/2013 | HM Paint Contractors | Paint Turnkey.-11115 Leah Dr. | $3,700.00 |
| 04/18/2013 | Home Depot | T-Pole.-11115 Leah Dr. | $445.26 |
| 05/10/2013 | HomeTeam Pest Defense, Inc. | 11115 Leah | $125.00 |
| 05/10/2013 | HomeTeam Pest Defense, Inc. | 11115 Leah | $150.00 |
| 11/07/2013 | HomeTeam Pest Defense, Inc. | 11115 Leah Elizabeth | $70.00 |
| 04/19/2013 | Javier A. Vivar | T-Pole.-11115 Leah Dr. | $100.00 |
| 05/30/2013 | Javier Camarena | Front Door.-11115 Leah | $1,100.00 |
| 06/28/2013 | Javier Camarena | Front Door-11115 Leah | $500.00 |
| 05/03/2013 | JC Hernandez Construction | Scrape Lot.-11115 Leah Dr. | $800.00 |
| 05/03/2013 | JC Hernandez Construction | Foundation Turnkey.-11115 Leah | $13,550.70 |
| 06/28/2013 | JC Hernandez Construction | Underground Electric.-11115 Leah | $1,000.00 |
| 06/28/2013 | JC Hernandez Construction | Trash Turnkey.-11115 Leah Dr. | $1,300.00 |
| 06/28/2013 | JC Hernandez Construction | Fence Turnkey.-11115 Leah Dr. | $2,600.00 |
| 06/28/2013 | JC Hernandez Construction | Landscaping.-11115 Leah Dr. | $2,500.00 |
| 06/28/2013 | JC Hernandez Construction | Driveway Turnkey.-11115 Leah | $5,400.00 |
| 06/28/2013 | JC Hernandez Construction | Final Grade Tractor.-11115 Leah | $400.00 |
| 06/28/2013 | JC Hernandez Construction | Cut Driveway.-11115 Leah Dr. | $500.00 |
| 06/28/2013 | JC Hernandez Construction | Rough Grade.-11115 Leah Dr. | $300.00 |
| 04/26/2013 | Joe Alvarez | Sand.-11115 Leah Dr. | $2,030.00 |
| 05/17/2013 | Joe Alvarez | 11115 Leah | $1,105.00 |
| 06/03/2013 | Joe Alvarez | Final Grade.-11115 Leah | $510.00 |
| 05/10/2013 | Jose Portillo A/C | A/C Turnkey Rough.-11115 Leah D | $4,000.00 |
| 06/28/2013 | Jose Portillo A/C | A/C TurnkeyFinal.-11115 Leah Dr. | $1,500.00 |
| 05/17/2013 | Juan C. Hdz. | 11115 Leah Materials Reimb | $500.00 |
| 07/22/2013 | Juan C. Hdz. | Materials Reimb 11115 leah | $637.58 |
| 05/03/2013 | Juan Cadesa | Decking.-11115 Leah Dr. | $555.00 |
| 05/03/2013 | Juan Cadesa | Shinges.-11115 | $880.00 |

## DEBO Homes L.L.C.
## 11115 Leah Dr.-Actual Cost Detail
### Subcontractors

| Date | Subcontractor | Job Description | Amount |
|------|---------------|-----------------|--------|
| 05/31/2013 | Kris Dominguez | Sales Commission.-11115 Leah D | $700.00 |
| 06/07/2013 | Kris Dominguez | Sales Commission.-11115 Leah dr | $700.00 |
| 05/24/2013 | LOS Construction | Trim I.-11115 Leah Dr. | S829.92 |
| 05/24/2013 | LOS Construction | Cabinets.-11115 Leah Dr. | $1,630.00 |
| 06/28/2013 | LOS Construction | Trim II.-11115 Leah Dr. | $300.00 |
| 05/24/2013 | Marcos Reyes | Vanity Tops Granite.-11115 Leah D | $3,236.00 |
| 04/25/2013 | Mortgage Property Services, Inc | 11115 Leah | $103.72 |
| 05/10/2013 | Mortgage Property Services, Inc | 111115 Leah | $103.72 |
| 08/07/2013 | Mortgage Property Services, Inc | 111115 LEah dr | $103.72 |
| 07/12/2013 | Mr. Glass & Mirror | Mirrors/Showers.-11115 Leah Dr. | $1,181.00 |
| 04/22/2013 | Nichols Enterprise | Cover-11115 Leah Dr. | $416.75 |
| 05/10/2013 | Orlando Arguelles | Electric Rough.-11115 Leah Dr. | $2,268.00 |
| 05/17/2013 | Orlando Arguelles | Extras.-11115 Leah dr. | $700.00 |
| 05/31/2013 | Orlando Arguelles | Electric Trim Final.-11116 Leah | $1,000.00 |
| 05/10/2013 | Pot-O-Gold Waste Service | 11115 Leah | $10.00 |
| 06/30/2013 | Pot-O-Gold Waste Service | 111115 Leah | $77.11 |
| 07/12/2013 | Pot-O-Gold Waste Service | 11115 Leah | $2.75 |
| 06/05/2013 | Reliant Energy | 11115 Leah Elizabeth | $0.00 |
| 07/05/2013 | Reliant Energy | 111115 Leah | $203.61 |
| 08/05/2013 | Reliant Energy | 11115 Leah dr | $36.48 |
| 09/04/2013 | Reliant Energy | 11115 Leah Dr. | $143.76 |
| 10/03/2013 | Reliant Energy | 11115 Leah | $138.81 |
| 11/01/2013 | Reliant Energy | 11115 Leah | $84.24 |
| 05/03/2013 | Rolando Cisnado | Cornice.-11115 Leah Dr. | $1,992.75 |
| 05/17/2013 | Sergio Medina | Batt Insulation.-11115 Leah Dr. | $700.00 |
| 05/17/2013 | Sergio Medina | Blown Insulation.-11115 Leah Dr. | $600.00 |
| 06/14/2013 | Sergio Medina | Gutters-11115 Leah | $500.00 |
| 06/28/2013 | Tiburcio Contreras | Tile Subc.-11115 Leah Dr. | $3,500.00 |
| 05/10/2013 | Victor Bonilla | Prewire Security.-11115 Leah Dr. | $450.00 |
| 06/28/2013 | Victor Bonilla | Security Final.-11115 Leah Dr. | $450.00 |
| | | | $86,359.79 |
| | | Total | $86,359.79 |

42,052.12

35,256.20

DEBO-HMS00021

## DEBO Homes L.L.C.
### 11115 Leah Dr.- Actual Cost Detail
Overhead Costs

| Date | Description | Amount |
|---|---|---|
| | Other Costs | |
| 05/17/2013 | Kris Dominguez | $ 700.00 |
| 06/13/2013 | Kris Dominguez | $ 700.00 |
| 06/21/2013 | Kris Dominguez | $ 700.00 |
| | | |
| | | |
| | | |
| | Total | $ 2,100.00 |

| | Lot Cost | |
|---|---|---|
| 4/17/2013 | Prosperity Bank | $ 18,500.00 |

| | Totals | |
|---|---|---|
| | Contract Sales Price | $ 168,000.00 |
| | | |
| | House Construction Costs | $151,100.78 |
| | | |
| | Closing Costs | $ 4,128.17 |
| | Customer Earnest Money\Upgrades | $ (1,000.00) |
| | Net Closing Costs | $ 3,128.17 |
| | | |
| | Total Actual Costs | $ 154,228.95 |
| | Gross Profit or (Loss) | $ 13,771.05 |

DEBO-HMS00022



**Mortgage Property Services, Inc.**
**J. R. SULLIVAN**
**CODE ENFORCEMENT OFFICER**
Office (281) 324-3852      mortgagepropserv@yahoo.com          Fax (281) 324-2138

REQUEST # _Kay465_

## ON SITE FOUNDATION, INSPECTION REPORT

These inspections and reports are for the sole purpose of Mortgage Property Services Inc., the home builder and their requirements. The buyer or other parties involved in this property have other rights to Inspections for their purposes and protection. This report is a professional opinion and is not a guaranty or warranty.

BUILDER _Debo Hms_                    PROP ADDRESS _11115 Leah Elizabeth_

DATE OF INSPECTION _4/25/13_          SUBDIVISION _Rosswind_

LOT _5_ BLK _8_ SEC _1_              INSPECTOR _Jim Sullivan_

☒ PRE-PLACEMENT   PLAN #_____    ☐ PLACEMENT   PLAN DATE_____

THIS REPORT IS FOR ON *SITE AND INTER-OFFICE* COMMUNICATIONS ONLY. THE OFFICIAL INSPECTION REPORT AND CERTIFICATIONS MUST BE OBTAINED FROM MORTGAGE PROPERTY SERVICES, INC. OR THE BUILDER.

FOR INSPECTIONS CALL (281) 324-3852 *mortgagepropserv@yahoo.com*

**LIST ALL SUBSTANTIAL, NON-COMPLIANCE WITH PLANS, SPECS AND RELATED CODES.**

A. ☐ NO NON-COMPLIANCE OBSERVED.

B. ☐ MINOR NON-COMPLIANCE OBSERVED AND LISTED, BUILDER SHALL COMPLY AND PROCEED

C. ☐ SERIOUS NON-COMPLIANCE LISTED, BUILDER SHALL CORRECT AND CALL FOR REINSPECTION.

### BEAMS

A. DEPTH SHOWN ON PLANS _26_ " (EXTERIOR)

B. DEPTH SHOWN ON PLANS _26_ " (INTERIOR)

C. WIDTH SHOWN ON PLANS _12_ "

D. FIELD MEASURED DEPTH _26_ " (EXTERIOR)

E. FIELD MEASURED DEPTH _26_ " (INTERIOR)

F. FIELD MEASURED WIDTH _12_ "

### REINFORCING STEEL

A. STEEL SHOWN ON DETAIL SHEET  ☒ YES  ☐ NO

B. IF "YES", WAS STEEL INSTALLED PER PLANS? ☒ YES ☐ NO

C. _5_ SIZE OF REBAR _N/A_ SIZE OF WIRE MESH

_complete float_
_tie cables at intersections_
_and top rebar_
_mystic pipes_

_work in progress_

____✓____ CORRECT AND PROCEED

_____ RECALL FOR REINSPECTION

_[signature]_
INSPECTOR'S SIGNATURE

PLAINTIFF'S EXHIBIT
12

DEBO-HMS00048



**Mortgage Property Services, Inc.**
**J. R. SULLIVAN**
**CODE ENFORCEMENT OFFICER**
**Office (281) 324-3852**          *mortgagepropserv@yahoo.com*                    *Fax (281) 324-2138*

REQUEST # 164706

## ON SITE FRAMING INSPECTION REPORT

These inspections and reports are for the sole purpose of Mortgage Property Services Inc., the home builder and their requirements. The buyer or other parties involved in this property have other rights to inspections for their purposes and protection. This report is a professional opinion and is not a guaranty or warranty.

BUILDER ___Debo Home's___ PROP ADDRESS ___11115 Leah Elizabeth___

DATE OF INSPECTION ___5/10/13___ SUBDIVISION ___Rosswind___

LOT ___5___ BLK ___8___ SEC ___1___ INSPECTOR ___Jim Sullivan___

PLAN # _____ PLAN DATE _____

**THIS REPORT IS FOR ON *SITE AND INTER-OFFICE* COMMUNICATIONS ONLY. THE OFFICIAL INSPECTION REPORT AND CERTIFICATIONS MUST BE OBTAINED FROM MORTGAGE PROPERTY SERVICES, INC. OR THE BUILDER.**

### FOR INSPECTIONS CALL (281) 324-3852 *mortgagepropserv@yahoo.com*

## LIST ALL SUBSTANTIAL, NON-COMPLIANCE WITH PLANS, SPECS AND RELATED CODES.

A. ❑ NO NON-COMPLIANCE OBSERVED.

B. ☑ MINOR NON-COMPLIANCE OBSERVED AND LISTED. BUILDER SHALL COMPLY AND PROCEED

C. ❑ SERIOUS NON-COMPLIANCE LISTED. BUILDER SHALL CORRECT AND CALL FOR REINSPECTION.

Protect elec. wires at copper pipes at master
bath lavatory
Add joist hangers at family room, Attic prop stairs
Block roof deck joints within 24" of ridge
Above family room

❑ CORRECT ITEMS NOTED ABOVE AND PROCEED        ☑ CORRECT ITEMS NOTED ABOVE RECALL FOR REINSPECTION

_____
INSPECTOR'S SIGNATURE

**MORTGAGE PROPERTY SERVICES, INC. • 23402 FM 2100 • HUFFMAN, TEXAS 77336**

DEBO-HMS00049

# MPS INSPECTION REQUEST

| REQUEST NUMBER MUST BE ON ALL INSPECTION REPORTS UPPER RIGHT CORNER | REQUEST_NUMBER | 166539 |
|---|---|---|

Tuesday, August 06, 2013                11:34:54

| | | | | |
|---|---|---|---|---|
| STREET NUMBER | 11115 | REQUEST DATE | 8/6/2013 | |
| STREET NAME | LEAH ELIZABETH DRIVE | | | |
| CITY | NEEDVILLE | | | |
| ZIPCODE | | | | |
| COUNTY | FORT BEND | LOCATION | | |
| INSPECTION TYPE | FINAL NW | SUBDIVISION | ROSEWIND | |
| BUILDER | DEBO HOMES | CALLED IN BY | JUAN CARLOS | |
| LOT | 5 | # OF STORIES | | |
| BLOCK | 8 | SQ FOOTAGE | | |
| SECTION | 1 | RE-INS | □ RE-2 □ RE-3 □ | |
| INSP DATE | 8/7/2013 | PHOTO'S NEEDED | □ | |
| PLANS | | | | |

No authorized plans found on file for this property.

| | | | |
|---|---|---|---|
| ASSIGNED INSPECTOR | JIM SULLIVAN | CONTACT PERSON | JUAN CARLOS |
| CONTACT PHONE NUMBER | 8323447120 | KEY MAP | |
| FHA Case No | | FHA FileName | |

SPECIAL INSTRUCTIONS

MILEAGE ADDED

☑ Passed
□ Hold
□ Failed

Initials_____

MORTGAGE PROPERTY SERVICES INC. 281-324-3852  FAX 281-324-2138                Page 1 of 1

DEBO-HMS00050

# EXHIBIT
# 2



DEFENDANT'S
EXHIBIT
2

PENGAD 800-631-6989

**LAUREL N. MILLER**
2906 COLONIAL DR.
SUGARLAND, TX. 77479.

32-61-12
1110
709267355

313

DATE 4/16/13

PAY TO THE
ORDER OF  Debo Homes                                    $59,300.00

FIFTY NINE THOUSAND THREE HUNDRED AND 00/100   DOLLARS

**CHASE** ⬡
JPMorgan Chase Bank, N.A.
Dallas, Texas 75201
www.Chase.com

MEMO  HMS/E/A Elizabeth
Needsville

⑆ 111000614⑆  709 267355⑈ 0313

EXHIBIT

**Z**

DEBO-HMS00013

LAUREL N. MILLER
2906 COLONIAL DR.
SUGARLAND, TX 77479

32-61
1110
7092673

314

DATE 4/16/13

PAY TO THE
ORDER OF  DEBO Homes                           $ 1,000.00

One Thousand and 100/100                         DOLLARS

CHASE ⬡
JPMorgan Chase Bank, N.A.
Dallas, Texas 75201
www.Chase.com

11/16 CAMBERMOOR

MEMO  EARNEST $

⑈:111000614⑈:    7092673551⑈0314

DEBO-HMS00014

# EXHIBIT
# 10



DEFENDANT'S
EXHIBIT
10

PENGAD 800-631-6989

From: Brian Crockett <bcrockett@newton law firs.com>
Date: May 22, 2013, 1:38:36 PM CDT
To: "krissdominguez@yahoo.com" <krissdominguez@yahoo.com>, "info@debohomes.com" <info@debohomes.com>
Cc: "lorinew99@aol.com" <lorinew99@aol.com>
Subject: 11115 Leah Elizabeth Dr., Needville, Texas 77461

Dear Mr. Rodriguez and Dominguez:

Laurel and Ellie Miller have retained our firm to investigate whether their home is being constructed in accordance with the plans and specifications of their contractual agreement with Debo Homes. In order to prevent irreparable harm, as well as, ensure that any defects have been corrected prior to continued building – we hereby demand that you cease and desist further construction on the home. Furthermore, please discontinue further contact with my clients. Please direct all questions, concerns or correspondence to our firm.

Once our experts have determined the current status of the home and whether any repairs are necessary – we will send notice of such repairs via certified mail. In accordance with the Residential Construction Liability Act, you will be provided an opportunity to make these reasonable and necessary repairs, prior to any suit being filed. Thank you for your patience, while we investigate this matter.

Very Respectfully,


**Brian H. Crockett**
*Newton Jones & Spaeth*
*Attorneys and Counselors at Law*
3405 Marquart

1

Houston, TX 77027
713-493-7620 (Telephone)
713-493-7633 (Facsimile)
713-493-7627 (Direct)
713-493-7591 (Direct Facsimile)
877-204-5670 (Toll Free)
**bcrockett@newton-lawyers.com**

*Confidentiality Notice:*

*The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system. Thank You*

# EXHIBIT
# 11



DEFENDANT'S
EXHIBIT

11

PENGAD 800-631-6989



# ÐEBØ HØMES

1108 FM 2977 Richmond, TX 77469      Office: 281-342-3528      Fax: 281-342-1088

May 29, 2013

Laurel and Ellie Miller:

Based off the contract made on April 13, 2013, Debo Homes LLC has an obligation to construct your new home at 11115 Leah Elizabeth Drive in Needville, TX. We have built and sold over 160 houses and have a strict construction standard in every one of our homes. It's come to my attention that you have concerns about the quality of construction and materials going into your home. I'm sorry that you feel that way, but I can assure you that the quality of construction and materials in your home has met our quality control standard. Throughout the construction of every one of our homes we schedule three inspections from a 3rd party (Mortgage Property Services) hired by Debo Homes to assure quality. A foundation inspection is done before we pour concrete, frame inspection is done before we insulate and install drywall, and finally a final inspection is done at the completion of the house. In addition, we also have our super-intendent on site supervising all subcontractors hired by Debo Homes. Also, you hired another inspector to inspect the frame of the house and we fixed the minor issues he requested.

We have a reputation of going above and beyond to meet our customer's satisfaction, if there is something we can do to accommodate your needs, please let us know. If you have any questions or doubts about the way we do a certain job, please ask us and in turn give us the opportunity to diligently answer you. We are professionals and were hired to provide our expertise in all aspects throughout the construction process; I believe that is why you decided to hire us to build your home. If you are not happy with our service, you are free to terminate the contract with Debo Homes and we will refund you 100% of the money you have given us after we sell the house. However, we are confident that we can reach an agreement and move forward with building your new house.

Juan Carlos Hernández
**President**
**Debo Homes LLC**

*DEBO-HMS00003*

# EXHIBIT
# 14



DEFENDANT'S
EXHIBIT
14

PENGAD 800-631-6989

# NEW HOME CONTRACT
### (Completed Construction)
NOTICE: Not For Use For Condominium Transactions or Closings Prior to Completion of Construction

1. **PARTIES:** The parties to this contract are _Debo Homes L.L.C._
(Seller) and _Joseph & Brittany Benge_ (Buyer). Seller agrees to sell and convey to Buyer and Buyer agrees to buy from Seller the Property defined below.

2. **PROPERTY:** Lot __5__ , Block __8__ ,
_Rose Meadow_ Addition, City
of __Needville__ , County of _Fort Bend_ ,
Texas, known as __11115 Leah Elizabeth, Needville, TX 77461__
(address/zip code), or as described on attached exhibit, together with: (i) improvements, fixtures and all other property located thereon; and (ii) all rights, privileges and appurtenances thereto, including but not limited to: permits, easements, and cooperative and association memberships. All property sold by this contract is called the "Property".

3. **SALES PRICE:**
A. Cash portion of Sales Price payable by Buyer at closing ................... $ _0_
B. Sum of all financing described below (excluding any loan funding
fee or mortgage insurance premium) ........................................ $ _168,000_
C. Sales Price (Sum of A and B) ............................................ $ _168,000_

4. **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)
☒ A. THIRD PARTY FINANCING: One or more third party mortgage loans in the total amount of $_____ (excluding any loan funding fee or mortgage insurance premium).
   (1) Property Approval: If the Property does not satisfy the lenders' underwriting requirements for the loan(s), (including, but not limited to appraisal, insurability and lender required repairs), Buyer may terminate this contract by giving notice to Seller prior to closing and the earnest money will be refunded to Buyer.
   (2) Credit Approval: (Check one box only)
     ☒(a) This contract is subject to Buyer being approved for the financing described in the attached Third Party Financing Addendum for Credit Approval.
     ☐(b) This contract is not subject to Buyer being approved for financing and does not involve FHA or VA financing.
☐ B. ASSUMPTION: The assumption of the unpaid principal balance of one or more promissory notes described in the attached TREC Loan Assumption Addendum.
☐ C. SELLER FINANCING: A promissory note from Buyer to Seller of $_____, secured by vendor's and deed of trust liens, and containing the terms and conditions described in the attached TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

5. **EARNEST MONEY:** Upon execution of this contract by all parties, Buyer shall deposit $ _1,000_ as earnest money with _Debo Homes L.L.C_
as escrow agent, at _____
(address). Buyer shall deposit additional earnest money of $ _0_ with escrow agent within _0_ days after the effective date of this contract. If Buyer fails to deposit the earnest money as required by this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**
A. TITLE POLICY: Seller shall furnish to Buyer at ☐Seller's ☒Buyer's expense an owner policy of title insurance (Title Policy) issued by _American Title Company_.
(Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:
  (1) Restrictive covenants common to the platted subdivision in which the Property is located.
  (2) The standard printed exception for standby fees, taxes and assessments.
  (3) Liens created as part of the financing described in Paragraph 4.
  (4) Utility easements created by the dedication deed or plat of the subdivision in which the Property is located.
  (5) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
  (6) The standard printed exception as to marital rights.
  (7) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
  (8) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the exception amended to read, "shortages in area".

Initialed for identification by Buyer _JB_ _BB_ and Seller _W_     TREC NO. 24-12

DEBO-HMS00029

B. **COMMITMENT:** Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier. If, due to factors beyond Seller's control, the Commitment and Exception Documents are not delivered within the time required, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

C. **SURVEY:** The survey must be made by a registered professional land surveyor acceptable to the Title Company and Buyer's lender(s). (Check one box only)

☐ (1) Within _____ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (T-47 Affidavit). **If Seller fails to furnish the existing survey or affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date.** If the existing survey or affidavit is not acceptable to Title Company or Buyer's lender(s), Buyer shall obtain a new survey at ☐ Seller's ☐ Buyer's expense no later than 3 days prior to Closing Date.

☒ (2) Within _20_ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.

☐ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense shall furnish a new survey to Buyer.

D. **OBJECTIONS:** Buyer may object in writing to defects, exceptions, or encumbrances to title: disclosed on the survey other than Items 6A(1) through (7) above; disclosed in the Commitment other than items 6A(1) through (8) above; or which prohibit the following use or activity: _____

_____.
Buyer must object the earlier of (i) the Closing Date or (ii) _10_ days after Buyer receives the Commitment, Exception Documents, and the survey. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived by Buyer. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. **TITLE NOTICES:**

(1) **ABSTRACT OR TITLE POLICY:** Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) **MEMBERSHIP IN PROPERTY OWNERS ASSOCIATION(S):** The Property ☒ is ☐ is not subject to mandatory membership in a property owners association(s). If the Property is subject to mandatory membership in a property owners association(s), Seller notifies Buyer under §5.012, Texas Property Code, that, as a purchaser of property in the residential community identified in Paragraph 2A in which the Property is located, you are obligated to be a member of the property owners association(s). Restrictive covenants governing the use and occupancy of the Property and all dedicatory instruments governing the establishment, maintenance, and operation of this residential community have been or will be recorded in the Real Property Records of the county in which the Property is located. Copies of the restrictive covenants and dedicatory instruments may be obtained from the county clerk. **You are obligated to pay assessments to the property owners association(s). The amount of the assessments is subject to change. Your failure to pay the assessments could result in enforcement of the association's lien on and the foreclosure of the Property.** Section 207.003, Property Code, entitles an owner to receive copies of any document that governs the establishment, maintenance, or operation of a subdivision, including, but not limited to, restrictions, bylaws, rules and regulations, and a resale certificate from a property owners' association. A resale certificate contains information including, but not limited to, statements specifying the amount and frequency of regular assessments and the style and cause number of lawsuits to which the property owners' association is a party, other than lawsuits relating to unpaid ad valorem taxes of an individual member of the association. These documents must be made available to you by the property owners' association or the association's agent on your request.

Initialed for identification by Buyer _____ _____ and Seller _____   TREC NO. 24-12

DEBO-HMS00030

**If Buyer is concerned about these matters, the TREC promulgated Addendum for Property Subject to Mandatory Membership in a Property Owners Association should be used.**

(1) STATUTORY TAX DISTRICTS: If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(4) TIDE WATERS: If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

(5) ANNEXATION: If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(6) PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER: Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(7) PUBLIC IMPROVEMENT DISTRICTS: If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

(8) TRANSFER FEES: If the Property is subject to a private transfer fee obligation, §5.205, Property Code, requires Seller to notify Buyer as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

## 7. PROPERTY CONDITION:

A. ACCESS, INSPECTIONS AND UTILITIES: Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller at Seller's expense shall immediately cause existing utilities to be turned on and shall keep the utilities on during the time this contract is in effect.

B. ACCEPTANCE OF PROPERTY CONDITION: (Check one box only)
   ☐ (1) Buyer accepts the Property in its present condition.
   ☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments:_____
   _____(Do not insert general phrases, such as "subject to inspections," that do not identify specific repairs.)
   NOTICE TO BUYER AND SELLER: Buyer's agreement to accept the Property in its present condition under Paragraph 7B(1) or (2) does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

C. WARRANTIES: Except as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties. Seller shall assign to Buyer at closing all assignable manufacturer warranties.

D. INSULATION: As required by Federal Trade Commission Regulations, the information relating to the insulation installed or to be installed in the Improvements at the Property is:

Initialed for identification by Buyer _____ _____ and Seller _____ _____          TREC NO. 24-12

**DEBO-HMS00031**

(check only one box below)
☐ (1) as shown in the attached specifications.
☐ (2) as follows:
   a) Exterior walls of improved living areas: insulated with _____ insulation to a thickness of _____ inches which yields an R-Value of _____.
   b) Walls in other areas of the home: insulated with_____ insulation to a thickness of _____ inches which yields an R-Value of _____.
   c) Ceilings in improved living areas: insulated with_____ insulation to a thickness of _____ inches which yields an R-Value of _____.
   d) Floors of improved living areas not applied to a slab foundation: insulated with_____ _____ insulation to a thickness of _____ inches which yields an R-Value of _____.
   e) Other insulated areas: insulated with _____insulation to a thickness of _____ inches which yields an R-Value of _____.
All stated R-Values are based on information provided by the manufacturer of the insulation.

E. LENDER REQUIRED REPAIRS AND TREATMENTS: Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs, which includes treatment for wood destroying insects. If the parties do not agree to pay for the lender required repairs or treatments, this contract will terminate and the earnest money will be refunded to Buyer. If the cost of lender required repairs and treatments exceeds 5% of the Sales Price, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

F. COMPLETION OF REPAIRS, TREATMENTS, AND IMPROVEMENTS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs, treatments, and improvements (Work) prior to the Closing Date. All required permits must be obtained, and Work must be performed by persons who are licensed or otherwise authorized by law to provide such Work. At Buyer's election, any transferable warranties received by Seller with respect to the Work will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed Work prior to the Closing Date, Buyer may exercise remedies under Paragraph 15 or extend the Closing Date up to 15 days if necessary for Seller to complete Work.

G. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

H. SELLER'S DISCLOSURE: Except as otherwise disclosed in this contract, Seller has no knowledge of the following:
   (1) any flooding of the Property which has had a material adverse effect on the use of the Property;
   (2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;
   (3) any environmental hazards or conditions materially affecting the Property;
   (4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;
   (5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or
   (6) any threatened or endangered species or their habitat affecting the Property.

I. RESIDENTIAL SERVICE CONTRACTS: Buyer may purchase a residential service contract from a residential service company licensed by TREC. If Buyer purchases a residential service contract, Seller shall reimburse Buyer at closing for the cost of the residential service contract in an amount not exceeding $_____. Buyer should review any residential service contract for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:**
A. The closing of the sale will be on or before _*December 31*_, 20_13_, or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.
B. At closing:
   (1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6 and furnish tax statements or certificates showing no delinquent taxes on the Property.
   (2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.
   (3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents reasonably required for the closing of the

Initialed for identification by Buyer ___ ___ and Seller ___ ___      TREC NO. 24-12

DEBO-HMS00032

sale and the issuance of the Title Policy.

(4) There will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing the payment of any loans assumed by Buyer and assumed loans will not be in default.

10. **POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition, ordinary wear and tear excepted: ☑ upon closing and funding ☐ according to a temporary residential lease form promulgated by TREC or other written lease required by the parties. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written lease will establish a tenancy at sufferance relationship between the parties. **Consult your insurance agent prior to change of ownership and possession because insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.**

11. **SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum, lease or other form has been promulgated by TREC for mandatory use.)

12. **SETTLEMENT AND OTHER EXPENSES:**
   A. The following expenses must be paid at or prior to closing:
   (1) Expenses payable by Seller (Seller's Expenses):
   (a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.
   (b) Seller shall also pay an amount not to exceed $ _____ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Land Board or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.
   (2) Expenses payable by Buyer (Buyer's Expenses): Appraisal fees; loan application fees; adjusted origination charges; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; loan title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan; Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender; and other expenses payable by Buyer under this contract.
   B. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Land Board or other governmental loan program regulations.

13. **PRORATIONS AND ROLLBACK TAXES:**
   A. PRORATIONS: Taxes for the current year, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year.
   B. ROLLBACK TAXES: If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property results in additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

Initialed for identification by Buyer ___ ___ and Seller ___ ___     TREC NO. 24-12

DEBO-HMS00033

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

**15. DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If Seller fails to comply with this contract Seller will be in default and Buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

**16. MEDIATION:** It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Subject to applicable law, any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☑will ☐will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

**17. ATTORNEY'S FEES:** A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

**18. ESCROW:**
   A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.
   B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may: (i) require a written release of liability of the escrow agent from all parties, (ii) require payment of unpaid expenses incurred on behalf of a party, and (iii) only deduct from the earnest money the amount of unpaid expenses incurred on behalf of the party receiving the earnest money.
   C. DEMAND: Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.
   D. DAMAGES: Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.
   E. NOTICES: Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** All covenants, representations and warranties in this contract survive closing. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

**20. FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

Initialed for identification by Buyer _____ and Seller _____          TREC NO. 24-12

DEBO-HMS00034

**21. NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

**To Buyer at:**

_2707 4th St #137_

_Rosenberg TX 77471_

Telephone: _(979) 997 0774_

Facsimile: _(832) 212 7081_

E-mail: _____

**To Seller at:**

_Debo Homes L.L.C_

_1108 FM 2977_

_Richmond TX 77469_

Telephone: _(281) 813 8814_

Facsimile: _(281) 342 1088_

E-mail: _____

**22. AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

- ☒ Third Party Financing Addendum for Credit Approval
- ☐ Seller Financing Addendum
- ☐ Addendum for Property Subject to Mandatory Membership in a Property Owners Association
- ☐ Buyer's Temporary Residential Lease
- ☐ Loan Assumption Addendum
- ☐ Addendum for Sale of Other Property by Buyer
- ☐ Addendum for Reservation of Oil, Gas and Other Minerals

- ☐ Addendum for "Back-Up" Contract
- ☐ Addendum for Coastal Area Property
- ☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum
- ☐ Seller's Temporary Residential Lease
- ☐ Short Sale Addendum
- ☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway
- ☐ Other (list): _____

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $_____ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _____ days after the effective date of this contract (Option Period). If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee to Seller within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐will ☐will not be credited to the Sales Price at closing. **Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

**24. CONSULT AN ATTORNEY:** TREC rules prohibit real estate licensees from giving legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's
Attorney is: _____

Seller's
Attorney is: _____

Telephone: ( ) _____

Telephone: ( ) _____

Facsimile: ( ) _____

Facsimile: ( ) _____

E-mail: _____

E-mail: _____

Initialed for identification by Buyer _____ _____ and Seller _____ _____     TREC NO. 24-12

DEBO-HMS00035

EXECUTED the ___19___ day of _October_____, 20_13_ (EFFECTIVE DATE).
(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

This contract is subject to Chapter 27 of the Texas Property Code. The provisions of that chapter may affect your right to recover damages arising from a construction defect. If you have a complaint concerning a construction defect and that defect has not been corrected as may be required by law or by contract, you must provide the notice required by Chapter 27 of the Texas Property Code to the contractor by certified mail, return receipt requested, not later than the 60th day before the date you file suit to recover damages in a court of law or initiate arbitration. The notice must refer to Chapter 27 of the Texas Property Code and must describe the construction defect. If requested by the contractor, you must provide the contractor an opportunity to inspect and cure the defect as provided by Section 27.004 of the Texas Property Code.

Buyer _____

Buyer _____

Seller _____

Seller _____

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, (512) 936-3000 (http://www.trec.texas.gov) TREC NO. 24-12. This form replaces TREC NO. 24-11.

TREC NO. 24-12

DEBO-HMS00036

## BROKER INFORMATION

| Other Broker Firm | License No. | Listing Broker Firm | License No. |
|---|---|---|---|
| represents ☐ Buyer only as Buyer's agent<br>☐ Seller as Listing Broker's subagent | | represents ☐ Seller and Buyer as an Intermediary<br>☐ Seller only as Seller's agent | |

| Licensed Supervisor of Associate | Telephone | Licensed Supervisor of Associate | Telephone |
|---|---|---|---|

| Associate | Telephone | Listing Associate | Telephone |
|---|---|---|---|

| Other Broker's Address | Facsimile | Listing Broker's Office Address | Facsimile |
|---|---|---|---|

| City | State | Zip | City | State | Zip |
|---|---|---|---|---|---|

Associate Email Address

Listing Associate's Email Address

| Selling Associate | Telephone |
|---|---|

| Selling Associate's Office Address | Facsimile |
|---|---|

| City | State | Zip |
|---|---|---|

Selling Associate's Email Address

Listing Broker has agreed to pay Other Broker_____ of the total sales price when the Listing Broker's fee is received. Escrow agent is authorized and directed to pay other Broker from Listing Broker's fee at closing.

## OPTION FEE RECEIPT

Receipt of $_____ (Option Fee) in the form of _____ is acknowledged.

| Seller or Listing Broker | Date |
|---|---|

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☑Contract and ☑$ *1,000* Earnest Money in the form of *check* is acknowledged.

Escrow Agent: _____ Date: _____

By: _____

Email Address _____

Address _____

Telephone (____) _____

City _____ State _____ Zip _____

Facsimile: (____) _____

TREC NO. 24-12

DEBO-HMS00037



PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)

# THIRD PARTY FINANCING ADDENDUM FOR CREDIT APPROVAL

## TO CONTRACT CONCERNING THE PROPERTY AT

_11115 Leah Elizabeth Needville, TX 77461_

(Street Address and City)

Buyer shall apply promptly for all financing described below and make every reasonable effort to obtain credit approval for the financing (Credit Approval). Buyer shall furnish all information and documents required by lender for Credit Approval. Credit Approval will be deemed to have been obtained when (1) the terms of the loan(s) described below are available and (2) lender determines that Buyer has satisfied all of lender's requirements related to Buyer's assets, income and credit history. If Buyer cannot obtain Credit Approval, Buyer may give written notice to Seller within _____ days after the effective date of this contract and this contract will terminate and the earnest money will be refunded to Buyer. **If Buyer does not give such notice within the time required, this contract will no longer be subject to Credit Approval. Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

_NOTE: Credit Approval does not include approval of lender's underwriting requirements for the Property, as specified in Paragraph 4.A.(1) of the contract._

Each note must be secured by vendor's and deed of trust liens.

**CHECK APPLICABLE BOXES:**

☐ A. CONVENTIONAL FINANCING:

　☐ (1) A first mortgage loan in the principal amount of $ _____ (excluding any financed PMI premium), due in full in _____ year(s), with interest not to exceed _____% per annum for the first _____year(s) of the loan with Adjusted Origination Charges as shown on Buyer's Good Faith Estimate for the loan not to exceed _____% of the loan.

　☐ (2) A second mortgage loan in the principal amount of $_____ _____(excluding any financed PMI premium), due in full in _____year(s), with interest not to exceed _____% per annum for the first _____year(s) of the loan with Adjusted Origination Charges as shown on Buyer's Good Faith Estimate for the loan not to exceed _____ % of the loan.

☐ B. TEXAS VETERANS LOAN: A loan(s) from the Texas Veterans Land Board of $_____ for a period in the total amount of _____years at the interest rate established by the Texas Veterans Land Board.

☐ C. FHA INSURED FINANCING: A Section _____ FHA insured loan of not less than $_____ (excluding any financed MIP), amortizable monthly for not less than _____years, with interest not to exceed _____% per annum for the first _____year(s) of the loan with Adjusted Origination Charges as shown on Buyer's Good Faith Estimate for the loan not to exceed _____ % of the loan. As required by HUD-FHA, if FHA valuation is unknown, _"It is expressly agreed that, notwithstanding any other provision of this contract, the purchaser (Buyer) shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the purchaser (Buyer) has been given in accordance with HUD/FHA or VA requirements a written statement issued by the Federal Housing Commissioner, Department of Veterans Affairs, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than $_____. The purchaser (Buyer) shall have the privilege and option of proceeding with consummation of the contract without regard to the_

Initialed for identification by Buyer _____ _____ and Seller_____ _____ 　　TREC NO. 40-5

DEBO-HMS00038

___11115 Lear Elizabeth___ ___Needville, TX 77461___
(Address of Property)

amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the Property. The purchaser (Buyer) should satisfy himself/herself that the price and the condition of the Property are acceptable."

❑ D. VA GUARANTEED FINANCING: A VA guaranteed loan of not less than $_____ (excluding any financed Funding Fee), amortizable monthly for not less than_____years, with interest not to exceed_____% per annum for the first _____year(s) of the loan with Adjusted Origination Charges as shown on Buyer's Good Faith Estimate for the loan not to exceed _____% of the loan.

VA NOTICE TO BUYER: "It is expressly agreed that, notwithstanding any other provisions of this contract, the Buyer shall not incur any penalty by forfeiture of earnest money or otherwise or be obligated to complete the purchase of the Property described herein, if the contract purchase price or cost exceeds the reasonable value of the Property established by the Department of Veterans Affairs. The Buyer shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the reasonable value established by the Department of Veterans Affairs."

If Buyer elects to complete the purchase at an amount in excess of the reasonable value established by VA, Buyer shall pay such excess amount in cash from a source which Buyer agrees to disclose to the VA and which Buyer represents will not be from borrowed funds except as approved by VA. If VA reasonable value of the Property is less than the Sales Price, Seller may reduce the Sales Price to an amount equal to the VA reasonable value and the sale will be closed at the lower Sales Price with proportionate adjustments to the down payment and the loan amount.

Buyer hereby authorizes any lender to furnish to the Seller or Buyer or their representatives information relating only to the status of Credit Approval of Buyer.

_____     _____
Buyer                         Seller

_____     _____
Buyer                         Seller

This form has been approved by the Texas Real Estate Commission for use with similarly approved or promulgated contract forms. Such approval relates to this form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, (512) 936-3000 (http://www.trec.texas.gov) TREC No. 40-5. This form replaces TREC No. 40-4.

TREC NO. 40-5

DEBO-HMS00039

JOSEPH A BENGE
BRITTANY L BENGE
2207 4TH STREET # 122
ROSENBERG, TX 77471

764

10/19/13

Pay to the
Order of __Debo Homes LLC__ $ 1000⁰⁰

__One thousand $00/100__ Dollars

★ NEWFIRST | National Bank

El Campo / Houston / Needville / Rosenberg
Sugar Land / Victoria / Wharton
www.NewFirst.com

For __Earnest Money__    _Brittany Benge_

⑆113104796⑆ 303 453⑈ 0764

DEBOHMS00040



# A. Settlement Statement (HUD-1)

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1. [X] FHA  2. [ ] RHS  3. [ ] Conv. Unins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: | |
| 4. [ ] VA  5. [ ] Conv. Ins. | 1746-13-1152 | 5970300916 | 512-1382863-703 | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| JOSEPH BENGE AND BRITTANY BENGE 11115 LEAH ELIZABETH DRIVE NEEDVILLE, TX 77461 | DEBO HOMES LLC., A TEXAS LIMITED LIABILITY COMPANY 1110 FM 2977 RICHMOND, TX 77469 | ENVOY MORTGAGE LTD. 5100 WESTHEIMER ROAD, SUITE 320, HOUSTON, TX 77056 |

| G. Property Location | H. Settlement Agent |  |
|---|---|---|
| 11115 LEAH ELIZABETH DRIVE, NEEDVILLE, TX 77461<br><br>COUNTY: FORT BEND<br>LOT: 5<br>BLOCK: 8<br>SUBDIVISION: ROSEMEADOW SEC 3 | AMERICAN TITLE COMPANY OF HOUSTON<br>6360 CORPORATE DRIVE, SUITE B<br>HOUSTON, TX 77036<br>Phone : (713) 774-0746 | |
| | **Place of Settlement**<br><br>6360 CORPORATE DRIVE, SUITE B<br>HOUSTON, TX 77036 | **I. Settlement Date** 11/27/2013<br><br>**Disbursement Date** 11/27/2013 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | $168,000.00 | 401. Contract Sales Price | $168,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | $6,831.97 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustment for items paid by seller in advance** | | **Adjustment for items paid by seller in advance** | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. All Taxes 219.22/yr 11/27/2013 to 1/1/2014 | $21.02 | 409. All Taxes 219.22/yr 11/27/2013 to 1/1/2014 | $21.02 |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due from Borrower** | $174,852.99 | **420. Gross Amount Due to Seller** | $168,021.02 |
| **200. Amounts Paid by or in Behalf of Borrower** | | **500. Reductions In Amount Due to Seller** | |
| 201. Deposit or earnest money | $1,000.00 | 501. Excess Deposits | |
| 202. Principal Loan Amount from Envoy Mortgage Ltd. | $164,957.00 | 502. Settlement Charges to Seller | $628.17 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Seller Paid Closing Costs | $2,500.00 | 504. | |
| 205. | | 505. | |
| 206. | | 506. Earnest money retained by Seller | $1,000.00 |
| 207. | | 507. Seller Paid Closing Costs | $2,500.00 |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/Town Taxes | | 510. City/Town Taxes | |
| 211. County Taxes | | 511. County Taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid by/for Borrower** | $168,457.00 | **520. Total Reduction Amount Due Seller** | $4,128.17 |
| **300. Cash at Settlement from/to Borrower** | | **600. Cash at Settlement to/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $174,852.99 | 601. Gross amount due to seller (line 420) | $168,021.02 |
| 302. Less amounts paid by/for borrower (line 220) | $168,457.00 | 602. Less reductions in amount due seller (line 520) | $4,128.17 |
| 303. Cash [X] From [ ] To Borrower | $6,395.99 | 603. Cash [X] To [ ] From Seller | $163,892.85 |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

Initials

DEBO-HMS00023

## L. Settlement Charges

| 700. Total Real Estate Broker Fees | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|
| Division of Commission (line 700) as follows: | | | |
| The following persons, firms or corporations received a portion of the real estate commission amount shown above: | | | |
| 701. Commission Listing | | | |
| 702. Commission Selling | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan Origination Fee (Origination Fee of $1621.20 included) to Envoy Mortgage Ltd. | $2,866.20 (from GFE #1 ) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen | -$3,390.11 (from GFE #2 ) | | |
| 803. Your adjusted origination charges | (from GFE A ) | -$531.91 | |
| 804. Appraisal Fee to Holbrook & Associates Real Estate Appraisals POC (Borrower) $394.00 | (from GFE #3 ) | $125.00 | |
| 805. Credit report to CBC | (from GFE #3 ) | $11.20 | |
| 806. Appraisal Review to Holbrook & Associates Real Estate Appraisals | (from GFE #3 ) | $259.00 | |
| 807. Flood Cert. Fee to First American Flood Data Services | (from GFE #3 ) | $10.00 | |
| 808. Final Inspection Fee to Holbrook & Associates Real Estate Appraisals | | $169.00 | |
| 809. Document Preparation to Robert A. Schlanger, P.C. | $250.00 | | |
| **900. Items Required by Lender to Be Paid in Advance** | | | |
| 901. Daily interest charges from 11/27/13 to 12/01/13 @ 19.7722/day Envoy Mortgage Ltd. | (from GFE #10) | $79.09 | |
| 902. Mortgage Insurance Premium HUD | (from GFE #3 ) | $2,837.10 | |
| 903. Homeowner's Insurance Universal North America Insurance Company for 1 Year | (from GFE #11) | $866.00 | |
| 904. | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Initial deposit for your escrow account | (from GFE #9 ) | $556.76 | |
| 1002. Hazard Ins. 1.0000 month(s) @ 72.17 / month(s) to Envoy Mortgage Ltd. | $216.51 | | |
| 1003. Mortgage Ins. 0.0000 month(s) @ 182.39 / month(s) to Envoy Mortgage Ltd. | | | |
| 1004. County Property Taxes 2.0000 month(s) @ 256.21 / month(s) to Envoy Mortgage Ltd. | $512.42 | | |
| 1005. Aggregate Accounting Adjustment to Envoy Mortgage Ltd. | -$72.17 | | |
| 1006. | | | |
| 1007. | | | |
| **1100. Title Charges** | | | |
| 1101. Title services and lender's title insurance to American Title Company of Houston | (from GFE #4 ) | $438.75 | |
| 1102. Escrow Fee to American Title Company of Houston | $200.00 | | $200.00 |
| 1103. Owner's Title Insurance to American Title Company of Houston/ATCOH/F.B.O. PGF | (from GFE #5 ) | $1,254.00 | |
| 1104. Lender's title insurance to American Title Company of Houston | $236.75 | | |
| 1105. Lender's title policy limit $164,957.00 | | | |
| 1106. Owner's title policy limit $168,000.00 | | | |
| 1107. Agent's portion of the total title insurance premium to American Title Company of Houston | $1,265.44 | | |
| 1108. Underwriter's portion of the total title insurance premium to Title Resources Guaranty Company | $223.31 | | |
| 1109. Deed Preparation to Robert A. Schlanger, P.C. | | | $100.00 |
| 1110. Tax Certificate to Processing Solutions, Inc. | | | $89.95 |
| 1111. Texas Policy Guaranty Fee - Owner to ATCOH/F.B.O. PGF | $2.00 | | |
| 1112. Texas Policy Guaranty Fee - Lender to ATCOH/F.B.O. PGF | $2.00 | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Government recording charges | (from GFE #7 ) | $70.00 | |
| 1202. Deed $19.00 Mortgage $55.00 Releases $ | | | $29.00 |
| 1203. Transfer taxes | (from GFE #8 ) | | |
| 1204. City/County tax/stamps Deed $ Mortgage $ | | | |
| 1205. State tax/stamps Deed $ Mortgage $ | | | |
| 1206. NTP | $15.00 | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Required services that you can shop for | (from GFE #6 ) | $370.88 | |
| 1302. Survey to Advance Surveying, Inc. | $370.88 | | |
| 1303. HOA Fee to Arg Rose Meadows | | $174.00 | |
| 1304. HOA Transfer Fee to Arg Rose Meadows | | $25.00 | |
| 1305. 2013 Taxes to Fort Bend County Tax Assessor - Collector | | | $219.22 |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | $9,031.97 | $426.17 |

If you have any questions about the settlement charges and loan terms listed on this form, please contact your lender. Settlement agent is not responsible for content of lender's disclosures at HUD.

The seller's and borrower's signatures hereon acknowledge their approval and signify their understanding that tax and insurance prorations and reserves are based on figures for the preceding year or supplied by others or estimated for the current year, and in the event of any change for the current year, all necessary adjustments will be made between borrower and seller directly. Any debit delinquent taxes or mortgage payoffs will be promptly reimbursed to the settlement agent by the seller.

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYERS

_____
Joseph Rojido

_____
Brittany Benge

SELLERS

Debo Homes LLC., a Texas limited liability company

_____
By: Juan C Hernandez, Member

_____
By: Juan Carlos Hernandez, Jr., Member

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent _____    Date 11/27/2013

*Any items marked "POC" were paid outside closing by: borrower POC (B), Lender POC (L), Mortgage Broker POC (M), Seller POC (S), Real Estate Agent POC (M); or Other POC (O).

DEBO-HMS00024

## Comparison of Good Faith Estimate (GFE) and HUD-1 Charges

| Charges That Cannot Increase | HUD-1 Line Number | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Our origination charge | # 801 | $2,866.20 | $2,866.20 |
| Your credit or charge (points) for the specific interest rate chosen | # 802 | ($3,398.11) | ($3,398.11) |
| Your adjusted origination charges | # 803 | ($531.91) | ($531.91) |
| Transfer taxes | # 1203 | | |

| Charges That In Total Cannot Increase More Than 10% | HUD-1 Line Number | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Government recording charges | # 1201 | $125.00 | $70.00 |
| Appraisal Fee | # 804 | $419.00 | $519.00 |
| Credit Report Fee | # 805 | $11.30 | $11.30 |
| Appraisal Review | # 806 | $269.00 | $269.00 |
| Flood Certification | # 807 | $10.00 | $10.90 |
| Final Inspection Fee | # 808 | $150.00 | $169.00 |
| Upfront Mortgage Insurance | # 902 | $2,837.10 | $2,837.10 |
| Total | | $3,821.40 | $3,885.40 |
| Increase between GFE and HUD-1 Charges | | $64.00 or | 1.67% |

| Charges That Can Change | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Initial deposit for your escrow account | # 1001 | $1,782.27 | $656.75 |
| Daily interest charges | # 901 $19.77/day | $79.09 | $79.09 |
| Homeowner's Insurance | # 903 | $980.00 | $866.00 |
| Title Services – Lender's Insurance | # 1101 | $900.00 | $438.75 |
| Owner's Title Insurance | # 1103 | $1,255.00 | $1,254.00 |
| Survey | # 1302 | $400.00 | $378.80 |

## Loan Terms

Loan Number: 5970300916

| | |
|---|---|
| Your initial loan amount is | $164,957.00 |
| Your loan term is | 30 years |
| Your initial interest rate is | 4.375 % |
| Your initial monthly amount owed for principal, interest and any mortgage insurance is | $1,006.00 Includes<br>[X] Principal<br>[X] Interest<br>[X] Mortgage Insurance |
| Can your interest rate rise? | [X] No. [ ] Yes, it can rise to a maximum of _____ %. The first change will be on _____ and can change again every _____ after _____. Every change date, your interest rate can increase or decrease by _____ %. Over the life of the loan, your interest rate is guaranteed to never be lower than _____ % or higher than _____ %. |
| Even if you make payments on time, can your loan balance rise? | [X] No. [ ] Yes, it can rise to a maximum of $ _____. |
| Even if you make payments on time, can your monthly amount owed for principal, interest and mortgage insurance rise? | [X] No. [ ] Yes, the first increase can be on _____ and the monthly amount owed can rise to $ _____. The maximum it can ever rise to is $ _____. |
| Does your loan have a prepayment penalty? | [X] No. [ ] Yes, your maximum prepayment penalty is $ _____ |
| Does your loan have a balloon payment? | [X] No. [ ] Yes, you have a balloon payment of $ _____ due in _____ years on _____. |
| Total monthly amount owed including escrow account payments | [ ] You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance. You must pay these items directly yourself.<br>[X] You have an additional monthly escrow payment of $ 328.38 that results in a total initial monthly amount owed of $ 1,334.38. This includes principal, interest, any mortgage insurance and any items checked below:<br>[X] Property taxes  [X] Homeowner's Insurance<br>[ ] Flood Insurance  [ ] _____<br>[ ] _____  [ ] _____ |

Note: If you have any questions about the Settlement Charges and Loan Terms listed on this form, please contact your lender.

Initials

DEBO-HMS00025

# EXHIBIT





DEFENDANT'S
EXHIBIT
20

PENGAD 800-631-6989

# OFFICIAL RECEIPT



## OFFICE OF
## ANNIE REBECCA ELLIOTT
## DISTRICT CLERK
## FORT BEND COUNTY
## 1422 EUGENE HEIMANN CIRCLE
## RICHMOND, TEXAS 77469

Payor
The Welscher Law Firm
1111 N Loop west
STE 702
Houston, TX 77008

Receipt No.
**2014-41064-DCLK**

Transaction Date
08/14/2014

| Description | Amount Paid |
|---|---|
| On Behalf Of Debo Homes LLC | |
| 13-DCV-209822 | |
| Laurel and Eliana Miller Plaintiffs, vs Debo Homes, LLC. Defendant. | |
| DEBO HOMES LLC | |
| Registry Deposit | 60,300.00 |
| SUBTOTAL | 60,300.00 |

**PAYMENT TOTAL**     **60,300.00**

| | |
|---|---|
| Cashier's Check (Ref #1632618) Tendered | 60,300.00 |
| Total Tendered | 60,300.00 |
| Change | 0.00 |

400th - Deposit into the Registry of Court.

| 08/14/2014 | Cashier alizahid | Audit |
|---|---|---|
| 03:22 PM | Station DCR18 | 5022554 |

## OFFICIAL RECEIPT

DEF # Exh 20